UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ERIC R. KINZLER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | |
| FIRST NBC BANK HOLDING COMPANY, ASHTON J. RYAN, JR. and MARY BETH VERDIGETS, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff Eric R. Kinzler, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by First NBC Bank Holding Company ("First NBC" or the "Company"), as well as media reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of First NBC common stock between May 10, 2013 and April 8, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act"). Defendants include First NBC and certain of its executives and/or directors.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

3.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Eric R. Kinzler acquired shares of First NBC common stock during the Class Period as set forth in the attached certification, which is incorporated herein by reference, and has been damaged thereby.

- 1 -

6.      Defendant First NBC is a bank holding company.   First NBC maintains its headquarters at 210 Baronne Street, New Orleans, Louisiana 70112.  First NBC stock is listed and trades on the NASDAQ under the ticker symbol "FNBC."  As of November 1, 2015, First NBC had more than 19 million shares of common stock issued and outstanding.

7.      Defendant Ashton J. Ryan, Jr. ("Ryan") is, and at all relevant times was, First NBC's Chairman of the Board, President and Chief Executive Officer ("CEO").

8.      Defendant Mary Beth Verdigets ("Verdigets") is, and at all relevant times was, the Company's Chief Financial Officer ("CFO") and Executive Vice President.

9.      The defendants referenced above in ¶¶7-8 are collectively referred to herein as the "Individual Defendants."

### BACKGROUND

10.     First NBC is a bank holding company.  The Company offers a range of financial services through its wholly owned banking subsidiary, First NBC Bank.  It serves customers located in the Central Business District of New Orleans and the Mississippi Gulf Coast.  The Company's primary historical focus has been on commercial real estate and commercial lending. According to the Company, its loans include construction, commercial real estate, consumer real estate, commercial and industrial, and consumer, and its securities portfolio consists primarily of the United States Government agency obligations, mortgage-backed securities, and municipal securities, along with some corporate bonds.  The Company says that its securities consist of investment securities available for sale and investment securities held to maturity.  The Company's primary source of funding for its loans is deposits, which include noninterest-bearing demand, NOW accounts, money market accounts, savings deposits and certificates of deposit.

11.     A highly unique aspect of the Company is its investments in tax credits and the application of these tax credits to not only avoid paying income taxes (both federal and state) but to enhance earnings.  According to the Company, as a result of the tax credit initiative at First NBC, every $1 of pre-tax income is worth approximately $1.99 in net income.  By the end of fiscal year 2014 ("FY14"), the Company had $140.9 million in tax credit investments, including Community

Development Entities, Low-Income Housing Tax Credits, Federal Historic Rehabilitation Tax Credits and State New Market Tax Credits.

12.     In the spring of 2016, First NBC announced that its accounting dating back to 2011 was riddled with errors.  On February 1, 2016, First NBC announced that its earnings for the fourth quarter of 2015 ("4Q15") and FY15, the periods ended December 31, 2015, had significantly underperformed analysts' expectations, based, in large part, on the Company having taken an $8.2 million tax credit impairment.  Then on March 16, 2016, First NBC announced it had discovered errors in its accounting for its Federal and State Historic Rehabilitation tax credit entities that could potentially require the Company to restate its previously reported FY15 financial results.  On April 8, 2016, First NBC announced that it would be forced to restate its consolidated financial statements for fiscal years 2014, 2013, 2012 and 2011, including each of the interim periods within fiscal years 2015, 2014 and 2013 – ***the Company's entire reporting history as a publicly traded company*** – and that the Company's financial statements for FY11 through FY15, including all interim quarters, could no longer be relied upon.  First NBC blamed "an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities" and disclosed that "the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities."  The Company further disclosed that "[c]ontemporaneously with determining the ultimate impact to First NBC's financial statements, the Company [was] working to remediate the issues that caused the errors," and that it was "assessing the impact of the identified errors on management's assessment of internal control over financial reporting for the year ended December 31, 2015."

### MATERIALLY FALSE AND MISLEADING
### CLASS PERIOD STATEMENTS

13.     On November 9, 2012, First NBC filed with the SEC a Form S-1 registration statement, which, following multiple amendments made in response to comments received from the SEC and being declared effective by the SEC on May 9, 2013, would be used to conduct the IPO.

14.     On May 10, 2013, First NBC priced the IPO at $24 per share and filed with the SEC its final Prospectus, which formed part of the Registration Statement, pursuant to which First NBC

sold 4,791,667 shares of its common stock to the public (including an overallotment option granted to the underwriters to purchase up to an additional 625,000 shares).

15.     The Registration Statement stated that First NBC's "strategic focus [was] on building a franchise with meaningful market share and strong revenues complemented by operational efficiencies that [it] believe[d] [would] produce attractive risk-adjusted returns for [its] shareholders," and that "[a]s of December 31, 2012, on a consolidated basis, [the bank] had total assets of $2.7 billion, net loans of $1.9 billion, total deposits of $2.3 billion, and shareholders' equity of $248.1 million."

16.     The Registration Statement stated that "[n]et interest income increased to $74.8 million for the year ended December 31, 2012 from $52.6 million for the year ended December 31, 2011, an increase of $22.1 million, or 42.1%," adding that the "primary driver was an increase in interest income to $106.5 million from $79.0 million for the year ended December 31, 2012 versus 2011, an increase of $27.5 million, or 34.8%, which was the result of the significant growth in average interest-earning assets to $2.2 billion from $1.5 billion."

17.     The Registration Statement stated that First NBC's "business model [was] focuse[d] on a traditional, relationship-based, community bank structure guided by the following principles: disciplined risk management; responsive, high-quality service; focus on building long-term relationships; credibility within our communities; creativity and efficiency."

18.     The Registration Statement stated that First NBC had "experienced strong loan demand driven by recovery efforts to rebuild housing, commercial real estate and public sector infrastructure following Hurricane Katrina, the revival of the hospitality industry in [its] market and customer disruption associated with increased bank consolidation activity."

19.     The Registration Statement stated that First NBC's "consolidated financial statements [were] prepared in accordance with accounting principles generally accepted in the United States and with general practices within the financial services industry."

20.     The Registration Statement stated that First NBC was "focus[ed] on risk management in numerous other areas throughout [its] organization, including with respect to asset/liability management, regulatory compliance and internal controls," and that the Company was

"implementing management assessment and testing of internal controls consistent with the Sarbanes-Oxley Act," had "engaged an experienced independent public accounting firm to assist [it] with respect to compliance," and had "also engaged another experienced independent public accounting firm to review and assess [its] controls with respect to technology, as well as to perform penetration testing to assist [it] in managing the risks associated with information security."

21.     On May 10, 2013, the first day of the Class Period, First NBC common stock began trading on the NASDAQ.  The Company issued a press release that day which stated, in part, that "First NBC had assets of approximately $2.8 billion as of March 31, 2013."

22.     On July 30, 2013, First NBC issued a press release announcing its 2Q13 financial results for the interim period ended June 30, 2013.  The Company reported net income of $8.6 million, or $0.48 diluted earnings per share ("EPS"), and total assets of $3.0 billion.

23.     On August 14, 2013, First NBC filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2013 (the "2Q13 10-Q"), which was signed and certified under the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Ashton and Verdigets.  The 2Q13 10-Q reiterated the financial results reported on July 30, 2013.  The 2Q13 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

24.     On November 7, 2013, First NBC issued a press release announcing its 3Q13 financial results for the interim period ended September 30, 2013.  The Company reported net income of $10.4 million, or $0.54 diluted EPS, and total assets of $3.2 billion.

25.     On November 14, 2013, First NBC filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2013 (the "3Q13 10-Q"), which was signed and certified under SOX by defendants Ashton and Verdigets.  The 3Q13 10-Q reiterated the financial results reported on November 7, 2013.  The 3Q13 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

26.     On February 11, 2014, First NBC issued a press release announcing its 4Q13 and FY13 financial results for the periods ended December 31, 2013.  The Company reported net income

of $13.5 million, or $0.69 diluted EPS, for 4Q13, and net income of $40.9 million, or $2.32 diluted EPS, and total assets of $3.3 billion for FY13.

27.     On March 31, 2014, First NBC filed its annual report on Form 10-K with the SEC for the period ended December 31, 2013 (the "2013 10-K"), which was signed and certified under SOX by defendants Ashton and Verdigets.  The 2013 10-K reiterated the financial results reported on February 11, 2014.  The 2013 10-K further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

28.     On May 1, 2014, First NBC issued a press release announcing its 1Q14 financial results for the interim period ended March 31, 2014.  The Company reported net income of $12.8 million, or $0.66 diluted EPS, and total assets of $3.5 billion.

29.     On May 15, 2014, First NBC filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2014 (the "1Q14 10-Q"), which was signed and certified under SOX by defendants Ashton and Verdigets.  The 1Q14 10-Q reiterated the financial results reported on May 1, 2014.  The 1Q14 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

30.     On July 28, 2014, First NBC issued a press release announcing its 2Q14 financial results for the interim period ended June 30, 2014.  The Company reported net income of $12.7 million, or $0.65 diluted EPS, and total assets of $3.6 billion.

31.     On August 14, 2014, First NBC filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2014 (the "2Q14 10-Q"), which was signed and certified under SOX by defendants Ashton and Verdigets.  The 2Q14 10-Q reiterated the financial results reported on July 28, 2014.  The 2Q14 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

32.     On October 28, 2014, First NBC issued a press release announcing its 3Q14 financial results for the period ended September 30, 2014.  The Company reported net income of $14.4 million, or $0.73 diluted EPS, and total assets of $3.6 billion.

33.     On November 12, 2014, First NBC filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2014 (the "3Q14 10-Q"), which was signed and certified under SOX by defendants Ashton and Verdigets.  The 3Q14 10-Q reiterated the financial results reported on October 28, 2014.  The 3Q14 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

34.     On January 30, 2015, First NBC issued a press release announcing its 4Q14 and FY14 financial results for the periods ended December 31, 2014.  The Company reported net income of $15.7 million, or $0.80 diluted EPS, for 4Q14, and net income of $55.6 million, or $2.84 diluted EPS, and total assets of $3.8 billion for FY14.

35.     On February 18, 2015, the Company privately placed $60 million of its 5.75% Subordinated Notes due 2025 with certain qualified institutional investors, subject to the Company's promise to later register those notes for resale publicly.

36.     On March 31, 2015, First NBC filed its annual report on Form 10-K with the SEC for the period ended December 31, 2014 (the "2014 10-K"), which was signed and certified under SOX by defendants Ashton and Verdigets.  The 2014 10-K reiterated the financial results reported on January 30, 2015.  The 2014 10-K further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

37.     On April 30, 2015, First NBC issued a press release announcing its 1Q15 financial results for the period ended March 31, 2015.  The Company reported net income of $16.0 million, or $0.82 diluted EPS, and total assets of $4.1 billion.

38.     On May 8, 2015, First NBC filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2015 (the "1Q15 10-Q"), which was signed and certified under SOX by defendants Ashton and Verdigets.  The 1Q15 10-Q reiterated the financial results reported on April

30, 2015.  The 1Q15 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

39.     On August 11, 2015, First NBC filed an NT 10-Q, Notification of Late Filing, on Form 12b-25, which disclosed in pertinent part as follows:

> In connection with the preparation of its Form 10-Q for the quarter ended June 30, 2015, *the registrant identified errors in its accounting for certain of its investments in tax credit entities*.  As a result of the time needed by the registrant to evaluate the impact of the errors in its accounting for certain of its investments in tax credit entities, and for the registrant and its auditors to evaluate the implications of the adjustments on current and historical financial statements and the registrant's evaluation of internal control over financial reporting, the registrant requires additional time to complete and file its Form 10-Q.  The registrant expects to file its Form 10-Q within the extended time period prescribed under Exchange Act Rule 12b-25.

40.     On August 17, 2015, First NBC filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2015 (the "2Q15 10-Q"), which was signed and certified under SOX by defendants Ashton and Verdigets.  The 2Q15 10-Q reported net income of $17.2 million, or $0.88 diluted EPS, and total assets of $4.1 billion for 2Q15.  The 2Q15 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

41.     On August 27, 2015, the Company conducted a registered exchange of its $60 million of 5.75% Subordinated Notes due 2025 privately placed in February 2015 with notes registered for resale under the federal securities laws.  The registered exchange offering was conducted pursuant to a registration statement filed with the SEC on Form S-4 on May 18, 2015, which had been amended several times based on comments received from the SEC and declared effective by the SEC on August 20, 2015.  The registration statement for the exchange offering expressly incorporated by reference the Company's 2014 10-K and its 1Q15 and 2Q15 Forms 10-Q.

42.     On November 2, 2015, First NBC issued a press release announcing its 3Q15 financial results for the interim period ended September 30, 2015.  The Company reported net income of $17.8 million, or $0.92 diluted EPS, and total revenue of $4.3 billion.

43. On November 9, 2015, First NBC filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2015 (the "3Q15 10-Q"), which was signed and certified under SOX by defendants Ashton and Verdigets. The 3Q15 10-Q reiterated the financial results reported on November 2, 2015. The 3Q15 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

44. The statements referenced above in ¶¶14-19, 21-34, 36-38 and 40-43 were each materially false and misleading when made, as they failed to disclose and misrepresented the following adverse facts that were known to defendants or recklessly disregarded by them:

(a) That First NBC was improperly accounting for its Federal and State Historic Rehabilitation tax credit entities;

(b) That the carrying value of First NBC's investments in tax credits on its books was overstated and the Company should have marked these investments as impaired and taken charges against them on a more timely basis;

(c) That First NBC had not properly consolidated its variable interest entities related to Low-Income Housing tax credit entities;

(d) That First NBC had a larger exposure to the oil and gas industry than it had disclosed during the Class Period;

(e) That First NBC had failed to take adequate reserves against its growing oil and gas industry exposure;

(f) That First NBC lacked effective internal and reporting controls; and

(g) That the financial statements contained in the Registration Statement were not prepared in accordance with GAAP and, therefore, were materially false and misleading.

45. On February 1, 2016, First NBC issued a press release disclosing its 4Q15 and FY15 financial results. The Company reported net income of $15.8 million, or $0.82 diluted EPS, for 4Q15. For FY15, the Company reported net income of $67.3 million, or $3.44 diluted EPS, and total assets of $4.8 billion. The reported earnings significantly underperformed what defendants had led the investment community to expect, based, in large part, on an $8.2 million tax credit

impairment the Company disclosed it had been forced to take.  The Company also began to more fully disclose the true extent of its exposure to the oil and gas industry.  First NBC disclosed that its direct exposure to the oil and gas industry had increased from September 30, 2015 to December 31, 2015 due in part to an exploration and production ("E&P") client drawing down a loan to complete new drilling for its main well.  This increased the Company's exposure to energy-related credits by approximately $16 million quarter-over-quarter, entirely from the one large E&P credit that now totaled $90.2 million.  This loan was 57% of the bank's energy exposure and had been downgraded by the bank's examiners back in 2Q15.  The Company further disclosed that $39.7 million of a $69 million receivable related to ethanol production was past due.  The bank's energy loan exposure was also much larger, now at $158.4 million, or 4.5% of loans, and the release was evasive as to whether the Company had taken adequate reserves on its oil and gas exposure.

46.     On this news, the price of First NBC stock dropped $3.20 per share from its close of $30.40 per share on the evening of February 1, 2016 to close at $27.20 per share on February 2, 2016, a one-day decline of more than 10% on high trading volume.

47.     On February 11, 2016, First NBC filed a Form 8-K with the SEC providing supplemental information in response to inquiries the Company had received from investors and analysts concerning the Company's February 1, 2016 disclosures.  This time, however, the Company got so many questions that it issued a Supplemental Information Sheet utilizing a "question and answer" format that provided the background information that finally revealed the full extent to which the Company's exposure to the oil and gas industry had grown, stating in pertinent part as follows:

1)     *Why did the amount of loans to exploration and production companies increase in the fourth quarter?*

In its 2014 Form 10-K, the Company discussed a large loan to one oil and gas exploration company which had encountered cash flow difficulties when a pipeline serving a well in its largest oil field broke, requiring the well to go off-line for a period of time.  The break occurred on December 29, 2014 and caused the Company to reclassify all of the well's "proved producing reserves" to "proved undeveloped reserves" for purposes of the Company's reserve analysis as of December 31, 2014.  The loss of cash flow from the well subsequently resulted in a reduction of the borrower's cash flow, and the Company's classification of the credit. *In lieu of repairing the pipeline, which was expected to result in a resumption of production at its*

*historical levels of 100-200 barrels per day, the borrower elected to drill a new well, which was expected to increase production capacity to 1,000-1,200 barrels per day. The Company agreed to finance the new well based on the enhanced revenue expected to be derived from it. The increase in the Company's loans to exploration and production companies during the third and fourth quarters was attributable solely to the increased balances of this borrower related to the drilling of the new well, which is now complete.* Once connected to the pipeline, the production from the well is expected to substantially increase the borrower's cash flow, allowing for debt service and substantial debt reduction over the next five years. After considering the new well, together with a January 1, 2016 independent engineering valuation of the well's reserves, the Company's collateral position on the loan to this borrower conforms with the Company's loan policy, and the Company does not expect to recognize any loss with respect to this credit at current oil prices.

*     *     *

**3)**     *Give us more information regarding the investment in short-term receivables related to the ethanol company.* **Is this another example of oil and gas exposure in the Company's asset portfolio?**

The receivables from the ethanol company were purchased through The Receivables Exchange, a national exchange established to allow vendors to sell their customers' receivables to third party investors. Under the terms of the exchange contracts, the seller of the receivable is contractually committed to repurchase the receivable back from the seller if payment is not made by a specified repurchase date, subject to certain exceptions. Thus, the Company, as receivable purchaser, has two potential sources of repayment, the original issuer of the receivables (the ethanol company) or the seller and can choose to pursue either or both.

*The failure of the ethanol company to pay the invoices when due was the result of the financial difficulties of its parent, a Spanish "green" energy company with worldwide operations focused on expanding the use of solar power. This crisis caused U.S. suppliers of grain to the ethanol plants owned by the U.S. subsidiaries of the Spanish company to freeze credit to the ethanol plants for corn purchases, resulting in a shutdown 4 of the 6 ethanol plants owned by the U.S. subsidiaries of the Spanish company.* Based on the Company's assessment of the strength of the ethanol industry and the historical earnings performance of the ethanol company and the receivables seller, the Company believes that both the ethanol company and the receivables seller are capable of repaying the full amount of the receivable balance over time. In addition, the parent corporation of the ethanol company is evaluating certain restructuring options that would permit a more prompt repayment of the receivable. As a result of the foregoing, management does not expect that the Company will incur any loss on its investment in short-term receivables related to the past due receivables discussed above. *Finally, the receivable issued by the ethanol company represents 95% of the currently outstanding balance in the Company's investment in short term receivables.*

48.     The Supplemental Information Sheet further explained that the Company had never before taken reserves against its growing exposure to the oil and gas industry and that it was suddenly taking an $11 million reserve against this exposure, stating in pertinent part as follows:

2)     *Why didn't the Company disclose the amount of its loan loss reserve allocated to oil and gas credit exposure?*

The Company has never disclosed the amount of its reserves allocated to any particular industry.  After a review of the year-end disclosures of banks with significant oil and gas exposure, *the Company has determined that such a disclosure may be valuable and will do so in the Company's 2015 Form 10-K.*  As of December 31, 2015, the Company had no loans to its direct or indirect oil and gas customers which were classified as impaired *and thus had no specific reserves related to its oil and gas industry loans.* However, *in view of the substantial decline in oil prices, the Company has taken into account the exposure to the risk of loss in its portfolio within its ALLL methodology due to the oil and gas price decline and has allocated $11 million as of December 31, 2015*.

49.     The Supplemental Information Sheet also provided additional detail concerning how First NBC measures its tax credits and how the Company's improper accounting for its tax credits had adversely impacted its net income, stating in pertinent part as follows:

4)     **The fourth quarter net income of $15.7 million is less than the $18.1 million reported for the linked third quarter.  *What caused this and is it a trend?* Expenses seem to be very high in the fourth quarter and is this a trend?**

Both of these questions have the same answer, which is related to the Company's accounting change in the second quarter of 2015 related to tax credit investments.  Since inception, the Company had accounted for its tax credit investments using the cost method and had amortized that cost over its expected holding period for the investment.  This method resulted in consistent expense recognition from quarter to quarter and from year to year after giving effect to the growth in the Company's tax credit investment portfolio.  In June of 2015, the Company adopted the equity method of accounting for its historic tax credits as a preferable method of accounting for these investments.  As discussed in the Company's June 30, 2015 Form 10-Q, the cumulative effect of the change since the inception of our tax credit investments was immaterial and recognized in the second quarter.  The equity method does not utilize amortization (consistent write-off of the asset over a useful life) but rather impairment (recognized only as the investment is impaired, e.g. when it is probable that the investment balance will not be realized through future cash flow of the investment).  Under the equity method of accounting, some historic tax credit investments may not be impaired as long as they are held, while others may be written down to realizable value as impairment occurs.  This leads to uneven expense recognition from quarter to quarter as opposed to consistent amortization.

*With this background, the Company recognized no impairment with respect to its historic tax credit investments during the 3rd quarter of 2015*;

in the fourth quarter, three such investments became impaired. The impairment of $5 million, when combined with the costs associated with the State Investors Bank acquisition of $703,000, accounted for substantially all of the difference in profits between the fourth quarter and the third quarter. Excluding impairment and acquisition costs, the Company's earnings increased $1.5 million, or 8%, from third to the fourth quarter of 2015 and $4.3 million, or 28%, from the fourth quarter of 2014. The adoption of the equity method of accounting is expected to continue to impact the results of operations of the Company in the following manner. First, the amount of impairment expense recognized by the Company may continue to be inconsistent from quarter to quarter. Second, over the term of the investment, the Company expects to recognize less impairment expense than it would have recognized as amortization expense because the prior method resulted in the amortization of the entire investment. Finally, substantially all of the impairment expense recognized by the Company is expected to continue to be associated with the structure of the tax credit investment, rather than changes in operations or economic conditions, as less than 1% of all historic tax credit investment projects are recaptured because of business failure. Because substantially all of the impairment expense has been driven by the structure of the tax credit investment, the Company plans to modify the structure of future investments so as to minimize the likelihood of impairment, except in the case of changes in operations or economic conditions. For so long as impairment remains a meaningful expense on the Company's Statement of Income, the Company intends to continue to present non-GAAP financial information adjusting for impairment and other expenses associated with the Company's investment in tax credit entities to enable investors to better understand the results of operations of the Company.

5) **Can the amount of historic tax credits generated in 2015 continue in 2016 and beyond?**

*In 2014, the Company began to disclose the tax credits for which it had finalized tax credit investments for each of the next 5 years.* The Company believed such a disclosure would provide investors with the ability to evaluate the continuity of its tax credit investment activity. *There is a time lag between the date the Company enters into a commitment to invest in a tax credit transaction and the date in which the credits are earned.* Two of the types of Federal tax credits in which the Company invests in are multi-year credits (New Markets - 7 years and Low Income Housing - 10 years) while the third (Historic) is earned when the renovation is placed in service. *The Company intended to again present the table of tax credits already contracted for, by estimated year of recognition, in its 2015 Form 10-K. However, in response to inquiries from analysts, the Company is providing the disclosure at this time.*

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Historic | $ 47,336,517 | $ 43,350,474 | $ 144,855 | $ — | $ — |
| New Market | 16,871,711 | 14,851,823 | 8,901,852 | 5,099,838 | 2,100,000 |
| Low Income Housing | 5,050,642 | 5,525,400 | 5,525,400 | 525,400 | 4,854,361 |
| TOTAL | $ 69,258,870 | $ 63,727,697 | $ 14,572,107 | $ 5,625,238 | $ 6,954,361 |

50. Subsequently, on March 16, 2016, First NBC filed an NT 10-K, Notification of Late Filing, on Form 12b-25 with the SEC, disclosing in pertinent part as follows:

In connection with the preparation of its Form 10-K for the year ended December 31, 2015, *the registrant identified errors in its accounting for its Federal and State Historic Rehabilitation tax credit entities and is evaluating the accounting for certain other matters*.  As a result of the time needed by the registrant to evaluate the impact of the errors in its accounting *and assessment of internal control over financial reporting*, and for the registrant's auditors to evaluate the implications of the adjustments on current and historical financial statements and the registrant's internal control over financial reporting, the registrant requires additional time to complete and file its Form 10-K.

The registrant issued a preliminary earnings release on February 1, 2016 for the quarter ended December 31, 2015.  *The registrant has determined that the estimates of noninterest expense and income tax benefit contained in this preliminary release will likely be increased, and net income will likely be reduced, from the amounts reported for 2015.*  The registrant is still trying to evaluate and determine the amount of the adjustments and the impact, if any, to the fourth quarter of 2015, prior quarters of 2015, or prior years.  As a result, the information contained in the preliminary earnings release should not be relied upon pending the filing of Form 10-K.

51. As a result of this news, the price of First NBC stock dropped $5.33 per share, to close at $19.09 per share on March 16, 2016, a one-day decline of nearly 22% on extremely high trading volume.

52. Finally, on April 8, 2016, after the market closed, the Company filed a Current Report on Form 8-K with the SEC, which disclosed in pertinent part as follows:

**Item 4.02(a).  Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

On April 8, 2016, the Audit Committee of the Board of Directors (the "Audit Committee") and management of the Company, in consultation with the Company's independent registered public accounting firm, Ernst & Young LLP ("EY"), concluded that the consolidated financial statements as of and for the years ended December 31, 2014, 2013, 2012 and 2011 as well as each of the interim periods within the years ended December 31, 2015, 2014 and 2013, need to be restated and should no longer be relied upon.  Similarly, related press releases and earnings releases, as well as management's report on the effectiveness of internal control over financial reporting as of December 31, 2013 and 2014, should no longer be relied upon.

*The Company's management determined that the financial statements referred to above should be restated due to an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities and the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities.  The Company is continuing to review and quantify these and other potentially other less significant matters, which are expected to be reflected in the restated financial statements.*

The Company intends to file as soon as practicable restated consolidated financial statements as of December 31, 2014 and for the years ended December 31, 2014 and 2013 in the Company's Annual Report on Form 10-K for the year ended December 31, 2015 ("2015 Form 10-K"). In addition, the Company intends to include in the 2015 Form 10-K (i) restated Selected Financial Data for the years ended December 31, 2014, 2013, 2012 and 2011 and (ii) a discussion of the effect of the restatement over the covered periods as a part of Management's Discussion and Analysis. Based on the information regarding the years ended December 31, 2014, 2013, 2012 and 2011 that the Company intends to include in its 2015 Form 10-K, the Company does not intend to file an amendment to the Company's Annual Report on Form 10-K or the quarterly reports on Form 10-Q for the year ended December 31, 2014 or any prior period.

The Audit Committee and the Company's management team have discussed the matters disclosed in this Form 8-K under this Item 4.02(a) with the Company's independent registered public accounting firm, EY.

Management is continuing to assess the effect of the above matters on its conclusion on internal control over financial reporting as of December 31, 2015. The Company will report its conclusion regarding the Company's internal control over financial reporting and the effectiveness of its disclosure controls and procedures in the 2015 Form 10-K.

53.     The Company also attached a press release it had issued that evening to the Form 8-K, entitled "FIRST NBC RECEIVES EXPECTED NOTIFICATION OF DEFICIENCY FROM NASDAQ RELATED TO DELAY IN FILING 2015 FORM 10-K," which stated in pertinent part as follows:

First NBC Bank Holding Company ("First NBC"), the holding company for First NBC Bank, announced today that it received a notification from the Nasdaq Stock Market ("Nasdaq") informing First NBC that, because it had not timely filed its Annual Report on Form 10-K for the year ended December 31, 2015, it was not in compliance with Nasdaq Listing Rule 5250(c)(1). First NBC had previously disclosed in a filing made with the Securities and Exchange Commission on March 16, 2016 that its 2015 Form 10-K was not expected to be filed timely for the reasons described therein. The Nasdaq notification letter has no immediate effect on the listing or trading of First NBC's common stock on the Nasdaq Global Select Market.

Under Nasdaq rules, First NBC has 60 calendar days from the date of the letter, or until June 3, 2016, to submit a plan to regain compliance. If its plan is accepted, First NBC may be eligible for a listing exception of up to 180 calendar days or until September 26, 2016 to regain compliance. If Nasdaq staff concludes that First NBC will be unable to cure the deficiency, or if First NBC determines not to submit the required materials or make the required representations, First NBC's common stock will be subject to delisting by Nasdaq.

First NBC expects the audit of its 2015 consolidated financial statements to be completed, and its Annual Report on Form 10-K for the year ended December 31, 2015 to be filed, within the compliance period established by Nasdaq.

54.     As a result of this news, the price of First NBC stock declined $0.47 per share to close at $18.65 per share on April 11, 2016, the next trading day, a decline of 2% on high trading volume.

55.     As a result of defendants' false statements, First NBC common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the price of First NBC common stock was hammered by massive sales, sending First NBC's stock price down 56% from its Class Period high and erasing $454 million in market capitalization.

## LOSS CAUSATION/ECONOMIC LOSS

56.     During the Class Period, as detailed herein, defendants made false and misleading statements by misrepresenting the Company's business and prospects and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of First NBC common stock and operated as a fraud or deceit on Class Period purchasers of First NBC common stock. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of First NBC common stock fell precipitously, as the prior artificial inflation came out of the stock price over time.  As a result of their purchases of First NBC common stock during the Class Period, plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE
## AND FRAUD ON THE MARKET

57.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)      Plaintiff and other members of the Class purchased First NBC common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

58.      At all relevant times, the market for First NBC common stock was efficient for the following reasons, among others:

(a)      As a regulated issuer, First NBC filed periodic public reports with the SEC; and

(b)      First NBC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

59.      Plaintiff incorporates ¶¶1-58 by reference.

60.      During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.      Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes, and artifices to defraud;

(b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of First NBC common stock during the Class Period.

62.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for First NBC common stock.  Plaintiff and the Class would not have purchased First NBC common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

63.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of First NBC common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

64.     Plaintiff incorporates ¶¶1-63 by reference.

65.     The Individual Defendants acted as controlling persons of First NBC within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of First NBC stock, the Individual Defendants had the power and authority to cause First NBC to engage in the wrongful conduct complained of herein.  First NBC controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action on behalf of all purchasers of First NBC common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors and affiliates of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

67.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of

members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by First NBC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

68.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the 1934 Act;

(b)     whether statements made by defendants to the investing public omitted and/or misrepresented material facts about the business and operations of First NBC;

(c)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(d)     whether the price of First NBC common stock was artificially inflated; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as a Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff's reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 5, 2016                    LEMMON LAW FIRM, LLC
                                       ANDREW A. LEMMON (#18302)


                                        /s/ Andrew A. Lemmon
                                       ANDREW A. LEMMON
                                       P.O. Box 904
                                       15058 River Road
                                       Hahnville, LA  70057
                                       Telephone:  985/783-6789
                                       985/783-1333 (fax)
                                       andrew@lemonlawfirm.com

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       MARY K. BLASY
                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone: 619/230-0063
619/255-1856 (fax)

JOHNSON & WEAVER, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone: 770/200-3104
770/200-3101 (fax)

Attorneys for Plaintiff