# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ERIC R. KINZLER, Individually and on | ) | |
| Behalf of All Others Similarly Situated, | ) | CIVIL ACTION |
| | ) | |
| Plaintiff, | ) | No. 2:16-cv-04243-KDE-JVM |
| | ) | |
| v. | ) | JUDGE KURT D. |
| | ) | ENGELHARDT |
| FIRST NBC BANK HOLDING COMPANY, | ) | |
| ASHTON J. RYAN, JR., MARY BETH | ) | MAGISTRATE JUDGE |
| VERDIGETS, and ERNST & YOUNG LLP, | ) | JANIS VAN MEERVELD |
| | ) | |
| Defendants. | ) | SECTION "N" |
| | ) | |

# AMENDED COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan (admitted *pro hac vice*)
Robert A. Hoffman (admitted *pro hac vice*)
Jeffrey B. Gittleman (admitted *pro hac vice*)
Chad A. Carder (admitted *pro hac vice*)
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

*Lead Counsel and Attorneys for Lead Plaintiffs*

**TABLE OF CONTENTS**

**Page**

I.   NATURE OF THE ACTION .................................................................. 1

   A.   First NBC's Fraudulent Accounting for Investments
        in Tax Credit Entities .................................................................. 4

   B.   First NBC's Undisclosed Exposure to the Oil and Gas Industry ............... 9

   C.   First NBC's Failure to Disclose the Risk of Loss Arising
        from Investments in Short-Term Receivables ........................................ 11

   D.   Revelation of the Truth Concerning First NBC's Financial
        Condition and Its Impact on the Company's Stock Price ......................... 13

II.  JURISDICTION AND VENUE ............................................................... 18

III. PARTIES ........................................................................................ 18

   A.   Lead Plaintiffs ........................................................................... 18

   B.   First NBC Defendants .................................................................. 19

   C.   Auditor Defendant ...................................................................... 22

IV.  CLASS ACTION ALLEGATIONS ......................................................... 23

V.   BACKGROUND FACTS AND NATURE OF THE FRAUD
     AT FIRST NBC .............................................................................. 26

   A.   First NBC's Fraudulent Accounting for Tax Credit Investments ............. 26

        1.   Background ........................................................................ 26

        2.   Nature and Effect of the Fraud ................................................ 29

             a.   First NBC's Inappropriate Use of the Cost
                  Amortization Method ....................................................... 31

             b.   First NBC's Failure to Record and Report
                  Impairment .................................................................. 33

             c.   First NBC's Failure to Consolidate Variable
                  Interest Entities ............................................................. 35

B.    Fraudulent Accounting for Exposure to Oil and Gas Industry .................37

      1.    Background ................................................................37

      2.    Applicable GAAP Standards ..........................................38

      3.    Nature and Effect of the Fraud .....................................41

C.    Fraudulent Accounting for Short-Term Receivables Purchased
From an Ethanol Company on the Receivables Exchange ......................45

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD ..............................51

A.    Defendants' Materially False and Misleading Statements
Concerning and Stemming From First NBC's Tax
Credit Investments ........................................................................51

      1.    False and Misleading Statements Concerning Fiscal
Year 2013 and Prior Years ...........................................53

      2.    False and Misleading Statements Concerning Fiscal
Year 2014 ..................................................................68

      3.    False and Misleading Statements Concerning Fiscal
Year 2015 ..................................................................81

B.    Defendants' Materially False and Misleading Statements
Concerning First NBC's Exposure to the Oil and Gas Industry ..............95

C.    Defendants' Materially False and Misleading Statements
Concerning First NBC's Investments on the
Receivables Exchange ...................................................................100

D.    Defendants' Materially False and Misleading Statements
Concerning First NBC's Capital Position ...........................................107

VII.    THE TRUTH ABOUT FIRST NBC'S FINANCIAL CONDITION
BEGINS TO EMERGE ..................................................................109

VIII.    ERNST & YOUNG KNOWINGLY OR RECKLESSLY CERTIFIED
THAT FIRST NBC'S FINANCIAL STATEMENTS COMPLIED
WITH GAAP ..............................................................................130

A.    E&Y's Materially False and Misleading Statements During
the Class Period ..........................................................................132

      B.      E&Y's Audits Were Not Conducted in Accordance
with GAAS ...................................................................... 134

          1.      E&Y Failed to Exercise Due Professional Care
and Professional Skepticism ........................................ 136

          2.      E&Y Failed to Properly Assess Audit Risk ................ 139

          3.      E&Y Failed to Properly Identify and Assess the
Risk of Material Misstatement .................................... 140

          4.      E&Y Failed to Properly Plan Its Audits ..................... 142

      C.      E&Y Acted With Scienter ..................................................... 145

IX.     ADDITIONAL FACTS RELEVANT TO SCIENTER ...................................... 148

X.      LOSS CAUSATION ........................................................... 159

XI.     APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD
ON THE MARKET AND MATERIAL OMISSIONS ....................................... 167

XII.    CAUSES OF ACTION ....................................................... 168

      FIRST CLAIM FOR RELIEF ..................................................... 168

      SECOND CLAIM FOR RELIEF .................................................. 174

      THIRD CLAIM FOR RELIEF .................................................... 180

PRAYER FOR RELIEF .............................................................. 182

JURY DEMAND .................................................................... 183

Lead Plaintiffs, Oakland County Employees' Retirement System and Voluntary Employees' Benefit Association, Plymouth County Retirement System, and Central Laborers' Pension Fund ("Lead Plaintiffs" or "Plaintiffs") allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based upon, *inter alia*, counsel's investigation, which includes but is not limited to review and analysis of: (a) regulatory filings made by First NBC Bank Holding Company ("First NBC," "FNBC" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases issued and disseminated by the Company; (c) analyst and media reports concerning First NBC; (d) analysis of securities movement and pricing data; (e) other public information regarding the Company; (f) public information regarding certain of First NBC's borrowers and investments; (g) pertinent provisions within Generally Accepted Auditing Standards ("GAAS") and Generally Accepted Accounting Principles ("GAAP"); and (h) pertinent provisions within certain federal and state laws, pronouncements and regulations.

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of all investors, other than certain excluded persons per paragraph 48 below, who purchased First NBC's publicly traded common stock between May 10, 2013 and October 20, 2016, inclusive (the "Class Period").

2.      First NBC is a bank holding company headquartered in New Orleans, Louisiana that offers a broad range of financial services through its wholly-owned

banking subsidiary, First NBC Bank. First NBC's primary market is the New Orleans metropolitan area and the Florida panhandle.  The Company has a main office located in the Central Business District of New Orleans, 38 full service branch offices and a loan production office.  As of December 31, 2015, First NBC had total assets of $4.7 billion, net loans of $3.4 billion and total deposits of $3.8 billion.

3.      First NBC was founded by Defendant Ashton J. Ryan, Jr., the Company's Chief Executive Officer and, until recently, its Chairman.  First NBC commenced banking operations in 2006 and experienced significant growth, both organically and through acquisitions.  In May 2013, First NBC completed an initial public offering that raised $115 million through the issuance of nearly 4.8 million shares of common stock priced at $24 per share (the "IPO").

4.      This case has been brought because during the Class Period, Defendants deceived investors by, among other things, vastly overstating First NBC's reported profitability, failing to disclose material weaknesses in its internal controls over financial reporting, concealing the true extent of the Company's exposure to the oil and gas industry, and misstating the risks involved with its investments in short-term receivables. This deceptive conduct also had the effect of making First NBC's capital position appear vastly stronger than it actually was.

5.      The manipulative accounting techniques employed by the Company contributed to the appearance of solid earnings growth.  First NBC's reported net income increased from $29.4 million for 2012, to $40.9 million for 2013, to $55.6 million for 2014.  On February 1, 2016, First NBC issued unaudited financial results for 2015, reporting a further increase in net income to $67.3 million.  As 2016 unfolded, however,

a series of disclosures revealed that much of First NBC's reported strong earnings growth had been illusory.  In March and April 2016, First NBC disclosed that the filing of its Form 10-K for the year ended December 31, 2015, would be delayed due to accounting errors that the Company had identified, that its previously issued financial statements could no longer be relied upon, and that it was retracting the unaudited financial results reported for 2015.

6.      When First NBC finally filed its 2015 Form 10-K on August 25, 2016, the Company **restated its financial results for periods covering its entire history as a publicly traded company** (and for prior periods as well).  In so doing, the Company acknowledged that its financial statements were false *at the time they were issued*.  The Company also belatedly acknowledged numerous material weaknesses in internal controls.  These material weaknesses stemmed mostly from "***the dominant influence of the Chief Executive Officer over accounting and reporting matters***" and the "***failure of executive management to establish a tone and control consciousness that consistently emphasizes the importance of internal control over financial reporting***."

7.      These circumstances were not new.  Indeed, in 2012, First NBC had a material weakness in internal controls that was closely related to one of the material weaknesses the Company acknowledged in 2016; *i.e.*, a lack of employees with the appropriate technical skills and knowledge regarding tax credit investments.  While First NBC falsely reassured investors that the material weakness had been adequately addressed, it persisted throughout the Class Period as a result of Defendant Ryan's dominant influence.

8.     The First NBC Defendants' false portrayal of the Company's financial condition was manifested in primarily three areas:  manipulative accounting techniques applied to the Company's investments in tax credit entities; the failure to disclose the Company's true exposure to the oil and gas industry; and the Company's failure to disclose the true risks associated with its investments in short-term receivables.  These manipulations impacted First NBC's most important financial metrics, such as profitability and capital position.

### A.     First NBC's Fraudulent Accounting for Investments in Tax Credit Entities

9.     Historically, local and regional banks such as First NBC have generated profits through loans.  The interest rate spread between the rate a bank can borrow capital and lend capital drives profits.  However, in the interest rate environment over the past several years (including during the Class Period), the profit margin that can be achieved on the interest rate spread has been historically low.

10.    First NBC sought to address this issue by creating a different type of profit center:  one that was created through investments in tax credit entities, not only to avoid paying income taxes (both federal and state) but to enhance earnings.  The Company invests in entities that qualify for federal tax credits under the Community Reinvestment Act.  The investments in various tax credit-motivated development projects have occurred under one of three programs:  the Federal New Markets Tax Credit; the Federal Historic Rehabilitation Tax Credit; or the Low Income Housing Tax Credit.  The Company generates returns on these investments through the receipt of federal and, if applicable, state tax credits.  First NBC has asserted that as a result of its tax credit strategy, every $1 of pre-tax income is worth approximately $1.99 net income.  During

the Class Period, the tax credit benefits provided an enormous boost to First NBC's reported net income.  For example, in 2013 and 2014, the tax credit benefits alone accounted for 48.2% and 48.5%, respectively, of the Company's reported net income.

11.    In his letter to shareholders in the 2014 Annual Report, Defendant Ryan emphasized that First NBC's tax credit investments were not merely incidental to the Company's traditional lending activities, but were fundamental to its business strategy for enhancing shareholder returns:

> One part of our strategy is to provide our shareholders with exceptional returns.  ***Our investment in tax credits helps provide those returns.*** Although the geography of these returns in our income statement is unusual (a credit income tax provision), ***the net returns are excellent and contribute to our strong earnings performance.***[1]

Similarly, in other investor presentations during the Class Period, First NBC repeatedly described its tax credit investments as "***core***" to its business strategy.  While the Company acknowledged that tax credit investments were the "most discussed and misunderstood part of our business," it sought to allay investor concerns by assuring them that ***"[m]anagement has a deep understanding of this business***."

12.    Unbeknown to investors, however, the "excellent" returns produced by First NBC's tax credit investments were illusory because they were vastly overstated.  Due to the nature of tax credit entities, which are essentially investments in real estate rehabilitation and/or construction projects, tax credit partnerships invested in real estate generate substantial losses to the investor in the early phases of the projects.  These losses are generated by depreciation of the real estate, interest expense from debt financing, construction costs, and the inability to realize rental income until the properties can

---

[1] Unless noted otherwise, all quoted language that is bolded and italicized within this Complaint denotes emphasis added.

receive a certificate of occupancy.  In order to maximize the profitability of its tax credit investments, First NBC manipulated the accounting for these investments in such a way as to avoid recording its proportionate share of the losses generated by the development projects and impairment expenses arising from the reduced carrying value of its investments.

13.     As further described herein, First NBC's tax credit accounting improprieties were mainly threefold.  First, in violation of GAAP, the Company used an "amortized cost method" to account for its investments in tax credit entities, rather than proper application of the equity method of accounting, as required by GAAP.  Use of the amortized cost method artificially reduced the Company's reported expenses throughout the Class Period.  Second, First NBC violated GAAP by failing to recognize any impairment of its tax credit investments throughout most of the Class Period, despite admittedly having information available at the time it issued its financial results indicating that such investments were in fact impaired.  By failing to recognize any impairment, First NBC avoided reducing the carrying value of its investments in tax credit entities and, thus, avoided a corresponding increase in reported expenses.  Finally, First NBC violated GAAP by failing to consolidate certain investments in federal low income housing tax credit entities that were determined to be variable interest entities  in which the Company was the primary beneficiary.  As a result, the Company failed to properly account for losses generated by these entities.  Further, Defendant Ernst & Young LLP ("E&Y"), the Company's outside auditor throughout the Class Period, failed to conduct audits of the Company in compliance with GAAS and, accordingly,

misrepresented in its reports during the Class Period that First NBC's financial statements were presented fairly in conformity with GAAP.

14.     The proper application of GAAP to the Company's tax credit investments had an enormous impact on the impairments ultimately reported by First NBC in its 2015 Form 10-K.  For example, when First NBC initially reported its unaudited 2015 financial results in its February 1, 2016 press release, it stated that the impairment of its investment in tax credit entities was approximately $19 million.  However, the Company's 2015 Form 10-K ultimately disclosed that *the correct impairment increased to $59.5 million*. First NBC recorded no impairments at all on its tax credit investments for 2013 and 2014. But the 2015 Form 10-K, which included restated financial results for those years, now showed that the actual impairments on tax credit investments at the 2013 and 2014 year-ends were approximately $13 million and $25 million, respectively.  Moreover, the impairments recognized in the restated 2013 and 2014 financial results far outstripped the improperly accounted for amortization expense previously recognized by the Company as a result of its failure to apply the correct accounting method under GAAP.

15.     These results were not the product of innocent mistakes.  Rather, they were a direct outgrowth of the Company's need to find a source of profitability to supplement the thin margins of traditional banking activities and of the material weaknesses in internal controls that had been evident from before First NBC's inception as a public company.  In 2012, First NBC identified an internal control weakness relating "*to the accounting for the deferred tax aspects of certain of our investments in the entities that generate tax credits*."  This material weakness was attributed to "*the lack of a sufficient number of accounting employees with the appropriate technical skills and*

7

*knowledge regarding tax credit investments*."   In the registration statement for the Company's initial public offering in May 2013, First NBC represented that it had taken steps to remediate the material weakness.  Further, in its 2014 Form 10-K, the Company stated affirmatively that it maintained effective internal controls over financial reporting and Defendant E&Y – supposedly based on a GAAS-compliant audit – similarly represented that the Company's internal controls were effective.  But in its belatedly-filed 2015 Form 10-K, First NBC acknowledged a material weakness relating to its accounting for tax credit entities in terms that were starkly similar to those that described the material weakness in 2012:  a "*lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax credit related entities* and the related evaluation of impairment, if any, associated with these investments."

16.     Defendant Ryan's dominant influence over accounting and reporting matters and the lack of adequate accounting personnel meant that key decisions concerning the accounting for tax credit entities remained centralized with him and his executive management.   Defendant Ryan was motivated to make decisions that artificially inflated First NBC's earnings because almost all the First NBC stock he owned, 435,000 shares out of a total of 475,000, was pledged as collateral for various debt obligations, including real estate investments.   Thus, Defendant Ryan had a powerful, personal motive to maintain First NBC's stock price at elevated levels in order to avoid the need to post additional collateral on the loans secured by his stock.

**B.      First NBC's Undisclosed Exposure to the Oil and Gas Industry**

17.     From the beginning of the Class Period through the middle of 2014, crude oil prices were in the range of $100 per barrel.  Starting in mid-2014, the price of oil fell precipitously, reaching about $50 per barrel by the end of 2014 and falling to under $40 per barrel by the end of 2015.  Given First NBC's ties to the Louisiana economy, the decline in oil prices prompted investor concern about the extent of the Company's exposure to the oil and gas industry.  On March 31, 2015, First NBC filed its 2014 Form 10-K and issued its 2014 Annual Report to Shareholders.  In his letter to shareholders, Defendant Ryan addressed these concerns, telling investors that "First NBC has very limited exposure (3% of its loan portfolio) to the oil and oil service industries."

18.     First NBC failed to disclose, however, that notwithstanding its purported limited exposure to the oil industry, the Company was then at risk on a large loan that it had made to an oil exploration and production company.  In late 2014, a pipeline serving a well in the largest oil field of the exploration and production company broke.  The well was required to go off-line and the exploration and production company experienced cash flow difficulties.  Rather than repair the pipeline, the borrower elected to drill a new well. First NBC agreed to finance this operation, substantially increasing its loans to the exploration and production company in the third and fourth quarters of 2015.  By the end of 2015, First NBC had loaned the company $90.2 million, representing *57% of the Company's exposure to the energy sector*.

19.     Despite the fact that the pipeline broke at the end of 2014, First NBC made no mention of the loan or the problems being encountered by the borrower in either its 2014 Form 10-K or its First Quarter 2015 Form 10-Q.  The Company's Second

Quarter 2015 Form 10-Q made only a bare reference to this matter, noting that the loan was now classified as substandard due to "the fluctuations in energy commodity prices and the level of production from [the borrower's] shallow-water well." Indeed, the Second Quarter Form 10-Q reassured investors that "[t]he company anticipates that production will resume in the near future." These statements were false because they failed to disclose that production had been completely off-line since December 2014 and that First NBC was extending additional credit to the borrower to enable production to resume.

20.     As noted above, on February 1, 2016, First NBC issued a press release announcing its fourth quarter and full year 2015 earnings. With regard to oil and gas industry loans, the press release blandly reported that the "Company's exposure to exploration and production in its oil and gas portfolio was approximately $90.2 million." Separately, First NBC told analysts at Sandler O'Neill that the loan "related to a shallow-water drilling project that has been offline for some time now … but that is now ready to return to production." This was followed by a February 11, 2016 Form 8-K disclosure that acknowledged the financial difficulties of the borrower, but nevertheless maintained that the Company did not expect to recognize any loss.

21.     It was only when First NBC filed its long overdue 2015 Form 10-K that the Company finally admitted that, as of year-end 2015, it was required to deeply discount the value of the collateral for the loan **and establish a $30 million reserve allowance**. The 2015 Form 10-K attributed the belated establishment of this reserve to a material weakness in First NBC's internal controls relating to the monitoring of borrowers' ability to repay loans. This material weakness flies in the face of repeated

10

assertions during the Class Period that the Company was "actively monitoring both its direct and indirect oil and gas related credits."  And, in fact, the 2015 Form 10-K admission and other facts about the loan make clear that First NBC was simply "hiding the ball" when it failed to tell investors about the pipeline break right away and the fact that the Company would be extending even more financing to the borrower to drill a new well.

> **C.** **First NBC's Failure to Disclose the Risk of Loss Arising from Investments in Short-Term Receivables**

22.     During the Class Period, First NBC made investments in short-term receivables acquired through an electronic platform known as the "Receivables Exchange."  First NBC deemed these investments as offering more attractive yields than other forms of investment and, accordingly, its investment in short-term receivables grew from around $81 million at the end of 2012 to over $246 million at the end of 2013. They remained near that level through the end of 2014.  In its 2014 Form 10-K, First NBC for the first time included a risk factor discussion of short-term investments, noting that "[a]s with substantially all of our investment securities, we are subject to credit risk with respect to our investments in short-term receivables."  This risk was tempered by the fact that First NBC purported to "engage in a review of all sellers from which we purchase receivables over the exchange prior to investing in short-term receivables" and the fact that the purchase agreements "provide recourse against the seller" in the event of non-payment or other breaches.

23.     In its February 1, 2016 press release announcing its 2015 financial results, First NBC noted that its investment balance in short-term receivables at year-end was $95.5 million and that $69.0 million of this amount was "due from a U.S. company that

produces ethanol for blending in gasoline."  The press release also disclosed that $39.7 million of the receivables from the ethanol company were now past due.  First NBC asserted, however, that management did not expect to incur any loss on this investment, based on, among other things, an "analysis of the financial capabilities of the obligor."  In its Form 8-K filed on February 11, 2016, First NBC noted that the failure of the ethanol company to pay the invoices was the result of the financial difficulties of the U.S. company's Spanish parent.  Nevertheless, First NBC again asserted that it did not expect to incur any loss based, in part, on "the historical earnings performance of the ethanol company" and the fact that its Spanish parent was "evaluating certain restructuring options that would permit a more prompt repayment of the receivable."

24.     These statements were highly misleading.  First NBC did not disclose that the obligor on the receivable was Abengoa Bioenergy Company, the United States subsidiary of its Spanish parent, Abengoa S.A.  It also failed to disclose that Abengoa S.A. *had actually filed in late 2015 for preliminary protection under Spanish insolvency laws*.  Moreover, the U.S. subsidiary filed for bankruptcy under Chapter 11 just weeks after the Company's February 2016 disclosures.  Thus, contrary to First NBC's assertions, neither the U.S. ethanol company nor its Spanish parent possessed the wherewithal to make full payment of the receivable.

25.     Ultimately, when First NBC filed its 2015 Form 10-K in August 2016, the Company recorded an impairment charge for the entire balance of the $69.9 million receivable, effectively acknowledging that the Company's February 1, 2016 earnings release was false because it failed to include this charge.  First NBC also represented in the Form 10-K that the circumstances giving rise to this write-off were caused by a

12

material weakness in internal controls "*related to the evaluation and ongoing monitoring of the financial stability and creditworthiness of companies from which [the Company] acquired short-term receivables*."

> **D.      Revelation of the Truth Concerning First NBC's Financial Condition and Its Impact on the Company's Stock Price**

26.      Starting on February 1, 2016, when First NBC issued its unaudited fourth quarter and full year 2015 financial results, the artificial inflation of the Company's stock price resulting from its false and misleading statements began to be removed.   The Company's reported 2015 earnings were significantly below consensus estimates based, in part, on a higher than expected fourth quarter tax credit impairment charge (which itself was woefully understated).   As described above, the earnings release also noted First NBC's $90.2 million exposure to the oil and gas sector and the $39.7 million that was past due on its $69 million ethanol receivable.   These disclosures prompted concern among investors and analysts.   For example, analysts at Sandler O'Neill issued a report on February 2, 2016, stating:   "We are definitely disappointed in the bank's 4Q results given the much higher than expected tax credit impairment, the increase in energy-related loans (without a disclosed reserve percentage), and the announcement of past due receivables investments related to the oil and gas sector."   In response to the February 1, 2016 press release, the price of First NBC stock dropped the next day by $3.20 per share, or about 10.5%, to close at $27.20.

27.      On March 16, 2016, First NBC stunned the market by announcing that it would delay filing its 2015 Form 10-K.   *The Company disclosed that it had identified errors in its accounting for its Federal and State Historic Rehabilitation tax credit entities and other items and that its previous release of 2015 earnings was being*

*retracted.*  First NBC said it was evaluating the impact of the accounting errors and assessing its internal controls.  As a result of this news, First NBC stock plunged $5.33 per share, or 22%, to close at $19.09 on March 16, 2016, on extremely high trading volume of over 1 million shares.

28.     Then, on April 8, 2016, the Company filed a Form 8-K and press release disclosing that the Company's audit committee and management had determined that all of First NBC's previously-issued financial statements *from 2011 through 2014* should no longer be relied upon.  The Form 8-K stated:  "The Company's management determined that *the financial statements referred to above should be restated due to an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities and the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities*.  The Company is continuing to review and quantify these and other potentially other less significant matters, which are expected to be reflected in the restated financial statements."  As a result of this news, First NBC stock fell $0.47 per share to close at $18.65 on April 11, 2016, the next trading day, a decline of 2%.

29.     From its inception as a public company, First NBC maintained that the bank was "well-capitalized," the soundest capital classification for FDIC-insured institutions.  Defendants' accounting maneuvers concealed the fact that the Company's capital position was not as strong as investors had been led to believe.  But on August 12, 2016, the Company's statements concerning its capital position were challenged when HoldCo Asset Management ("HoldCo"), an investor holding $8 million face value of First NBC's subordinated debt, published an open letter to First NBC.   HoldCo's letter

posed a series of questions that primarily concerned First NBC's accounting for its tax credit investments and the significance of the Company's deferred tax asset arising from such investments to the Company's capital position.  HoldCo posited that First NBC would need to raise at least $300 million in new common equity over the next two years to be considered a "well-capitalized" bank by banking regulators.  In response to the publication of the HoldCo letter, the price of First NBC stock fell $2.21 to close at $13.54 on August 12, 2016, a 14% decline, on heavy volume of over 1.1 million shares.  On the next trading day, August 15, 2016, First NBC shares declined by an additional $1.33 to close at $12.21, on continued heavy volume of over 910,000 shares.  The Company's stock thus experienced a two-day decline of $3.54, or nearly 22.5%, in response to the publication of the HoldCo letter.

30.    On August 25, 2015, First NBC at last filed its 2015 Form 10-K.  ***First NBC revealed that the Securities and Exchange Commission had commenced an investigation of the Company's financial reporting.***  The 2015 Form 10-K also showed the enormous impact of the accounting improprieties discussed above.  For example, while First NBC, in its February 1, 2016 press release, had initially reported 2015 net income of $67 million, the Company ***actually incurred a net loss of about $25 million – marking a $92 million swing.***  Likewise, 2014 net income, originally reported as $55.6 million, was restated downward to $44.5 million, a 20% reduction; and 2013 net income, originally reported as $40.9 million, was restated downward to $33.6 million, a 17.8% reduction.  The restatement included many other ways in which the Company's financial results had been misreported from 2013 through 2015, as further detailed below.

31.     First NBC's 2015 Form 10-K also showed deterioration in the bank's capital position.   As of December 31, 2015, the bank fell below "well-capitalized" minimum capital ratios with respect to Tier 1 risk-based capital and total risk-based capital.   The decline of these ratios – below the minimum threshold for the well-capitalized classification – was attributable in substantial part to each of the types of misrepresentations made by the Company, as summarized above and described in greater detail below, including the restatement of financial results arising from First NBC's bogus accounting for tax credit investments, the write-off of the $69 million ethanol receivable, and the belated establishment of a $30 million reserve associated with the loan to the oil exploration and production borrower.

32.     On September 2, 2016, after the close of the market, First NBC filed a Form 8-K disclosing that Defendant E&Y, its outside auditor from before the IPO and throughout 2015, had notified the Company "that it was declining to stand for re-appointment" as the Company's independent auditor.   First NBC stated that E&Y's audit services to the Company would cease upon the Company's filing of its respective Forms 10-Q for the quarters ended March 31, 2016 and June 30, 2016.   As a result of this news, First NBC stock fell by $0.90 on the next trading day, September 6, 2016, to close at $11.95, a decline of 7% on high volume of over 550,000 shares.

33.     Finally, on October 20, 2016, First NBC filed its Form 10-Q for the quarter ended June 30, 2016.   In addition to reporting its quarterly results, the Company reported it had been informed by the Federal Reserve Bank of Atlanta ("FRB") and the Louisiana Office of Financial Institutions ("OFI") that it had been deemed to be in "**_troubled condition_**" under the relevant banking regulations.   Such designation places

restrictions on, among other things, First NBC's ability to incur debt, pay interest and dividends, and appoint new directors and officers.  As a result of this news, shares of First NBC plummeted by $2.15 to close at $9.05 on October 20, 2016, a decline of 19%, on enormous volume of over 1.9 million shares.  First NBC stock continued to fall on heavy volume over the next two trading days, closing at $6.65 on October 24, 2016. Thus, over the three trading days following disclosure of First NBC's "troubled condition" designation, the Company's stock declined by $4.45 or 40.6%.

34.     Since the end of the Class Period, reports concerning First NBC's deteriorated condition have continued unabated.  The Company has disclosed that it has retained the services of two investment banks to explore "all strategic options" to advance the interests of the company and its stockholders.  Press reports have indicated the Company is considering undertaking potential private capital raises as well as an outright sale of the Company.  *See, e.g.,* Rachel Louise Ensign, *"First NBC Bank Weighing Capital Raising or Sale: A large common-stock offering would dilute existing shareholders,"* Wall Street Journal (Nov. 6, 2016, 8:28 ET), *available at http://www.wsj.com/articles/first-nbc-bank-weighing-capital-rise-or-sale-sources-1478468909.*  And on November 17, 2016, after the market close, First NBC announced that it has entered into a Consent Order with the FDIC and OFI.  The Consent Order requires that First NBC, among other actions, to submit plans for the reduction of substandard "classified" assets, the attainment and maintenance of minimum capital levels and the enhancement of internal controls.  The bank must also adopt measures to enhance its balance sheet liquidity.  As a result of this announcement, the price of First NBC stock fell on November 18, 2016 by $1.75, or 21%, to close at $6.30.

17

## II.       JURISDICTION AND VENUE

35.       The claims asserted herein on behalf of Lead Plaintiffs and the Class (defined in ¶ 48 below) arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated by the SEC.

36.       This Court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

37.       Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  First NBC maintains its executive offices in this District and many of the acts and transactions giving rise to the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.

38.       In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, and the facilities of a national securities market.

## III.     PARTIES

### A.      Lead Plaintiffs

39.       Lead Plaintiffs purchased or acquired the common stock of First NBC during the Class Period as set forth in Exhibits A, B and C hereto and suffered damages as the result of the violations of the federal securities laws alleged herein:

a.       Lead Plaintiff Oakland County Employees' Retirement System and Voluntary Employees' Benefit Association ("Oakland County") is a municipal

corporation organized under the laws of the State of Michigan. Oakland County is an institutional investor providing retirement benefits to the employees of Oakland County, Michigan, and has assets totaling over $1.5 billion. Oakland County purchased or acquired 34,484 shares of First NBC common stock during the Class Period for $927,936.

b.     Lead Plaintiff Plymouth County Retirement System ("Plymouth County") is a defined benefit retirement plan based in Plymouth, Massachusetts, that provides retirement benefits to more than 9,000 beneficiaries. As of June 27, 2016, Plymouth County's assets under management had a market value in excess of $834 million. Plymouth County purchased or acquired 23,199 shares of First NBC common stock during the Class Period for $675,760.

c.     Lead Plaintiff Central Laborers' Pension Fund ("Central Laborers") is an institutional investor established in 1965 that provides annuity and pension benefits to active and retired laborers and their beneficiaries throughout most of Illinois and has approximately $1 billion in assets under management. Central Laborers purchased or acquired 21,332 shares of First NBC common stock during the Class Period for $626,301.

**B.     First NBC Defendants**

40.     At all times relevant hereto, First NBC was a Louisiana corporation with its principal executive offices located in New Orleans, Louisiana, that operated as a bank holding company offering a broad range of financial services through its wholly-owned banking subsidiary, First NBC Bank, a Louisiana state non-member bank. Shares of First

NBC trade on the NASDAQ Stock Market under the ticker symbol "FNBC."   As of August 15, 2016, First NBC had 19,231,427 shares of common stock outstanding.

41.     Defendant Ashton Joseph Ryan, Jr. ("Ryan") has served as President and Chief Executive Officer of First NBC Bank since its inception in 2006 and First NBC Bank Holding Company since its formation in 2007.   Defendant Ryan also served as Chairman of the Board of First NBC Bank from its inception in 2006 and First NBC Bank Holding Company from its formation in 2007 until September 16, 2016.   As asserted by First NBC in its public filings for its May 2013 IPO, Ryan "has more than 40 years of financial services experience, including 20 years in Arthur Andersen's financial institutions audit practice and more than 20 years of commercial banking experience." Prior to First NBC's inception, Defendant Ryan served as President of First Trust Corporation, Chief Executive Officer and President of First Bank & Trust (New Orleans), and President of First National Bank of Commerce, the lead bank of First Commerce Corporation, until First Commerce Corporation's acquisition by Bank One in 1998. During the Class Period, Defendant Ryan owned approximately 475,000 shares of First NBC common stock, the vast majority of which (approximately 435,000 shares) was pledged as collateral for various debt obligations, including real estate investments. Defendant Ryan signed the Company's annual reports on Forms 10-K for 2013 through 2015, and attested to the accuracy of the Company's quarterly reports on Forms 10-Q beginning in the second quarter of 2013 through the second quarter of 2016.  Defendant Ryan also signed the Company's registration statement related to its IPO.

42.     Defendant Mary Beth Verdigets ("Verdigets") served as Executive Vice President and Chief Financial Officer of First NBC from 2011 until September 16, 2016,

at which time she assumed the role of Treasurer of First NBC.  Before joining First NBC Bank, Defendant Verdigets served as Vice President and Manager of Financial Planning at First Bank and Trust from 2000 to 2006, as a financial analyst at Whitney National Bank from 1999 to 2000, and in various accounting-related positions for First Commerce Corporation from 1993 to 1999.  Defendant Verdigets is a certified public accountant. Defendant Verdigets signed the Company's annual reports on Forms 10-K for 2013 through 2015, and attested to the accuracy of the Company's quarterly reports on Forms 10-Q beginning in the second quarter of 2013 through the second quarter of 2016. Defendant Verdigets also signed the Company's registration statement related to its IPO.

43.     Defendants Ryan and Verdigets are collectively referred to herein as the "Officer Defendants."   The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of First NBC's reports to the SEC, the Company's press releases, and presentations to securities analysts, institutional investors and other members of the market.  Each Officer Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Officer Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### C.   Auditor Defendant

44.     Defendant E&Y is a "Big 4" public accounting firm with its United States headquarters located at 5 Times Square, New York, New York.   E&Y served as First NBC's outside auditor since before First NBC's IPO.   E&Y audited the financial statements of First NBC for the years ended December 31, 2011, 2012, 2013, and 2014, and issued unqualified (or "clean") auditor's reports thereon which were included in either First NBC's offering materials related to its IPO (for the years ended December 31, 2011 and 2012) or in First NBC's Forms 10-K (for the years ended December 31, 2013 and 2014).   E&Y's unqualified auditor reports were dated March 29, 2013, March 31, 2014, and March 31, 2015, and certified that, among other things, its audits were performed in accordance with GAAS.

45.     Specifically, in each of the unqualified auditor's reports on First NBC's 2011-2014 financial statements, E&Y certified that: (1) it had audited First NBC's financial statements in accordance with the standards of the Public Company Accounting Oversight Board; (2) it had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement;" (3) in its opinion, First NBC's financial statements "present fairly, in all material respects, the consolidated financial position" of First NBC in conformity with GAAP; and (4) its audits provided a "reasonable basis" for its opinions.

46.     E&Y further consented to the incorporation by reference of its unqualified auditor report dated March 29, 2013, on the consolidated balance sheets of First NBC as of December 31, 2012 and 2011, and the related consolidated statements of income, comprehensive income, shareholders' equity, and cash flows for each of the three years

in the period ended December 31, 2012, into the offering documents related to the IPO. The Registration Statement included E&Y's "Consent of Independent Registered Public Accounting Firm," dated April 8, 2013, by which E&Y consented to the incorporation by reference into the Registration Statement of its unqualified auditor's report dated March 29, 2013.  E&Y also consented to the incorporation by reference into the May 10, 2013 Prospectus of its unqualified auditor's report, dated March 29, 2013.  Specifically, under the caption "Experts" in the May 10, 2013 Prospectus, First NBC stated that its "consolidated financial statements at December 31, 2012 and 2011 and for each of the three years in the period ended December 31, 2012 appearing in this prospectus and registration statement have been audited by [E&Y]," as evidenced in its March 29, 2013 report, and were "included in reliance upon such report given on the authority of that firm as experts in accounting and auditing."

47.     During the years 2012 through 2015, the fees paid to E&Y by First NBC were reported to be as follows:

| Year | Audit Fees | Tax Fees | Audit Related Fees | All Other Fees |
|------|-----------|----------|--------------------|----------------|
| 2012 | $851,066 | $143,125 | $1,322,600 | - |
| 2013 | $513,599 | $165,500 | $418,025 | - |
| 2014 | $1,636,649 | $134,000 | $73,200 | $3,100 |
| 2015 | $5,027,309 | $222,450 | - | $1,500 |

## IV.     CLASS ACTION ALLEGATIONS

48.     Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the common stock of First NBC during the period from May 10, 2013, through October 20, 2016 (the "Class Period"), and who were damaged

thereby (the "Class").  Excluded from the Class are Defendants, their officers, directors and partners, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, First NBC's common stock was actively traded on the NASDAQ Stock Market (the "NASDAQ"), an efficient market, and responded promptly to the disclosure of new, material information as it was made known to the market.  As of August 15, 2016, First NBC had 19,231,427 shares of common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that Class members number in the thousands.

50.     There is a well-defined community of interests in the questions of law and fact involved in the case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

(a)     Whether Defendants violated the federal securities laws;

(b)     Whether Defendants misrepresented material facts concerning First NBC;

(c)     Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

24

(e)     Whether Defendants engaged in perpetuating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

(f)     Whether First NBC's SEC filings issued during the Class Period that contained financial information (*i.e.*, its Forms 10-K, 10-Q, 8-K, and S-1) contained untrue or materially misleading statements;

(g)     Whether the price of First NBC's common stock was artificially inflated; and

(h)     The extent of damages sustained by Class members and the appropriate measure of damages.

51.     The claims of Lead Plaintiffs are typical of the Class and Lead Plaintiffs and all members of the Class sustained damages as a result of the conduct complained of herein.

52.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs have no interests that are contrary to or in conflict with those of the members of the Class that Lead Plaintiffs seek to represent.

53.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

54.     Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## V.      BACKGROUND FACTS AND NATURE OF THE FRAUD AT FIRST NBC

55.     As more fully described below, during the Class Period, the First NBC Defendants deceived investors by, among other things, misrepresenting First NBC's reported financial results, failing to disclose material weaknesses in its internal control over financial reporting, concealing the true extent of the Company's exposure to the oil and gas industry, and misstating the risks involved in the Company's investments in short-term receivables.  All of this misconduct was orchestrated in an effort to make First NBC appear more profitable and financially secure than it actually was.

### A.      First NBC's Fraudulent Accounting for Tax Credit Investments

#### 1.      Background

56.     First NBC Bank was chartered in 2006 in the aftermath of the devastation of the New Orleans metropolitan area by Hurricane Katrina, and was focused on taking advantage of opportunities to be found in the recovery of New Orleans including tax credits that were generated through reconstruction efforts.  Throughout the Class Period, First NBC invested in tax credit entities that qualified for Federal tax credits under the Community Reinvestment Act ("CRA").  First NBC's participation and investment in such entities afforded it the associated Federal tax credits from investments – namely Federal New Market Tax Credits ("NMTC"), Low-Income Housing Tax Credits ("LIHTCs"), and Federal Historic Rehabilitation Tax Credits ("FHRTCs") – to offset the Company's income tax liability.[2]

---

[2] First NBC's accounting misstatements related primarily to investments in entities that obtained LIHTCs and FHRTCs.

57.    The Company's investments in such entities greatly impacted First NBC's profits and losses because these types of investments generally afford companies "tax benefits in the form of tax deductions from operating losses and tax credits" (Accounting Standards Codification ("ASC") 323-740-05-3) and such benefits were an integral part of the Company's business model to grow profits throughout the Class Period.   These investments in tax credit entities, as disclosed by the Company and discussed throughout this Complaint, provided substantial boosts to First NBC's net income.   For instance, on the originally reported 2013 and 2014 Forms 10-K, tax credit benefits alone accounted for 48.2% and 48.5% of the Company's net income.[3]

58.    During the Class Period, First NBC publicly reported financial results that corroborated assertions made by Defendants that First NBC was a rapidly growing company reaping strong returns from its investments in tax credit entities.   Defendants prominently touted the Company's financial strength in press releases and public filings with the SEC, as well as in presentations to investors.   Specifically, in the offering materials for the Company's IPO, First NBC stated that, "[s]ince inception, First NBC Bank ha[d] experienced tremendous growth, both organically and acquisitively, in becoming a premier banking institution in New Orleans."   Indeed, for the years ended December 31, 2011 through 2014, First NBC originally reported net income of $19.7 million, $29.5 million, $40.9 million, and $55.6 million – a growth rate of approximately 180%.   And in quarterly earnings press releases and other filings throughout the Class Period, First NBC similarly reported a consistent trend of, among other things, increasing

---

[3] During these years, First NBC recorded $19.751 and $26.976 million in tax credits from investments in tax credit entities.

net income, accumulated earnings, earnings per common share ("EPS"), total assets, total shareholders' equity, and income available to common shareholders.

59.     Further, in numerous presentations directly to investors during the Class Period, Defendants Ryan and Verdigets lauded these strong financial trends while simultaneously trumpeting the strength and uniqueness of the Company's investments in tax credits, noting that First NBC's tax credit business generated *"[s]trong financial returns,"* and was *"an integral part of First NBC's commercial banking business"* and *"core to First NBC's corporate strategy."*   Defendants Ryan and Verdigets also represented to investors at these presentations that First NBC's management had a special expertise and aptitude for the Company's tax credit investments, stating unequivocally that *"[m]anagement has a deep understanding of this business."*

60.     In sum, by all appearances, during the Class Period First NBC was performing extremely well.  And the Company's common stock price was a direct reflection of First NBC's stellar reported results, rising from the May 2013 IPO price of $24 to trade above $30 at the beginning of 2014 and to trade at a Class Period high of over $43 in November of 2015.  However, as was ultimately revealed, the Company's purportedly strong financial returns were a sham.

61.     As noted above, through the CRA, the United States government incentivizes investors, frequently banks, to invest capital into projects that improve underprivileged communities as well as historic properties.  The entities through which such investments are made into these types of projects are referred to as "tax credit entities" or "tax credit partnerships."  A tax credit entity, often a partnership, is a vehicle through which parties may invest in real estate – a low-income rental property, historic

buildings, etc. – that generates "tax benefits in the form of tax deductions from operating losses and tax credits" for the investor. ASC 323-740-05-3. The tax deductions and credits obtained through the partnership ultimately reduce the investor's income tax liability, which is considered the benefit afforded the participants.

62. For tax purposes, an obligation to pay income tax can be reduced by way of either deductions or credits. An income tax deduction is a reduction of an entity's taxable income on its Federal income tax return. After all tax deductions are subtracted from a taxpayer's income, the pre-tax net income is multiplied by a company's applicable income tax rate to calculate its income tax liability. A *deduction* reduces an entity's tax liability by an amount equal to that obtained by multiplying the statutory tax rate of the company, which in the case of First NBC was roughly 35%, by the amount of the deduction. Thus, for every $1 deduction, First NBC could have expected to receive a $0.35 tax savings.

63. On the other hand, an income tax *credit* directly reduces a taxpayer's liability on a dollar-for-dollar basis. As such, a tax credit often generates greater tax savings. Thus, for every $1 in tax credits, First NBC expected a $1 reduction in its tax liability (as opposed to, for example, $0.35 for an equivalent $1 deduction). As such, tax credits were extremely valuable to First NBC's reduction of its tax liability.

## 2. Nature and Effect of the Fraud

64. As described above, First NBC engaged in the business of investment in tax credit entities in order to supplement the limited profitability that could be achieved through traditional banking activities. Indeed, First NBC in its first two years as a public company relied on its tax credit investments for up to nearly half of its reported

profitability.  Given the importance of its tax credit investments, First NBC sought to structure its accounting for these investments in a way that would maximize their profitability.  Defendants were aware that the underlying real estate rehabilitation and construction projects of the tax credit entities generated losses in their early phases due to depreciation of the real estate, interest expense from debt financing, construction costs and an inability to realize rental income before a certificate of occupancy can be obtained.  Accordingly, they engaged in manipulative accounting so that First NBC could avoid recording its proportionate share of the losses generated by the development projects and the impairment expenses arising from the reduced carrying value of its investments.

65.     The misstatements in First NBC's prior Forms 10-K and 10-Q relating to the Company's investments in tax credit entities emanated from three primary issues:  (1) an inappropriate use of the 'amortized cost method' of accounting for investments in tax credit entities that was designed to, and did, effectively reduce the Company's reported expenses throughout the Class Period; (2) failing to recognize any impairment (or far too little impairment) of its tax credit investments despite having information available at the time First NBC issued its financial results indicating that such investments were in fact impaired, also resulting in a reduction of Company's reported expenses throughout much of the Class Period; and (3) for a portion of investments that generated LIHTCs, failing to properly identify and consolidate those entities into its balance sheets during the Class Period, which allowed the Company to forego recognition and reporting of losses generated by these investments.  Due to the materiality of these misstatements, individually and in the aggregate, as discussed herein, First NBC's financial statements

were materially misstated and violated GAAP throughout the Class Period.

### a.     First NBC's Inappropriate Use of the Cost Amortization Method

66.     GAAP provides the accounting treatment guidance to investors who have non-controlling interests in partnerships or LLCs that also can exert significant influence over the entity.  *See* ASC 970-323: *Real Estate–Investments–Equity Method and Joint Ventures*.  GAAP is universally clear that investors must assess the rights of the owner of an LLC regardless of whether the owner is a LP or GP in the partnership.  Such an assessment should be based upon the terms of the operating agreement and the substance of the arrangement, which dictates the rights of each owner.

67.     The "substance" of the partnership arrangement also dictates the accounting method an investor should utilize when accounting for an investment in a partnership such as a tax credit entity.  GAAP guidance provides, in relevant part:

> ***The equity method of accounting for investments in general partnerships is generally appropriate for accounting by limited partners for their investments in limited partnerships***.
>
> ASC 970-323-25-6.
>
> [.…]
>
> If the ***substance of the partnership arrangement*** is such that the general partners are not in control of the major operating and financial policies of the partnership, a limited partner may be in control.  An example could be a limited partner holding over 50 percent of the total partnership interest.  A controlling limited partner shall be guided in accounting for its investment by the principles for investments in subsidiaries.
>
> ASC 970-323-25-8.

68.     Throughout most of the Class Period, First NBC used the cost method to recognize the original cost of its investment as an asset on the balance sheet and then

amortized the cost over the asset's estimated holding period.  The cost method, however, is available *only* to investors who exert minimal or no influence over an investee.  ASC 970-323-25-8.  In its second quarter 2015 Form 10-Q, First NBC stated that "the Company determined that based on its equity ownership structure in certain of these investments [*i.e.*, in tax credit entities] *the equity method of accounting should have been applied*."  Thus, First NBC acknowledged that at the time it made its tax credit investments the "substance" of the operating agreements of the LLCs required the Company to account for these investments by the equity method, rather than the cost method.

69.     First NBC's use of the amortized cost method to account for its tax credit investments had profound ramifications.  By inappropriately amortizing its investments using a straight-line amortization over periods of 10 or 15 years depending upon the type of investment and credit sought, First NBC generated a ratable amortization expense that was substantially smaller than the accumulated losses that would have "flowed through" to the Company's income statement if the investments had been properly accounted for under the equity method.  Thus, the Company's reported noninterest expenses were substantially understated during the period while its reported earnings were overstated.

70.     Furthermore, had the Company utilized the equity method required under GAAP, First NBC would have been required to record its initial investment on the balance sheet at cost and, at each reporting period, the Company would have had to adjust the carrying value of its investment to reflect "its share of the earnings or losses of an investee in the periods for which they are reported by the investee in its financial statements."  *See* ASC 323-10-35-4.  Thus, profits generated by the investment would

have increased the investor's holdings on the balance sheet, while losses would have reduced its investment.[4]

71.     As First NBC set up its investments to record 99% or more ownership of the entity, practically all of the losses recorded by the tax credit entity should have been recorded on the Company's financial statements throughout the period.  This is extremely significant because, due to the nature of tax credit entities, which are essentially investments in real estate rehabilitation and/or construction projects, tax credit partnerships invested in real estate *generate substantial losses to the investor for both tax and financial reporting purposes from the beginning of the investment*.  These losses are generated by depreciation of the real estate, interest expense from debt financing, construction costs of the properties and the inability to realize rental income until a certificate of occupancy for the development project is issued.  As First NBC's investment holdings in tax credit entities reached over $100 million towards the end of the Class Period, the increased activity led to increased losses generated by increases in the aforementioned expenses.  By accounting for the Company's investments in tax credit entities with the improper "amortized cost method" in violation of GAAP, Defendants structured the accounting to conceal these losses from investors since they were not reflected upon the Company's income statement.

### b.     First NBC's Failure to Record and Report Impairment

72.     In addition to the improper use of the "amortized cost method" of accounting for investments in tax credit entities, First NBC also violated GAAP by

---

[4] Under the cost method that was used by First NBC, no such increase or reduction is applied to an investment based upon the investee's profits or losses.  As such, the "financial statements of an investor prepared under the cost method may not reflect substantial changes in the affairs of an investee [*i.e.*, the LLC]."  ASC 325-20-35-2.

failing to adequately assess such investments for impairment throughout the Class Period. As First NBC ultimately acknowledged in its 2015 Form 10-K, the Company did not properly assess its investments in tax credit entities for impairment during the Class Period, ***despite having information available when it issued its financial results showing that the entities were, in fact, impaired***. Similar to Defendants' use of an improper accounting method for these investments, Defendants' failure to record the impairment of First NBC's investments in tax credit entities had the effect of materially understating the Company's reported expenses during the Class Period.

73.     In assessing investments for impairment, GAAP requires a company to evaluate whether the carrying amount of an asset is recoverable.  The carrying amount is recoverable when (i) the higher of its fair value less costs of disposal or (ii) value in use, is higher than its carrying amount.  In the case of an investment in a tax credit partnership, the carrying amount is the initial investment and the fair value is the net assets of the partnership.  If the carrying amount is not recoverable, the asset is impaired. A loss representing the amount of the impairment should be included in the operating expenses section of the income statement, and the carrying amount of the investment on the balance sheet is then reduced to its recoverable amount.

74.     Under GAAP, "a loss in [the] value of an investment" that is not a temporary decline must be recognized in the period in which it occurs.  ASC 970-323-35-12.  During the Class Period, First NBC represented that "all of the Company's investments in limited partnerships [were] evaluated for impairment at the end of each reporting period."  However, by the Company's own admission in the 2015 Form 10-K, First NBC did not conduct proper "analyses of potential impairments given information

34

*that was available at the time the prior period statements were issued*."  Thus, First NBC failed to comply with GAAP and misrepresented the value of its investments in tax credit entities on its financial statements.

75.    Collectively, combined with the Company's misstatements relating to accounting for investments in tax credit entities, the lack of impairment charges taken by First NBC during the Class Period materially understated noninterest expenses.  GAAP required the recognition of impairment charges in the periods from which they emanated.  By failing to take these charges, First NBC understated reported noninterest expenses throughout the Class Period in violation of GAAP.  Indeed, in 2013 and 2014, noninterest expenses were *approximately 40% higher* than what the Company originally reported for those years.

### c.    First NBC's Failure to Consolidate Variable Interest Entities

76.    First NBC also acknowledged in its belatedly-filed 2015 Form 10-K that, during the Class Period, it failed to properly consolidate certain tax credit partnerships that were determined to be Variable Interest Entities ("VIEs") due to the Company being a "primary beneficiary" of such entities.[5]  Based upon the structure of its investments in tax credit entities, GAAP required First NBC to assess whether such partnerships were in fact VIEs for the benefit of the investor, *i.e.*, First NBC.  VIEs must be identified by an organization in order to properly ascertain whether the entity must be consolidated for

---

[5] In its 2015 Form 10-K, First NBC described VIEs as "[e]ntities that, in general, either do not have equity investors with voting rights or that have equity investors that do not provide sufficient financial resources for the entity to support its activities."  The Company stated that it "use[d] VIEs in various legal forms to conduct normal business activities" and that *"[t]he Company reviews the structure and activities of VIEs for possible consolidation."*

financial reporting purposes.  Consolidation is the means by which an investor, or parent company, recognizes the entirety of the assets, liabilities, revenues, and expenses of the investee, or subsidiary, in its financial statements.  Consolidated financial statements are vital to users of the financial statements, as GAAP explains:

> The purpose of consolidated financial statements is to present [...] the results of operations and the financial position of a parent and all its subsidiaries [and investments] as if the consolidated group were a single economic entity. There is a presumption that consolidated financial statements are more meaningful than separate financial statements and that they are usually necessary for a fair presentation when one of the entities in the consolidated group directly or indirectly has a controlling financial interest in the other entities.

ASC 810-10-10-1.

77.     Furthermore, the design of a legal entity is important in determining what constitutes a VIE.  Investors must assess their influence, control, and the benefit received from their ownership stake in an entity to consider if the investment is in fact a subsidiary or VIE that must be consolidated for financial reporting purposes.  ASC 810-10-15-14.

78.     GAAP provides a clear step by step analysis to parent companies and investors to aid in evaluating VIEs for possible consolidation.  *See, e.g*., ASC 810-10-25. ***Nevertheless, First NBC failed to properly perform this analysis because here, too, Defendants sought to account for these investments in a manner that would boost the Company's reported profitability***.  Because First NBC failed to properly consolidate its investments in these LIHTC entities, the Company only reported the cost less periodic systematic amortizations of these investments on its balance sheet rather than reporting the consolidated operations and earnings of these entities in its financial statements, which was required under GAAP.  This allowed Defendants to conceal the losses generated by these investments during the Class Period.  Along with the other accounting

machinations involving First NBC's investments in tax credit entities that violated GAAP, as set forth above, this caused First NBC to issue materially false and misleading financial statements during the Class Period.

### B.      Fraudulent Accounting for Exposure to Oil and Gas Industry

#### 1.      Background

79.      From the beginning of the Class Period through June 2014, the price of oil hovered around $100 a barrel.  But beginning in July 2014, the price of oil began to plummet, falling to less than $50 a barrel at the beginning of 2015.  Because First NBC is based in Louisiana, investors became very concerned about the Company's risk of exposure to the oil and gas industry once the price of oil began to fall.

80.      In a concerted effort to shield the Company's true risk of exposure to the oil and gas industry from investors, knowing that the truth would have a significant negative impact on the price of First NBC stock, Defendants embarked on a campaign of misinformation that was designed to, and had the effect of, making First NBC appear to be a safer investment than it was given the plummeting price of oil.  In addition to making affirmative representations that led investors to believe that First NBC was insulated from the effects of plummeting oil prices generally, Defendants also issued false and misleading statements regarding an ever-growing oil exploration and production loan that would eventually reach $90.2 million.  Defendants' false and misleading statements and omissions concerning First NBC's risk exposure to the oil and gas industry, and its failure to properly account for and disclose that exposure, violated GAAP.

81.   Investors would only come to know the truth about the Company's risk exposure and its failure to properly account for that exposure through a series of disclosures beginning in early 2016.

## 2.   Applicable GAAP Standards

82.   First NBC's disclosures and its accounting during the Class Period violated fundamental principles of GAAP and SEC regulations.   As it relates to the Company's failure to disclose and account for its true risk of exposure to the oil and gas industry, including First NBC's exposure to plummeting oil prices and its ever-growing exploration and production credit, the Company violated Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("FAS 5)," under SFAS No. 168, ASC Topic 450.

83.   FAS 5 requires that estimated losses from loss contingencies such as losses from uncollectible loans, should be recorded in the provision for loan losses and accrued by charges to income (*i.e.*, expenses) when two criteria are met (1) based on information available prior to the issuance of the financial statement, it is probable ("likely to occur") that the loans were impaired (or liabilities have been incurred) at the date of the financial statements, and (2) the amount of losses can be reasonably estimated.

84.   Under FAS 5, First NBC was required to record a loss contingency in its provision for loan losses when it was ***probable*** that a loss would be incurred and that loss was reasonably ***estimable***.   Further, even if there was at least a reasonable possibility that a loss would be incurred, but one or both of the two conditions of FAS 5 was not met (*i.e.*, if it was not ***probable*** that the loan has been impaired and/or the amount of such impairment was not reasonably ***estimable***), or if the Company was exposed to losses in

38

excess of the amount already accrued, FAS 5 still required that First NBC make a disclosure about the loss contingency in the footnotes to its financial statements, which should have included the nature of the contingency and given an estimate of possible loss or range of loss, or stated that an estimate of loss could not be made.

85.    First NBC's allowance for loan losses ("ALL") was reported on its balance sheet as a reduction in assets and its provision for loan losses ("PLL") was reported as a charge against income.  The ALL was meant to reflect, at any point in time, the expected (*i.e.*, probable) and estimable losses in the Company's portfolio of loans and, therefore, to serve as a current estimate of those losses.  As the Company determined that loans were not recoverable and charged them off, the amount of those loans was removed from the balance sheet and absorbed by the ALL.  As such, the ALL needed to be sufficient at all times to cover probable and estimable losses.  In order to properly account for the worsening credit quality in the oil and gas industry, First NBC was required under GAAP to record periodic increases to the PLL to reflect its current estimate of probable credit losses.

86.    The PLL was not meant to correlate with loans that were charged off in the present quarter.  Rather, GAAP recognizes that lenders are able to identify signs of impairment well before a loan is actually charged off, whether through the bank's knowledge of the borrower's future cash flows, or through economic trends that are likely to negatively affect the borrower's ability to pay the loan in accordance with the terms of the loan, including declining values for the collateral, *e.g.*, oil reserves, underlying the loan.

87.     Thus, the governing accounting literature speaks to "accounting for a loss contingency" rather than the actual charge off of the loan.  Under GAAP, a provision for loan losses (*i.e.*, an increase of the ALL) is recorded as an expense, which reduces pre-tax earnings on a dollar-for-dollar basis.  However, a provision for loan losses is not an irreversible admission of a loss.  If a bank records a provision for losses that were probable at the time, but a change in circumstances render the loss unlikely and, as a result, the ALL is overstated, the bank will then record an increase in income.  Thus, adjustments to the ALL are directly linked to net income and a bank's earnings per share.  First NBC repeatedly represented that it accounted for its ALL for its loan portfolio in accordance with GAAP.

88.     In light of the critical importance of an allowance of loan losses to a lending institution's financial statements, on December 13, 2006, the FDIC and the Board of Governors of the Federal Reserve System, together with other banking regulators, jointly issued an *Interagency Policy Statement Allowance for Loan and Lease Losses*, which stated, in part, that:

> The ALLL [allowance for loan and lease losses] ***represents one of the most significant estimates in an institution's financial statements*** and regulatory reports.  ***Because of its significance, each institution has a responsibility for developing, maintaining, and documenting a comprehensive, systematic, and consistently applied process for determining the amounts of the ALLL and the provision for loan and lease losses (PLLL)***.  To fulfill this responsibility, ***each institution should ensure controls are in place to consistently determine the ALLL in accordance with GAAP***, the institution's stated policies and procedures, management's best judgment and relevant supervisory guidance.
>
> ***As of the end of each quarter, or more frequently if warranted, each institution must analyze the collectability of its loans and leases held for investment . . . and maintain an ALLL at a level that is appropriate and determined in accordance with GAAP.  An appropriate ALLL covers estimated credit losses on individually evaluated loans that are determined***

*to be impaired as well as estimated credit losses inherent in the remainder
of the loan and lease portfolio.*

### 3.      Nature and Effect of the Fraud

89.     Beginning in the second half of 2014, when oil prices began to plummet,
Defendants engaged in a concerted scheme to falsely portray First NBC as a company
with little exposure to the oil and gas industry in light of plummeting oil prices.
Defendants did this, in part, by making what investors now know were materially false
and misleading statements in the Company's filings with the SEC, in the Company's
annual letter to shareholders, and in conversations with investors and analysts that were
disseminated into the market.  In addition to these materially false and misleading
statements, and in order to further mislead investors, defendants violated GAAP by
failing to record any loss contingency related to First NBC's exposure to falling oil prices
or related specifically to a large loan made by First NBC to an oil exploration and
production company, even though such contingent losses were probable and estimable,
and by failing to make any disclosure in the footnotes to its financial statements about
potential losses in its oil and gas credits due to falling oil prices or due to this large loan.

90.     As oil prices began their precipitous decline in the second half of 2014,
Defendants continually sought to reassure investors that First NBC had little or no
exposure to those declines.  Specifically, in SEC filings through the second half of 2014,
including in First NBC's press releases announcing the Company's financial results for
the second and third quarters of 2014, Defendants assured investors that "economic
market conditions in the New Orleans trade area" remained "favorable" despite declining
oil prices.  And beginning with its press release on January 30, 2015, First NBC
represented to investors that the Company was *"actively monitoring"* its oil and gas

credits. The Company would continue to make similar representations in SEC filings announcing First NBC's financial results and in meetings with investors throughout 2015.

91. Further reinforcing Defendants' explicit assertions that First NBC had little to no exposure to falling oil and gas prices, the Company included the following statement with respect to its oil and gas exposure in its 2014 Form 10-K filed with the SEC on March 31, 2015:

> Commercial loans represent the second largest category of loans in the portfolio. The Company attributes its commercial loan growth during the year in part to the growth in its oil and gas portfolio, specifically with respect to oil and gas service companies. The oil and gas portfolio comprises approximately 3% of the Company's total loan portfolio. ***Management is actively monitoring these credits and believes that the recent downturn in oil prices should not have a near term impact on its oil and gas portfolio, which is primarily to oil and gas service companies***.

And in Defendant Ryan's annual shareholder letter that was included First NBC's 2014 Annual Report, Defendant Ryan specifically addressed investor concern over falling oil prices and any risk to the Company, stating:

> ***[t]here has been a lot of investor concern related to the oil price pullback and its impact on the New Orleans economy and on First NBC Bank.*** Although New Orleans sits above the center of oil and gas activity in Louisiana, South Louisiana has very little direct exposure to that industry. Prior to the last oil crisis which peaked in 1986, New Orleans had thousands of white collar jobs in the city in the regional headquarters of the large oil companies and in the headquarters of major oil field service businesses. Almost all of these left the area after the oil crash in 1986. South Louisiana is the center of the Gulf of Mexico service industry and the jumping off point for labor and supplies for the shallow and deep water exploration and production in the Gulf and is being affected by the oil price pullback. How significant this impact will be depends on the depth and duration of the pullback. ***First NBC has very limited exposure (3% of its loan portfolio) to the oil and oil service industries. Moreover, the New Orleans economy has very low exposure to the oil industry, especially given the strong prospects for its primary economic drivers.***

42

92.     During the same period that Defendants were making these reassurances about First NBC's exposure to falling oil prices, they also sought to conceal from investors the true nature of a large loan First NBC made to an oil exploration and production company that would become much larger over the course of 2015 and would eventually total $90.2 million.   As set forth below, and unbeknownst to investors throughout 2015, the oil well supporting repayment of this loan had been completely offline since a pipeline break on December 29, 2014, and First NBC was lending the borrower additional money to drill a new well throughout 2015, all the while failing to reserve against or disclose the possibility of any loss related to the loan.

93.     Throughout 2015, Defendants also issued what investors would learn later were blatantly false and misleading statements concerning the growth of its commercial loan portfolio, its outstanding loan commitments, and the nature of the large loan to the oil exploration and production company.   Specifically, in its January 30, 2015 press release, First NBC stated that "[t]he oil and gas commercial loan portfolio is approximately 3% of the Company's total loan portfolio.   The Company has outstanding loan commitments related to the oil and gas portfolio of approximately $15.1 million as of December 31, 2014."   Defendants, however, failed to disclose the exploration and production loan or any details concerning the loan, including the pipeline break that occurred more than a month before the press release was issued.

94.     Defendants would not mention the loan at all until nearly eight months after the pipeline break, and even then would only make bland and patently misleading disclosures about the status of the loan.   Specifically, in the Company's Form 10-Q for the second quarter of 2015 filed with the SEC on August 17, 2015, First NBC disclosed

that the Company's exposure to exploration and production in its oil and gas portfolio had reached $61.2 million with outstanding commitments of $3.0 million. Defendants falsely asserted that the loan was ***"affected by the fluctuations in energy commodity prices and the level of production from its shallow-water well."*** Defendants did not mention the pipeline break, or that the significant growth in its oil and gas exploration portfolio was due to the fact that the Company was extending additional credit to the borrower for completion of a second well. First NBC also stated that it expected that production would ***"resume in the near future."*** Similarly false and misleading statements were made in First NBC's third quarter 2015 Form 10-Q, filed with the SEC on November 9, 2015.

95.    As more fully described below, First NBC's disclosures beginning in February 2016, more than a year and a half after oil prices began their plunge and fourteen months after the pipeline break, revealed that defendants' prior assertions concerning the Company's risk of exposure to the oil and gas industry were materially false and misleading when made and that defendants had violated GAAP in failing to properly reserve for that exposure.

96.    In a series of disclosures throughout 2016, First NBC finally admitted it had substantial exposure to the oil and gas industry, including to falling oil and gas prices and the large oil and gas exploration loan that had ballooned to a total of $90.2 million. Ultimately, First NBC acknowledged that an $11 million reserve was necessary to account for the substantial decline in oil and gas prices and that a ***$30.0 million reserve, or 40.0% of its total allowance for loan losses,*** was necessary to account for the status of the large loan to the oil exploration and production exploration company.

44

First NBC would also reveal a host of material weaknesses in its internal control over financial reporting, including material weaknesses that specifically impacted the Company's ALL methodology.

97.    In stark contrast to defendants' prior disclosures playing down the oil and gas industry's impact on the Company, First NBC stated in its 2015 Form 10-K that "while the economy in New Orleans metropolitan area is more diversified than in the 1980's, the energy sector continues to play an important role" and the bank's borrowers in this industry "can be significantly impacted by volatility in oil and gas prices, as well as material declines in the level of drilling and production activity in Louisiana."

**C.    Fraudulent Accounting for Short-Term Receivables Purchased From an Ethanol Company on the Receivables Exchange**

98.    Throughout the Class Period, the Company made significant investments in short-term receivables on The Receivables Exchange.   But while the Company significantly increased its investments in these short-term receivables, the First NBC and the Executive Defendants failed to disclose the risk of loss from such investments to the Company's investors and, instead, repeatedly reassured investors that First NBC's investments on The Receivables Exchange were safe because of, among other things, repurchase agreements First NBC had with the seller of the receivables.   In late-2015, First NBC ran into problems collecting on a receivables contract from an ethanol company totaling $69.9 million.   On February 1, 2016, First NBC issued unaudited financial results for the fourth quarter and full year 2015.   Although the Company's press release mentioned that $39.7 million of the balance was past due, the financial results released by the Company violated GAAP because, among other reasons, they failed to record any loss contingency related to this receivables contract, even though such a

45

contingency was probable and estimable. Indeed, First NBC's press release and a subsequent February 11, 2016 Form 8-K were blatantly false and misleading because they failed to disclose key facts about the financial viability of the receivables' obligor.

99.    In its 2013 Form 10-K, filed on March 31, 2014, the Company revealed that it had "increased its investment in short-term receivables to $246.8 million compared to $81.0 million as of December 31, 2012." The $246.8 million in short-term receivable investments represented approximately 7.5% of the Company's total assets as of December 31, 2013. The 2013 Form 10-K provided the following details about the Company investments in short-term receivables: "The Company invests in short-term receivables which are purchased on an exchange. These short-term receivables have repayment terms of less than a year. The investments are recorded on the consolidated balance sheets at cost plus accreted discount."

100.    The 2013 Form 10-K further explained that, in addition to having payment terms of less than one year, the short-term receivable investments also benefit the Company because they provide a high short-term return:

> The Company invests in short-term trade receivables. These receivables are traded on an exchange and are covered by a repurchase agreement of the seller of the receivables, if not paid within a specified period of time. ***The Company invests in these receivables since they provide a higher short-term return for the Company.*** The Company had $246.8 million invested in short-term receivables at December 31, 2013, an increase of $165.8 million over the prior year.

101.    The Company would make similar disclosures about these short-term receivables investments throughout 2014 and 2015, with the Company's total investment in such receivables falling in a range of $236.6 million to $252.5 million. In its third quarter 2015 Form 10-Q, filed on November 9, 2015, however, First NBC reported that it had $182.9 million invested in short-term receivables as of September 30, 2015. By this

time, unbeknownst and concealed by the First NBC Defendants from investors, more than $69 million of First NBC's total of $182.9 million was invested in a problematic receivables contract from an ethanol company purchased on The Receivables Exchange. In the Form 10-Q, however, the First NBC Defendants gave no explanation for why the Company's total investments in short-term receivables had dropped significantly from the prior quarter, and continued to assert that these investments provided a "higher short-term return for the Company."

102.    On February 1, 2016, First NBC issued a press release disclosing its fourth-quarter 2015 and fiscal-year 2015 financial results.  That press release disclosed that First NBC had unexpectedly decreased its investments in short-term receivables, which the First NBC Defendants misleadingly attributed to a "strategic decision to increase [First NBC's] liquidity and capital position":

> At December 31, 2015, the Company's investment in short-term receivables was $95.5 million, **a decrease of $84.0 million from September 30, 2015 and $141.6 million from December 31, 2014. The decrease in investment in short-term receivables was primarily due to the Company's strategic decision to increase its liquidity and capital position.**

103.    The February 1, 2016 disclosure also explained that a large portion of the Company's investments in short-term receivables was due from a U.S. ethanol company:

> Included in the Company's investment in short-term receivables was $69.0 million due from a U.S. company that produces ethanol for blending in gasoline.  As of December 31, 2015, $15.0 million of that balance was past due, with an additional $24.7 million past due as of the date of this release. In addition to the Company's rights against the obligor on the receivables, the Company and the receivables seller are parties to an agreement providing for certain repurchase obligations by the receivables seller with respect to past due receivables.  At this time, based on its analysis of the financial capabilities of the obligor and the receivables seller and after consultation with independent counsel, management does not expect that the Company will incur any loss on its investment in its investment in short-term receivables related to the past due receivables.

At that time, the $69 million investment in short-term receivables due from the ethanol company represented over 72% of First NBC's total short-term receivables investments.

104. On February 11, 2016, First NBC filed a Form 8-K with the SEC providing supplemental information in response to inquiries the Company had received from investors and analysts concerning the Company's February 1, 2016 disclosures. Using a "question and answer" format, the Company provided additional details about, among other things, its short-term receivables investments, revealing that the ethanol company that owed First NBC $69.0 million was having financial difficulties. The First NBC Defendants nevertheless asserted that First NBC did not expect to suffer any losses on the Company's investment:

> **Give us more information regarding the investment in short-term receivables related to the ethanol company. Is this another example of oil and gas exposure in the Company's asset portfolio?**
>
> The receivables from the ethanol company were purchased through The Receivables Exchange, a national exchange established to allow vendors to sell their customers' receivables to third party investors. Under the terms of the exchange contracts, the seller of the receivable is contractually committed to repurchase the receivable back from the seller if payment is not made by a specified repurchase date, subject to certain exceptions. ***Thus, the Company, as receivable purchaser, has two potential sources of repayment, the original issuer of the receivables (the ethanol company) or the seller and can choose to pursue either or both.***
>
> The failure of the ethanol company to pay the invoices when due was the result of the financial difficulties of its parent, a Spanish "green" energy company with worldwide operations focused on expanding the use of solar power. This crisis caused U.S. suppliers of grain to the ethanol plants owned by the U.S. subsidiaries of the Spanish company to freeze credit to the ethanol plants for corn purchases, resulting in a shutdown 4 of the 6 ethanol plants owned by the U.S. subsidiaries of the Spanish company. Based on the Company's assessment of the strength of the ethanol industry and the historical earnings performance of the ethanol company and the receivables seller, ***the Company believes that both the ethanol company and the receivables seller are capable of repaying the full amount of the receivable balance over time.*** In addition, the parent corporation of the ethanol company is evaluating certain restructuring

48

options that would permit a more prompt repayment of the receivable. As a result of the foregoing, ***management does not expect that the Company will incur any loss on its investment in short-term receivables related to the past due receivables discussed above.*** Finally, the receivable issued by the ethanol company represents 95% of the currently outstanding balance in the Company's investment in short term receivables.

105.  The First NBC Defendants purposely did not reveal the name of the Spanish ethanol company or its subsidiary.  However, the company was Abengoa S.A., an engineering and clean technology company, which had recently filed for protection under Spanish insolvency laws and has a number of U.S. subsidiaries that also have filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code.

106.  Abengoa S.A.'s financial troubles were well-known by as early as August 2015.  On August 3, 2015, the price of Abengoa S.A's bonds and shares plummeted on news that the company was unable to reassure investors that it could stop burning cash. *Bloomberg* reported that there were serious liquidity concerns and that investors had lost confidence in Abengoa S.A.'s ability to generate sufficient cash to service its debt.

107.  On November 25, 2015, Abengoa S.A. announced its intention to seek protection under Article 5bis of Spanish insolvency law—a pre-insolvency statute that permits a company to enter into negotiations with certain creditors for restructuring of its financial affairs.  Then, on February 24, 2016, Abengoa Bioenergy U.S. Holding, LLC filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Missouri. The bankruptcy petition was filed on behalf of Abengoa Bioenergy U.S. Holding, LLC and five affiliated entities.

108.  Certain filings in these related bankruptcy cases confirm that Abengoa S.A. is the Spanish company referenced in First NBC's February 11, 2016 Form 8-K. First NBC filed a notice of appearance in the Abengoa Bioenergy U.S. Holding, LLC

bankruptcy case.   Moreover, a creditor identified as The Receivables Exchange, LLC, based in New Orleans, Louisiana, filed a proof of claim against one of the U.S. subsidiaries—Abengoa Bioenergy Company LLC.

109.   Considering that Abengoa S.A. and certain of its U.S. subsidiaries were in financial trouble and ultimately sought bankruptcy protection, it was probable that these entities would be unable to pay the full amount of the receivable balance.   Indeed, as discussed above, Abengoa S.A.'s financial troubles were well-known by as early as August 2015—more than seven months before the Company's February 11, 2016 disclosure. These liquidity concerns were confirmed when Abengoa S.A. filed for protection under Spanish insolvency laws on November 25, 2015.   Nevertheless, First NBC represented in the February 11, 2016 Form 8-K that it *"believes that both the ethanol company and the receivables seller are capable of repaying the full amount of the receivable balance over time"* and that *"management does not expect that the Company will incur any loss on its investment in short-term receivables related to the past due receivables discussed above."*   These statements were materially false and misleading because the Company knew at the time that Abengoa S.A. had sought protection under Spanish insolvency laws and that its U.S. subsidiaries were likely do the same under U.S. law.

110.   In addition, the representations of First NBC and the Executive Defendants that the Company performed reviews of sellers from which the Company purchased receivables were also false and misleading.  The Company ultimately revealed that this was false when it disclosed on August 25, 2016, in First NBC's 2015 Form 10-K, that it had identified a host of material weaknesses in its internal control over financial

reporting which impacted, among other things, the "monitoring of credit to borrowers and investments in short-term receivables."

111.    First NBC was required to recognize a loss contingency under FAS 5 for these short-term receivables once information became available indicating that it was probable that the receivables had become impaired and that the amount of loss could be reasonably estimated.  Rather than reserving for the estimated amount of receivable that could become uncollectable, the Company knowingly or recklessly assured investors that its investment in the short-term receivables was protected and issued unaudited 2015 financial results that failed to include any such reserve.  First NBC was subsequently forced to record a belated write down of its entire investment.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.    Defendants' Materially False and Misleading Statements Concerning and Stemming From First NBC's Tax Credit Investments

112.    First NBC admitted in its 2015 Form 10-K, filed with the SEC on August 25, 2016, that every financial statement the Company issued from even before it became a public company through the quarter ended September 30, 2015 – 11 consecutive SEC filings – was materially false and misleading, and needed to be restated.  Accordingly, until it issued its restatement, *each and every one of the Forms 10-K and 10-Q that the Company filed with the SEC, and each and every press release that the Company issued during the Class Period announcing its financial results, was materially false and misleading*.

113.    These false statements materially overstated, among other things, the Company's net income, accumulated earnings, EPS, total assets, total shareholders'

equity, and income available to common shareholders, and materially understated the expenses and/or impairment of its investments in tax credit entities. These financial metrics were fraudulently inflated through the Company's use of improper accounting practices related to the recognition of impairment for, and consolidation of, its investments in tax credit entities.[6] All of these material misstatements and omissions allowed the Company to falsely represent that it had a booming tax credit investment business with little downside when the truth was that the Company's ever-increasing concentration of tax credit investments were subjecting the Company to significant impairment charges that would have a drastic effect on First NBC's previously-reported growth, profitability, and capital position when finally revealed.

114.    First NBC issued these false and misleading financial statements in order to fraudulently inflate the Company's stock price. The scheme worked, as First NBC's stock price steadily increased from a price of $24 per share at the start of the Class Period to trade over $43 by the end of November 2015 – *a nearly 80% increase in the first 2 ½ years of the Class Period*.

---

[6] As set forth herein, First NBC also failed to disclose problems with a material investment in short-term receivables and affirmatively misrepresented the collectability of the investment when it finally did disclose the problems it was encountering, and issued materially false and misleading statements concerning its exposure to the oil and gas industry and its capital position.

1.      **False and Misleading Statements Concerning Fiscal Year 2013 and Prior Years**

115.    On November 9, 2012, First NBC filed a draft Form S-1 Registration Statement with the SEC for its IPO, which after comment from the SEC was followed by a Form S-1 Registration Statement filed with the SEC on April 8, 2013 and several amendments thereto (the "Registration Statement").   First NBC also filed a final Prospectus with the SEC on May 10, 2013 (together with the Registration Statement, the "IPO Offering Materials").   The Registration Statement was declared effective by the SEC on May 9, 2013.   Pursuant to the Registration Statement, First NBC sold 4,791,667 shares of its common stock to the public (including an overallotment option granted to the underwriters to purchase up to an additional 625,000 shares) at $24 per share.

116.    In the IPO Offering Materials, First NBC sold itself to investors as a rapidly growing bank dedicated to strong risk management that differentiated itself from its competitors because of its strong capital levels, experienced management team, and sound asset quality.   First NBC asserted that, "[a]s of December 31, 2012, on a consolidated basis, [it] had total assets of $2.7 billion, net loans of $1.9 billion, total deposits of $2.3 billion, and shareholders' equity of $248.1 million."   First NBC also stated that its annual net income had consistently increased in the five years leading up to its IPO, reporting $2.2 million in net income for 2008, $4.2 million for 2009, $10.1 million for 2010, $19.7 million for 2011, and $29.5 million for 2012.

117.    In addition to this impressive financial growth, First NBC maintained in its IPO Offering Materials that it had significant advantages over its competitors:

> Since the current economic crisis began in 2008, ***many of our competitors have suffered significant operating and regulatory challenges*** and, as a result, we believe, have been unable to effectively service their customers'

needs and compete in our market.  Throughout our operating history, ***we have maintained a stable banking platform with strong capital levels and sound asset quality***.  At December 31, 2012, we had a 7.15% tangible common equity ratio, a 9.04% tier 1 leverage capital ratio, a 11.26% tier 1 risk-based capital ratio and a 12.51% total risk-based capital ratio. Contributing to our stability is ***our track record of sound asset quality trends***.  Our highest annual rate of net loan charge-offs to average loans over the past five years was 0.19% in 2011, and our average annual rate of net loan charge-offs to average loans over the same period was 0.08%. Furthermore, utilizing the prior experience of our management team at larger banks, we believe that we have built a scalable corporate infrastructure, including technology and banking processes, capable of supporting acquisitions and continued growth while improving operational efficiencies.  ***We believe that our strong capital and asset quality levels will allow us to grow and that our operating platform will allow us to manage that growth effectively, resulting in greater efficiency and improved profitability.***

In fact, First NBC told investors that it believed that its ***"strong capital position [gave it] an instant advantage over [its] competitors***."

118.    With respect to risk mitigation, First NBC said in the IPO Offering Materials that it placed a significant emphasis on "risk mitigation as an integral component of [its] organizational culture."  This included a "focus on risk management in numerous … areas throughout our organization, including with respect to asset/liability management, regulatory compliance and internal controls."  First NBC noted that it was "implementing management assessment and testing of internal controls consistent with the Sarbanes-Oxley Act and ha[d] engaged an experienced independent public accounting firm to assist [it] with respect to compliance."

119.    With respect to its accounting for its low income housing and federal historical rehabilitation tax credits, First NBC represented that:

> the Company invests in a tax credit entity, usually a limited liability company, which owns the real estate.  The Company receives a 99.9% nonvoting interest in the entity that must be retained during the compliance period for the credits (15 years for Low-Income Housing

credits and 5 years for Historic credits).   In most cases, the Company's interest in the entity is generally reduced from a 99.9% interest to a 10% to 25% interest at the end of the compliance period.   Control of the tax credit entity rests in the 0.1% interest general partner, who has the power and authority to make decisions that impact economic performance of the project and is required to oversee and manage the project.  Due to the lack of any voting, economic, or managerial control, and due to the contractual reduction in its investment, the Company accounts for its investment by amortizing its investment, beginning at the issuance of the certificate of occupancy of the project, over the compliance period, as management believes any potential residual value in the real estate will have limited value.

The Company also stated that its investments in federal historic tax credit partnerships and low-income housing partnerships were evaluated for impairment at the end of each reporting period.  With respect to its accounting for variable interest entities, First NBC represented that the Company used "VIEs in various legal forms to conduct normal business activities" and that "the Company reviews the structure and activities of VIEs for possible consolidation."   First NBC also stated that "the Company also owns noncontrolling variable interests in certain limited partnerships for which it does not absorb a majority of expected losses or receive a majority of expected residual returns that are not included in the accompanying consolidated financial statements."

120.    First NBC further represented that its "consolidated financial statements [were] prepared in accordance with accounting principles generally accepted in the United States and with general practices within the financial services industry."

121.    In the IPO Offering Materials, First NBC also disclosed that, after the issuance on April 30, 2012 of its audited financial statements for the year ended December 31, 2011, the Company determined that it was required to restate its previously issued 2011, 2010, and 2009 audited financial statements.   First NBC said "[t]he restatement was necessary to properly allocate among the appropriate periods an amount

related to [its] deferred income taxes that was originally recorded and presented only as part of [its] 2011 results of operations." Further, First NBC "determined that the errors that required the restatement were caused by a lack of a sufficient number of accounting employees with the appropriate technical skills and knowledge regarding the income tax accounting for [its] tax credit investments" and "concluded that this was a material weakness in [its] internal control that related to the accounting for the deferred tax aspects of certain of [its] investments in the entities that generate the tax credits."

122.   Importantly, however, First NBC *assured investors that it had addressed the material weakness*, saying that it had taken "the appropriate actions to address the weakness, including hiring additional accounting personnel, providing training to our personnel to develop the expertise in tax credits, using outside accountants and consultants to supplement our internal staff when necessary, and implementing additional internal control procedures." To further assure investors that the issues had been addressed and would not recur, *First NBC said that its board of directors, in coordination with its audit committee, would "continually assess the progress and sufficiency of these initiatives and make adjustments, as necessary."*

123.   On May 15, 2013 and June 6, 2013, First NBC issued press releases regarding its IPO, each stating in part that the Company "had assets of approximately $2.8 billion as of March 31, 2013."

124.   On June 24, 2013, First NBC filed with the SEC its Form 10-Q for the first quarter of 2013, the period ending March 31, 2013. The First Quarter 2013 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Ryan and Verdigets. In the First Quarter 2013 10-Q, First NBC represented that it had

net income of over $8.2 million, an increase of over $1.8 million compared to first quarter 2012, that "[d]iluted earnings per share for the first quarter of 2013 were $0.58, an increase of $0.14, or 31.8%, compared to first quarter of 2012," and that "[s]hareholders' equity increased $7.8 million, or 3.2%, to $255.9 million at March 31, 2013" which was "primarily the result of $8.2 million in net income for the first quarter of 2013." First NBC also reported "[t]otal assets at March 31, 2013 were $2.8 billion, up $123.9 million, or 4.6%, from December 31, 2012," and said the increase "was primarily a result of increases in total investments of $78.2 million and loans of $64.6 million."

125. As it related to the Company's investments in tax credit entities, First NBC stated that it "engages in material investments in entities that are designed to generate tax credits" and that these investments rose to nearly $66.7 million as of March 31, 2013. Specifically with respect to the Company's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, First NBC represented that, based on the structure of these transactions, the Company would recover its investments solely through use of the tax credits that were expected to be generated by the investments and that these amounts would be amortized on a straight-line basis over the period during which the Company retained, or maintained, its 99.9% interest in the property. The Company did not disclose or discuss any impairment with respect to its investments in tax credit entities.

126. First NBC further asserted that its financial results for the first quarter of 2013 were prepared in accordance with GAAP and that an "evaluation of the effectiveness of the Company's disclosure controls and procedures as of March 31, 2013 was carried out under the supervision, and with the participation of, [Defendants Ryan

and Verdigets]."  Based on that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the [Exchange Act]."  Defendants further represented that there was "no significant change in the Company's internal controls over financial reporting."[7]

127.  On July 30, 2013, First NBC issued a press release announcing the Company's financial results for the second quarter of 2013.  For the quarter, the Company reported net income of $8.6 million and diluted EPS of $0.48.  The Company also prominently touted its growth, stating that "[t]he Company continued its historically strong growth with assets at June 30, 2013 of $3.0 billion, compared to $2.4 billion as of June 30, 2012 an increase of $598 million, or 25%."  Further, "[w]ith the proceeds from the initial public offering, shareholders' equity at June 30, 2013 reached $363 million as compared to the prior year June 30, 2012 of $236 million, an increase of 54%."

128.  On July 31, 2013, First NBC filed with the SEC a Form 8-K announcing that Defendant Ryan would make a presentation to investors at the Fourteenth Annual Community Bank Investor Conference sponsored by Keefe, Bruyette & Woods, Inc., an underwriter for First NBC's IPO, to be held July 30 and July 31, 2013 in New York City. First NBC's Form 8-K attached the slides used in Defendant Ryan's presentation, which

---

[7] Defendants Ryan and Verdigets also executed SOX certifications attesting that, among other things, (1) they had reviewed First NBC's quarterly report on Form 10-Q; (2) the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; (3) the financial statements, and other financial information included in the report, fairly presented in all material respects the financial condition, results of operations and cash flows of First NBC; and (4) each Defendant had designed and evaluated the effectiveness of the Company's disclosure controls and procedures, including disclosing any change in First NBC's internal control over financial reporting.

painted a picture of consistent historical growth and increasing profitability at First NBC and heavily promoted and stressed the importance to investors of the Company's use and reliance on tax credits, calling the Company's tax credit business a *"unique feature"* with *"[s]trong financial returns"* that was *"an integral part of First NBC's commercial banking business"* and *"core to First NBC's corporate strategy."* The presentation also represented to investors that First NBC's management had a special expertise and aptitude for these tax credit investments, stating unequivocally that *"[m]anagement has a deep understanding of this business."*

129.   On August 14, 2013, First NBC filed with the SEC its Form 10-Q for the second quarter of 2013, the period ending June 30, 2013. The Second Quarter 2013 10-Q substantially reiterated the false information announced in First NBC's prior press release and was signed and certified under SOX by Defendants Ryan and Verdigets.

130.   As it related to its investments in tax credit entities, First NBC disclosed that these investments rose to over $79.3 million as of June 30, 2013 and stated that "[t]he Company has made and will continue to make material investments in tax credit-motivated projects," in part because First NBC management believed that "these investments present attractive after tax economic returns…." Specifically addressing the Company's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, First NBC represented that, based on the structure of these transactions, the Company would recover its investments solely through use of the tax credits that were expected to be generated by the investments and that these amounts would be amortized on a straight-line basis over the period during which the Company

retained, or maintained, its 99.9% interest in the property.  The Company did not disclose or discuss any impairment with respect to its investments in tax credit entities.

131.    First NBC further asserted that its financial results for the second quarter of 2013 were prepared in accordance with GAAP and that an "evaluation of the effectiveness of the Company's disclosure controls and procedures as of June 30, 2013 was carried out under the supervision, and with the participation of, [Defendants Ryan and Verdigets]."  Based on that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the [Exchange Act]."  Defendants further represented that there was "no significant change in the Company's internal controls over financial reporting."    Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

132.    On November 7, 2013, after the market closed, First NBC issued a press release announcing the Company's financial results for the third quarter of 2013.  For the quarter, the Company reported net income of over $10.4 million, an increase of more than $2 million over the same quarter in 2012.  Diluted EPS for the quarter was $0.54.  First NBC again prominently touted its growth, stating that "[t]he Company continues to experience strong asset growth, with total assets of $3.2 billion at September 30, 2013, an increase of 4.4% from June 30, 2013 and 25.6% from September 30, 2012."  First NBC also disclosed that "[s]hareholders' equity totaled $368.8 million at September 30, 2013, an increase of $120.7 million from year-end 2012" which was "primarily attributable to

the results of the Company's initial public offering and retained earnings over the period."

133.   The Company's financial results had a direct impact on the price of First NBC's stock.   In the first trading session after the announcement, First NBC stock *increased nearly 9%* from a close of $26.28 on November 7, 2013 to a close of $28.60 on November 8, 2013.

134.   On November 14, 2013, First NBC filed with the SEC its Form 10-Q for the third quarter of 2013, the period ending September 30, 2013.  The Third Quarter 2013 10-Q substantially reiterated the false information announced in First NBC's prior press release and was signed and certified under SOX by Defendants Ryan and Verdigets.

135.   As it related to its investments in tax credit entities, First NBC disclosed that these investments rose to over $85.9 million as of September 30, 2013, an increase of $18.5 million or 27.4% compared to December 31, 2012, and stated that "[t]he Company has made and will continue to make material investments in tax credit-motivated projects," in part because First NBC management believed that "these investments present attractive after tax economic returns…."  Specifically addressing the Company's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, First NBC represented that, based on the structure of these transactions, the Company would recover its investments solely through use of the tax credits that were expected to be generated by the investments and that these amounts would be amortized on a straight-line basis over the period during which the Company retained, or was required to maintain, its 99.9% interest in the property.  The Company

did not disclose or discuss any impairment with respect to its investments in tax credit entities.

136.   First NBC further asserted that its financial results for the third quarter of 2013 were prepared in accordance with GAAP and that an "evaluation of the effectiveness of the Company's disclosure controls and procedures as of September 30, 2013 was carried out under the supervision, and with the participation of, [Defendants Ryan and Verdigets]."   Based on that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the [Exchange Act]."   Defendants further represented that there was "no significant change in the Company's internal controls over financial reporting."   Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

137.   Later the same day, First NBC filed with the SEC a Form 8-K announcing that Defendant Ryan would make a presentation to investors at the 2013 East Coast Financial Services Conference sponsored by Sandler O'Neill Partners, L.P., an underwriter for First NBC's IPO, to be held November 14, 2013 in Naples, Florida.  First NBC's Form 8-K attached the slides used in Defendant Ryan's presentation, which painted a picture of consistent historical growth and increasing profitability at First NBC and heavily promoted and stressed the importance to investors of the Company's use and reliance on tax credits, calling the Company's tax credit business a *"unique feature"* with *"[s]trong financial returns"* that was *"an integral part of First NBC's commercial banking business"* and *"core to First NBC's corporate strategy."*  The presentation also

represented to investors that First NBC's management had a special expertise and aptitude for these tax credit investments, stating unequivocally that *"[m]anagement has a deep understanding of this business."*

138.   On February 11, 2014, First NBC issued a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2013. For the quarter, the Company reported net income of $13.5 million, an increase of more than $8.4 million over the same quarter in 2012, and diluted EPS of $0.69.  Net income for 2013 was reported as $40.9 million, with diluted EPS of $2.32.  First NBC again prominently touted its growth, stating that "[t]he Company continues to experience strong asset growth, with total assets of $3.3 billion at December 31, 2013, an increase of 4.0% from September 30, 2013 and 23.1% from December 31, 2012."  First NBC also disclosed that "[s]hareholders' equity totaled $381.9 million at December 31, 2013, an increase of $133.8 million from year-end 2012" which was "primarily attributable to the results of the Company's initial public offering and retained earnings over the period."

139.   Two days later, on February 13, 2014, First NBC filed with the SEC a Form 8-K announcing that Defendant Ryan and Defendant Verdigets would make a presentation to investors at the 2014 Financial Institutions Investor Conference sponsored by Sterne Agee, an underwriter for First NBC's IPO, to be held February 13-14, 2014 in Boca Raton, Florida.  First NBC's Form 8-K attached the slides used in the presentation made by Defendants Ryan and Verdigets, which painted a picture of consistent historical growth and increasing profitability at First NBC and heavily promoted and stressed the importance to investors of the Company's use and reliance on tax credits, calling the Company's tax credit business a *"unique feature"* with *"[s]trong financial returns"* that

was **"an integral part of First NBC's commercial banking business"** and **"core to First NBC's corporate strategy."**  The presentation also represented to investors that First NBC's management had a special expertise and aptitude for these tax credit investments, stating unequivocally that **"[m]anagement has a deep understanding of this business."**

140.  On March 31, 2014, First NBC filed its Form 10-K for the year-ended December 31, 2013 (the "2013 10-K").  The 2013 10-K substantially reiterated the false information announced in First NBC's prior press release and was signed and certified under SOX by Defendants Ryan and Verdigets.

141.  As it related to its investments in tax credit entities, First NBC stated that these investments rose to $117.7 million as of December 31, 2013, an increase of $31.8 million or 37% compared to September 30, 2013, and an increase of $50.3 million or nearly 75% compared to December 31, 2012.  First NBC stated that "[t]he Company has made and will continue to make material investments in tax credit-motivated projects," in part because First NBC management believed that "these investments present attractive after tax economic returns…."  Specifically addressing its accounting related to low-income housing and federal historic rehabilitation tax credits, First NBC represented that the Company would recover its investments solely through use of the tax credits that were expected to be generated by the investments and that these amounts would be amortized on a straight-line basis over the period during which the Company retained, or maintained, its 99.9% interest in the property.  The Company also stated that its investments in federal historic tax credit partnerships and low-income housing partnerships were evaluated for impairment at the end of each reporting period, but did not disclose any impairment with respect to its investments in tax credit entities.

142.   With respect to its accounting for variable interest entities, First NBC represented that the Company used "VIEs in various legal forms to conduct normal business activities" and that "the Company reviews the structure and activities of VIEs for possible consolidation."   First NBC also stated that "[n]oncontrolling variable interests in certain limited partnerships for which [First NBC] does not absorb a majority of expected losses or receive a majority of expected residual returns…are not included in the accompanying consolidated financial statements."

143.   First NBC reiterated, with respect to the material weakness in internal controls that it discovered in 2012, that it had taken appropriate steps to address the weakness.  Further, the Company asserted that its financial results for the fourth quarter and year ended December 31, 2013 were prepared in accordance with GAAP and that "[A]s of the end of the period covered by this Annual Report on Form 10-K, the Company carried out an evaluation under the supervision and with the participation of its management, including [Defendants Ryan and Verdigets], of the effectiveness of the design and operation of the Company's disclosure controls and procedures…."  Based upon that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures were effective."  Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

144.   On the same day as it filed its 2013 Form 10-K, First NBC also released an annual report to shareholders titled "First NBC Bank Holding Company 2013 Annual Report, Success on the River."  In a letter to the shareholders, Defendant Ryan stated that "[a]s a result of the favorable climate for growth, First NBC had grown to $3.3 billion in assets as of December 31, 2013 and reported net income for that year of $40.9 million."

Defendant Ryan also highlighted First NBC's record reported earnings and bullish outlook for the future, stating:

> First NBC had an excellent year in 2013. Total assets grew 23.1% to $3.3 billion. Loans increased 22.7% to $2.32 billion. Net income available to common shareholders for the year was $40.6 million, an increase of 43% over that of 2012. Earnings per share, on a fully diluted basis, was $2.32, an increase of 15% over that of 2012, despite the issuance of 4,792,000 new shares in the company's May 2013 initial public offering. Fourth quarter earnings per share on a fully diluted basis were $0.69 per share, the highest quarterly amount in our history.
>
> Overall, the outlook for a continuation of our success appears to be strong with an excellent economic environment in its trade area and a favorable competitive positioning resulting from its adopted strategy of high quality, relationship banking carried out by bankers with long-term relationships with their customers.

145.    Each of the press releases and SEC filings referenced in ¶¶ 116-144 above, and the financial results provided therein, were materially false and misleading when issued because, as described above, First NBC's reported financial results violated GAAP and materially overstated, among other things, reported net income, accumulated earnings, EPS, shareholders' equity and total assets, and materially understated impairment on its tax credit investments in violation of GAAP.

146.    As First NBC admitted in its 2015 Form 10-K filed on August 25, 2016, First NBC's Class Period financial results were materially misstated in violation of GAAP as a result of, among other things, (1) the use of an improper amortized cost method in accounting for the Company's various investments in tax credit partnerships, rather than proper application of the equity method of accounting under GAAP, which also allowed First NBC to avoid recognition of both impairments to those investments and its proportionate share of the losses of the investees; and (2) First NBC's failure to properly consolidate certain investments in federal low income tax credit entities that

were determined to be variable interest entities in which First NBC was the primary beneficiary and thus should have properly been consolidated under GAAP. Defendants employed these manipulative accounting techniques to make the Company's operations and financial condition appear substantially better than they were.

147.   In fact, for fiscal year 2013, First NBC admitted in its 2015 Form 10-K that, primarily due its failure to properly consolidate its VIEs and recognize significant impairment related to its investments in tax credit entities in violation of GAAP, the Company, among other things, (1) materially overstated net income by nearly 22%, reporting $40.9 million when it was only $33.6 million; (2) materially overstated its accumulated earnings by 20%, reporting $100.4 million when it was only $83.6 million; (3) materially overstated its diluted EPS by 24%, reporting $2.32 per share when it was only $1.87 per share; and (4) materially understated the impairment in its investments in tax credit entities, for which it should have recorded $13.1 million of impairment.

148.   Additionally, from the beginning of the Class Period through the restatement, Defendants' statements concerning First NBC's internal controls were materially false and misleading and omitted material information because, at all relevant times, First NBC had material weaknesses in its internal control over financial reporting. Pertinent to the tax credit entities, First NBC admitted in its 2015 Form 10-K that its internal controls over financial reporting were not effective as of December 31, 2015 due to material weaknesses with respect to (1) First NBC's control environment and risk assessment; (2) the lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax related entities and the related evaluation of

67

impairment associated with those investments; (3) the lack of accounting personnel with the technical expertise and knowledge to properly identify certain investments in real estate entities made by the Company and evaluate them under GAAP to determine if the investment qualified as a variable interest entity and whether consolidation was necessary; and (4) the preparation and review of journal entries. As such, all of Defendants' statements concerning First NBC's internal controls in the SEC filings referenced in ¶¶ 116-122; 124-126; 129-131; 134-136; and 140-143 above, including each of the SOX certifications made by Defendants Ryan and Verdigets, were materially false and misleading when issued.

149. First NBC's materially false and misleading misstatements and omissions concerning the accounting for its investments in tax credit entities and its internal controls had a dramatic impact on the price of First NBC's shares, *which increased nearly 40% during the year, from $24 at the start of the Class Period to $33.57 on February 12, 2014, the day after First NBC announced its financial results for fiscal 2013.*

### 2. False and Misleading Statements Concerning Fiscal Year 2014

150. During 2014, First NBC continued to report strong financial results and growth. In each of its press releases, Forms 10-Q and Form 10-K, First NBC falsely boasted increasing net income over prior year periods, as well as increasing total assets and shareholders' equity. *As was ultimately revealed, however, the only way that First NBC was able to achieve such impressive results for 2014 was through, among other things, manipulative accounting practices which were designed to, and did, materially overstate the Company's net income, accumulated earnings, EPS, total assets, total*

68

*shareholders' equity, and income available to common shareholders, all while materially understating the impairment of its investments in tax credit entities.*

151.   On May 1, 2014, First NBC issued a press release announcing the Company's financial results for the first quarter of 2014.  For the quarter, the Company reported net income of $12.8 million, an increase of more than $4.5 million or nearly 55% over the same quarter in 2013.  Diluted EPS for the quarter was $0.66.  First NBC again prominently touted its growth, stating that "[t]he Company continues to experience strong asset growth, with total assets of $3.5 billion at March 31, 2014, an increase of 6.0% from December 31, 2013 and 24.6% from March 31, 2013."   First NBC also represented that "[s]hareholders' equity totaled $395.4 million at March 31, 2014, an increase of $13.5 million from December 31, 2013" which was "primarily attributable to the Company's retained earnings over the period."

152.   On May 13, 2014, First NBC filed with the SEC a Form 8-K announcing that Defendant Ryan would make a presentation to investors at the 2014 Gulf South Bank Conference to be held Tuesday, May 13, 2014.  First NBC's Form 8-K attached the slides used in Defendant Ryan's presentation, which painted a picture of consistent historical growth and increasing profitability and earnings at First NBC and heavily promoted and stressed the importance of the Company's use and reliance on tax credits to investors, crediting the Company's tax credit business with providing "[s]trong financial returns" and calling it *"an integral part of First NBC's commercial banking business"* and *"core to First NBC's [corporate strategy]."*  The presentation also represented to investors that First NBC's management had a special expertise and aptitude for these tax credit

69

investments, stating unequivocally that *"[m]anagement has a deep understanding of this business."*

153.   On May 15, 2014, First NBC filed with the SEC its Form 10-Q for the first quarter of 2014, the period ending March 31, 2014.  The First Quarter 2014 10-Q substantially reiterated the false information announced in First NBC's prior press release and was signed and certified under SOX by Defendants Ryan and Verdigets.

154.   As it related to its investments in tax credit entities, First NBC disclosed that these investments rose to nearly $121.4 million as of March 31, 2014, an increase of $3.7 million over the prior quarter, and stated that "[t]he Company has made and will continue to make material investments in tax credit-motivated projects," in part because First NBC management believed that "these investments present attractive after tax economic returns…."   Specifically addressing the Company's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, First NBC represented that, based on the structure of these transactions, the Company would recover its investments solely through use of the tax credits that were expected to be generated by the investments and that these amounts would be amortized on a straight-line basis over the period during which the Company retained, or maintained, its 99.9% interest in the property.  The Company did not disclose or discuss any impairment with respect to its investments in tax credit entities.

155.   First NBC further asserted that its financial results for the first quarter of 2014 were prepared in accordance with GAAP and that an "evaluation of the effectiveness of the Company's disclosure controls and procedures as of March 31, 2014 was carried out under the supervision, and with the participation of, [Defendants Ryan

and Verdigets]."  Based on that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the [Exchange Act]."  Defendants further represented that "there have not been any change [sic] in the Company's internal controls over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

156.   On May 22, 2014, First NBC filed with the SEC a Form 8-K attaching as an exhibit a slide presentation used in connection with First NBC's annual shareholders' meeting held on May 22, 2014.  The presentation reiterated the Company's financial results for the first quarter of 2014, and also included a slide summarizing First NBC's 2013 accomplishments in which the Company listed "[a]ssets of $3.3 billion," "[n]et [i]ncome of $40.9 million," "[a]sset [g]rowth of 23.1%," "[p]rofit [g]rowth of 38.9%," and "[b]asic [e]arnings per [s]hare [g]rowth of 16.7%."  Other slides painted a picture of consistent historical increases in both total assets and net income at First NBC from as early as 2006 through 2013.

157.   On July 28, 2014, First NBC issued a press release announcing the Company's financial results for the second quarter of 2014.  For the quarter, the Company reported net income of $12.7 million, an increase of more than $4 million or 47% over the same quarter in 2013.  Diluted EPS for the quarter was $0.65.  First NBC again prominently touted its growth, stating that "[t]he Company continues to experience

strong asset growth, with total assets of $3.6 billion at June 30, 2014, an increase of 8.6% from December 31, 2013 and 17.9% from June 30, 2013." First NBC also stated that "[s]hareholders' equity totaled $409.2 million at June 30, 2014, an increase of $13.8 million from March 31, 2014" which was "primarily attributable to the Company's retained earnings over the period."

158.   On July 29, 2014, First NBC filed with the SEC a Form 8-K announcing that Defendant Ryan would make a presentation to investors at the KBW Fifteenth Annual Community Bank Investor Conference to be held Tuesday, July 29, 2014. First NBC's Form 8-K attached the slides used in Defendant Ryan's presentation, which painted a picture of consistent historical growth and increasing profitability and earnings at First NBC and heavily promoted and stressed the importance of the Company's use and reliance on tax credits to investors, crediting the Company's tax credit business with providing *"[s]trong financial returns"* and calling it *"an integral part of First NBC's commercial banking business"* and *"core to First NBC's corporate strategy."* The presentation also represented to investors that First NBC's management had a special expertise and aptitude for these tax credit investments, stating unequivocally that *"[m]anagement has a deep understanding of this business."*

159.   On August 14, 2014, First NBC filed with the SEC its Form 10-Q for the second quarter of 2014, the period ending June 30, 2014. The Second Quarter 2014 10-Q substantially reiterated the false information announced in First NBC's prior press release and was signed and certified under SOX by Defendants Ryan and Verdigets.

160.   As it related to its investments in tax credit entities, First NBC disclosed that these investments stood at nearly $112 million as of June 30, 2014, and stated that

72

"[t]he Company has made and will continue to make material investments in tax credit-motivated projects." Specifically addressing the Company's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, First NBC represented that, based on the structure of these transactions, the Company would recover its investments solely through use of the tax credits that were expected to be generated by the investments and that these amounts would be amortized on a straight-line basis over the period during which the Company retained, or maintained, its 99.9% interest in the property. The Company did not disclose or discuss any impairment with respect to its investments in tax credit entities.

161. First NBC further asserted that its financial results for the second quarter of 2014 were prepared in accordance with GAAP and that an "evaluation of the effectiveness of the Company's disclosure controls and procedures as of June 30, 2014 was carried out under the supervision, and with the participation of, [Defendants Ryan and Verdigets]." Based on that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the [Exchange Act]." Defendants further represented that "there have not been any change [sic] in the Company's internal controls over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

73

162.   On October 28, 2014, First NBC issued a press release announcing the Company's financial results for the third quarter of 2014.  For the quarter, the Company reported net income of over $14.3 million, an increase of nearly $3.9 million or 37% over the same quarter in 2013.  Diluted EPS for the quarter was $0.73.  First NBC again prominently touted its growth, stating that "[t]he Company continues to experience strong asset growth, with total assets of $3.6 billion at September 30, 2014, an increase of 10.6%, from December 31, 2013."  First NBC also stated that "[s]hareholders' equity totaled $423.5 million at September 30, 2014, an increase of $41.7 million from December 31, 2013" which was "primarily attributable to the Company's retained earnings over the period."

163.   On November 12, 2014, First NBC filed with the SEC its Form 10-Q for the third quarter of 2014, the period ending September 30, 2014.  The Third Quarter 2014 10-Q substantially reiterated the false information announced in First NBC's prior press release and was signed and certified under SOX by Defendants Ryan and Verdigets.

164.   As it related to its investments in tax credit entities, First NBC represented that these investments rose to over $118 million, an increase of more than $6.2 million over the prior quarter, and stated that "[t]he Company has made and will continue to make material investments in tax credit-motivated projects."  Specifically addressing the Company's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, First NBC represented that, based on the structure of these transactions, the Company would recover its investments solely through use of the tax credits that were expected to be generated by the investments and that these amounts would be amortized on a straight-line basis over the period during which the Company

retained, or maintained, its 99.9% interest in the property.  The Company did not disclose or discuss any impairment with respect to its investments in tax credit entities.

165.    First NBC further asserted that its financial results for the third quarter of 2014 were prepared in accordance with GAAP and that an "evaluation of the effectiveness of the Company's disclosure controls and procedures as of September 30, 2014 was carried out under the supervision, and with the participation of, [Defendants Ryan and Verdigets]."   Based on that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the [Exchange Act]."   Defendants further represented that "there have not been any change [sic] in the Company's internal controls over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."   Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

166.    On November 13, 2014, First NBC filed with the SEC a Form 8-K announcing that Defendant Ryan would make a presentation to investors at the Sandler O'Neill 2014 East Coast Financial Services Conference to be held November 12-13, 2014.  First NBC's Form 8-K attached the slides used in Defendant Ryan's presentation, which again painted a picture of consistent historical growth and increasing profitability and earnings at First NBC and heavily promoted and stressed the importance of the Company's use and reliance on tax credits to investors, crediting the Company's tax credit business with providing ***"[s]trong financial returns"*** and calling it ***"an integral***

part of First NBC's commercial banking business" and "core to First NBC's corporate strategy." The presentation also represented to investors that First NBC's management had a special expertise and aptitude for these tax credit investments, stating unequivocally that "[m]anagement has a deep understanding of this business."

167.    On January 30, 2015, First NBC issued a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2014. For the quarter, the Company reported net income of $15.7 million, an increase of more than $2.1 million over the same quarter in 2013, and diluted EPS of $0.80.  Net income for 2014 was reported as $55.6 million, an increase of $14.7 million or 36% over 2013, with diluted EPS of $2.84.  First NBC again prominently touted its growth, stating that "[t]he Company continues to experience strong asset growth, with total assets of $3.8 billion at December 31, 2014, an increase of 14.1% from December 31, 2013."  First NBC also stated that "[s]hareholders' equity totaled $436.4 million at December 31, 2014, an increase of $54.5 million from year-end 2013" which was "primarily attributable to the Company's earnings over the period."

168.    On March 31, 2015, First NBC filed its Form 10-K for the year-ended December 31, 2014, which it amended on June 17, 2015 (together, the "2014 Form 10-K").  The 2014 Form 10-K substantially reiterated the false information announced in First NBC's prior press release and was signed and certified under SOX by Defendants Ryan and Verdigets.

169.    As it related to its investments in tax credit entities, First NBC represented that these investments rose to $140.9 million as of December 31, 2014, an increase of $23.2 million or nearly 20% compared to December 31, 2013.   First NBC stated that

"[t]he Company has made and will continue to make material investments in tax credit-motivated projects," in part because First NBC management believed that "these investments present attractive after tax economic returns…." Specifically addressing the Company's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, the Company represented it used the cost method of accounting for these investments, that the Company expected to recover its investments solely through use of the tax credits that were expected to be generated by the investments, and that these amounts would be amortized on a straight-line basis over the period during which the Company retained, or maintained, its ownership interest in the property. The Company stated that its investments in the limited partnerships were evaluated for impairment at the end of each reporting period, but did not disclose any impairment with respect to its investments in tax credit entities.

170.   With respect to its accounting for variable interest entities, First NBC represented that the Company used "VIEs in various legal forms to conduct normal business activities" and that "the Company reviews the structure and activities of VIEs for possible consolidation." First NBC also stated that "[n]oncontrolling variable interests in certain limited partnerships for which [First NBC] does not absorb a majority of expected losses or receive a majority of expected residual returns are not included in the accompanying consolidated financial statements."

171.   First NBC reiterated that, with respect to the internal weakness that it discovered in 2012, it had taken the appropriate steps to address the weakness. The Company also asserted that its financial results for the fourth quarter and year ended December 31, 2014 were prepared in accordance with GAAP and that "[m]anagement of

the Company, with the supervision and participation of [Defendants Ryan and Verdigets], has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures … as of the end of the period covered by this report."  Based on this evaluation, Defendants Ryan and Verdigets concluded that the Company's disclosure controls and procedures "were effective as of the end of the period covered by this report."  Further, First NBC represented that "[a]s of December 31, 2014, management assessed the effectiveness of the Company's internal control over financial reporting" and that, "[b]ased on the assessment, management determined that the Company maintained effective internal control over financial reporting as of December 31, 2014."  In fact, First NBC stated that "[t]here were no changes in the Company's internal control over financial reporting… during the period covered by this report that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting."   Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

172.   On the same day as it filed its 2014 Form 10-K, First NBC also released an annual report to shareholders titled "First NBC Bank Holding Company 2014 Annual Report, Strength Commitment Service."  First NBC's growing tax credit business was a major focus of the Report.  In a letter to the shareholders, Defendant Ryan highlighted First NBC's strong growth, stating:

> [d]uring the past year, our Company continued its strong growth and operating results consistent with prior years.  As of December 31, 2014, the Company's total assets were $3.8 billion, an increase of 14% over that of the prior year end.  Total loans reached $2.8 billion reflecting an 18% growth rate.  Our net income available to common shareholders totaled $54.1 million for 2014, a 40% increase over the $38.6 million generated in 2013.  Earnings per share on a fully diluted basis was $2.84, an increase of 22% over the $2.32 for 2013.

Defendant Ryan also specifically addressed First NBC's tax credit business, stating in pertinent part:

> …I am often asked why we invest in tax credits when most other banks our size do not. My response to that query follows:
>
> - ***Our investment in tax credits is an integral part of our commercial real estate business.*** We are commercial lenders with an emphasis on commercial real estate, and we use tax credits to enhance our commercial real estate lending. Our investment substantially increases the equity in real estate development projects which qualify for tax credits and thus results in lower loan to value and higher debt service coverage ratio, both major risk mitigators for our lending risk profile. ***Also, our understanding of tax credits and our investment in the projects, makes us the lender of choice for real estate projects in our markets, which has enabled us to dominate this type of lending in New Orleans since tax credit equity also enhances owner/developer profits…***
>
> - ***One part of our strategy is to provide our shareholders with exceptional returns. Our investment in tax credits helps provide those returns.*** Although the geography of these returns in our income statement is unusual (a credit income tax provision), ***the net returns are excellent and contribute to our strong earnings performance.***

Later in the Annual Report, under the heading "Continuing Growth & Expansion," First NBC continued to discuss its reliance on tax credits, stating:

> Through December 31, 2014, First NBC's investment in various forms of tax credits totaled almost $406.0 million, and the Bank has generated loans of approximately $265.5 million related to the projects over the last five years. ***First NBC continues to benefit from the tax credits generated from the projects,*** as well as expanded relationships which include deposits and loans that generate additional fee and interest income associated with these projects.

173.    Each of the press releases and SEC filings referenced in ¶¶ 151-172 above, and the financial results provided therein, were materially false and misleading when issued because, as described above, First NBC's financial results violated GAAP and

materially overstated, among other things, net income, accumulated earnings, EPS, shareholders' equity and total assets, and materially understated impairment on its tax credit investments in violation of GAAP.

174.    As First NBC admitted in its 2015 Form 10-K, First NBC's Class Period financial results were materially misstated in violation of GAAP as a result of, among other things, (1) the use of an improper amortized cost method in accounting for the Company's various investments in tax credit partnerships, rather than proper application of the equity method of accounting under GAAP, which also allowed First NBC to avoid recognition of both impairments to those investments and its proportionate share of the losses of the investees; and (2) the failure by First NBC to properly consolidate certain investments in federal low income tax credit entities that were determined to be variable interest entities in which First NBC was the primary beneficiary and thus should have properly been consolidated under GAAP.  Defendants employed these manipulative accounting techniques to make the Company's operations and financial condition appear substantially better than they were.

175.    In fact, for fiscal year 2014, First NBC admitted in its 2015 Form 10-K that, primarily due its failure to properly consolidate its VIEs and recognize significant impairment related to its investments in tax credit entities in violation of GAAP, the Company, among other things, (1) materially overstated net income by nearly 25%, reporting $55.6 million when it was actually $44.5 million; (2) materially overstated its accumulated earnings by nearly 22%, reporting $155.6 million when it was actually $127.8 million; (3) materially overstated its diluted EPS by over 25%, reporting $2.84 per share when it was actually $2.27 per share; and (4) materially understated the impairment

in its investments in tax credit entities, for which it should have recorded $25.1 million of impairment instead of no impairment.

176.   Additionally, pertinent to the 2014 statements about the tax credit entities investments, Defendants' statements concerning First NBC's internal controls were materially false and misleading and omitted material information because, as First NBC admitted in its 2015 Form 10-K, the Company's internal control over financial reporting was not effective due to material weaknesses with respect to (1) First NBC's control environment and risk assessment; (2) the lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax related entities and the related evaluation of impairment associated with those investments; (3) the lack of accounting personnel with the technical expertise and knowledge to properly identify certain investments in real estate entities made by the Company and evaluate them under GAAP to determine if the investment qualified as a variable interest entity and whether consolidation was necessary; and (4) the preparation and review of journal entries.  As such, all of Defendants' statements concerning First NBC's internal controls in the SEC filings referenced in ¶¶ 153-155; 159-161; 163-165; and 168-171 above, including each of the SOX certifications made by Defendants Ryan and Verdigets, were materially false and misleading when issued.

### 3.      False and Misleading Statements Concerning Fiscal Year 2015

177.   As set forth below, during 2015, First NBC continually reported strong financial results and growth.  In each of its press releases and Forms 10-Q, First NBC boasted increasing net income over prior year periods, as well as increasing total assets

and shareholders' equity.  First NBC's financial results had a dramatic impact on the price of First NBC's shares, which *increased nearly 26% for the year*, from $32.75 on February 2, 2015 to $41.15 on November 10, 2015, the day after First NBC filed its third quarter 2015 Form 10-Q.  As ultimately revealed, however, First NBC's impressive results for 2015 were the product of, among other things, manipulative accounting practices which were designed to, and did, materially overstate the Company's net income, accumulated earnings, EPS, total assets, total shareholders' equity, and income available to common shareholders, all while materially understating the expenses and impairment of its investments in tax credit entities.

178.   On April 30, 2015, First NBC issued a press release announcing the Company's financial results for the first quarter of 2015.  For the quarter, the Company reported net income of $16.1 million, an increase of $3.2 million or 25% over the same quarter in 2014.  Diluted EPS for the quarter was $0.82.  First NBC again prominently touted its growth, stating that "[t]he Company had total assets of $4.1 billion at March 31, 2015, an increase of 8.5%, from December 31, 2014."  First NBC also disclosed that "[s]hareholders' equity totaled $450 million at March 31, 2015, an increase of $13.6 million from year-end 2014" which was "primarily attributable to the Company's earnings over the period."

179.   On May 4, 2015, First NBC filed with the SEC a Form 8-K announcing that Defendant Ryan would make a presentation to investors at the Gulf South Bank Conference to be held May 4-5, 2015.  First NBC's Form 8-K attached the slides used in Defendant Ryan's presentation, which painted a picture of consistent historical growth and increasing profitability and earnings at First NBC and heavily promoted and stressed

the importance of the Company's use and reliance on tax credits to investors, crediting the Company's tax credit business with providing *"[s]trong financial returns"* and calling it *"an integral part of First NBC's commercial banking business"* and *"core to First NBC's corporate strategy."*  The presentation also represented to investors that First NBC's management had a special expertise and aptitude for these tax credit investments, stating unequivocally that *"[m]anagement has a deep understanding of this business."*

180.   On May 8, 2015, First NBC filed with the SEC its Form 10-Q for the first quarter of 2015, the period ending March 31, 2015.  The First Quarter 2015 10-Q substantially reiterated the false information announced in First NBC's prior press release and was signed and certified under SOX by Defendants Ryan and Verdigets.

181.   As it related to its investments in tax credit entities, First NBC disclosed that these investments rose to $147.1 million, an increase of $6.2 million over the prior quarter, and stated that "[t]he Company has made and will continue to make material investments in tax credit-motivated projects."  Specifically addressing the Company's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, the Company represented it used the cost method of accounting for these investments, that the Company expected to recover its investments solely through use of the tax credits that were expected to be generated by the investments, and that these amounts would be amortized on a straight-line basis over the period during which the Company retained, or maintained, its ownership interest in the property.  The Company stated that its investments in the limited partnerships were evaluated for

impairment at the end of each reporting period, but did not report any impairment with respect to its investments in tax credit entities.

182.    First NBC further asserted that its financial results for the first quarter of 2015 were prepared in accordance with GAAP and that an "evaluation of the effectiveness of the Company's disclosure controls and procedures as of March 31, 2015 was carried out under the supervision, and with the participation of, [Defendants Ryan and Verdigets]."  Based on that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the [Exchange Act]."  Defendants further represented that "there have not been any change [sic] in the Company's internal controls over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

183.    On May 21, 2015, First NBC filed with the SEC a Form 8-K attaching as an exhibit a slide presentation used in connection with First NBC's annual shareholders' meeting held on May 21, 2015.  In addition to discussing the Company's financial results for the first quarter of 2015, the presentation included a slide reviewing the year 2014, which First NBC called "[a]nother high growth year."  On that slide, the Company noted, among other things, (1) "[n]et income of $55.6 million, an increase of $14.7 million, or 35.9%, from year end 2013," (2) "EPS on a diluted basis of $2.84, an increase of $0.52, or 22.4%, from year end 2013," and (3) "[t]otal assets of $3.8 billion, an increase of

$464.0 million from December 31, 2013." First NBC also noted that its tax credit investment, net of accumulated amortization, grew to $140.9 million, an increase of 19.7% from December 31, 2013, and singled out its increased investment in federal historic tax credit projects of $26.1 million over December 31, 2013. In a slide showing the Company's outlook for 2015 and beyond, First NBC stated that it would continue to invest in federal tax credit projects, and specifically would have increasing historic tax credit investment over the next 3 years.

184. On June 10, 2015, First NBC filed with the SEC a Form 8-K announcing that Defendants Ryan and Verdigets would make a presentation to certain institutional investors on June 10, 2015. First NBC's Form 8-K attached the slides used in the presentation, which painted a picture of consistent historical growth and increasing profitability and earnings at First NBC and heavily promoted and stressed the importance of the Company's use and reliance on tax credits to investors, crediting the Company's tax credit business with providing ***"[s]trong financial returns"*** and calling it ***"an integral part of First NBC's commercial banking business"*** and ***"core to First NBC's corporate strategy."*** The presentation also represented to investors that First NBC's management had a special expertise and aptitude for these tax credit investments, stating unequivocally that ***"[m]anagement has a deep understanding of this business."*** Finally, in a slide showing the Company's outlook for 2015 and beyond, First NBC stated that it would continue to invest in federal tax credit projects, and specifically would have increasing historic tax credit investment over the next 3 years.

185. On August 11, 2015, First NBC filed a Form 12b-25 Notification of Late Filing with the SEC. The Company explained that it could not make a timely filing of its

Form 10-Q for the second quarter of 2015, the period ending June 30, 2015, because the Company had "identified errors in its accounting for certain of its investments in tax credit entities" and needed time to "evaluate the impact of the errors" as well as to allow First NBC and E&Y "to evaluate the implications of the adjustments on current and historical financial statements and [First NBC's] evaluation of internal control over financial reporting…."

186.    On August 17, 2015, First NBC filed with the SEC its Form 10-Q for the second quarter of 2015, the period ending June 30, 2015.  The Second Quarter 2015 10-Q was signed and certified under SOX by Defendants Ryan and Verdigets.  In the Second Quarter 2015 10-Q, First NBC represented that it had net income of $17.2 million, an increase of $4.5 million, or 35%, compared to the second quarter of 2014, that "[d]iluted earnings per share for the second quarter of 2015 were $0.88, an increase of $0.23, or 35.4%, compared to the second quarter of 2014," and that "[s]hareholders' equity increased $33.5 million, or 7.7%, to $469.9 million from December 31, 2014" which was "primarily attributable to the Company's retained earnings over the period."  First NBC also reported "[t]otal assets at June 30, 2015 were $4.1 billion, an increase of $375.9 million, or 10.0%, from December 31, 2014."

187.    First NBC also disclosed that it had identified errors in its accounting for its investments in certain tax credit entities and that it would be changing the accounting method it used to account for these investments, but that none of the errors it found had a material impact on the Company's consolidated financial statements for any prior periods.  Specifically, First NBC represented that:

> [t]he Company identified errors in the accounting for its investments in certain tax credit entities during its quarterly financial statement close

process.   The errors were corrected in the Company's consolidated financial statements as of June 30, 2015 and for the three months then ended.  ***The errors did not have a material impact to the consolidated financial statements for any prior periods as previously reported and were not material to the anticipated annual results for the year ended December 31, 2015.***

The Company continued its explanation of the change, as follows:

> The Company has historically accounted for the investments in tax credits entities using an amortized cost method over the related tax credit compliance period.  The Company determined that based on its equity ownership structure in certain of these investments the equity method of accounting should have been applied.  Under the equity method of accounting, the Company records its share of earnings (losses) as a component of noninterest expense and evaluates its investments in tax credit entities for impairment at the end of each reporting period.  During the review of certain of its investments in tax credit entities, the Company also identified a single investment in a tax credit entity, determined to be a variable interest entity (VIE) that was not consolidated as required.  The Company was deemed to have a controlling financial interest in the VIE because it had both the power to direct the activities of the VIE that most significantly impact the VIE's economic performance and the obligation to absorb losses of the entity or the right to receive benefits from the entity that could potentially be significant to the VIE.

> The Company utilized the guidance provided in Accounting Standards Codification (ASC) Topic 250 as well as SEC Staff Accounting Bulletins (SAB) No. 99 and No. 108.   The guidance required the Company to evaluate and assess the materiality of these errors both qualitatively and quantitatively, and ***the Company concluded that these errors did not materially misstate previously issued financial statements for any prior periods.  As a result, amendment of the Company's previously filed Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K are not required.***

188.    As it related to its investments in tax credit entities, First NBC disclosed that these investments rose to $174.3 million, an increase of $33.4 million, or nearly 24%, over December 31, 2014, and stated that "[t]he Company has made and will continue to make material investments in tax credit-motivated projects."  Specifically addressing the Company's accounting for its investments related to low-income housing

and federal historic rehabilitation tax credits, the Company represented it now used the equity method of accounting for these investments and that its investments in the limited partnerships were evaluated for impairment at the end of each reporting period.

189.    Importantly, the Second Quarter 2015 10-Q was the first time during the Class Period that First NBC disclosed any impairment with respect to its investments in tax credit entities, explaining in a footnote that "[t]he amounts [for total investment in tax credit entities impairment] represent the cumulative net impact of the reversal of previously recorded amortization and equity income or loss and impairment that should have been recorded on the Company's consolidated statement of income and balance sheets…." In other words, due to First NBC's change from the amortized cost method of accounting for its investments in tax credit entities to utilization of the equity method of accounting for these investments, the Company recorded impairment on these investments for the first time.  As such, First NBC reported total impairment of $2.6 million for the second quarter of 2015 with respect to its investments in tax credit entities.

190.    For its low-income housing tax credits, First NBC stated that it expected to recover its remaining investments through the use of the tax credits that were generated by the investments and any equity returns received through the limited partnerships.  Similarly, with respect to its federal historic rehabilitation tax credits, the Company stated that it expected to recover its remaining investments through the equity ownership in the underlying projects.  For both its low-income housing and federal historic rehabilitation tax credit limited partnerships, First NBC represented that it evaluated those entities for possible consolidation as VIEs based on the Company's determination as to whether it

was the primary beneficiary, but it determined that none of the VIEs should be consolidated except for a single low-income housing investment.

191. Despite the errors it reported with respect to accounting for its investments in tax credit entities that it asserted were immaterial, and the change in accounting methodology, First NBC stated that its financial results for the second quarter of 2015 were prepared in accordance with GAAP and that an "evaluation of the effectiveness of the Company's disclosure controls and procedures as of June 30, 2015 was carried out under the supervision, and with the participation of, [Defendants Ryan and Verdigets]." Based on that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the [Exchange Act]." Defendants further represented that "there have not been any change [sic] in the Company's internal controls over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

192. On September 14, 2015, First NBC filed with the SEC a Form 8-K announcing that Defendant Ryan would make a presentation to investors on Monday, September 14, 2015. First NBC's Form 8-K attached the slides used in the presentation, which painted a picture of consistent historical growth and increasing profitability and earnings at First NBC and heavily promoted and stressed the importance of the Company's use and reliance on tax credits to investors, crediting the Company's tax

credit business with providing **"[s]trong financial returns"** and calling it **"an integral part of First NBC's commercial banking business"** and **"core to First NBC's corporate strategy."**  The presentation also represented to investors that First NBC's management had a special expertise and aptitude for these tax credit investments, stating unequivocally that **"[m]anagement has a deep understanding of this business."**

193.   In a slide titled "Correction of Immaterial Errors," First NBC addressed the errors in its accounting for its investments in certain tax credit entities disclosed in the Second Quarter 2015 10-Q, stating that the Company **"adopted the equity method of accounting for its investments in tax credit entities (previously used the amortized cost method),"** that it had "identified a single investment in a tax credit entity that should have been consolidated," and that the **"[e]rrors were not material to prior period consolidated financial statements or anticipated annual results for 2015."**  First NBC also included a slide showing the impact of the correction of the errors, which included impairment amounts that Defendants admitted should have been taken in prior periods.

194.   On November 2, 2015, First NBC issued a press release announcing the Company's financial results for the third quarter of 2015.  For the quarter, the Company reported net income of $17.8 million, an increase of $3.4 million or nearly 24% over the same quarter in 2014.  Diluted EPS for the quarter was $0.92.  First NBC again prominently touted its growth, stating that "[t]he Company had total assets of $4.3 billion at September 30, 2015, an increase of 15.8% from December 31, 2014."  First NBC also disclosed that "[s]hareholders' equity totaled $486.2 million at September 30, 2015, an increase of $49.8 million from year-end 2014" which was "primarily attributable to the Company's earnings over the period."

90

195.    On November 9, 2015, First NBC filed with the SEC its Form 10-Q for the third quarter of 2015, the period ending September 30, 2015.  The Third Quarter 2015 10-Q substantially reiterated the false information announced in First NBC's prior press release and was signed and certified under SOX by Defendants Ryan and Verdigets.

196.    After again summarizing the errors in its accounting for its investments in certain tax credit entities disclosed in the Second Quarter 2015 10-Q, and noting that the Company had adopted the equity method of accounting for its investments in tax credit entities rather than the previously-utilized amortized cost method, First NBC disclosed that during the third quarter of 2015, it had identified additional out of period misstatements related to the correction of immaterial errors associated with its investment in tax credit entities.  Specifically, First NBC stated:

> During the third quarter of 2015, the Company identified additional out of period errors **related to the correction of immaterial errors associated with its investment in tax credit entities.**  The Company, in performing its impairment testing on its investment in tax credit entities as of September 30, 2015 identified errors in the calculation of impairment amounts recorded for its Low-Income Housing, Federal New Markets and State Historic Rehabilitation tax credit projects.  The Company also identified additional depreciation and interest expense on the Low-Income Housing investment VIE in the prior period.  ***The errors did not have a material impact on the consolidated financial statements for any prior periods as previously reported and were not material to the anticipated annual results for the year ending December 31, 2015.***
>
> During the third quarter of 2015, the Company utilized the guidance provided in Accounting Standards Codification (ASC) Topic 250 as well as SEC Staff Accounting Bulletins (SAB) No. 99 and No. 108.  The guidance required the Company to evaluate and assess the materiality of these errors both qualitatively and quantitatively, and **the Company concluded that these errors did not materially misstate previously issued financial statements for any prior periods.  As a result, amendment of**

*the Company's previously filed Quarterly Reports on Form 10-Q and
Annual Reports on Form 10-K was not required.*

Just like the errors it previously disclosed in the Second Quarter 2015 10-Q, the Company continued to assert that these new errors it disclosed in the Third Quarter 2015 10-Q were immaterial and did not require the restatement of its prior financial statements.

197.   As it related to its investments in tax credit entities, First NBC disclosed that these investments stood at $172.3 million at September 30, 2015, an increase of $31.3 million, or over 22%, compared to December 31, 2014, and stated that "[t]he Company has made and will continue to make material investments in tax credit-motivated projects." First NBC stated that "[t]he Company anticipates its investments in tax credit entities to be driven by increases in Federal Historic Rehabilitation Tax Credit project investments in 2015 and 2016."

198.   Specifically addressing the Company's accounting for its investments related to low-income housing and federal historic rehabilitation tax credits, the Company reiterated that it now used the equity method of accounting for these investments and that its investments in the limited partnerships were evaluated for impairment at the end of each reporting period. First NBC reported total impairment of $3.3 million for the third quarter of 2015 with respect to its investments in tax credit entities. For its low-income housing tax credits, First NBC stated that it expected to recover its remaining investments through the use of the tax credits that were generated by the investments and any equity returns received through the limited partnerships. Similarly, with respect to its federal historic rehabilitation tax credits, the Company stated that it expected to recover its remaining investments through the equity ownership in the underlying projects. For both its low-income housing and federal historic rehabilitation tax credit limited partnerships,

First NBC represented that it evaluated those entities for possible consolidation as VIEs based on the Company's determination as to whether it was the primary beneficiary, but it determined that none of the VIEs should be consolidated except for a single low-income housing investment.

199.    As with its earlier reporting periods, First NBC stated that its financial results for the third quarter of 2015 were prepared in accordance with GAAP and that an "evaluation of the effectiveness of the Company's disclosure controls and procedures as of September 30, 2015 was carried out under the supervision, and with the participation of, [Defendants Ryan and Verdigets]."  Based on that evaluation, Defendants Ryan and Verdigets "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the [Exchange Act]."  Defendants further represented that "there have not been any changes in the Company's internal controls over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  Defendants Ryan and Verdigets also executed SOX certifications substantially similar to the certifications described above.

200.    Each of the press releases and SEC filings referenced in ¶¶ 178-199 above, and the financial results provided therein, were materially false and misleading when issued because, as described above, First NBC's financial results violated GAAP and materially overstated, among other things, net income, accumulated earnings, EPS, shareholders' equity and total assets, and materially understated impairment on its tax credit investments in violation of GAAP.  As First NBC admitted in its 2015 Form 10-K,

First NBC's previously reported financial results were materially misstated through the use of at least two fraudulent accounting practices, including (1) the use of an improper amortized cost method in accounting for the Company's various investments in tax credit partnerships, rather than proper application of the equity method of accounting under GAAP, which also allowed First NBC to avoid recognition of both impairments to those investments and its proportionate share of the losses of the investees; and (2) the failure by First NBC to properly consolidate certain investments in federal low income tax credit entities that were determined to be variable interest entities in which First NBC was the primary beneficiary and thus should have properly been consolidated under GAAP. Defendants fraudulently employed these, and other, accounting machinations to make the Company's operations and financial condition appear substantially better than they were.

201.    Further, even after the Company changed from utilization of the improper amortized cost method of accounting to the equity method of accounting for its investments in tax credit entities in the second quarter of 2015, First NBC's financial results continued to be materially misstated due to First NBC's failure to properly recognize impairment from those investments.  As First NBC finally admitted in the 2015 Form 10-K, the Company was forced to recognize "additional impairments to certain investments in Federal and State Historic Rehabilitation Tax Credit entities *based on information available at the time the related financial statements were issued*."  To be clear, First NBC admitted that it materially understated the amount of impairments to these investments *despite the fact that the information necessary to make a proper assessment of the true amount of impairment required was available to First NBC at the time of the issuance of those prior misstated financial statements.*

202.   Additionally, during the entirety of the Class Period, Defendants' statements concerning First NBC's internal controls were materially false and misleading and omitted material information because, at all relevant times, First NBC had material weaknesses in its internal control over financial reporting.   Pertinent to the 2015 statements about the tax credit entities investments, First NBC admitted in its 2015 Form 10-K that its disclosure controls and procedures and internal control over financial reporting were not effective due to material weaknesses with respect to (1) First NBC's control environment and risk assessment; (2) the lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax related entities and the related evaluation of impairment associated with those investments; (3) the lack of accounting personnel with the technical expertise and knowledge to properly identify certain investments in real estate entities made by the Company and evaluate them under GAAP to determine if the investment qualified as a variable interest entity and whether consolidation was necessary; and (4) the preparation and review of journal entries.   As such, all of Defendants' statements concerning First NBC's internal controls in the SEC filings referenced in ¶¶ 180-182; 186-191; and 195-199 above, including each of the SOX certifications made by Defendants Ryan and Verdigets, were materially false and misleading when issued.

**B.     Defendants' Materially False and Misleading Statements Concerning First NBC's Exposure to the Oil and Gas Industry**

203.   In order to allow the Company to report artificially inflated financial results, First NBC and the Executive Defendants also concealed from investors the true extent of First NBC's exposure to the oil and gas industry once oil prices began falling in

the second half of 2014 by (1) issuing materially false and misleading statements insisting that First NBC had very little risk of exposure to falling oil prices due to its limited overall exposure to the oil and gas industry; and (2) issuing materially false and misleading statements concerning the status of a large loan First NBC made to an oil exploration and production company that had encountered problems as early as the end of 2014.

204.    At the beginning of the Class Period and continuing through the middle of 2014, prices of crude oil hovered around $100 per barrel.  From that point on, however, the price of crude oil dropped dramatically, reaching around $50 per barrel by the end of 2014 and continuing to decline to under $40 per barrel by the end of 2015.

205.    Once oil prices began dropping in the second half of 2014, Defendants made materially false and misleading misrepresentations that were intended to, and did, mislead investors into believing that the Company had very little risk of loss from its exposure to the oil and gas industry because First NBC had very little such exposure.  For example, the Company included the following statement with respect to its oil and gas exposure in its 2014 Form 10-K filed with the SEC on March 31, 2015:

> Commercial loans represent the second largest category of loans in the portfolio. The Company attributes its commercial loan growth during the year in part to the growth in its oil and gas portfolio, specifically with respect to oil and gas service companies. ***The oil and gas portfolio comprises approximately 3% of the Company's total loan portfolio. Management is actively monitoring these credits and believes that the recent downturn in oil prices should not have a near term impact on its oil and gas portfolio, which is primarily to oil and gas service companies***.

206.    Similarly, in his letter to the shareholders that was included in First NBC's 2014 Annual Report issued on the same day as the 2014 Form 10-K, Defendant Ryan

specifically addressed investor concern over falling oil prices and any risk to the Company, stating:

> [t]here has been a lot of investor concern related to the oil price pullback and its impact on the New Orleans economy and on First NBC Bank… **First NBC has very limited exposure (3% of its loan portfolio) to the oil and oil service industries. Moreover, the New Orleans economy has very low exposure to the oil industry, especially given the strong prospects for its primary economic drivers.**

207. In First NBC's public filings and press releases from the third quarter of 2014, issued beginning on November 13, 2014, through the third quarter of 2015, issued on November 2 and 9, 2015, First NBC did not provide **any disclosures** when discussing its loan portfolio, nonperforming assets, or allowance for loan losses that would have alerted investors to the significant risks the Company faced due to the deterioration in crude oil prices. Indeed, in a presentation filed with the SEC that Defendant Ryan gave to investors on September 14, 2015, he personally assured investors that the Company was "actively monitoring" its oil and gas credits, thereby suggesting that investors need not be concerned about the Company's exposure to falling oil prices. An analyst from Sandler O'Neill attended this investor presentation and reported the next day that Defendant Ryan "spoke at length on the New Orleans economy and **tried to dispel the belief that New Orleans is a heavy oil and gas market**" and stated that "his markets are **fairly well insulated** from [oil and gas] downside."

208. All of Defendants' material misstatements and omissions referenced in ¶¶ 205-207 above, and each of the Company's press releases and SEC filings referenced, including the financial results provided therein, were materially false and misleading when issued because, as described herein, First NBC concealed from investors its true exposure to the oil and gas industry and failed to adequately reserve against that exposure

in violation of GAAP.  As set forth more fully herein, it was only starting in February 2016 that Defendants began to disclose to investors the Company's true exposure to the oil and gas industry, including taking an $11 million reserve against this exposure due to the "substantial decline in oil prices."

209.    Beginning in 2015, Defendants also issued a series of materially false and misleading statements and omitted to provide investors with material information concerning the status of a large loan First NBC made to an oil exploration and production company that had encountered problems as early as the end of 2014.  Specifically, the borrower began having cash flow difficulties when a pipeline serving a well in its largest oil field broke on December 29, 2014, requiring the well to go off-line for a period of time.  In lieu of repairing the pipeline, the exploration and production company elected to drill a new well, which First NBC agreed to finance, substantially increasing First NBC's exposure to the oil and gas industry during the third and fourth quarters of 2015.

210.    Throughout 2015, Defendants concealed all of this material information about this large loan, which stood at $90.2 million as of December 31, 2015 and represented 57% of First NBC's total energy exposure.  For example, despite the fact that the pipeline broke on December 29, 2014, there was no mention of this loan, or the problems encountered by the borrower, in either First NBC's 2014 Form 10-K or in the Company's First Quarter 2015 10-Q.  Similarly, the Company's earnings releases of January 30, 2015 and April 30, 2015 contained no such disclosures.  It was not until nearly eight months later, in August 2015 when First NBC filed its Second Quarter 2015 10-Q, that it first mentioned the loan, stating only that:

> [t]he increase in the Company's classified commercial loan portfolio compared to December 31, 2014 was due primarily to one exploration and

production credit *which was affected by the fluctuations in energy commodity prices and the level of production from its shallow-water well.* The Company continues to monitor this credit as the borrower has experienced issues with the distribution and production from its shallow-water well. The Company anticipates that production will resume in the near future.

First NBC included a similar disclosure to this in the Company's Third Quarter 2015 Form 10-Q, without providing any additional details or background.

211. All of Defendants' material misstatements and omissions referenced in ¶ 210 above, were materially false and misleading when issued because, as described herein, First NBC concealed from investors material information concerning this loan and its collectability, including that the borrower was in distress because its pipeline broke on December 29, 2014 and that, although the borrower was in severe financial distress, the Company had extended even more credit to the borrower to build a second well. As set forth more fully herein, it was only starting in February 2016 that Defendants began to disclose this material information to investors, after the loan balance had ballooned to $90.2 million. Even then, Defendants continued to mislead investors by failing to disclose that First NBC was required to a substantial $30 million reserve for this loan, a fact that was not revealed until the Company filed the 2015 Form 10-K.

212. Additionally, Defendants' statements concerning First NBC's internal controls were materially false and misleading and omitted material information because, at all relevant times, First NBC had material weaknesses in its internal control over financial reporting. Certain of these material weaknesses, including material weaknesses with respect to (1) First NBC's control environment and risk assessment and (2) the monitoring of certain borrowers' ability to repay loans related directly to Defendants' concealment of First NBC's risk of loss from its exposure to the oil and gas industry from

investors, including the risk of loss from its large loan to the oil exploration and production company. These rendered all of Defendants' statements concerning First NBC's internal controls in the SEC filings referenced above, including each of the SOX certifications made by Defendants Ryan and Verdigets, materially false and misleading when issued.

### C. Defendants' Materially False and Misleading Statements Concerning First NBC's Investments on the Receivables Exchange

213. Throughout the Class Period, Defendants also concealed First NBC's risk of loss related to certain short-term receivable investments the Company made on a platform called the "Receivables Exchange." The Receivables Exchange is an electronic exchange for the purchase and sale of accounts receivable. During the Class Period, First NBC exponentially and materially increased its investments in short-term receivables through the Receivables Exchange and the Company frequently touted the attractive yields that it was receiving through those investments. As with First NBC's investments in tax credit entities and its risk from exposure to the oil and gas industry, however, Defendants concealed from investors the downside risks First NBC was exposed to through its increasing investments in the Receivables Exchange. These risks would materialize in 2016, when First NBC was forced to disclose that it encountered problems with a receivables contract involving an ethanol company, that the Company was being forced to take a $69.9 million impairment with respect to that contract, and that First NBC had a material weakness related to the evaluation and ongoing monitoring of the financial stability and creditworthiness of companies from which it acquired short-term receivables.

214.    Throughout the Class Period, First NBC disclosed the total amount of its investments in short-term receivables in its financial statements under the heading of "Investment Securities" and the line item of "Other securities," with its investments in short-term receivables comprising the bulk of this line item amount.    Along with disclosing the total amount of its investment in short-term receivables under this line item, First NBC typically made a statement generally describing its investments in short-term receivables.    For example, in the Registration Statement, First NBC indicated that its total investment in other securities as of December 31, 2012 totaled $81.044 million and stated that "[i]ncluded in other securities are short-term trade receivables purchased on an exchange, which are typically guaranteed by the seller of the receivables."

215.    For fiscal 2013, First NBC's disclosures concerning its investments in short-term receivables remained similar to the general disclosure included in the Registration Statement, but the amount of its investment in the other securities line item grew materially and exponentially.    For example, in the First Quarter 2013 10-Q, First NBC disclosed that its investments in other securities, including the short-term receivables, grew to $101.823 million, a $20.8 million or 26% increase over December 31, 2012.    In the Second Quarter 2013 10-Q, First NBC disclosed that its investments in other securities rose again to $176.867 million, an enormous increase of over $75 million or 74% over the prior quarter.    In the Third Quarter 2013 10-Q, First NBC disclosed that its investments in other securities rose again to $192.066 million, a further increase of $15.2 million or 8.6% over the prior quarter.    In its Forms 10-Q during fiscal 2013, First NBC made minor changes to its general description of its investments in short-term receivables, and in the Third Quarter 2013 10-Q the Company represented that

"[i]ncluded in other securities are short-term trade receivables purchased on an exchange, which are covered by a repurchase agreement from the seller of the receivables, if not paid within a specified period."

216.    In First NBC's 2013 Form 10-K, the Company attributed an increase in its interest income to, among other things, its investments in short-term receivables, stating that "[i]nterest income increased $17.6 million, or 16.5%, during 2013 compared to 2012" and that the "increases were driven by increases in loan growth, investment securities and investment in short-term receivables…." The Company also disclosed that it had increased its investment in these short-term receivables "to $246.8 million compared to $81.0 million as of December 31, 2012," an increase of $165.8 million in a single year, and began reporting its total amount invested in short-term receivables on its own line item.

217.    In the 2013 Form 10-K, First NBC also stated that it was decreasing investments in other areas to devote more funds to investments in short-term receivables due to their attractive financial benefits, stating that a "decrease in [First NBC's] securities portfolio was primarily due to the Company investing some of the proceeds from the prepayments, calls and maturities of securities to investments in short-term receivables which have a higher short-term earning yield and the increase in unrealized losses during the year due to movements in interest rates." Giving further disclosure that was intended to reassure investors concerning the Company's risk of loss related to these investments, First NBC stated that "[t]he Company invests in short-term trade receivables purchased on an exchange, which are covered by a repurchase agreement from the seller of the receivables, if not paid within a specified period" and that "[s]ince the receivables

are traded on an exchange, the Company has the ability to resell the receivables on the exchange."

218. For fiscal 2014, the Company's investments in short-term receivables remained at nearly a quarter of a billion dollars, with First NBC reporting total short-term receivable investments of $237.7 million for the first quarter of 2014, $252.5 million for the second quarter of 2014, and 240.8 million for the third quarter of 2014. In its quarterly filings, First NBC continued to attribute an increase in its interest income to, in part, its investments in short-term receivables, asserted that these investments provided a "higher short-term return for the Company."

219. In First NBC's 2014 Form 10-K, the Company disclosed that "[a]s of December 31, 2014, [it] had $237.1 million in investments in short-term receivables" and stated that "[i]nterest income increased $26.0 million, or 20.9%, during 2014 compared to 2013" with the increases being "driven by higher yields on average interest-earning assets and increases in loans and investment in short-term receivables." First NBC further stated that it invested in these short-term receivables "since they provide a higher short-term return for the Company."

220. The 2014 Form 10-K was the first time that the Company included a risk factor related to its investments in short-term securities through the Receivables Exchange, but as with First NBC's other disclosures related to these short-term receivables the disclosure was designed to allay any investor concern regarding the investments by touting (1) First NBC's purported controls regarding its review of all sellers from which it purchased receivables over the exchange; (2) its history of not

having suffered any losses with respect to its investments; and (3) the recourse against

any seller of the receivables, as follows:

> **We are subject to risks associated with our investments in short-term receivables.** (emphasis in original)
>
> As a part of our liquidity management strategy, we invest in short-term receivables traded over the Receivables Exchange, a New York Stock Exchange listed electronic exchange for the sale and purchase of accounts receivable of companies whose annual revenues exceed $1 billion, whose common equity is listed on a national securities exchange or whose debt is rated by Standard & Poor's or Moody's.  As of December 31, 2014, we had $237.1 million in investments in short-term receivables.  Our investments in short-term receivables are subject to agreements that provide recourse against the seller with respect to any invoiced amounts deemed in dispute, upon the breach of any representation or warranty made to us by the seller, or with respect to any credit adjustments related to the receivable.  As with substantially all of our investment securities, we are subject to credit risk with respect to our investments in short-term receivables.  We engage in a review of all sellers from which we purchase receivables over the exchange prior to investing in short-term receivables.  Since we commenced our investments in short-term receivables in 2010, we have not suffered any losses with respect to our investments.  However, we cannot assure you that we will not sustain any losses in the future.

Further assuring investors regarding the safety of its investments in short-term

receivables, First NBC represented that the short-term receivables were "covered by a

repurchase agreement from the seller of the receivables, if not paid within a specified

period," and that "[s]ince the receivables [were] traded on an exchange, the Company

[had] the ability to resell the receivables on the exchange."

221.    For the first two quarters of fiscal 2015, the Company's investments in

short-term receivables remained at nearly a quarter of a billion dollars, with First NBC

reporting short-term receivable investments of $236.6 million for the first quarter of 2015

and $250.6 million for the second quarter of 2015.  But in the third quarter of 2015, the

Company's investments in short-term receivables fell to $182.9 million.  First NBC gave

no explanation for the decline. Additionally, First NBC continued to assert that these investments provided a "higher short-term return for the Company."

222. It was only in February 2016 that the Company first disclosed problems with its investments in short-term receivables while also massively decreasing its investments in those short-term receivables. Specifically, on February 1, 2016, the Company issued a press release announcing its financial results for the fourth quarter of 2015, stating that (1) at December 31, 2015, the Company's investment in short-term receivables was $95.5 million, a substantial decline from the prior quarter; (2) this massive decrease in investment in short-term receivables was primarily due to the Company's strategic decision to increase its liquidity and capital position; and (3) included in the Company's investment in short-term receivables was $69.0 million due from a U.S. company that produces ethanol for blending in gasoline, and $15.0 million of that balance was past due as of the end of 2015, with an additional $24.7 million past due as of the date of the press release.

223. First NBC further represented that: (a) "[i]n addition to the Company's rights against the obligor on the receivables, the Company and the receivables seller are parties to an agreement providing for certain repurchase obligations by the receivables seller with respect to past due receivables," and (b) First NBC management did not expect that the Company would incur any loss on its investment. Further amplifying this sentiment, on February 11, 2016, First NBC stated that it had two potential sources of repayment on the receivables contract, the original issuer of the receivables (the ethanol company) or the seller, *and that it could choose to pursue either or both.* First NBC further represented that because the Company believed "that both the ethanol company

and the receivables seller are capable of repaying the full amount of the receivable balance over time," management did not expect that the Company would incur any loss on this investment in short-term receivables.

224.    All of Defendants' statements referenced in ¶¶ 214-223 above were materially false and misleading when issued because, as described herein, First NBC concealed from investors First NBC's risk of loss related to its investments in short-term receivables on the Receivables Exchange, and further concealed and then made material misstatements concerning a receivables contract involving an ethanol company for which the Company was ultimately forced to take a $69.9 million impairment charge.

225.    Additionally, Defendants' statements concerning First NBC's internal controls were materially false and misleading and omitted material information because, at all relevant times, First NBC had material weaknesses in its internal control over financial reporting.   Certain of these material weaknesses, including its material weakness related to the evaluation and ongoing monitoring of the financial stability and creditworthiness of companies from which it acquired short-term receivables, related directly to Defendants' concealment of First NBC's risk of loss from its exposure to short-term receivables purchased on the Receivables Exchange, including the risk of loss from the receivables contract with the ethanol company referenced herein.   These rendered all of Defendants' statements concerning First NBC's internal controls in the SEC filings referenced above, including each of the SOX certifications made by Defendants Ryan and Verdigets, materially false and misleading when issued.

**D.      Defendants' Materially False and Misleading Statements Concerning First NBC's Capital Position**

226.      Throughout the Class Period, Defendants issued materially false and misleading statements regarding First NBC's capital position, portraying the Company as a beacon of financial strength and stability with a clear capital edge over its competitors and reporting that First NBC's regulatory capital ratios meant that the bank was "well capitalized" throughout the Class Period.

227.      Specifically, in the IPO Offering Materials, First NBC told investors that its ***"strong capital position [gave the Company] an instant advantage over [its] competitors."***  The Company would reiterate this assertion in both its 2013 Form 10-K and 2014 Form 10-K.  In fact, the Company asserted that First NBC Bank was "chartered with an initial capitalization of $61.8 million from local investors and highly sophisticated institutional investors, making it the largest initial capitalization of a *de novo* financial institution to commence operations under a Louisiana charter."  First NBC also represented that,

> [a]s of December 31, 2012, 2011 and 2010, First NBC Bank Holding Company and First NBC Bank were in compliance with all applicable regulatory capital requirements, and First NBC Bank was classified as "well capitalized," for purposes of the FDIC's prompt corrective action regulations.   "Well capitalized" is the highest capital classification for FDIC-insured financial institutions in the United States.

228.      First NBC made similar representations in its Forms 10-Q and 10-K filed with the SEC during the Class Period.  In each of those filings from the beginning of the Class Period through the Third Quarter 2015 10-Q, First NBC represented that the Company was in compliance with all capital regulatory requirements, and that First NBC Bank was classified as "well capitalized" for purposes of the FDIC's prompt corrective action regulations.  First NBC also included a table showing regulatory capital ratios in

its financial statements, and specifically the minimum ratios required to be considered well capitalized along with First NBC's reported ratios, which were all reported as well in excess of the minimum ratios.

229.    First NBC further disclosed that federal banking regulators were required to take various mandatory supervisory actions and were authorized to take other discretionary actions with respect to institutions that were undercapitalized, with the severity of the action depending upon the capital category in which the institution is placed.  First NBC also stated that a failure to meet minimum capital requirements could initiate certain mandatory and possibly additional discretionary actions by regulators that, if undertaken, could have a direct material effect on the consolidated financial statements of the Company.

230.    Additionally, in various presentations made to investors throughout the Class Period, Defendants Ryan and Verdigets made affirmative representations regarding First NBC's capital position, touting its strong capital ratios.  Defendants did so in presentations at (1) the Fourteenth Annual Community Bank Investor Conference sponsored by Keefe, Bruyette & Woods, Inc., held on July 30 and July 31, 2013 in New York City (Defendant Ryan); (2) the 2013 East Coast Financial Services Conference sponsored by Sandler O'Neill Partners, L.P., held on November 14, 2013 in Naples, Florida (Defendant Ryan); (3) the 2014 Financial Institutions Investor Conference sponsored by Sterne Agee, held February 13-14, 2014 in Boca Raton, Florida (Defendants Ryan and Verdigets); and (4) a presentation to certain institutional investors on June 10, 2015 in New York, New York (Defendants Ryan and Verdigets).

231.   All of Defendants' statements referenced in ¶¶ 227-230 above, were materially false and misleading when issued because, as further described below, Defendants' materially false and misleading misstatements and omissions related to First NBC's investments in tax credit entities, its oil and gas exposure, and its short-term receivable investments served to mask the Company's true capital position throughout the Class Period, which did not, in fact, qualify First NBC as "well capitalized."

## VII.   THE TRUTH ABOUT FIRST NBC'S FINANCIAL CONDITION BEGINS TO EMERGE

232.   By late November to early December 2015, First NBC's stock reached a peak of over $40 per share.   This was based, at least in part, on Defendants' representations concerning the beneficial impacts of the Company's investments in tax credit entities, its transactions on the Receivables Exchange, its internal controls, its purported minimal exposure to the oil and gas industry which was retrenching in the face of declining energy prices, and its allegedly "well capitalized" capital position.   But First NBC's positive story began to unravel early in 2016 as the Company reported its unaudited fourth quarter and full year 2015 results.   Nevertheless, First NBC's stock continued to trade at artificially inflated levels because the truth about the Company's financial condition, exposure to the oil and gas industry and investments in short-term receivables was only gradually revealed in a series of partial corrective disclosures over the course of 2016.

233.   On February 1, 2016, First NBC announced its fourth quarter and full year 2015 financial results.   For the fourth quarter, the Company reported net income of $15.8 million, or $0.82 diluted EPS.   For 2015, it reported net income of $67.3 million, or $3.44 diluted EPS.   The reported earnings were significantly below the consensus estimate of

analysts and were impacted, in part, by an $8.2 million impairment charge associated with First NBC's investments in tax credit entities.  The Company also disclosed that it had made a $69 million investment in a short-term receivable from a "U.S. company that produces ethanol for blending in gasoline" and that $39.7 million in payments on this receivable were past due.  Nevertheless, management asserted that it did not expect to incur any loss on its investment.  First NBC also reported that its exposure to exploration and production in its oil and gas portfolio was $90.2 million, a $16 million increase over the third quarter of 2015.

234.    Commenting on these results, analysts at Sandler O'Neill noted in a report issued on February 2, 2016 that:  "Not only did the bank miss consensus estimates, but it also disclosed some energy-related receivables investments that are currently past due." Sandler O'Neill issued a subsequent report on the same day titled, "Insights From Conversation with Management."  This second report noted, *inter alia*:

> We were definitely disappointed in the bank's 4Q results given the much higher than expected tax credit impairment, the increase in energy-related loans (without a disclosed reserve percentage), and the announcement of past due receivables related to the oil and gas sector (ethanol)…
>
> FNBC had its exposure to energy-related credits increase by ~$16 million q/q, entirely from its one large E&P [exploration and production] credit that now totals $90.2M.  ***This loan is 57% of the bank's energy exposure and was downgrade[d] by the bank's examiner's (sic) in 2Q15.***  This particular credit is responsible for the entirety of the bank's "doubtful" exposure and much of the y/y increase in "substandard."

235.    In response to First NBC's disclosures, including management's communications with Sandler O'Neill, the price of First NBC stock dropped $3.20 per share, from a close of $30.40 per share on February 1, 2016 to a close at $27.20 per share on February 2, 2016, a one-day decline of 10.5%.

236.     Although First NBC's February 1-2, 2016 disclosures conveyed new information to the market concerning, among other things, the fourth quarter tax credit impairment charge, the $69 million ethanol-related receivable, and the $90.2 million exploration and production credit, these disclosures were themselves materially false and misleading in at least several important respects:

(a)     In regard to the tax credit impairment charge, First NBC failed to disclose that its application of the equity method of accounting was improper and that, as a result, the reported $8.2 million charge was materially understated;

(b)     In regard to the $39.7 million in payments that were past due on the ethanol receivable, the Company stated that "based on its analysis of the financial capabilities of the obligor and the receivables seller and after consultation with independent counsel, management does not expect that the Company will incur any loss on its investment in its investment in short-term receivables related to the past due receivables."  Although not disclosed by First NBC, the obligor on the $69 million receivable was an ethanol company known as Abengoa Bioenergy Company, LLC, the United States subsidiary of a Spanish company, Abengoa S.A.   First NBC failed to disclose that both the U.S.-based company and its Spanish parent were severely financially distressed companies.  In fact, Abengoa S.A. had announced in late 2015 that it was filing for preliminary protection under Spanish insolvency laws.  And on February 24, 2016, Abengoa's U.S. subsidiary filed for bankruptcy under Chapter 11.  Thus, First NBC's February 1, 2016 press release led investors to believe that the obligor of the receivable possessed "financial capabilities" when, in fact, it lacked the wherewithal to

make full payment of the receivable.  As a result, the entire $69 million receivable should have been deemed impaired as of year-end 2015; and

        (c)     In regard to oil and gas industry loans, First NBC's February 1, 2016 press release blandly noted that the "Company's exposure to exploration and production was approximately $90.2 million."  First NBC management told Sandler O'Neill analysts that the credit "related to a shallow-water drilling project that has been offline for some time now … but that is now ready to return to production."  These statements failed to disclose that the borrower (*i.e.*, the oil and gas exploration company) had encountered cash flow difficulties when a pipeline serving a well in its largest oil field broke and that First NBC had extended increasing amounts of credit (now up to $90.2 million) so that the borrower could drill a new well in lieu of repairing the pipeline. The statements also failed to disclose that as of year-end 2015, First NBC was required to discount the collateral for this loan and establish a reserve against possible losses.

237.    As further described below, First NBC was ultimately forced to retract the financial results it issued on February 1, 2016.  When, almost eight months later, First NBC finally issued its 2015 audited financial results, the Company **reported a net loss for the year of over $25 million**—rather than the $15.8 million in net income reported on February 1, 2016—based largely on a vastly higher impairment of its tax credit investments, the write-off of the ethanol receivable and the establishment of a reserve allowance on the loan to the exploration and production company.  Thus, **the February 1, 2016 press release overstated First NBC's net income by more than $40 million.**

238.    The second Sandler O'Neill report issued on February 2, 2016 noted that First NBC's "disclosure and communication has been a hindrance to the shares in the

recent term."  Indeed, the Company's press release of the previous day gave rise to so many questions from investors that First NBC felt compelled to issue a Form 8-K on February 11, 2016 that provided supplemental information to the February 1 press release in a question and answer format.  First NBC provided some additional detail concerning the $90.2 million credit relating to the exploration and production company, its accounting for investments in tax credit entities and the $69 million past due receivable relating to the ethanol company, but continued to mislead investors about important aspects of these matters.

239.   For example, the February 11 Form 8-K stated the following in regard to the $90.2 million exploration and production loan:

**Why did the amount of loans to exploration and production increase in the fourth quarter?**

In its 2014 Form 10-K, the Company discussed a large loan to one oil and gas exploration company which had encountered cash flow difficulties when a pipeline serving a well in its largest oil field broke, requiring the well to go off-line for a period of time.  The break occurred on December 29, 2014 and caused the Company to reclassify all of the well's "proved producing reserves" to "proved undeveloped reserves" for purposes of the Company's reserve analysis as of December 31, 2014.  The loss of cash flow from the well subsequently resulted in a reduction of the borrower's cash flow, and the Company's classification of the credit.  In lieu of repairing the pipeline, which was expected to result in a resumption of production at its historical levels of 100-200 barrels per day, the borrower elected to drill a new well, which was expected to increase production capacity to 1,000-1,200 barrels per day.  The Company agreed to finance the new well based on the enhanced revenue expected to be derived from it. The increase in the Company's loans to exploration and production companies during the third and fourth quarters was attributable solely to the increased balances of this borrower related to the drilling of the new well, which is now complete.  Once connected to the pipeline, the production from the well is expected to substantially increase the borrower's cash flow, allowing for debt service and substantial debt reduction over the next five years.  After considering the new well, together with a January 1, 2016 independent engineering valuation of the well's reserves, the Company's collateral position on the loan to this

borrower conforms with the Company's loan policy, and the Company does not expect to recognize any loss with respect to this credit at current oil prices.

240.     This disclosure was tainted by incorrect and misleading information. Contrary to what was stated in the February 11 Form 8-K, First NBC's 2014 Form 10-K did not contain any mention whatsoever of the loan to the exploration and production company and the fact that the company had encountered financial difficulties due to the failure of a pipeline.  First NBC made no mention of any problems with this credit until August 17, 2015, when it filed its Form 10-Q for the quarter ended June 30, 2015.  Even then, the Company stated only that:  "At December 31, 2014 the Company had classified loans in its commercial loan portfolio of $24.8 million classified as substandard.  The increase in the Company's classified commercial loan portfolio compared to December 31, 2014 was due primarily to one exploration and production credit which was affected by the fluctuations in energy commodity prices and the level of production from its shallow-water well."  Thus, First NBC's February 11 Form 8-K marked the first time that the Company acknowledged the financial difficulties of the borrower due to that fact that a pipeline had broken and that First NBC had provided increasing amounts of credit to finance the drilling of a well.  More significantly, while First NBC asserted that it did not expect to recognize any loss on the loan, it failed to disclose that it was required to discount the collateral value of the well and to establish a reserve against the $90.2 million loan.

241.     The February 11 Form 8-K also explained that First NBC had never before taken reserves against its growing exposure to the oil and gas industry and that it was now suddenly taking an $11 million reserve against this exposure, stating:

**Why didn't the Company disclose the amount of its loan loss reserve allocated to oil and gas credit exposure?**

The Company has never disclosed the amount of its reserves allocated to any particular industry.  After a review of the year-end disclosures of banks with significant oil and gas exposure, the Company has determined that such a disclosure may be valuable and will do so in the Company's 2015 Form 10-K.  As of December 31, 2015, the Company had no loans to its direct or indirect oil and gas customers which were classified as impaired and thus had no specific reserves related to its oil and gas industry loans.  However, in view of the substantial decline in oil prices, the Company has taken into account the exposure to the risk of loss in its portfolio within its ALLL methodology due to the oil and gas price decline and has allocated $11 million as of December 31, 2015.

242.    As concerns the $69 million receivable investment related to the ethanol company that was past due, the February 11 Form 8-K provided the following information:

**Give us more information regarding the investment in short-term receivables related to the ethanol company.  Is this another example of oil and gas exposure in the asset portfolio?**

The receivables from the ethanol company were purchased through The Receivables Exchange, a national exchange established to allow vendors to sell their customers' receivables to third party investors.  Under the terms of the exchange contracts, the seller of the receivable is contractually committed to repurchase the receivable back from the seller if payment is not made by a specified repurchase date, subject to certain exceptions.    Thus, the Company, as receivable purchaser, has two potential sources of repayment, the original issuer of the receivables (the ethanol company) or the seller and can choose to pursue either or both.

The failure of the ethanol company to pay the invoices when due was the result of the financial difficulties of its parent, a Spanish "green" energy company with worldwide operations focused on expanding the use of solar power.  This crisis caused U.S. suppliers of grain to the ethanol plants owned by the U.S. subsidiaries of the Spanish company to freeze credit to the ethanol plants for corn purchases, resulting in a shutdown [of] 4 of the 6 ethanol plants owned by the U.S. subsidiaries of the Spanish company.  ***Based on the Company's assessment of the strength of the ethanol industry and the historical earnings performance of the ethanol company and the receivables seller, the Company believes that both the ethanol company and the receivables seller are capable of repaying the***

115

> ***full amount of the receivable balance over time. In addition, the parent corporation of the ethanol company is evaluating certain restructuring options that would permit a more prompt repayment of the receivable.*** As a result of the foregoing, management does not expect that the Company will incur any loss on its investment in short-term receivables related to the past due receivables discussed above. Finally, the receivable issued by the ethanol company represents 95% of the currently outstanding balance in the Company's investment in short term receivables.

The information provided was misleading in that it failed to disclose that the identity of the "Spanish 'green' energy company" was Abengoa S.A. and that Abengoa, in late 2015, had filed for preliminary creditor protection under Spanish insolvency laws. While First NBC asserted that the parent company was "evaluating certain restructuring options that would permit a more prompt payment of the receivable," it failed to disclose that the parent's options were limited as a result of the proceedings under Spanish insolvency laws. Moreover, while First NBC cited the "historical earnings performance" of the U.S. subsidiary ethanol company as a basis for its conclusion that the balance of the receivable was capable of being repaid, it failed to disclose the identity of that company, Abengoa Bioenergy Company, was itself in extreme financial distress that severely constrained its ability to pay. (In fact, as noted above, Abengoa Bioenergy Company, filed for bankruptcy under Chapter 11 less than two weeks later, on February 24, 2016.) As a result, the entirety of the $69 million receivable should have been deemed impaired as of year-end 2015.

243.    The February 11 Form 8-K also discussed the impact of First NBC's accounting for investments in tax credit entities on the Company's reported and anticipated financial results:

> **The fourth quarter net income of $15.7 million is less than the $18.1 million reported for the linked third quarter. What caused this and is**

**it a trend?  Expenses seem to be very high in the fourth quarter and is
this a trend?**

Both of these questions have the same answer, which is related to the
Company's accounting change in the second quarter of 2015 related to tax
credit investments.  Since inception, the Company had accounted for its
tax credit investments using the cost method and had amortized that cost
over its expected holding period for the investment.  This method resulted
in consistent expense recognition from quarter to quarter and from year to
year after giving effect to the growth in the Company's tax credit
investment portfolio.  In June of 2015, the Company adopted the equity
method of accounting for its historic tax credits as a preferable method of
accounting for these investments.  ***As discussed in the Company's June
30, 2015 Form 10-Q, the cumulative effect of the change since the
inception of our tax credit investments was immaterial and recognized in
the second quarter.***  The equity method does not utilize amortization
(consistent write-off of the asset over a useful life) but rather impairment
(recognized only as the investment is impaired, e.g. when it is probable
that the investment balance will not be realized through future cash flow
of the investment).  Under the equity method of accounting, some historic
tax credit investments may not be impaired as long as they are held, while
others may be written down to realizable value as impairment occurs.
This leads to uneven expense recognition from quarter to quarter as
opposed to consistent amortization.

***With this background, the Company recognized no impairment with
respect to its historic tax credit investments during the 3rd quarter of
2015; in the fourth quarter, three such investments became impaired.***
The impairment of $5 million, when combined with the costs associated
with the State Investors Bank acquisition of $703,000, accounted for
substantially all of the difference in profits between the fourth quarter and
the third quarter.  Excluding impairment and acquisition costs, the
Company's earnings increased $1.5 million, or 8%, from third to the
fourth quarter of 2015 and $4.3 million, or 28%, from the fourth quarter of
2014.  The adoption of the equity method of accounting is expected to
continue to impact the results of operations of the Company in the
following manner.  First, the amount of impairment expense recognized by
the Company may continue to be inconsistent from quarter to quarter.
Second, over the term of the investment, the Company expects to
recognize less impairment expense than it would have recognized as
amortization expense because the prior method resulted in the
amortization of the entire investment.  Finally, substantially all of the
impairment expense recognized by the Company is expected to continue
to be associated with the structure of the tax credit investment, rather than
changes in operations or economic conditions, as less than 1% of all
historic tax credit investment projects are recaptured because of business

117

failure. Because substantially all of the impairment expense has been driven by the structure of the tax credit investment, the Company plans to modify the structure of future investments so as to minimize the likelihood of impairment, except in the case of changes in operations or economic conditions.  For so long as impairment remains a meaningful expense on the Company's Statement of Income, the Company intends to continue to present non-GAAP financial information adjusting for impairment and other expenses associated with the Company's investment in tax credit entities to enable investors to better understand the results of operations of the Company.

This discussion was false and misleading because it failed to disclose that the Company's application of the equity method of accounting for its investments in tax credit entities was improper.  It failed to disclose, among other things, that the Company had improperly determined that there was no impairment of historic tax credit investments in the third quarter of 2015 and that the $5 million impairment in the fourth quarter associated with such credits was understated.  It also failed to disclose that, contrary to First NBC's assertion that the cumulative effect of its adoption of the equity method of accounting in the second quarter of 2015 was "immaterial," proper application of the equity method required the Company's previously reported financial results to be restated by highly material amounts.

244.   In response to the February 11 Form 8-K, Sandler O'Neill issued a report on the same day, noting, among other things, that the 8-K "largely reiterates what we already knew" and that "[d]isclosure and communication from the company have greatly constrained the valuation and while this 8k will help, it will still take time for the bank to regain credibility with the Street in our view."  Given that the February 11 Form 8-K was viewed as largely reiterating information that was already known, there was no significant movement in First NBC's stock price on February 11, 2016.  Indeed, the price

of First NBC stock continued to be maintained at artificially inflated levels due to the Company's continued dissemination of false and misleading information to the market.

245.    On March 16, 2016, First NBC stunned the market by filing with the SEC an NT 10-K, Notification of Late Filing, on Form 12b-25, announcing that it would delay filing its Form 10-K for the year ended December 31, 2015.  The Company disclosed that it had identified errors in its accounting for its Federal and State Historic Rehabilitation tax credit entities and other items and that its previous release of 2015 earnings was being retracted.  The Company's filing stated, in pertinent part:

> In connection with the preparation of its Form 10-K for the year ended December 31, 2015, ***the registrant identified errors in its accounting for its Federal and State Historic Rehabilitation tax credit entities and is evaluating the accounting for certain other matters.***  As a result of the time needed by the registrant to evaluate the impact of the errors in its accounting and ***assessment of internal control over financial reporting***, and for the registrant's auditors to evaluate the implications of the adjustments on current and historical financial statements and the registrant's internal control over financial reporting, ***the registrant requires additional time to complete and file its Form 10-K.***
>
> The registrant issued a preliminary earnings release on February 1, 2016 for the quarter ended December 31, 2015.  ***The registrant has determined that the estimates of noninterest expense and income tax benefit contained in this preliminary release will likely be increased, and net income will likely be reduced, from the amounts reported for 2015.***  The registrant is still trying to evaluate and determine the amount of the adjustments and the impact, if any, to the fourth quarter of 2015, prior quarters of 2015, or prior years.  ***As a result, the information contained in the preliminary earnings release should not be relied upon pending the filing of Form 10-K.***

246.    As a result of this news, First NBC stock plunged $5.33 per share, or 22%, to close on March 16, 2016 at $19.09, on extremely high trading volume of over 1 million shares.

247.    Then, on April 8, 2016, the Company filed a Form 8-K and press release with the SEC disclosing that the Company's audit committee and management had determined that *the company's consolidated financial statements for the years ended December 31, 2014, 2013, 2012 and 2011, as well as each of the interim periods within the years ended December 31, 2015, 2014 and 2013, should no longer be relied upon*. First NBC stated that it planned to include restated financial statements as of December 31, 2014 for the years ended December 31, 2014 and 2013, as well as restated selected financial data and a discussion of the effect of the restatement over all covered periods, in its 2015 Form 10-K annual report.   The 8-K further stated:   "The Company's management determined that *the financial statements referred to above should be restated due to an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities and the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities*.  The Company is continuing to review and quantify these and other potentially other less significant matters, which are expected to be reflected in the restated financial statements."

248.    As the Company further stated in its press release:  "The estimated impact of the errors on current and prior periods remains under review and analysis... The company is working to remediate the issues that caused the errors.  The company is also assessing the impact of the identified errors on management's assessment of internal control over financial reporting for the year ended December 31, 2015 and the affected periods noted above."

249.    As a result of this news, First NBC stock fell $0.47 per share to close at $18.65 on April 11, 2016, the next trading day, a decline of 2%.

250.    On June 21, 2016, First NBC issued a press release announcing that NASDAQ had accepted its plan to regain compliance with the listing rules of NASDAQ, to allow for the Company's continued listing on the NASDAQ Global Select Market. The compliance plan called for the Company to file its 2015 Form 10-K by August 15, 2016.

251.    On August 12, 2016, HoldCo Asset Management ("HoldCo"), an investor of $8 million face value of First NBC's subordinated debt, published an open letter to First NBC.  The letter posed a series of questions that mostly concerned First NBC's accounting for its tax credit investments and the significance of the Company's deferred tax asset arising from such investments to the Company's capital position.  HoldCo posited in the letter that First NBC would need to raise at least $300 million in new common equity over the next two years to be considered a "well-capitalized" bank by banking regulators.

252.    In response to the publication of the HoldCo letter, the price of First NBC stock fell $2.21 to close on August 12 at $13.54, a 14% decline on heavy volume of over 1.1 million shares.  On the next trading day, August 15, 2016, First NBC shares declined by an additional $1.33 to close at $12.21, on continued heavy volume of over 910,000 shares.  The Company's stock thus experienced a two-day decline of $3.54 or nearly 22.5% as a result of the publication of the HoldCo letter.

253.    On August 15, 2016, First NBC announced that the filing of its 2015 Form 10-K, which had been expected that day under the terms of the Company's compliance

plan with NASDAQ, was being further delayed as it worked with its auditors to complete and finalize the audit of the Company's 2015 financial statements and the restated financial results of prior years.  The Company also reported that it had been notified by NASDAQ that it was not in compliance with NASDAQ listing rules because it did not timely file its second quarter 2016 Form 10-Q.

254.   On August 25, 2016, First NBC filed its long delayed Form 10-K for the year ended December 31, 2015.  ***First NBC disclosed that the SEC had commenced an investigation of the Company's financial reporting.***  The 2015 Form 10-K also revealed staggering impairment charges in 2015 associated with the Company's investments in tax credit entities and the ethanol company receivable, the establishment of a large reserve associated with the $90 million credit extended to oil and gas exploration company, a restatement of previous financial results that reflected steep declines in net income and other financial metrics as a result of the Company's revised accounting for tax credit entities, a host of material weaknesses in internal controls over financial reporting, and a deteriorating regulatory capital position.

255.   For 2015, First NBC reported a net loss of $25.2 million or a diluted loss per share of $1.36.  The loss was primarily the product of three significant factors:

(a)   First NBC recorded a $59.5 million impairment charge on its investment in tax credit entities.  This impairment charge was the result of the Company's now proper application of the equity method of accounting to such investments;

(b)   First NBC wrote-down the entirety of its $69.9 million investment in the short-term receivables of the ethanol manufacturer.  Contrary to First NBC's

assertion in February 2016 that it did not expect to incur any losses on this investment, the Company's CEO, Defendant Ryan, acknowledged belatedly in a September 8, 2016 conference call with investors and analysts that in "late December of 2015, one of our investments, which was an ethanol manufacturer that had about seven invoices with a total of $69.9 million defaulted.  And the repurchase agreement was not honored by the seller.  And as a result of that, we're going to have to litigate … ***As a result of that, we made a decision to impair the whole amount of the receivable as of 12/31 and to treat it as a recovery when it's collected***;" and

        (c)    First NBC established a $30 million reserve associated with $90.2 million credit extended to the exploration and production company that was forced to drill a new well after the failure of a pipeline serving a well in its largest oil field.  First NBC had asserted in its February 11 Form 8-K that it did not expect to incur any loss on the loan.  But on the Company's September 8, 2016 conference call, Defendant Ryan acknowledged belatedly that because the new well was not complete as of year-end 2015, it "was considered as proved undeveloped.  And that means that it doesn't have access to a pipeline, and it is ***in a category in which the regulatory guidelines requires almost an 80% discount in the collateral value associated with that well.  So we also provided a $30 million reserve in 2015 related to that well***."

256.    The 2015 Form 10-K also included a restatement of First NBC's financial results for the years ended December 31, 2013 and 2014 and for the quarters ending March 31, 2015, June 30, 2015 and September 30, 2015.  The impact of the restatement

on the Company's consolidated statements of income is summarized below:

**Annual Consolidated Statements of Income as Originally Reported**
*(In thousands)*

| Years Ended December 31, | 2015[a] | 2014 | 2013 |
|---|---|---|---|
| Amortization* / Impairment** Expense of Investments in Tax Credit Entities | $18,980** | $14,059* | $8,639* |
| Impairment Expense of Short-term Receivables/Allowance for Oil and Gas Loan | $0 | $0 | $0 |
| Pre-Tax Income/(Loss) | $10,662 | $28,613 | $21,160 |
| Income Tax Expense/(Benefit) | ($56,634) | ($26,976) | ($19,751) |
| Net Income/(Loss) | $67,296 | $55,589 | $40,911 |

**Annual Consolidated Statements of Income as Restated**
*(In thousands)*

| Years Ended December 31, | 2015[a] | 2014 | 2013 |
|---|---|---|---|
| Impairment Expense of Investments in Tax Credit Entities | $59,540 | $25,067 | $13,099 |
| Impairment Expense of Short-term Receivables/Allowance for Oil and Gas Loan | $99,895 | $0 | $0 |
| Pre-Tax Income/(Loss) | ($131,502) | $11,784 | $10,219 |
| Income Tax Expense/(Benefit) | ($106,265) | ($32,723) | ($23,407) |
| Net Income/(Loss) | ($25,237) | $44,507 | $33,626 |

[a] 2015 Originally Stated Income Data is from the February 1, 2016 Form 8-K. Formal financial statements for the full year were never issued until the 2015 Form 10-K was issued on August 25, 2016.

**Quarterly Consolidated Statements of Income as Originally Reported**
*(In thousands)*

| 2015 Quarters Ended | September 30 | June 30 | March 31 |
|---|---|---|---|
| Amortization* / Impairment** Expense of Investments in Tax Credit Entities | $3,253** | $2,647** | $4,852* |
| Pre-Tax Income/(Loss) | $3,639 | $964 | $4,628 |
| Income Tax Expense/(Benefit) | ($14,562) | ($16,228) | ($11,440) |
| Net Income/(Loss) | $18,201 | $17,192 | $16,068 |

**Quarterly Consolidated Statements of Income as Restated**
*(In thousands)*

| 2015 Quarters Ended | September 30 | June 30 | March 31 |
|---|---|---|---|
| Impairment Expense of Investments in Tax Credit Entities | $13,229 | $11,661 | $13,348 |
| Pre-Tax Income/(Loss) | ($6,590) | ($5,891) | ($4,732) |
| Income Tax Expense/(Benefit) | ($18,111) | ($18,596) | ($14,684) |
| Net Income/(Loss) | $11,521 | $12,705 | $9,952 |

257.   The 2015 Form 10-K further revealed that First NBC was beset with numerous material weaknesses in its internal controls over financial reporting.   As acknowledged by the Company, "[t]he control deficiencies failed to prevent and detect a number of accounting errors, which led to the restatement" of financial results.   Among other material weaknesses identified by the Company were an "*ineffective control*

124

*environment*" caused, in part, by "*the dominant influence of the Chief Executive Officer over accounting and reporting matters without adequate transaction level and review controls, to arrive at appropriate conclusions*."   First NBC executive management also *failed to "establish a tone and control consciousness that consistently emphasizes the importance of internal control over financial reporting*."   First NBC also acknowledged that it had insufficient qualified accounting personnel with appropriate expertise and experience in numerous areas, including, among others: accounting for investments in tax credit entities, variable interest entities and business combinations, application of the allowance for loan loss methodology, credit and receivable evaluations and the journal entry and review process.

258.   First NBC described the material weaknesses in internal controls as follows:

### Ineffective Control Environment and Risk Assessment

The Company identified a material weakness related to its control environment and risk assessment, which did not sufficiently promote internal control over financial reporting throughout the Company's management structure.   *Principal contributing factors included the dominant influence of the Chief Executive Officer over accounting and reporting matters without adequate transaction level and review controls, to arrive at appropriate conclusions; insufficient qualified personnel, at both the executive management and staff levels, with appropriate knowledge, experience and training on accounting and reporting matters; the lack of adequate oversight by the Company's Board of Directors ("Board"); and the failure of executive management to establish a tone and control consciousness that consistently emphasizes the importance of internal control over financial reporting, risk management and segregation of duties within the Company.* Impacted areas of the organization included the financial statement closing process, journal entry review and approval process, credit and receivable evaluations and the application of the allowance for loan loss methodology, identification, evaluation, and consolidation of variable interest entities and of the accounting for tax credit investments.   *This material weakness was a contributing factor in the development of the*

*other material weaknesses described below and the Company's restatement of its financial results for all periods presented in this Annual Report on Form 10-K.*

## Monitoring of Credit to Borrowers, Application of the Allowance for Loan Loss Methodology, and Investments in Short-Term Receivables

*The Company identified a material weakness related to the monitoring of certain borrowers' ability to repay loans.*  There were instances in which the valuation of collateral related to certain loans either was inaccurate or did not take into account supporting data available through other sources.   In addition, some loans were evaluated for loss in accordance with ASC 450 when they should have been evaluated for impairment and the creation of a specific reserve in accordance with ASC 310-10.  *This material weakness resulted in material adjustments to the allowance for loan losses subsequent to December 31, 2015 after unaudited annual and fourth quarter financial information had been included in a Form 8-K filed with the Securities and Exchange Commission.*

*The Company also identified a material weakness related to the evaluation and ongoing monitoring of the financial stability and creditworthiness of companies from which the Company acquired short-term receivables.  In this regard, the Company identified a certain short-term borrower that defaulted on a portion of its obligation to the Company.  As a result, the Company recognized an impairment of its investment in short-term receivables for the year ended December 31, 2015.*

## Accounting for Investment in Tax Credit Entities

*The Company identified a material weakness related to the lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax credit related entities and the related evaluation of impairment, if any, associated with these investments. This material weakness resulted in material errors in the amount of impairment recorded, which led the Company to record additional adjustments to the financial statements for all periods presented in this Annual Report on Form 10-K.*

## Identification, Evaluation, and Consolidation of Variable Interest Entities

*The Company identified a material weakness related to the lack of accounting personnel with the technical expertise and knowledge to*

*properly identify certain investments in real estate entities made by the Company and evaluate them under GAAP to determine if the investment qualified as a variable interest entity and whether consolidation was necessary under the applicable accounting guidance.* In addition, certain investments recorded at cost should have been recorded under the equity method of accounting, which would have resulted in the recognition of additional earnings/losses and related impairment charges. *This material weakness resulted in the failure to properly (i) consolidate a variable interest entity that sustained losses over all periods presented in this Annual Report on Form 10-K* and that should have been included in the Company's reports of operations for such periods and (ii) record appropriate amounts of earnings/losses and impairment-related charges over those periods.

### Accounting for Business Combinations

*The Company identified a material weakness related to the lack of accounting personnel with the knowledge of accounting for business combinations in accordance with GAAP to accurately and timely record the necessary valuation adjustments to the acquired assets, liabilities and goodwill at the time of a business combination transaction.* As a result, certain valuation adjustments were not recorded as of the date the relevant business combination was complete as required by GAAP.

### Review of Journal Entries

*The Company identified a material weakness related to the preparation and review of journal entries.* The material weakness resulted from an insufficient formalized process to ensure journal entries were prepared and reviewed by the appropriate management or accounting personnel.

259. The 2015 Form 10-K included E&Y's report on its audit of First NBC's internal controls over financial reporting. E&Y's audit report identified six categories of material weaknesses, consistent with First NBC's description as set forth above.

260. First NBC's 2015 Form 10-K also showed deterioration in the bank's capital position. As of December 31, 2015, the bank fell below "well-capitalized" minimum capital ratios with respect to Tier 1 risk-based capital and total risk-based capital. The decline of these ratios below the minimum threshold for the well-capitalized classification was attributable to the restatements of the Company's reported net income

127

and capital base over the years, as well as the Company's belated write-off of the $69 million ethanol receivable and the belated establishment of a $30 million reserve associated with the loan to the oil exploration and production borrower.

261.   On September 2, 2016, after the close of the market, First NBC filed with the SEC a Form 8-K disclosing that **E&Y had notified the Company "that it was declining to stand for re-appointment" as the Company's independent auditor**.  First NBC stated that E&Y's audit services to the Company would cease upon the Company's filing of its respective Forms 10-Q for the quarters ended March 31, 2016 and June 30, 2016.  As a result of this news, First NBC stock fell by $0.90 on the next trading day, September 6, 2016, to close at $11.95, a decline of 7% on high volume of over 550,000 shares.

262.   On September 23, 2016, after the close of the market, First NBC announced that the filing of its Forms 10-Q for the quarters ended March 31, 2016 and June 30, 2016 would be further delayed.  Under the terms of its plan to regain compliance with NASDAQ listing rules, the Company had been expected to file the reports by September 26, 2016.  As a result of this news, First NBC stock fell by $1.01 on the next trading day, September 26, 2016, to close at $10.00, a decline of about 9% on heavy volume of over 885,000 shares.  A week later, on September 30, 2016, First NBC filed its Form 10-Q for the quarter ended March 31, 2016, reporting results that were by and large in line with the market's expectations.

263.   On October 20, 2016, First NBC filed its Form 10-Q for the quarter ended June 30, 2016.  In addition to reporting the Company's financial results for the quarter, the Company disclosed it had been informed by the Federal Reserve Bank of Atlanta

("FRB") and the Louisiana Office of Financial Institutions ("OFI") that it had been deemed to be in **"troubled condition"** under the relevant banking regulations.  Such designation places restrictions on, among other things, First NBC's ability to incur debt, pay interest and dividends, and appoint new directors and officers.  First NBC disclosed:

> **On October 11, 2016, the holding company was informed in writing by the Federal Reserve Bank of Atlanta ("FRB") and Louisiana Office of Financial Institutions ("OFI") that it is deemed to be in "troubled condition"** under Section 225.71 of Regulation Y. This regulatory designation results in two primary limitations upon the holding company. First, **the Company will be required to seek the prior approval of the FRB before adding any new director or senior executive officer at the holding company level or changing the responsibilities of any current senior executive officer.** Second, the Company may not make indemnification or severance payments to, or enter into agreements providing for such indemnification or severance payments with, institution-affiliated parties, which include key employees and directors of the Company, without complying with certain statutory restrictions including prior approval of the FRB and FDIC.
>
> **The FRB has also advised the Company that in light of its obligation to serve as a source of financial and managerial strength to the Bank, the Company should not incur indebtedness; distribute any interest, principal or other sums on subordinate debentures; declare or pay dividends on any of the Company's equity securities; redeem any corporate stock; or make any other payment representing a reduction in capital, except for the payment of normal and routine operating expenses, without prior FRB and OFI approval.**

264.    As a result of this news, shares of First NBC plummeted by $2.15 to close on October 20, 2016 at $9.05, a decline of 19% on enormous volume of over 1.9 million shares.  First NBC stock continued to fall on heavy volume over the next two trading days, closing at $6.65 on October 24, 2016.  Thus, over the three trading days following disclosure of First NBC's "troubled" designation, the Company's stock declined by $4.45 or 40.6%.  As described above, on November 17, after the close of the market, First NBC

129

reported that it had entered into a Consent Order with FDIC and OFI,  As a result, First

NBC stock declined the next day by $1.75, or 21%, to close at $6.30.

## VIII.  ERNST & YOUNG KNOWINGLY OR RECKLESSLY CERTIFIED THAT FIRST NBC'S FINANCIAL STATEMENTS COMPLIED WITH GAAP

265.   E&Y was First NBC's "independent auditor" throughout the Class Period.

Prior to the Class Period, E&Y also audited the Company's financial statements for the

years ended December 31, 2012 and 2011.[8]  In accordance with GAAS, E&Y was

charged with the responsibility of opining as to whether First NBC prepared its financial

statements in accordance with GAAP.   However, as evidenced by the Company's

disclosures regarding the issues contained in First NBC's 2015 Form 10-K, First NBC's

financial statements from even before the Class Period and its IPO through the end of the

Class Period failed in almost all respects to comply with GAAP.

266.   E&Y knew or recklessly disregarded that First NBC's financial statements

for the years 2011 through 2014, as filed with the SEC in First NBC's Forms 10-K and

other SEC filings, as well as First NBC's reported quarterly financial results during 2015,

were materially overstated and were not presented in accordance with GAAP.

267.   Specifically, E&Y knew, or but for its reckless disregard should have

known, that, among other fraudulent accounting practices, First NBC, in violation of

GAAP:  (i) materially overstated, among other things, the Company's net income,

accumulated earnings, EPS, total assets, total shareholders' equity, and income available

to common shareholders, and materially understated the expenses and/or impairment of

its investments in tax credit entities, through use of the improper amortized cost method

of accounting for its investments in tax credit entities; and (ii) failed to disclose First

---

[8] The audited financial statements for the years ended December 31, 2012 and 2011 were included in the April 8, 2013 Form S-1 filed with the SEC.

NBC's true risk exposure to the oil and gas industry, including failing to disclose the amount of its loan loss reserves that were attributable to the oil and gas industry and, in any event, failing to take any reserves with respect to its oil and gas industry exposure. E&Y also knew, or but for its reckless disregard should have known, that First NBC's internal controls were wholly inadequate during the Class Period and that the Executive Defendants created a culture of fraudulent accounting and inadequate disclosure, where the "tone at the top" was focused on meeting financial expectations and reporting ever-increasing growth and profits.

268.   In addition to the identified accounting improprieties as set forth herein, numerous red flags signaling First NBC's accounting improprieties also existed and were readily apparent had E&Y been conducting its audits in accordance with GAAS.  Indeed, at the beginning of the Class Period, First NBC disclosed that it had previously identified a material weakness in its internal control that related to the accounting for the deferred tax aspects of certain of its investments in the entities that generate tax credits, a business that Defendants admitted was an "integral part of First NBC's commercial banking business" and "core to First NBC's corporate strategy," but had taken actions that the Company believed remediated the material weakness.  As such, the accounting for First NBC's investments in tax credit entities, and its internal controls concerning the Company's tax credit business, should have been a central focus for E&Y.  Thus, in certifying that First NBC's financial statements fairly represented First NBC's financial condition and results of operations in conformity with GAAP, E&Y knowingly or recklessly ignored accounting improprieties, numerous red flags and material internal control deficiencies at First NBC, which should have alerted E&Y to the fact that the

131

Company's financial reporting practices violated GAAP, and that its financial statements were materially false and misleading.

**A.   E&Y's Materially False and Misleading Statements During the Class Period**

269.   Despite the numerous GAAP violations evident in First NBC's financial statements during the Class Period, E&Y expressed unqualified opinions in the auditor's reports it issued, representing that First NBC's financial statements were presented fairly, in all material respects, and in accordance with GAAP for each of the years ended December 31, 2011, December 31, 2012, December 31, 2013 and December 31, 2014. As set forth below, the specific false and misleading statements for which E&Y is charged with liability under Section 10(b) are statements contained in First NBC's Forms 10-K, including, but not limited to, First NBC's financial statements and the notes thereto, as well as E&Y's unqualified auditor's reports on First NBC's financial statements for the fiscal years ended December 31, 2011, December 31, 2012, December 31, 2013 and December 31, 2014.

270.   Specifically, E&Y issued an unqualified auditor's report for the years ended December 31, 2011 and December 31, 2012, which it consented to have included in the Registration Statement for First NBC's IPO.  In that report, E&Y stated that:

> We have audited the accompanying consolidated balance sheets of First NBC Bank Holding Company (the Company) as of December 31, 2012 and 2011, and the related consolidated statements of income, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2012….
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)….
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of First NBC Bank Holding Company as of December 31, 2012 and 2011, and the

132

consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2012, in conformity with U.S. generally accepted accounting principles.

271.   Similarly, for the year-ended December 31, 2013, E&Y audited First NBC's financial statements and issued the following materially false and misleading unqualified auditor's report, dated March 31, 2014:

> We have audited the accompanying consolidated balance sheets of First NBC Bank Holding Company as of December 31, 2013 and 2012, and the related consolidated statements of income, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2013....
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)....
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of First NBC Bank Holding Company at December 31, 2013 and 2012, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2013, in conformity with U.S. generally accepted accounting principles.

272.   And for the year-ended December 31, 2014, E&Y audited First NBC's financial statements and internal control over financial reporting and issued the following materially false and misleading unqualified auditor's report, dated March 31, 2015:

> We have audited the accompanying consolidated balance sheets of First NBC Bank Holding Company as of December 31, 2014 and 2013, and the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2014....
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)....
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of First NBC Bank Holding Company at December 31, 2014 and 2013, and the consolidated results of its operations and its cash flows for each of the

three years in the period ended December 31, 2014, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), First NBC Bank Holding Company's internal control over financial reporting as of December 31, 2014, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated March 31, 2015 expressed an unqualified opinion thereon.

273.     However, contrary to E&Y's opinions, First NBC's financial statements were materially misstated throughout the Class Period.  Although First NBC management has acknowledged that the Company's financial statements, including Forms 10-K and 10-Q during the Class Period, were materially misstated, E&Y has only expressed an adverse opinion in regards to the effectiveness of the Company's internal control over financial reporting for the year ended December 31, 2015.  Thus, even now, E&Y has not altered any of its opinions related to the years 2014 and 2013 despite the fact that First NBC management has disclosed such periods had material misstatements in the financial statements and likely material weaknesses in the Company's internal control over financial reporting.  Further, as set forth below, E&Y's audits of First NBC's financial statements for these years were not performed in accordance with GAAS and, as such, E&Y's representations were materially false and misleading in numerous respects.

**B.     E&Y's Audits Were Not Conducted in Accordance with GAAS**

274.     Audit firms that provide opinions upon the financial statements of registrants with the SEC, including E&Y, are required to be registered with the Public Company Accounting Oversight Board ("PCAOB").  All such auditors are also subject to

the professional standards adopted and promulgated by the PCAOB, which constituted the prevailing audit standards throughout the Class Period.[9]

275.    The fair presentation of financial statements in conformity with GAAP is the responsibility of a company's management.  The external auditor's responsibilities are to (1) plan and perform an audit to obtain reasonable assurance about whether financial statements are free of material misstatement, whether caused by error or fraud, (2) express an opinion on "the fairness with which [such financial statements] present, in all material respects, financial position, results of operations, and its cash flows in conformity with [GAAP] and (3) to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period."  AU 110, *Responsibilities and Functions of the Independent Auditor* ("AU 110"), AU 110.01-.02.

276.    Additionally, an auditor of an SEC-registered entity such as E&Y is also required to provide an opinion upon the effectiveness of the Company's system of internal control over financial reporting.  As discussed above, E&Y provided audit opinions during the Class Period that opined that First NBC's financial statements were free of material misstatement and the Company's internal control over financial reporting was working effectively.  Specifically, E&Y issued unqualified opinions[10] in regard to the Company's annual financial statements in the 2013, 2014, and 2015 Forms 10-K and

---

[9] The Auditing Standards ("AUs") emanate from the AICPA Auditing Standards Board and were adopted by the PCAOB.  Such standards are referred to as Generally Accepted Auditing Standards ("GAAS").

[10] An unqualified opinion states that the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles. This is the opinion expressed in the standard report…  AU 508, *Reports on Audited Financial Statements* ("AU 508"), AU 508.10 (footnotes omitted).

also to the effectiveness of the Company's internal control over financial reporting in the 2014 Form 10-K.

277.    A violation of any of the PCAOB standards, especially in the event that the financial statements of the entity being subjected to the audit are materially misstated – either because of the violation or for some other reason – represents a failure on the part of the auditor to have adequately complied with the applicable professional standards.  In certifying First NBC's financial statements, E&Y falsely represented that its audits were conducted in accordance with GAAS when, in fact, E&Y violated GAAS in numerous respects during the course of its "audits" of First NBC's financial statements.

### 1.    E&Y Failed to Exercise Due Professional Care and Professional Skepticism

278.    The overarching obligations to which an auditor must adhere when performing procedures underlying the expression of an audit opinion are the exercise of due professional care and professional skepticism. Auditing standards accepted and promulgated by the PCAOB require auditors to exercise due professional care in all phases of an audit, including the planning and performance of the audit, as well as in the preparation of the audit report.  AU 230.01, .08.

279.    The concept of due professional care is defined, in essence, as "…what the independent auditor does and how well he or she does it."  AU 230.04.  Further, AU 230 defines due professional care as "the degree of skill commonly possessed by other auditors" which requires an auditor to exercise "reasonable care and diligence" and "professional skepticism."  AU 230.05, .07.  Professional skepticism is described "an attitude that includes a questioning mind and a critical assessment of audit evidence." AU 230.07-.09.

136

280.     The exercise of due professional care and professional skepticism underlies all phases of an auditor's process for carrying out his/her responsibilities of planning and performing an audit to obtain reasonable assurance about whether such financial statements are free of material misstatement (as described by AU 316), whether caused by error or fraud.   Due professional care and professional skepticism are particularly important to an auditor's efforts to (1) determine areas to be tested and the nature, timing, and extent of the tests to be performed, (2) interpret the results of audit testing, and (3) evaluate audit evidence.  AU 230.11.

281.     The importance of the relationship between the exercise of professional skepticism and an auditor's consideration of the risk of material misstatement due to fraud is described by AU 316 in the following manner:

> Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. ***The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred.*** In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU 316.13.

282.     The Appendix to AU 316 provides numerous examples of fraud risk factors to be considered by an auditor as part of his/her assessment of the risk of material misstatement in an entity's financial statements due to fraud.  AU 316.85.  While fraud risk factors are not necessarily indicative of actual fraud, these risks factors trigger, in the

context of a financial statement audit, heightened scrutiny on the part of the auditor. Thus, when an auditor is aware of risk factors from prior audits or has determined that fraud risk factors are present, he or she should respond, for instance, by modifying the nature, timing and extent of audit procedures performed.  AS 13.14.

283.   If, after consideration of the aforementioned guidance, and after appropriately modifying his/her audit approach to respond to the existence of fraud risk factors, the auditor has determined that misstatements in the financial statements may be the result of fraud, the auditor is then required by AU 316 to do the following: (1) discuss the matter and approach for further investigation with an appropriate level of management, (2) if the fraud involves senior management or causes a material misstatement of the financial statements report directly to the audit committee, (3) consider whether significant deficiencies exist that must be communicated to senior management and the audit committee, and/or  (4) consider communicating other fraud risks it had identified.  AU 316.81-.89.

284.   In First NBC's Registration Statement filed on April 8, 2013, the Company's management disclosed material weaknesses related to accounting for investments in tax credit entities.  As evidenced by such disclosures and the subsequent material weaknesses disclosed in the Company's 2015 Form 10-K, First NBC had numerous material weaknesses that were prevalent during the Class Period.  *Despite being aware of the fact that the Company had identified a material weakness in its internal control over financial reporting relating to the accounting for investments in tax credit entities, primarily with respect to the quality and capability of the accounting staff at the Company, E&Y failed to: (1) exercise due professional care and a*

*heightened level of professional skepticism, (2) sufficiently identify and/or address many of the risk factors identified within AU 316 about which it either had knowledge or should have had knowledge as a result of its role as external auditor, and (3) modify the nature and extent of its audit procedures in the face of known information, with respect to its review and audit procedures for the financial statements of First NBC as of and for the years ended December 31, 2014 and 2013.*  E&Y failed, therefore, to satisfy the required criteria established within AU 230, AU 316, and AS 13, among others discussed below.

### 2.      E&Y Failed to Properly Assess Audit Risk

285.    Auditing Standard ("AS") 8 provides guidance on the auditor's consideration of audit risk when performing an audit of financial statements in accordance with the PCAOB.  AS 8 states:

> [T]he auditor must plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement due to error or fraud.  Reasonable assurance is obtained by reducing audit risk to an appropriately low level through applying due professional care, including obtaining sufficient audit evidence.

AS 8.03 (footnotes omitted).

286.    Audit risk is defined as the risk that the auditor expresses an inappropriate audit opinion when the financial statements are materially misstated.  Further, audit risk is "a function of the risk of material misstatement and detection risk"[11] that exists in the context of an audit or that is created by audit procedures performed or not performed by the auditor.  AS 8.04.

---

[11] Detection risk is the risk that procedures performed by the auditor will not detect a misstatement that exists and that could be material.  AS 8.09.

287.    AS 8 provides that the auditor is required to assess the risks of material misstatement at the financial statement level[12] and at the assertion level.[13]  AS 8.05.  The auditor then uses the assessed risk of material misstatement to determine the appropriate level of detection risk – or the risk that material misstatements in the financial statements will not be identified.  As noted in AS 8, "[t]he higher the risk of material misstatement, the lower the level of detection risk needs to be in order to reduce audit risk to an appropriately low level."  AS 8.10.

288.    During the course of its audits of First NBC, E&Y failed to adequately identify and/or address particular audit risks emanating from all of the information of which it was aware and from particular audit issues that arose in connection with its planning and risk assessment of audit engagements during the Class Period.  Most specifically, E&Y failed to adequately address the risk that the Company's financial statements might be materially misstated as a result of an identified and ongoing material weakness in its internal control over financial reporting.

### 3.    E&Y Failed to Properly Identify and Assess the Risk of Material Misstatement

289.    AS 12 establishes requirements of the auditor regarding the process of identifying and assessing risks of material misstatement of the financial statements.  AS 12.01.  AS 12 requires the auditor to "perform risk assessment procedures that are sufficient to provide a reasonable basis for identifying and assessing the risks of material

---

[12] Risk of material misstatement at the financial statement level may be especially relevant to the auditor's consideration of the risk of material misstatement due to fraud.  AS 8.06.

[13] Risk of material misstatement at the assertion level consists of *inherent* risk and *control* risk.  Inherent risk refers to the susceptibility of an assertion to a misstatement that could be material before consideration of any related controls.  Control risk refers to the risk that a misstatement could occur in an assertion and that could be material will not be prevented or detected on a timely basis by the company's internal control.  AS 8.07

misstatement,[14] whether due to error or fraud," and offers guidance as to the design of further audit procedures."  AS 12.04 (footnote added).

290.    As noted in this standard,  the "risk of material misstatement can arise from a variety of sources, including external factors, such as conditions in the company's industry and environment, and company-specific factors, such as the nature of the company, its activities, and internal control over financial reporting."  AS 12.05.

291.    AS 12 requires that certain audit procedures be performed to identify and appropriately assess the risks of material misstatement in financial statements, which includes consideration of both external factors and company-specific factors. The risk assessment procedures include:

   a.  Obtaining an understanding of the company and its environment;

   b.  Obtaining an understanding of internal control over financial reporting ;

   [….]

   f.  Inquiring of the audit committee, management, and others within the company about the risks of material misstatement.

AS 12.05.

292.    During its audits for the relevant timeframe, E&Y failed to appropriately identify and assess the risk of material misstatement of the financial statements by, among other things, ignoring and/or failing to adequately consider certain external and company-specific factors that would have impacted such risk including (1) known deficiencies in the Company's internal control over financial reporting, including the dominant influence of Defendant Ryan; (2) previously-identified material weaknesses,

---

[14] In an integrated audit, the risks of material misstatement of the financial statements are the same for both the audit of internal control over financial reporting and the audit of financial statements. The auditor's risk assessment procedures should apply to both the audit of internal control over financial reporting and the audit of financial statements.  AS 12.06.

especially in view of the information of which E&Y was or became aware during the course of its engagement as set forth in the preceding section; and (3) Defendant Ryan's powerful, personal motive to maintain First NBC's stock price at elevated levels given that almost all the First NBC stock he owned, 435,000 shares out of a total of 475,000, was pledged as collateral for various debt obligations, including real estate investments.

293.    As discussed herein, E&Y failed to conduct its audits of the Company's financial statements as of and for the years ended December 31, 2013 and 2014 in accordance with PCAOB standards.  E&Y failed to exercise due professional care and professional skepticism, and to act in good faith, by failing to (1) properly assess the risk of material misstatement due to error in accounting and financial reporting, specifically errors in the accounting for investments in tax credit entities, which had been a historic, recurring problem at First NBC, (2) properly assess the control environment and risk assessment elements of the Company's internal control over financial reporting, including previously-identified material weaknesses relating to the Company's investments in tax credit entities, and (3) appropriately respond to, and thereby essentially ignore, the presence of certain known audit and fraud risk factors and inherent risks particular to First NBC, including but not limited to the risk posed Defendant Ryan's dominant influence over accounting and reporting matters and the fact that Defendant Ryan had pledged as collateral for his personal investing purposes so much (435,000 shares) of his total First NBC share holdings (475,000 shares).

## 4.    E&Y Failed to Properly Plan Its Audits

294.    AS 9 provides guidance on the auditor's responsibilities to properly plan the audit.  *See, e.g.,* AS 9.04.  Planning an audit includes establishing the overall audit strategy and developing an audit plan -- which includes, planned risk assessment

procedures and planned responses to the risks of material misstatement.  AS 9.05.  In developing the audit strategy and audit plan, the auditor should evaluate whether a number of matters are important to the company's financial statements and internal control over financial reporting.  These matters include among other things:

- ***Knowledge of the company's internal control over financial reporting obtained during other engagements performed by the auditor;***

- Matters affecting the industry in which the company operates, such as financial reporting practices, economic conditions, laws and regulations, and technological changes;

- Matters relating to the company's business, including its organization, operating characteristics, and capital structure;

- The auditor's preliminary judgments about materiality, risk, and, in integrated audits, other factors relating to the determination of material weaknesses;

- ***Control deficiencies previously communicated to the audit committee or management;***

- Legal or regulatory matters of which the company is aware;

- ***The type and extent of available evidence related to the effectiveness of the company's internal control over financial reporting;***

- ***Preliminary judgments about the effectiveness of internal control over financial reporting;***

- Public information about the company relevant to the evaluation of the likelihood of material financial statement misstatements and the effectiveness of the company's internal control over financial reporting.

AS 9.07 (footnotes omitted).

295.    The auditor should also consider numerous factors which are relevant to the assessment of the risks of material misstatement associated with a particular location or business unit and to the determination of necessary audit procedures.  These factors include:

143

    c.   The specific risks associated with the location or business unit that present a reasonable possibility of material misstatement to the company's consolidated financial statements;

[….]

    f.   The effectiveness of the control environment, particularly with respect to management's control over the exercise of authority delegated to others and its ability to effectively supervise activities at the location or business unit; and

    g.   The frequency, timing, and scope of monitoring activities by the company or others at the location or business unit.

AS 9.12.

296.    In regard to such risk assessments, when conducting an audit of the financial statements of a company holding investments in tax credit entities, as was the case with First NBC, the auditor should determine the extent to which audit procedures should be performed to verify that current, accurate information is available to obtain sufficient appropriate evidence to attain reasonable assurance about whether the consolidated financial statements are free of material misstatement.  This includes determining the valuation of the entities, the various IRS regulations governing tax credits and entities setup to receive such credits, the number and diversity of entities invested in by the Company, the legal structure of the entities and identified or unidentified VIEs, and the treatment of tax credits available to the entity.  As such, E&Y should have planned its audit, in accordance with PCAOB standards, to include procedures to mitigate the risk of material misstatement in First NBC's financial statements relating to these areas, and the nature, timing, and extent of procedures related to auditing the Company's investments in tax credit entities accordingly.  AS 9.11.

297.    During the course of an audit, the auditor should modify the overall audit strategy and the audit plan, as necessary, if circumstances change significantly during the course of the audit, including changes that might arise from a revised assessment of the risks of material misstatement or the discovery of a previously-unidentified risk of material misstatement.  AS 9.15.  In the case of First NBC, E&Y was aware from the beginning of the Class Period that management had (a) a historic problem accounting for investments in tax credit entities, (b) there was a lack of sufficient, competent managers and staff in the Company's accounting department with knowledge of GAAP for accounting for investments in tax credit entities, and (c) both a material weakness in internal control over financial reporting and material restatements in the December 31, 2012 Annual Report had been identified related to investments in tax credit entities.  E&Y was also aware that, throughout the Class Period, First NBC management touted the Company's investments in tax credit entities *"an integral part of First NBC's commercial banking business"* and *"core to First NBC's corporate strategy,"* and as something unique that differentiated First NBC from other banks.  Thus, during the course of its audits throughout the Class Period, E&Y should have been aware that misstatements in accounting for investment in tax credit entities was an extremely high risk area to their audit and altered its audit procedures and the type of audit evidence it obtained to mitigate such risk.

### C.    E&Y Acted With Scienter

298.    E&Y acted with scienter in violating these most fundamental principles of GAAS, and in expressing its materially false and misleading unqualified audit opinions regarding First NBC's financial statements in that E&Y either had actual knowledge of, or recklessly disregarded, the fact that First NBC's financial statements violated GAAP

and were materially false and misleading.  Indeed, as discussed above, E&Y's audits were so deficient that they amounted to no audits at all, and, as a result, E&Y had no reasonable bases to issue its unqualified audit opinions upon which it knew investors would rely.

299.    In conducting its audits for the fiscal years ended December 31, 2011 through December 31, 2014, E&Y had access to the files and key employees of the Company at all relevant times.  As a result of the auditing and other services it provided to First NBC, E&Y personnel were present at First NBC's corporate headquarters throughout each year, and had continual access to and knowledge of First NBC's confidential internal corporate, financial, operating, and business information, and had the opportunity to observe and review the Company's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as the Company's internal controls and structures.

300.    Based on this level of presence, access and involvement, E&Y's failure to: (i) act on the improprieties it uncovered during its audits of First NBC and (ii) detect First NBC's rampant accounting manipulations, can only be the product of actual knowledge or severe recklessness.  First NBC has now admitted that its financial statements both during and before the Class Period did not comply with GAAP.  Moreover, the Company's disclosures in its Forms 8-K issued March 16, 2016 and April 8, 2016 and in the Company's 2015 Form 10-K establish a pervasive dereliction by First NBC management in complying with the basic requirements of GAAP.  Therefore, E&Y's unqualified opinions during the Class Period, stating that First NBC's financial statements did comply with GAAP, were false and violated GAAS.

301.    Further, during the Class Period, E&Y provided First NBC with independent accounting, auditing and tax services, as well as with accounting advice and consultation regarding First NBC's annual and quarterly reports that the Company filed with the SEC and publicly distributed.   For these services, E&Y was highly compensated and, as such, First NBC was a valuable client of E&Y.

302.    According to First NBC's proxy statements, E&Y was paid a total of over $10 million for its services to First NBC from 2012 through 2015.   This included payments of $2.31 million in 2012 ($851,066 in audit fees, $1,322,600 in audit-related fees, and $143,125 in tax fees), $1.1 million in 2013 ($513,599 in audit fees, $418,025 in audit-related fees, and $165,500 in tax fees), $1.85 million in 2014 ($1,636,649 in audit fees, $73,200 in audit-related fees, $134,000 in tax fees, and $3,100 in all other fees), and $5.25 million in 2015 ($5,027,309 in audit fees, $222,450 in tax fees, and $1,500 in all other fees).   These payments raise serious questions, especially in light of the extensive GAAS violations alleged above and the significant overstatements that E&Y allowed First NBC to report at the same time E&Y issued unqualified, "clean" opinions concerning the Company's financial statements, as to whether E&Y conducted its audits with due care and with an independent, and indeed critical, viewpoint, as is required by GAAS.   E&Y participated in the wrongdoing alleged herein in order to retain First NBC as a client, to protect the lucrative fees it received from First NBC, and to get Defendant Ryan's recommendation for other potential business.

303.    For the reasons set forth above, E&Y utterly failed in its role as auditor. E&Y disregarded its duty to perform proper audits of First NBC and failed to take any reasonable steps to ensure that its audit opinions were accurate.   For the severely reckless

and/or knowing failures of E&Y to comply with GAAS, as set forth above, E&Y violated the federal securities laws.

## IX.    ADDITIONAL FACTS RELEVANT TO SCIENTER

304.    Each of the Executive Defendants acted with scienter in that, as set forth herein, each knew or recklessly disregarded that First NBC's publicly reported financial results issued during the Class Period were materially false and misleading.  Defendants Ryan and Verdigets were the senior management of the Company, and thus at all times were the ones with principal responsibility for ensuring that the Company's financial statements were accurate, truthful and prepared in accordance with GAAP.  Yet, as the Company itself has acknowledged, the accounting improprieties occurred in part because of an *"ineffective control environment"* due to *"the dominant influence of the Chief Executive Officer over accounting and reporting matters without adequate transaction level and review controls, to arrive at appropriate conclusions."*  While First NBC only acknowledged the material weakness arising from Defendant Ryan's dominant influence in 2016, such influence was, in fact, pervasive from before First NBC's inception as a public company.

305.    While this admission alone is strong evidence of scienter, this Complaint is replete with multiple specific instances where Defendants Ryan and Verdigets intentionally and purposefully made materially false and misleading statements or omitted to disclose material information, and caused the Company to do the same, in a coordinated effort to artificially inflate First NBC's reported profitability and to avoid disclosure of material negative information about the Company from investors. Defendants Ryan and Verdigets did so despite their clear knowledge of non-public facts

148

that plainly contradicted the public statements they were making, and that they were causing the Company to make, or served to reveal that those statements were plainly misleading when made.  At a minimum, the conduct of Defendants Ryan and Verdigets constituted an extreme departure from the standards of ordinary care that they knew presented a significant danger of misleading investors as to First NBC's true financial condition.

306.    For example, at the beginning of the Class Period, the Company disclosed that it had been forced to restate financial results from prior periods due to a material weakness in the Company's internal control related to the accounting for the deferred tax aspects of certain of its investments in the entities that generate tax credits.  Specifically, the Company "determined that the errors that required the restatement were caused by a lack of a sufficient number of accounting employees with the appropriate technical skills and knowledge regarding the income tax accounting for [its] tax credit investments."  First NBC, however, reassured investors that it had taken what it believed were "the appropriate actions to address the weakness, including hiring additional accounting personnel, providing training to our personnel to develop the expertise in tax credits, using outside accountants and consultants to supplement our internal staff when necessary, and implementing additional internal control procedures."  The filing with the SEC that included this representation – the Registration Statement for the IPO – was signed by Defendants Ryan and Verdigets, and thus, the statement is directly attributable to them, as well as the Company.

307.    Defendants Ryan and Verdigets knew that First NBC's business of investing in tax credit entities was of critical importance to the Company's financial

results and, as such, it was of critical importance to investors.[15]   In fact, in periodic investor presentations throughout the Class Period, Defendants Ryan and Verdigets recognized and stressed the importance of this business to the Company and its investors, highlighting it as a *"unique feature"* with *"[s]trong financial returns"* that was *"an integral part of First NBC's commercial banking business"* and *"core to First NBC's corporate strategy."*   Defendants Ryan and Verdigets also assured investors that First NBC *"[m]anagement [had] a deep understanding of this business."*   All of these statements, which were made by Defendants Ryan and Verdigets at investor presentations during the Class Period – as specifically identified above – are also directly attributable to these Defendants.

308.    Throughout the Class Period, Defendants Ryan and Verdigets also signed SOX certifications attesting that, among other things, (1) First NBC's financial statements did not contain untrue statements of material fact or omit to state material facts necessary to make the statements made not misleading; (2) the financial statements fairly presented in all material respects the financial condition, results of operations and cash flows of First NBC; and (3) they had designed and evaluated the effectiveness of the Company's disclosure controls and procedures, including disclosing any change in First NBC's internal control over financial reporting.   These certifications by Defendants Ryan and Verdigets, which were issued each quarter as identified above, not only assured investors that First NBC's financial results were accurate and free of misstatement, but also served to corroborate the Company's assertions that any prior material weakness had been properly addressed.   Given the Company's prior restatement and material weakness,

---

[15] As set forth more fully herein, in 2013 and 2014, the tax credit benefits achieved from these investments accounted for 48.2% and 48.5%, respectively, of First NBC's reported net income.

the Company's assurances regarding the steps taken to address the material weakness, and that the prior restatement and material weakness centered on such an admittedly important part of First NBC's business, Defendants Ryan and Verdigets were under a heightened duty to monitor First NBC's internal control over financial reporting and make accurate SOX certifications.

309.    Despite their knowledge of the importance of First NBC's tax credit business to investors and the concern of investors regarding First NBC's prior restatement and material weakness with respect to this business, and despite their *explicit reassurances* to investors concerning their expertise with respect to First NBC's tax credit business, First NBC would ultimately be forced to restate its financial results for periods covering its entire history as a publicly traded company (and for prior periods as well), acknowledging that its prior financial statements were false *at the time they were issued* due to misstatements related to, among other things, its accounting for the Company's investments in tax credit entities.  Specifically, the Company (1) used an improper amortized cost method of accounting for its investments in tax credit entities, allowing it to artificially reduce the Company's expenses; (2) improperly failed to recognize any impairment on its investments in tax credit entities throughout most of the Class Period, though it knew at the time those investments were in fact impaired; and (3) improperly failed to consolidate certain investments in federal low income housing tax credit entities.  As set forth herein, the proper application of GAAP to the Company's investments in tax credit entities had an enormous impact on the Company's financial results.  Moreover, the fact that First NBC and Defendants Ryan and Verdigets stated that the Company conducted impairment analyses when, in truth, such impairment analyses

were not conducted until very late in the Class Period, indicates not only that the earlier statements were materially false and misleading, but that they were also made knowingly and/or with severe recklessness.

310.    First NBC also acknowledged in its 2015 Form 10-K signed by Defendants Ryan and Verdigets, which contained the Company's restatement of its financial results and was issued on August 25, 2016, that the information upon which the restatement was based *was available at the time of the prior financial statements.*  It further belatedly disclosed a material weakness relating to First NBC's accounting for tax credit entities in terms that were very similar to those that described the previously-disclosed material weakness in 2012:  a *"lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax related entities…."*

311.    These facts as alleged more fully herein with respect to the Company's accounting for its investments in tax credit entities support a strong inference of scienter against Defendants Ryan and Verdigets, as well as the Company.  At a minimum, the actions of Defendants Ryan and Verdigets during the Class Period – for which First NBC is also liable – constituted an extreme departure from the standards of ordinary care that they knew presented a significant danger of misleading investors as to First NBC's true financial condition.  This is especially true when considered collectively with the other allegations of misconduct alleged herein.

312.    With respect to the Company's exposure to the oil and gas industry, Defendants Ryan and Verdigets knew that plummeting oil prices beginning in mid-2014 meant that the Company should have taken reserves with respect to its oil and gas

industry loans.  However, instead of taking these reserves, which would have negatively impacted the Company's financial results, Defendants Ryan and Verdigets told investors that they should not worry about any such exposure.  Specifically, Defendant Ryan told investors that First NBC had **"very limited exposure"** to the oil and oil service industries, and in the Company's 2014 Form 10-K Defendants Ryan and Verdigets caused the Company to state that **"[m]anagement believes that the recent downturn in oil prices should not have a near term impact on its oil and gas portfolio, which is primarily to oil and gas service companies."**  Defendants Ryan and Verdigets knew, at the time these statements were made, that plummeting oil prices could have an impact on First NBC's business, and that they should reserve for that impact.  Yet not only did they fail to do so, but they issued statements and caused First NBC to issue statements falsely portraying the Company's exposure to the oil and gas industry.  Later, First NBC would take an $11 million reserve as of December 31, 2015, specifically related to "the substantial decline in oil prices," and, in the Company's 2015 Form 10-K, would recognize a material weakness in its application of the allowance for loan loss methodology.

313.    Defendants Ryan and Verdigets also knew about a large loan made by First NBC to an oil exploration and production company, and the details concerning that loan, **but purposefully misled** investors with respect to the loan and its problems.  Specifically, Defendants Ryan and Verdigets knew that (1) First NBC had made a large loan to an oil exploration and production company; (2) the oil exploration and production company had encountered cash flow difficulties as early as December 29, 2014, when a pipeline serving a well in its largest oil field broke; and (3) in lieu of repairing the pipeline, the oil exploration and production  company decided to drill a new well, which

First NBC agreed to finance and that would eventually cause the loan to balloon to a total balance of $90.2 million.  Despite having all of this information, Defendants Ryan and Verdigets initially caused First NBC to omit discussion of the loan entirely, ***with no mention of the loan appearing in either First NBC's 2014 Form 10-K issued on March 31, 2015 or in the Company's First Quarter 2015 10-Q issued on May 8, 2015***.

314.    When First NBC finally did discuss the loan, Defendants Ryan and Verdigets caused the Company to issue false and misleading statements about the loan and its status, including a statement in the Company's Second Quarter 2015 10-Q, issued on August 17, 2015, that the loan was ***"affected by the fluctuations in energy commodity prices and the level of production from its shallow-water well."***  A similar disclosure was made in the Company's Third Quarter 2015 10-Q issued on November 9, 2015.  All of these statements were signed by Defendants Ryan and Verdigets, and accordingly, all are directly attributable to them.

315.    Only later would the Company reveal, in a contradictory SEC filing signed by Defendants Ryan and Verdigets, the full details regarding the problems with the loan, of which Defendants Ryan and Verdigets had been aware.  And even then, First NBC failed to disclose that it was required to discount the collateral value of the well and establish a reserve against the $90.2 million loan.  The appropriate reserve – $30 million (approximately one-third of the total loan amount) – was later disclosed in the Company's 2015 Form 10-K.

316.    These facts as alleged more fully herein with respect to the Company's exposure to the oil and gas industry support a strong inference of scienter against Defendants Ryan and Verdigets.  At a minimum, the actions of Defendants Ryan and

Verdigets during the Class Period constituted an extreme departure from the standards of ordinary care that they knew presented a significant danger of misleading investors as to First NBC's true financial condition.  This is especially true when considered collectively with the other allegations of misconduct alleged herein.

317.    With respect to First NBC's investments in short-term receivables on the Receivables Exchange, Defendants Ryan and Verdigets knew that there were risks in making such investments in short-term receivables, but during the Class Period caused First NBC to issue statements in its periodic filings with the SEC touting the attractive yields the Company received through those investments and reassuring investors that First NBC performed a review of all sellers from which it purchased receivables over the exchange and that its agreements provided recourse against those sellers.

318.    Defendants Ryan and Verdigets also knew that First NBC had purchased $69 million in receivables from an ethanol company through the Receivables Exchange in 2015, and that the ethanol company had failed to make payments under the contract when due.  While First NBC disclosed that the failure of the ethanol company to make the payments was due to the financial difficulties of its parent, which it described as a Spanish "green" energy company, Defendants Ryan and Verdigets knew the identity of this Spanish company as Abengoa SA.  Defendants Ryan and Verdigets also knew that Abengoa, in 2015, *had filed for preliminary creditor protection under Spanish insolvency laws*.  Defendants Ryan and Verdigets also knew that the ethanol company itself, Abengoa Bioenergy Company, was also in extreme financial distress.  However, rather than disclose this clearly material information and take an impairment with respect to the Company's investment, Defendants Ryan and Verdigets actively misled investors

about the Company's risk of loss on its investment, causing First NBC to tell investors that, based on First NBC's assessment of the strength of the ethanol industry and the historical earnings performance of the ethanol company and the receivables seller, the Company believed that both the ethanol company and receivables seller were capable of repaying the full amount of the receivables balance over time and that *"management does not expect that the Company will incur any loss on its investment in short-term receivables" related to this contract.* Defendants Ryan made these representations in the Company's Form 8-K SEC filing of February 11, 2016, which he signed and, therefore, which is directly attributable to him.   In sharp contrast to these knowing misrepresentations, it was only in the 2015 Form 10-K, issued on August 25, 2016, that the Company wrote-down the entirety of its $69.9 million investment in the short-term receivables of the ethanol manufacturer.

319.    These facts as alleged more fully herein with respect to the Company's investments in short-term receivables support a strong inference of scienter against Defendants Ryan and Verdigets.   At a minimum, the actions of Defendants Ryan and Verdigets during the Class Period constituted an extreme departure from the standards of ordinary care that they knew presented a significant danger of misleading investors as to First NBC's true financial condition.   This is especially true when considered collectively with the other allegations of misconduct alleged herein.

320.    The magnitude, duration and nature of the fraud also establishes scienter on the part of Defendants Ryan and Verdigets, as well as the Company.   *First*, each misstatement within the financial statements issued during the Class Period *had an impact in inflating the Company's reported financial results*.   This was true of the

misstatements relating to (a) the tax credit entities, (b) First NBC's overall oil and gas exposure as well as its loans to the oil exploration and production company, and (c) the $69 million in receivables from the ethanol company through the Receivables Exchange. The fact that each of the misstatements within these sectors led to more rather than less inflation in the Company's reported results – and therefore more inflation in the Company's stock price – serves to confirm that these were not innocent mistakes or even the product of negligence.  If they had been, chances are that at least some of them would have pointed in the other direction.

321.   **Second,** as noted herein, the restatement was massive, impacting by clearly material amounts each prior financial statement First NBC had issued as a public company, as well as prior periods.  Rather than the impairment of $19 million with respect to its investment in tax credit entities that the Company reported in its February 1, 2016 press release, First NBC's 2015 Form 10-K ultimately disclosed that *the correct impairment amount was $59.5 million – approximately three times the amount initially reported.*  Further, while First NBC previously reported net income for 2015 of $67 million, First NBC admitted that it actually suffered a loss of $25 million, *a staggering decrease of over $92 million.*  As detailed above, the Company also made significant negative adjustments to its previously-reported net income figures for 2014 and 2013.

322.   **Third**, in its 2015 Form 10-K, First NBC also admitted that the material weakness that the Company said led to the restatement stemmed mostly from (a) a lack of trained personnel, which weakness First NBC and Defendants Ryan and Verdigets had consistently represented *had been cured* as of the time of the IPO, (b) *"the dominant influence of the Chief Executive Officer over accounting and reporting matters,"* and

(c) the *"failure of executive management to establish a tone and control consciousness that consistently emphasizes the importance of internal control over financial reporting."* Combined, the facts set forth above and herein with respect to the conduct of Defendants Ryan and Verdigets, their backgrounds and knowledge of accounting (including Defendant Ryan's prior experience serving for 20 years in Arthur Andersen's financial institutions audit practice and Verdigets' background and responsibilities as the Company's CFO), the significant negative impact of the adjustments on First NBC's financial statements, and the Company's stunning admissions all serve to defeat any potentially competing inference that these misstatements were either innocent mistakes or merely acts of negligence.

323.   Defendant Ryan also received a direct, significant and concrete personal financial benefit as a result of his participation in the fraudulent scheme to artificially inflate First NBC's financial results and its stock price.  As set forth herein, and as the Company has now admitted in an SEC filing that Defendant Ryan signed, Defendant Ryan exercised a dominant influence over accounting and reporting matters during the Class Period.  In addition to all of the direct and circumstantial evidence of scienter summarized above, Defendant Ryan was also motivated by the fact that nearly all of the First NBC stock he owned, 435,000 shares out of a total of 475,000 shares, was pledged as collateral for various debt obligations, including real estate investments.  Since Defendant Ryan's loans from outside lenders were collateralized by his First NBC stock, if the value of the stock declined to levels below the loan amounts, Ryan could be forced to sell his stock to repay the obligations (which likely would have further depressed the market price of his stock holdings) or post additional collateral.  As such, Defendant

Ryan had a strong, unique and personal motive to engage in the misconduct alleged herein, and took advantage of the opportunity afforded him by his position to artificially inflate First NBC's reported financials for his personal benefit.

## X. LOSS CAUSATION

324. During the Class Period, as alleged herein, Defendants engaged in a scheme to deceive the market and in a course of conduct that artificially inflated the value of First NBC's securities and operated as a fraud on Class Period purchasers of First NBC stock by misrepresenting, *inter alia*, (1) the Company's financial condition and reported financial results; (2) the adequacy of the Company's internal controls over financial reporting; (3) the Company's exposure to the oil and gas industry; (4) the Company's investment in short-term receivables; and (5) the sufficiency of the Company's capital position.

325. As a result of their purchases of First NBC securities during the Class Period at artificially inflated prices, Plaintiffs and other members of the Class suffered economic loss; *i.e.*, damages under the federal securities laws, when subsequent disclosures slowly removed the inflation from such securities.

326. The false and misleading statements and material omissions caused First NBC's common stock to trade at artificially inflated levels throughout the Class Period. After an initial public offering priced at $24 per share, First NBC's stock reached a Class Period high of $43.52 on November 30, 2015. However, as the direct and proximate result of various corrective disclosures set forth herein, which, over time, revealed the truth about the false and misleading statements and disclosed facts that had been previously concealed by the Defendants' wrongful conduct, by the end of the Class

Period, First NBC stock plummeted to an October 20, 2016 close of $9.05 per share.  It has since fallen even lower with some further adverse revelations.

327.   In 2016, as partial corrective disclosures were made to the market, the price of First NBC stock declined with relevant news.  Conversely, when Defendants made statements during the Class Period that portrayed the Company's financial condition and internal controls, oil and gas industry exposure and risks of investments in short-term receivables in a false light, the market reacted positively, which allowed the Company's stock either to remain at its then-current trading levels or even increase in price.

328.   For example, on November 7, 2013, after the market closed, First NBC announced its third quarter 2013 financial results, reporting diluted EPS of $0.54 per share.  This was $0.04 per share higher than the consensus estimate of analysts.  These results were driven, in part, by the purported contribution of the Company's investments in income tax credit entities.  Indeed, as Sandler O'Neill noted in a report issued on the next day:

> **Stronger than expected tax credits:**  The main driver of the beat [*i.e.*, results beating Sandler O'Neill's expectations] was a stronger than expected pace of tax credits (leading to a larger net tax benefit - $5.7 mil. vs. $4.2 mil in 2Q13) …
>
> **Maintaining BUY:**
>
> *                              *                              *
>
> We acknowledge that the tax credit business, which is somewhat unique in terms of its contribution to [First NBC], where it resides on the P&L (below the line as opposed to above it), and the difficulty in forecasting it on a quarter-to-quarter basis, may not get the same multiple in the stock today as would other more traditional revenue drivers.  However, we think as each quarter goes by, investors and analysts will get more comfortable valuing (and more confident in forecasting) the business as part of the core

earnings stream at [First NBC].  Plus, we think that as mgmt delivers on additional earnings reports (this is only [First NBC's] 2nd earnings release since going public) and increasingly gets in front of investors, it will take additional steps to enhance the transparency and predictability of the business for investors.

329.    As alleged herein, far from having taken steps to enhance the "transparency" of its business of investing in tax credit entities, First NBC concealed that the accounting for these investments was fraudulent and in violation of GAAP. However, based on the Company's positive earnings report, derived, in part, from an inflated contribution of First NBC's tax credit investments, the price of First NBC's common stock increased on November 8, 2013 by $2.32, or 8.8%, to close at $28.60.

330.    Similarly, on January 30, 2015, after the market closed, First NBC announced its fourth quarter and full year 2014 financial results, reporting fourth quarter diluted EPS of $0.80 and full year diluted EPS of $2.84.  The fourth quarter results exceeded consensus estimates by $0.05.  In a report issued on February 2, 2015, Sandler O'Neill noted that First NBC's fourth quarter earnings beat its own expectations by $0.07, crediting "the large $10.6M tax benefit" for the outcome.  Sandler O'Neill further noted that "[t]ax credit related income was significantly higher than our expectations and covered up some relative weakness in other areas."  Sandler O'Neill issued another report on the next day, where it discussed the Company's tax credit business in greater depth:

**Significant Value Remains in the Shares**

…  The bank has proven the stability of its tax credit business, and upside remains there as well.

- **Tax Credit Impact Remains Strong, and Look Stronger into 2015** – There is always a lot of trepidation from investors around this component of FNBC's earnings, but the bank continues to outperform expectations and show that this is a sustainable component of the bank's overall earnings profile.  While the multiple given to this

> component will remain discounted, we view the severity of this
> discount [as] unnecessary.

Although investors did not know it at the time, the tax credit business was far from "stable," but was, instead, bolstered by fraudulent accounting.

331.    The February 3, 2015, Sandler O'Neill report also included a section on First NBC's exposure to the oil and gas industry.  The report stated:

> Given FNBC's primary geography in New Orleans and some previous
> comments about its growth in energy-related lending, many investors had
> concerns and we believe that the bank sufficiently addressed them this
> quarter.  The bank's total exposure amounts to 3% of loans (~$83M) +
> about $15M in outstanding commitments.  This is a small portion of the
> bank's overall book … Interestingly, the bank has also noted that this
> slowdown in oil prices should not overly impact the New Orleans
> economy near-term as the permitting process for new exploration and
> other capital expenditures has remained stagnant in the years after the BP
> oil spill in 2010.  This slowdown may make forward growth in the region
> slightly slower, but there should not be a big drop-off from today's
> production levels or on overall economic activity according to
> management.

As alleged herein, management failed to disclose that a large loan to an exploration and production company was at risk because a pipeline servicing the borrower had broke.

332.    Given First NBC's false, but reassuring statements about its exposure to the energy sector, as well as its fraudulent accounting for tax credit investments, the market reacted positively to the Company's January 30, 2015 earnings announcement.  On the next trading day, February 2, 2015, First NBC stock rose $1.79, or 5.8%, to close at $32.75.

333.    On February 1, 2016, after the market closed, the first in a series of corrective disclosures was made that began to remove the inflation from First NBC's stock price, as the Company issued unaudited fourth quarter and full year 2015 financial results.  As described in more detail above, these results were below analysts'

expectations, based, in part, on a higher than expected $8.2 million fourth quarter impairment charge associated with First NBC's tax credit investments. The Company's earnings announcement also noted First NBC's $90.2 million exposure to oil exploration and production and the fact that $39.7 million was past due on its investment in $69 million in receivables from an ethanol company.

334.    The February 1, 2016 press release was at least partially corrective of Defendants' prior false and misleading statements because: (a) it indicated to investors that First NBC's impairment charges on tax credit investments might be higher than expected after the Company first began to record impairments in the second quarter of 2015; (b) in contrast to Defendants' previous representations that the Company's exposure to the oil and gas sector was limited, it disclosed a significant increase in the Company's exposure to that sector; and (c) in contrast to Defendants' previous statements that the risk of loss on its investments in short-term receivables was limited, it now gave rise to concerns these investments were subject to a heightened risk. Indeed as Sandler O'Neill noted in a report issued on the day of the earnings release: "We were definitely disappointed in the bank's 4Q results given the much higher than expected tax credit impairment, the increase in energy-related loans (without a disclosed reserve percentage), and the announcement of past due receivables investments related to the oil and gas sector (ethanol)." In response to the February 1, 2016 press release, the price of First NBC stock declined the next day by $3.20 per share, or 10.5%, to close at $27.20. This price decline was limited because, as detailed above, the Company failed to disclose the full truth concerning its fraudulent accounting for tax credit investments, nor did it inform investors that a reserve needed to be established for the loan to the exploration and

production company and that the troubled ethanol receivable needed to be written off entirely.

335.    On March 16, 2016, First NBC disclosed that the filing of its 2015 Form 10-K was being delayed due to errors that had been identified in its accounting for Federal and State Historic Rehabilitation tax credit entities.  The Company stated that the information contained in its February 1, 2016 earnings release should not be relied upon and that it expected that net income would likely be reduced from the amounts previously reported for 2015.  The market reacted immediately and negatively to this news.  First NBC stock plunged $5.33 per share, or 22%, to close on March 16, 2016 at $19.09 on extremely high trading volume of over 1 million shares.

336.    On April 8, 2016, First NBC filed a Form 8-K and press release disclosing that the Company's audit committee and management had determined that all of the Company's financial statements from 2011 through 2014 should no longer be relied upon.  The Form 8-K further stated:  "The Company's management determined that the financial statements referred to above should be restated due to an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities and the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities.  The Company is continuing to review and quantify these and other potentially other less significant matters, which are expected to be reflected in the restated financial statements."  First NBC also disclosed in its press release that the Company was assessing its internal controls over financial reporting.  As a result of this news, First NBC stock fell $0.47 per share to close at $18.65 on April 11, 2016, the next trading day, a decline of 2%.

337.    On August 12, 2016, HoldCo Asset Management, an investor of $8 million face value of First NBC's subordinated debt, published an open letter to First NBC.  As further described above, the letter raised questions about the adequacy of First NBC's capital position—which was ultimately shown to have been misrepresented during the Class Period.  According to HoldCo's analysis, First NBC needed to raise at least $300 million in new common equity over the next two years to be considered a "well-capitalized" bank by banking regulators.    In response to the publication of the HoldCo letter, the price of First NBC stock fell $2.21 to close on August 12 at $13.54, a 14% decline on heavy volume of over 1.1 million shares.  On the next trading day, August 15, 2016, First NBC shares declined by an additional $1.33 to close at $12.21, on continued heavy volume of over 910,000 shares.  The Company's stock thus experienced a two-day decline of $3.54 or nearly 22.5% as a result of the publication of the HoldCo letter.

338.    On September 2, 2016, after the close of the market, First NBC filed a Form 8-K disclosing that Ernst & Young had notified the Company "that it was declining to stand for re-appointment" as the Company's independent auditor.  First NBC stated that Ernst & Young's audit services to the Company would cease upon the Company's filing of its respective Forms 10-Q for the quarters ended March 31, 2016 and June 30, 2016.  As a result of this news, First NBC stock fell by $0.90 on the next trading day, September 6, 2016, to close at $11.95, a decline of 7% on high volume of over 550,000 shares.

339.    On September 23, 2016, after the close of the market, First NBC announced that filing of its Forms 10-Q for the quarters ended March 31, 2016 and June

30, 2016 would be further delayed.  As a result of this news, First NBC stock fell by $1.01 on the next trading day, September 26, 2016, to close at $10.00, a decline of about 9% on heavy volume of over 885,000 shares.

340.   Finally, on October 20, 2016, the impact of the Company's false portrayal of its financial condition was more fully revealed when First NBC filed its Form 10-Q for the quarter ended June 30, 2016.  The Company reported it had been informed by the FRB and OFI that it had been deemed to be in "troubled condition" under the relevant banking regulations.  As further described above, such designation places restrictions on, among other things, First NBC's ability to incur debt, pay interest and dividends, and appoint new directors and officers.  As a result of this news, shares of First NBC plummeted by $2.15 to close on October 20, 2016 at $9.05, a decline of 19% on enormous volume of over 1.9 million shares.  First NBC stock continued to fall on heavy volume over the next two trading days, closing at $6.65 on October 24, 2016.  Thus, over the three trading days following disclosure of First NBC's "troubled" designation, the Company's stock declined by $4.45 or 40.6%.  Moreover, as an article published October 20, 2016 explained, First NBC's stock "has now plummeted 75% year to date, while the SPDR S&P Regional Banking ETF has gained 2.9% and the S&P 500 has tacked on 4.7%."  *See* Tomi Kilgore, *"First NBC Bank's stock dives after disclosing 'troubled condition' designation,"* MarketWatch.com (Oct. 20, 2016, 2:55 ET).

341.   The price declines directly and proximately resulting from the above discussed disclosures were not caused by market conditions, industry news, randomness, or by First NBC-related information unrelated to the alleged fraud. Each of the above referenced disclosures partially corrected the false and misleading information previously

provided to the market for which the Plaintiffs, on behalf of themselves and the Class, seek to be compensated.  Indeed, the bad news about First NBC's actual financial and operating condition has continued to be revealed even after the end of the Class Period in this action.

## XI.  APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET AND MATERIAL OMISSIONS

342.  Plaintiffs assert two bases for a presumption of reliance in this action. *First*, the material omissions are presumed to have inflated the market prices of First NBC common stock under the presumption stated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  *Second*, at all relevant times, the market for First NBC common stock was an efficient market that promptly digested current information with respect to the Company from publicly-available sources and reflected such information in the prices of the Company's securities.  Among other factors, throughout the Class Period:

(a)  First NBC's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, First NBC filed periodic public reports with the SEC;

(c)  First NBC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.  Securities analysts and the business press

followed and published reports regarding First NBC that were publicly available to investors; and

(d)      The market price of First NBC common stock reacted promptly to the dissemination of new, material information regarding the Company.

343.    As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for First NBC securities was artificially inflated. Under such circumstances, the presumptions of reliance available under the "fraud-on-the-market" and *Affiliated Ute* theories apply.

344.    Plaintiffs and the other Class members relied on the integrity of the market price for the Company's stock and were substantially damaged as a direct and proximate result of their purchases of First NBC common stock at artificially inflated prices and the subsequent decline in the price of that common stock when the truth was fully disclosed.

345.    Had Plaintiffs and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased First NBC common stock at the artificially inflated prices in the market.

## XII.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**For Violations of Section 10(b) of The Exchange Act and Rule 10b-5
(Against Defendants First NBC, Ryan, and Verdigets)**

346.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

347.    During the Class Period, Defendants First NBC, Ryan and Verdigets disseminated or approved the false statements specified above, which they knew or

deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

348.   These Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of First NBC common stock during the Class Period.

349.   These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, First NBC's investments in tax credit entities, exposure to the oil and gas industry including its loan to an oil exploration and production company as well as receivables purchased on the Receivables Exchange, and its internal controls; (ii) artificially inflate and maintain the market price of First

NBC stock; and (iii) cause Plaintiffs and other members of the Class to purchase First NBC stock at artificially inflated prices.

350.   Defendant First NBC is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

i.      First NBC's press release of May 15, 2013;

ii.     First NBC's press release of June 6, 2013;

iii.    First NBC's Form 10-Q, filed with the SEC on June 24, 2013;

iv.     First NBC's press release of July 30, 2013;

v.      First NBC's Form 10-Q, filed with the SEC on August 14, 2013;

vi.     First NBC's press release of November 7, 2013;

vii.    First NBC's Form 10-Q, filed with the SEC on November 14, 2013;

viii.   First NBC's press release of February 11, 2014;

ix.     First NBC's Form 10-K, filed with the SEC on March 31, 2014;

x.      First NBC's press release of May 1, 2014;

xi.     First NBC's Form 10-Q, filed with the SEC on May 15, 2014;

xii.    First NBC's press release of July 28, 2014;

xiii.   First NBC's Form 10-Q, filed with the SEC on August 14, 2014;

xiv.    First NBC's press release of October 28, 2014;

xv.     First NBC's Form 10-Q, filed with the SEC on November 12, 2014;

xvi.    First NBC's press release of January 30, 2015;

xvii.   First NBC's Form 10-K, filed with the SEC on March 31, 2015;

170

xviii.     First NBC's press release of April 30, 2015;

xix.     First NBC's Form 10-Q, filed with the SEC on May 8, 2015;

xx.     First NBC's Form 10-K/A, filed with the SEC on June 17, 2015;

xxi.     First NBC's Form 12b-25, filed with the SEC on August 11, 2015;

xxii.     First NBC's Form 10-Q, filed with the SEC on August 17, 2015;

xxiii.     First NBC's press release of November 2, 2015;

xxiv.     First NBC's Form 10-Q, filed with the SEC on November 9, 2015;

xxv.     First NBC's press release of February 1, 2016; and

xxvi.     First NBC's Form 8-K of February 11, 2016.

351.    First NBC is further liable for the false and misleading statements made in the IPO Offering Materials, as alleged above, and other false and misleading statements made by Defendants Ryan and Verdigets in press releases and during presentations with investors and analysts as well as in connection with First NBC's annual reports and annual shareholders meetings, as alleged above, as the makers of such statements and under the principle of *respondeat superior*.

352.    Defendants Ryan and Verdigets are liable for the false and misleading statements they made and/or signed, as follows:

i.     Throughout the Class Period, as alleged above, Defendant Ryan signed the IPO Offering Materials, Forms 10-K, Forms 10-Q, and certifications in Forms 10-K and Forms 10-Q, made statements in and was directly responsible for other statements made in press releases, Forms 8-K and during meetings and presentations with

investors and analysts, and signed letters addressed to First NBC's shareholders that were attached to First NBC's annual reports.

ii.     Throughout the Class Period, as alleged above, Defendant Verdigets signed the IPO Offering Materials, Forms 10-K, Forms 10-Q, and certifications in Forms 10-K and Forms 10-Q, and made statements in and was directly responsible for other statements made in press releases, Forms 8-K and during meetings and presentations with investors and analysts.

353.   As a result, Defendants Ryan and Verdigets are liable for the above-identified false and misleading statements they made and/or signed during the Class Period.  As more fully stated in the description of the fraud (Section V), pursuant to the aforesaid plan and course of conduct, these Defendants participated, directly and indirectly, in the preparation and/or issuance of the statements and documents referred to above, including in First NBC's filings with the SEC, press releases, and IPO Offering Materials.  These statements and documents were materially false and misleading, as First NBC has acknowledged that a restatement of each and every fiscal period financial statement before issuance of the 2015 Form 10-K was required.

354.   At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused the damages sustained by Lead Plaintiffs and the Class.

355.   These Defendants engaged in a scheme to misrepresent the financial condition and results of First NBC and to consummate the initial public offering, and to maintain and/or inflate the prices of First NBC securities in order to, among other things,

assist Defendant Ryan as the vast majority of his First NBC stock was pledged as collateral for various debt obligations, including his real-estate investments.  Specifically, these Defendants knew or should have known that First NBC's reported annual financial results for the years 2011 through 2014, as filed with the SEC in First NBC's Forms 10-K and other SEC filings, and its reported quarterly financial results for the years 2013 through the third quarter of 2015, and as allegedly restated in August 2016 to correct prior errors in the financial statements, and disseminated to the investing public, were materially overstated and were not presented in accordance with GAAP, and that First NBC did not have adequate internal controls, in contrast to what was represented to the public repeatedly in the Company's Class Period SEC filings.

356.   The 2013 and 2014 Forms 10-K, the 2013 through 2015 Forms 10-Q, and all earnings releases issued during the Class Period were materially false and misleading; contained untrue statements of material facts; omitted to state material facts necessary to make the statements made in those SEC filings, under the circumstances in which they were made, not misleading; and failed to adequately disclose material facts.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those SEC filings included, but were not limited to, overstatement of net income, accumulated earnings, EPS, total assets, total shareholders' equity, and income available to common shareholders and understatement of the impairment of First NBC's investments in tax credit entities.

357.   As described above at Section IX and elsewhere, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless

disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

358.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at First NBC, which resulted in the enormous overstatements of net income, accumulated earnings, EPS, total assets, total shareholders' equity, and income available to common shareholders, among other key measures, establish a strong inference that First NBC, Ryan and Verdigets acted with scienter in misrepresenting the Company's financial condition during the Class Period.  First NBC, Ryan and Verdigets caused the Company's reported financial results to be materially overstated, and its impairment to be materially understated.

359.    Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for First NBC common stock.  Plaintiffs and the Class would not have purchased First NBC stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

360.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of First NBC common stock during the Class Period.

<u>**SECOND CLAIM FOR RELIEF**</u>

**For Violations of Section 10(b) and Rule 10b-5 of The Exchange Act**
**(Against Defendant E&Y)**

361.    This Count is asserted on behalf of all Class members who purchased First NBC stock from May 10, 2013 to April 8, 2016.  Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth set forth herein.

362.    Defendant E&Y, individually and in concert with others, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, First NBC's investments in tax credit entities, exposure to the oil and gas industry including its loan to an oil exploration and production company as well as receivables purchased on the Receivables Exchange, and its internal controls; (ii) artificially inflate and maintain the market price of First NBC stock; and (iii) cause Plaintiffs and the Class to purchase First NBC common stock at artificially inflated prices.

363.    As more fully stated above, pursuant to the aforesaid plan and course of conduct, E&Y participated, directly and indirectly, in the preparation and/or issuance of the statements and documents referred to above, including in First NBC's filings with the SEC and IPO Offering Materials.  These statements and documents were materially false and misleading, as First NBC and E&Y have acknowledged by stating that a restatement of each and every fiscal period financial statement before issuance of the 2015 Form 10-K was required.

364.    At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused the damages sustained by Plaintiffs and the Class.

365.    E&Y, among others, engaged in a scheme to misrepresent the financial condition and results of First NBC and to consummate First NBC's initial public offering, and to maintain and/or inflate the prices of First NBC stock in order to, among other things, gain lucrative auditing and other services from First NBC.  Specifically, E&Y knew or recklessly disregarded that First NBC's reported annual financial results for the years 2011 through 2014, as filed with the SEC in First NBC's Forms 10-K and other SEC filings, and its reported quarterly financial results for the years 2013 through the third quarter of 2015, and as allegedly restated in the 2015 Form 10-K to correct prior errors in the financial statements, and disseminated to the investing public, were materially overstated and were not presented in accordance with GAAP; that E&Y's year-end audits were not performed in accordance with GAAS; and, therefore, that E&Y's unqualified auditor's reports, as included or incorporated by reference in those annual reports and other SEC filings, were materially false and misleading.

366.    First NBC's reported annual financial results for the years 2011 through 2014, as filed with the SEC in First NBC's Forms 10-K and other SEC filings, and its reported quarterly financial results for the years 2013 through the third quarter of 2015 were materially false and misleading; contained untrue statements of material facts; omitted to state material facts necessary to make the statements made in those SEC filings, under the circumstances in which they were made, not misleading; and failed to adequately disclose material facts.  As detailed herein, the misrepresentations contained

176

in, or the material facts omitted from, those SEC filings included, but were not limited to, overstatement of net income, accumulated earnings, EPS, total assets, total shareholders' equity, and income available to common shareholders and understatement of the impairment of First NBC's investments in tax credit entities, as well as the representations in E&Y's unqualified auditor's reports issued in connection with its audits of First NBC's financial statements for those years, in which E&Y certified that: (i) it had audited First NBC's year-end financial statements in accordance with GAAS; (ii) it had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; (iii) in its opinion, First NBC's financial statements "present fairly, in all material respects, the consolidated financial position" of First NBC "in conformity with U.S. generally accepted accounting principles;" and (iv) E&Y's audits provided a "reasonable basis" for its opinions.  As detailed herein, E&Y's auditor's reports were materially false and misleading.  E&Y did not make a reasonable investigation or possess reasonable grounds for the belief that the statements described above, which were contained in the 2013 and 2014 Forms 10-K, and incorporated by reference in other SEC filings, including in the IPO Offering Materials, were true, were without omissions of any material facts, and were not misleading.

367.   E&Y, with knowledge of the false and misleading nature of the statements contained in its unqualified auditor's reports, and in reckless disregard of the true nature of its audits, caused the public statements to contain misstatements and omissions of material facts as alleged herein.  As described herein, E&Y's audits of First NBC's financial statements for 2011 through 2014 were not performed in accordance with GAAS, and, in fact, E&Y had no basis for its unqualified auditor's reports.  E&Y's

unqualified auditor's reports dated March 29, 2013, March 31, 2014, and March 31, 2015, issued in connection with those audits, as included in the Forms 10-K and other SEC filings, in which E&Y certified, among other things, that its audits were performed in accordance with GAAS, were materially false and misleading.

368.   As described above, E&Y acted with scienter throughout the Class Period, in that it either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose the true facts, even though such facts were available to it. Indeed, E&Y's audits were so deficient that they amounted to no audit at all, and, as a result, E&Y had no reasonable bases to issue its unqualified auditor's reports upon which it knew investors would rely.

369.   In conducting its audits for the fiscal years ended December 31, 2011 through December 31, 2014, E&Y had access to the files and key employees of the Company at all relevant times.  As a result of the auditing and other services it provided to First NBC, E&Y personnel were present at First NBC's corporate headquarters throughout each year, and had continual access to and knowledge of First NBC's confidential internal corporate, financial, operating, and business information, and had the opportunity to observe and review the Company's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as the Company's internal controls and structures.

370.   Based on this level of presence, access and involvement, E&Y's failure to detect First NBC's rampant accounting manipulations can only be the product of actual knowledge or reckless disregard as to whether First NBC's financial statements complied

with GAAP, or a total disregard of its duty to perform a proper audit of the Company's financial statements.  First NBC has now admitted that its financial statements during the Class Period did not comply with GAAP.  Moreover, the Company's disclosures in its Forms 8-K issued March 16, 2016 and April 8, 2016 and in the Company's 2015 Form 10-K establish a pervasive dereliction by First NBC management in complying with the basic requirements of GAAP.   Therefore, E&Y's unqualified auditor's reports during the Class Period, stating that First NBC's financial statements did comply with GAAP, were simply false and violated GAAS.

371.    Moreover, based on the facts alleged at Section VIII, above, E&Y acted intentionally or, at the least, recklessly by issuing unqualified auditor's reports during the Class Period, attesting to E&Y's compliance with GAAS in performing its audits and opining that First NBC's annual financial statements were materially accurate and fairly presented their financial results in compliance with GAAP, and further by consenting to its reports being incorporated in the IPO Offering Materials issued by First NBC.

372.    As a result of E&Y's deceptive practices and false and misleading statements and omissions, the market price of First NBC common stock was artificially inflated throughout the Class Period.  In ignorance of the false and misleading nature of the representations and omissions described above and the deceptive and manipulative devices employed by E&Y, Plaintiffs and the other members of the Class, in reliance on either the integrity of the market or directly on the statements and reports of E&Y, purchased First NBC publicly traded common stock at artificially inflated prices and were damaged thereby.

373.   In ignorance of the materially false and misleading nature of the reports and statements described above, Plaintiffs and the Class relied to their detriment on the statements described above and/or on the integrity of the market prices as reflecting the completeness and accuracy of the information disseminated in connection with their purchases of the securities.  Had Plaintiffs and the other members of the Class known of the material adverse information not disclosed by E&Y, or been aware of the truth behind E&Y's material misstatements, they would not have purchased First NBC publicly traded common stock at artificially inflated prices, if at all.

374.   By virtue of the foregoing, E&Y violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### THIRD CLAIM FOR RELIEF

**For Violations of Section 20(a) of The Exchange Act**
**(Against Defendants Ryan and Verdigets)**

375.   Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

376.   This Count is asserted against Defendants Ryan and Verdigets for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

377.   During their tenures as officers and/or directors of First NBC, each of these Defendants was a controlling person of First NBC within the meaning of § 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of First NBC, these Defendants had the power and authority to cause First NBC to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by First

NBC during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

378.   In their capacities as senior corporate officers of the Company, and as more fully described above, each of the Executive Defendants had direct involvement in the day-to-day operations of the Company and in First NBC's financial reporting and accounting functions.  Each of the Executive Defendants were also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by First NBC during the Class Period.  As a result of the foregoing, the Executive Defendants, as a group and individually, were controlling persons of First NBC within the meaning of § 20(a) of the Exchange Act.  Further, as detailed above, the Executive Defendants had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.

379.   By reason of their positions as officers and/or directors of First NBC as described above, each of the Executive Defendants is a "controlling person" within the meaning of § 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein.  Because of their executive, officer and/or director positions within First NBC, these Defendants had access to adverse non-public financial information about the Company and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

380.   As set forth above, First NBC violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as

controlling persons of First NBC and as a result of their own aforementioned conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired First NBC securities. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of First NBC, each of these Defendants is culpable for the material misstatements and omissions made by First NBC, including such misstatements in Company press releases, Forms 10-K, Forms 10-Q, Forms 8-K and the IPO Offering Materials.

381.   As a direct and proximate result of these Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of First NBC stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment individually and on behalf of the Class, as follows:

A.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding Plaintiffs and the Class members damages, including interest;

C.   Awarding Plaintiffs reasonable costs, including attorneys' and expert's fees; and

D.   Awarding such equitable/injunctive or other relief for the benefit of the Class as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated:  December 5, 2016          _s/ Robert A. Hoffman_
Jeffrey W. Golan (admitted *pro hac vice*)
Robert A. Hoffman (admitted *pro hac vice*)
Jeffrey B. Gittleman (admitted *pro hac vice*)
Chad A. Carder (admitted *pro hac vice*)
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jgittleman@barrack.com
ccarder@barrack.com

*Lead Counsel and Attorneys for Lead Plaintiffs*

and

Vincent J. Glorioso, Jr. (#6064)
Maria B. Glorioso (#24435)
Vincent J. Glorioso, III (#26896)
**THE GLORIOSO LAW FIRM**
2716 Athania Pkwy.
Metairie, LA 70002
Telephone: (504) 569-9999
Facsimile: (504) 569-9022

Joel H. Bernstein (*pro hac* pending)
Michael W. Stocker (admitted *pro hac vice*)
Alfred L. Fatale III (*pro hac* pending)
Ross M. Kamhi (*pro hac* pending)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477

183

J. Gerard Stranch, IV
**BRANSTETTER, STRANCH &**
**JENNINGS, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801

*Additional Attorneys for Lead Plaintiffs*