# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ERIC R. KINZLER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | CIVIL ACTION |
| Plaintiff, | ) ) | No. 2:16-cv-04243-KDE-JVM |
| v. | ) ) | JUDGE KURT D. ENGELHARDT |
| FIRST NBC BANK HOLDING COMPANY, ASHTON J. RYAN, JR., MARY BETH VERDIGETS, and ERNST & YOUNG LLP, | ) ) ) ) | MAGISTRATE JUDGE JANIS VAN MEERVELD SECTION "N" |
| Defendants. | ) ) | |

**LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MOTIONS TO DISMISS OF DEFENDANTS FIRST NBC BANK HOLDING COMPANY AND MARY BETH VERDIGETS, AND DEFENDANT ASHTON J. RYAN, JR.**

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan (admitted *pro hac vice*)
Robert A. Hoffman (admitted *pro hac vice*)
Jeffrey B. Gittleman (admitted *pro hac vice*)
Chad A. Carder (admitted *pro hac vice*)
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

*Lead Counsel and Attorneys for Lead Plaintiffs*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ...................................................................................................6

    I.    First NBC's Fraudulent Accounting for Investments
        in Tax Credit Entities ................................................................................ 6

    II.   First NBC's Failure to Disclose the Truth About Its
        Oil-Related Exposure ................................................................................ 9

    III.  First NBC's Failure to Disclose the Truth About Its
        Investment in the Short Term Receivables of an Ethanol Company ................... 11

    IV.  First NBC Investors Were Injured When the Truth Was
        Revealed in a Series of Corrective Disclosures ....................................... 13

ARGUMENT ...................................................................................................................16

    I.    The Complaint States Actionable Claims Under Section
        10(b) of the Exchange Act ...................................................................... 16

        A.    The Complaint Adequately Alleges Scienter ........................................... 17

                1.    Legal Standards Under the PSLRA .............................................. 17

                2.    The Complaint Pleads Facts to Support a Strong
                      Inference of Scienter .......................................................... 19

                3.    Defendants Fail to Assert Any Factually Supported
                      Non-Culpable Inferences .................................................... 26

        B.    The Complaint Alleges Actionable Misstatements and
            Omissions ................................................................................ 37

        C.    The Complaint Adequately Alleges Loss Causation ................................. 45

    II.   The Complaint Adequately Alleges Control Person Liability ............................. 49

CONCLUSION ................................................................................................................49

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F3d 221 (5th Cir. 2009) ................................................... 48

*Bach v. Amedisys, Inc.*,
    Civil Action No. 10-00395-BAJ-RLB, 2016 U.S. Dist. LEXIS 111077
    (M.D. La. Aug. 19, 2016) ................................................... passim

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................... 46

*Brody v. Zix Corp.*,
    Civil Action No. 3:04-CV-1931-K, 2006 U.S. Dist. LEXIS 69302
    (N.D. Tex. Sept. 26, 2006) ................................................... 45, 49

*Catogas v. Cyberonics, Inc.*,
    292 Fed. Appx. 311 (5th Cir. 2008) ................................................... 48

*City of Pontiac Gen. Emples.' Ret. Sys. v. Dell Inc.*,
    Cause No. A-15-CV-374-LY, 2016 U.S. Dist. LEXIS 126219
    (W.D. Tex. Sept. 16, 2016) ................................................... 29

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................... 46

*Engel v. Sexton*,
    Civil Action No. 06-10447, 2009 U.S. Dist. LEXIS 12778
    (E.D. La. Feb. 11, 2009) ................................................... 18, 25

*Epstein v. World Acceptance Corp.*, Civil Action No. 6:14-CV-01606-MGL,
    2016 U.S. Dist. LEXIS 112727 (D.S.C. Aug. 24, 2016) ................................................... 32

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ................................................... 41, 42

*Goldstein v. MCI WorldCom*,
    340 F.3d 238 (5th Cir. 2003) ................................................... 36

*Greenberg v. Crossroads Sys., Inc.*,
    364 F.3d 657 (5th Cir. 2004) ................................................... 48

*In re Akorn Secs. Litig.*,
    No. 15 C 1944, 2017 U.S. Dist. LEXIS 31540 (N.D. Ill. Mar. 6, 2017) .............................. 25

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004).......................................................................... 33, 34

*In re Elec. Data Sys. Corp. Secs. & "ERISA" Litig.*,
    298 F. Supp. 2d 544 (E.D. Tex. 2004)................................................................................ 40

*In re Fleming Cos. Secs. and Derivative Litig.*,
    Civil Action No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488
    (E.D. Tex. June 10, 2004) ...................................................................................... 25, 27

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
    No. 13 CV 214 (HB), 2014 U.S. Dist. LEXIS 9689 (S.D.N.Y. Jan. 27, 2014)..................... 32

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014)...................................................................................... 34

*In re Maxwell Techs., Inc. Sec. Litig.*,
    18 F. Supp. 3d 1023 (S.D. Cal. 2014)..................................................................................... 34

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................................. 28, 30

*In re OCA, Inc.*,
    No. 05-2165, 2006 U.S. Dist. LEXIS 90854 (E.D. La. Dec. 14, 2006)..................... 17, 25, 28

*In re Pfizer Secs. Litig.*,
    No. 04 Civ. 9866 (LTS)(HBP), No. 05 MD 1688 (LTS),
    2012 U.S. Dist. LEXIS 39454 (S.D.N.Y. Mar. 22, 2012) ................................................ 41, 42

*In re Polaroid Corp. Secs. Litig.*,
    465 F. Supp. 2d 232 (S.D.N.Y. 2006).................................................................................... 35

*In re Triton Energy Ltd. Secs. Litig.*,
    No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920 (E.D. Tex. Mar. 30, 2001) ............. 17, 26, 27

*In re Turquoise Hill Resources Ltd. Sec. Litig.*,
    No. 13 Civ. 8846 (LGS), 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ............................... 33

*In re U.S. Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ................................................................................. 34

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003).................................................................................... 36

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ................................................................. 26

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ......................................................... 40, 41, 42, 43

*K.B. Partners I, L.P. v. Pain Therapeutics, Inc.*,
    No. A-11-CA-1034-SS, 2015 U.S. Dist. LEXIS 160519 (W.D. Tex. Dec. 1, 2015) ............ 18

*Kaltman v. Key Energy Servs.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006) ................................................... 25, 28, 44

*Local 703 I.B. of T. Grocery & Food Emples. Welfare Fund v. Regions Financial Corp.*,
    CV: 10-2847-IPJ, 2011 U.S. Dist. LEXIS 93873 (N.D. Ala. Aug. 23, 2011) ....................... 41

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ............................................................. 40, 44

*Marcus v. J.C. Penney Co.*,
    Civil Action No. 6:13-CV-00736-KNM, 2015 U.S. Dist. LEXIS 121683
    (E.D. Tex. Sept. 11, 2015) (Magistrate Report and Recommendation Adopted by
    District Court at 2015 U.S. Dist. LEXIS 131613 (E.D. Tex. Sept. 29, 2015) ................. 43, 44

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
    50 F. Supp. 3d 1328 (C.D. Cal. 2014) ..................................................... 34

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ............................................................. 6, 37, 38, 39

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ............................................................... 31

*Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*,
    499 Fed. Appx. 345 (5th Cir. 2012) ....................................................... 28

*Plotkin v. IP Axess Inc., Etc.*,
    407 F.3d 690 (5th Cir. 2005) ............................................................... 17

*Podraza v. Whiting*,
    790 F.3d 828 (8th Cir. 2015) ............................................................... 33

*Public Employees Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ..................................................... 45, 46, 47, 48

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ............................................................... 40

iv

*Schott v. Nobilis Health Corp.*,
    Civil Action No. H-16-141, 2016 WL 5539756 (S.D. Tex. Sept. 29, 2016) ........................ 35

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ........................................................................... *passim*

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014) ............................................................. *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................... *passim*

*Wachovia Equity Sec. Litig. v. Wachovia Corp.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) .................................................................. 33

Lead Plaintiffs respectfully submit this memorandum of law in opposition to the motion of defendants First NBC Bank Holding Company ("First NBC" or the "Company") and Mary Beth Verdigets, and the motion of Ashton J. Ryan, Jr., to dismiss Lead Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws filed on December 5, 2016 ("Complaint").

## PRELIMINARY STATEMENT

This securities fraud class action is brought on behalf of First NBC investors during the period from May 10, 2013 through October 20, 2016 (the "Class Period"). The action alleges that Defendants engaged in manipulative accounting and other fraudulent misconduct that caused substantial damages to Lead Plaintiffs and other members of the class. Defendants' misconduct principally concerned three matters: (i) First NBC's fraudulent accounting for its investments in tax credit entities; (ii) First NBC's failure to disclose and properly account for the true extent of its exposure to the oil and gas industry, including its concealment of key facts concerning a particularly troublesome loan to an oil exploration and production company; and (iii) First NBC's misleading portrayal of its investment in the short-term receivables of an ethanol manufacturer. As further described below, First NBC was ultimately required to restate its financial results, acknowledging that its accounting for investments in tax credit entities failed to comply with generally accepted accounting principles ("GAAP"). It also belatedly established a large reserve for the oil loan and wrote off the ethanol receivable in its entirety.

The respective motions to dismiss filed by defendants First NBC, Verdigets and Ryan (the "First NBC Defendants"), as well as the separate dismissal motion filed by defendant Ernst & Young LLP, are premised on Defendants' assertion that the Complaint's allegations are based solely on the fact that First NBC restated its financial results, which they each contend is an

insufficient basis for pleading securities fraud. Defendants argue that the accounting at issue required "nuanced and subjective" judgments and that the later reversal of these judgments is not necessarily indicative of a prior intent to engage in deceptive conduct. In making this argument, Defendants have chosen to ignore key aspects of the Complaint that explain why there is a strong basis for believing that Defendants' misconduct was not merely negligent, but fraudulent. Consideration of *all* of the Complaint's well-pled allegations in their totality compels the conclusion that Lead Plaintiffs have offered a more than adequate basis for their claims.

While Defendants seek to wrap the accounting decisions at issue in the mantle of complexity and subjectivity, the issues involved and the basis for the Complaint's assertions of fraud are actually quite straightforward. The facts are these: Throughout First NBC's history, including its time as a public company since its initial public offering ("IPO") in May 2013, First NBC made investments in tax credit entities and sought to turn those tax credits into a major profit center for the Company. Indeed, tax credit benefits were purportedly responsible for nearly half of First NBC's reported net income in 2013 and 2014. The profitability of this business, however, was founded on accounting that failed to comply with GAAP. For most of the Class Period, First NBC violated GAAP by, among other manipulative tactics, accounting for its tax credit investments using an "amortized cost method" and failing to record any impairment of its investments in these tax credit entities. This allowed First NBC to significantly under-report its expenses. For example, the Company failed to record any impairment expenses in 2013 and 2014, under-reporting such expenses by $13 million and $25 million, respectively. And in 2015, First NBC initially understated impairment by more than $40 million.

On August 25, 2016, First NBC belatedly released its audited 2015 financial results and restated its previously-issued financial statements for 2013 and 2014. By definition, a financial

restatement represents an acknowledgement that the Company's prior financial statements were false *when issued* and that the information that forms the basis of the restatement was available at the time of the prior financial statements.   A number of facts and admissions show that First NBC's restatement was the direct result of Defendants' knowing or severely reckless misconduct, including the following:

- **The material weakness in internal controls over financial reporting disclosed by First NBC in its 2016 restatement of financial results is nearly identical to a material weakness and restatement disclosed by the Company in 2013.**  In 2016, First NBC acknowledged that the Company had a material weakness "related to the lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax credit related entities …" Over three years earlier, in its registration statement for the Company's May 2013 IPO, First NBC revealed it had restated its 2009-2011 financial results due to the same material weakness:  "a lack of a sufficient number of accounting employees with the appropriate technical skills and knowledge regarding the income tax accounting for [its] tax credit investments."  Throughout most of the Class Period, the First NBC Defendants repeatedly assured investors that they had remediated the issues giving rise to the material weakness that caused its prior restatement, but the 2016 restatement plainly showed that such assurances were false.

- **The dominant influence of defendant Ashton Ryan and the failure of executive management to emphasize the importance of internal controls over financial reporting is a strong indicator of knowing or severely reckless misconduct.**  First NBC admitted in its 2016 restatement that it had an "ineffective control environment," and that the principal factors contributing to this material weakness included "*the dominant influence of the Chief Executive Officer over accounting and reporting matters*" and "*the failure of executive management to establish a tone and control consciousness that consistently emphasizes the importance of internal control over financial reporting*,…" There is no credible basis for believing that the dominant influence of defendant Ryan, First NBC's founder, chairman and CEO, began to make itself apparent only in 2016 or that the failure of executive management to emphasize the importance of internal controls arose only then.   Indeed, Ryan's dominant influence over accounting matters and executive management's failure to emphasize internal controls explains why First NBC's accounting personnel, which were previously found to be inadequate to handle the Company's accounting for tax credit entities, remained so through 2016.  The centralized decision-making at the top means that First NBC's improper accounting that is at issue in this case occurred ***at the direction of*** defendant Ryan and defendant Verdigets, who served as the Company's CFO.

- **Defendants asserted that the Company's tax credit investments were "core to First NBC's corporate strategy" and that "[m]anagement has a deep understanding of this business."**  These representations reinforce the highly significant role the tax credit investments played in First NBC's operations and reported profitability, as well as establishing that the accounting decisions at issue were made by executive management, including defendants Ryan and Verdigets. Moreover, with their deep understanding of the business, defendants Ryan and Verdigets knew or were severely reckless in disregarding that the Company's accounting for this business violated GAAP.

- **Defendants claimed that First NBC's tax credit investments were evaluated for impairment, yet the Company failed to record any impairment for these investments in 2013 and 2014.**  As noted above, First NBC's 2016 restatement recognized tens of millions of dollars of impairment on tax credit investments in 2013, 2014 and 2015.  Since the facts on which these impairment charges were based admittedly existed when the financial statements were originally issued, if First NBC had performed an impairment analysis in 2013 or 2014, the Company would have been expected to record at least *some* impairment, even if it failed to properly record the full extent of impairment that should have been recognized. The fact that First NBC did not record *any* impairment of these entities in 2013 and 2014 is thus highly suggestive that no impairment analysis was performed and the Company simply lied about doing so.

In addition to alleging facts that provide a more than adequate basis for the assertion that First NBC's accounting for its tax credit investments was fraudulent, the Complaint also provides a compelling foundation for inferring that Defendants knew and deliberately concealed material information about the oil loan and the ethanol receivable:

- **Defendants knowingly misrepresented the truth about a large loan the Company extended to an oil exploration and production company.**  In December 2014, a pipeline serving an offshore well of the borrower broke. Rather than repairing the pipeline, the borrower elected to drill a new well.  First NBC extended additional credit to the borrower for the drilling operation, increasing the Company's exposure from about $30 million to over $90 million by the end of 2015.  Defendants, of course, knew about the pipeline break and the Company's financing for the new well, yet made no mention of these highly material facts until February 2016. Rather, in its second quarter 2015 Form 10-Q, issued on August 17, 2015, the Company stated only that the loan was "affected by the fluctuations in energy commodity prices and the level of production from its shallow-water well."  And even when the Company's increased exposure to the loan was disclosed on February 1, 2016, Defendants failed to inform investors that First NBC was required to discount the collateral for the loan and establish a reserve against possible losses.  Only later, in First NBC's belatedly filed 2015

Form 10-K that included the restatement, did First NBC establish a $30 million loan loss provision and acknowledge a material weakness in its internal controls relating to the monitoring of borrowers' ability to repay loans.

- **Defendants concealed highly material information about an investment in short-term receivables.**  In February 2016, First NBC reported that $39.7 million of a $69 million investment in the short-term receivables of an ethanol company were past due.  The Company stated that the failure of the ethanol company to pay the invoices was the result of the financial difficulties of the ethanol company's Spanish parent, but nevertheless indicated that it did not expect to incur a loss based, in part, on "the historical earnings performance of the ethanol company" and the fact that the Spanish parent was "evaluating certain restructuring options that would permit a more prompt repayment of the receivable."  In making these disclosures, First NBC neither identified the ethanol company (Abengoa Bioenergy Company) nor its parent (Abengoa S.A.), nor did Defendants reveal that Abengoa S.A. had, in November 2015, filed for preliminary protection ***under Spanish insolvency laws***, severely constraining its ability to make full payment of the outstanding receivables.  Ultimately, First NBC was required to write-off the entire $69 million receivable and acknowledge a material weakness of internal control relating to the evaluation and monitoring of the financial stability and creditworthiness of companies from which it acquired short-term receivables.

These and other facts discussed below demonstrate that Lead Plaintiffs are not relying solely on the restatement in order to assert their claims and that the Complaint provides an ample basis for strongly inferring that Defendants acted with knowing or severely reckless disregard of the truth.  Defendants' other arguments in support of dismissal fare no better.  For example, even though Lead Plaintiffs do not need to plead "motive and opportunity," given that they have alleged with particularity Defendants' knowing or severely reckless misconduct, they have done so by alleging that defendant Ryan pledged over 90% of his First NBC stock holding as collateral for various real estate-related debt obligations, thereby creating a powerful incentive for him to maintain First NBC's stock price at artificially inflated levels.  Defendants also assert that the Complaint is deficient because it fails to allege that they did not actually believe what they characterize as statements of opinion at the time the statements were communicated.  Leaving aside the question of whether all of the challenged statements can fairly be construed as

statements of opinion, Defendants' argument is premised on an overly constrained reading of the Supreme Court's *Omnicare* decision, which held that a statement of opinion can be misleading if it "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015). Thus, regardless of whether Defendants believed First NBC's financial statements complied with GAAP, their statements about GAAP compliance were nevertheless misleading because they knew the Company had serious material weaknesses in internal controls, which casts grave doubt as to whether there was a reasonable basis for their opinions. Finally, contrary to Defendants' assertions, the Complaint's references to the price declines in First NBC stock in response to various corrective disclosures is more than sufficient to plead loss causation.

## STATEMENT OF FACTS

### I. First NBC's Fraudulent Accounting for Investments in Tax Credit Entities

First NBC was founded by defendant Ashton J. Ryan, Jr., who, until recently, served as the Company's Chairman and CEO. ¶ 3.[1] In May 2013, First NBC completed its IPO that raised $115 million through the issuance of nearly 4.8 million shares of common stock priced at $24 per share. *Id*. Historically, regional banks such as First NBC have generated profits through loans. However, in the interest rate environment that prevailed before and during the Class Period, the profit margin that could be achieved on the interest rate spread between the rates at which a bank can borrow and lend capital was low. ¶ 9. First NBC sought to address this issue by creating a different type of profit center: one that was created through investments in tax credit entities that qualified for Federal tax credits under the Community Reinvestment Act.

---

[1] Unless otherwise noted, all references to the Complaint shall appear as "¶ __."

These tax credits greatly enhanced the Company's reported profitability, accounting for nearly half of First NBC's reported net income in 2013 and 2014.  ¶¶ 10, 56-57.  During the Class Period, Defendants stated repeatedly that:  the net returns on the tax credit investments "*are excellent and contribute to our strong earnings performance*;" the tax credit investments were "*core*" to the First NBC's business strategy; and "*[m]anagement has a deep understanding of the business*."  ¶¶ 11, 59, 128, 137, 139, 152, 158, 166, 172, 179, 184, 192.

Unbeknownst to investors, the "excellent" returns on First NBC's tax credit investments were illusory because they were vastly overstated.  Due to the nature of tax credit entities, which are essentially investments in real estate rehabilitation and/or construction projects, the investments by tax credit partnerships in real estate generate substantial losses to the investor in the early phases of the projects due to depreciation, interest expense from debt financing, construction costs and the inability to realize rental income until the properties can receive a certificate of occupancy.  In order to maximize the profitability of its tax credit investments, First NBC manipulated the accounting for these investments to avoid recording its proportionate share of the losses generated by the development projects and expenses resulting from undisclosed impairments to the carrying value of the investments.  ¶¶ 12, 64.

First NBC's manipulative accounting for tax credit entities mainly took three forms.  ¶¶ 13, 65.  First, in violation of GAAP, the Company used an "amortized cost method" to account for its investments in tax credit entities, rather than proper application of the equity method of accounting.  ¶¶ 66-71.  Use of the amortized cost method artificially reduced the Company's reported expenses throughout the Class Period.  Second, First NBC violated GAAP by failing to recognize any impairment of its tax credit investments throughout most of the Class Period, despite admittedly having information available at the time it issued its financial results

7

indicating that such investments were in fact impaired.  ¶¶ 72-75.  By failing to recognize any impairment, First NBC avoided reducing the carrying value of its investments in tax credit entities and, thus, avoided a corresponding increase in reported expenses.  Third, First NBC violated GAAP by failing to consolidate certain investments in federal low income housing tax credit entities that were variable interest entities ("VIEs"), in which the Company was the primary beneficiary.  The Company thus failed to properly account for losses generated by these entities. ¶¶ 76-78.

The proper application of GAAP to the Company's tax credit investments had an enormous impact on the impairments ultimately reported by First NBC in its 2015 Form 10-K. For example, when First NBC initially reported its unaudited 2015 financial results in a February 1, 2016 press release, it stated that the impairment of its investment in tax credit entities was approximately $19 million.  However, the Company's 2015 Form 10-K ultimately filed on August 25, 2016, disclosed that *the correct impairment was $59.5 million*.  ¶ 14.  Further, whereas First NBC originally recorded no impairments *at all* in 2013 and 2014, the impairments on tax credit investments in its restated financial results for those years *were approximately $13 million and $25 million*.  The impairments in the restated 2013 and 2014 financial results far outstripped the improper amortization expense previously recognized by the Company as a result of its failure to apply the correct accounting method under GAAP.  ¶¶ 14, 256.

First NBC asserted that these accounting misstatements were caused by material weaknesses in internal controls that fostered an "ineffective control environment."  This ineffective control environment did not occur by happenstance.  Rather, First NBC admitted that the ineffective control environment was caused by the:

> *dominant influence of the Chief Executive Officer [Ashton Ryan] over accounting and reporting matters* without adequate transaction level and review

controls, to arrive at appropriate conclusions; insufficient qualified personnel, at both the executive management and staff levels, with appropriate knowledge, experience and training on accounting and reporting matters; the lack of adequate oversight by the Company's Board of Directors …; *and the failure of executive management to establish a tone and control consciousness that consistently emphasizes the importance of internal control over financial* reporting … .

¶¶ 6, 258.  First NBC also identified a separate material weakness related to a "lack of a sufficient number of accounting employees with the appropriate technical skills and knowledge" regarding the accounting for First NBC's tax credit investments.  This material weakness was *virtually identical* to the material weakness related to tax credit investments identified by First NBC in 2013 that gave rise to a restatement of the Company's financial results for 2009-2011.  ¶¶ 15, 121, 258.  Although the Company said during the Class Period that this material weakness had been addressed (¶¶ 121-122, 171), that was not true.  Indeed, by electing not to bolster First NBC's accounting staff with competent personnel, at a time when they had publicly acknowledged it was insufficient, defendants Ryan and Verdigets created the environment that allowed them to conceal the overstatements of the Company's actual results by ensuring there would not be qualified personnel to catch their misconduct.  Thus, when Defendants represented that the Company's financial statements complied with GAAP, they knew that they had no reasonable basis for reaching this conclusion.

## II.     First NBC's Failure to Disclose the Truth About Its Oil-Related Exposure

In his March 31, 2015 letter to shareholders (that was part of the Company's 2014 Annual Report), defendant Ryan told investors that "First NBC has very limited exposure (3% of its loan portfolio) to the oil and oil service industries."  ¶¶ 17, 91, 206.  Ryan and First NBC failed to disclose, however, that the Company was then at risk on a large loan that it had made to an oil exploration and production company.  In December 2014, a pipeline serving a well in the largest oil field of the borrower broke.  Rather than repair the pipeline, the borrower elected to

drill a new well, which First NBC agreed to finance.  As a result, First NBC's exposure to the borrower increased from around $30 million to over $90 million by the end of 2015.  ¶¶ 18, 211.

Although the pipeline broke at the end of 2014, First NBC remained silent about the loan in its 2014 Form 10-K and First Quarter 2015 Form 10-Q.  The Second Quarter 2015 Form 10-Q, filed nearly eight months after the pipeline broke, made only a passing reference to the loan, noting that it was now classified as substandard due to "the fluctuations in energy commodity prices and the level of production from [the borrower's] shallow-water well."  After making a similar disclosure in its Third Quarter Form 10-Q, First NBC issued a press release on February 1, 2016, in which the Company reported its fourth quarter and full year 2015 financial results and stated that its "exposure to exploration and production in its oil and gas portfolio was approximately $90.2 million."  Separately, First NBC told analysts at Sandler O'Neill that the loan "related to a shallow-water drilling project that has been offline for some time now … but that is now ready to return to production."  Absent in all of these disclosures was that the borrower's pipeline had broken and that First NBC was financing the drilling of an entirely new well.  ¶¶ 19-20, 210-211, 233, 236(c).

It was only when First NBC filed its long overdue 2015 Form 10-K in August 2016 that the Company finally admitted that, as of year-end 2015, it was required to deeply discount the value of the collateral for the loan *and establish a $30 million reserve allowance*.  The 2015 Form 10-K attributed the belated establishment of this reserve to a material weakness in First NBC's internal controls relating to the monitoring of borrowers' ability to repay loans.  It is clear, however, that Defendants simply did not want to disclose the truth about the broken pipeline and First NBC's risk of loss on financing a replacement well.  Indeed, the admitted

material weakness flies in the face of assurances during the Class Period that the Company was "actively monitoring" its oil and gas related credits.  ¶ 91.[2]

### III.   First NBC's Failure to Disclose the Truth About Its Investment in the Short-Term Receivables of an Ethanol Company

During the Class Period, First NBC made investments in short-term receivables acquired through an electronic platform known as the "Receivables Exchange."  First NBC deemed these investments as offering more attractive yields than other forms of investment and, accordingly, its investment in short-term receivables grew from around $81 million at the end of 2012 to around $240 million at the end of 2013 and 2014.  ¶¶ 214-219.  In its February 1, 2016 press release announcing its 2015 financial results, First NBC noted that its investment balance in short-term receivables at year-end was $95.5 million and that $69.0 million of this amount was "due from a U.S. company that produces ethanol for blending in gasoline."  The press release also disclosed that $39.7 million of the receivables from the ethanol company were now past due.  First NBC asserted, however, that management did not expect to incur any loss on this investment, based on, among other things, an "analysis of the financial capabilities of the obligor."  ¶¶ 22-23, 103, 222-223.

In a Form 8-K filed on February 11, 2016, First NBC noted that the failure of the ethanol company to pay the invoices was the result of the financial difficulties of the ethanol company's Spanish parent.  Nevertheless, First NBC again asserted that it did not expect to incur any loss

---

[2]  Defendants' representations were also materially false and misleading because the Company, in violation of GAAP, failed to take a reserve in 2014 for its exposure to the oil and gas industry.  At the beginning of the Class Period and continuing through the middle of 2014, prices of crude oil hovered around $100 per barrel.  From that point on, however, the price of crude oil dropped dramatically, reaching around $50 per barrel by the end of 2014.  ¶ 204.  Notwithstanding this approximately 50% decline, First NBC failed to take any reserve for its loan exposure in the oil and gas industry and, to the contrary, made materially false and misleading statements at 2014 year-end about that exposure.  ¶¶ 205-208.  However, in 2015 – *based on substantially the same facts that had been available at the time of the Company's year-end 2014 financial statement* – the Company took an $11 million loan loss reserve for its oil and gas exposure.  ¶ 239.  The failure to take such a reserve in the 2014 financial statements is yet another example of a misstatement that had the effect of further overstating the Company's reported results, as more fully described below.

based, in part, on "the historical earnings performance of the ethanol company" and the fact that its Spanish parent was "evaluating certain restructuring options that would permit a more prompt repayment of the receivable." ¶¶ 23, 104, 242, 318.

These statements were materially misleading. First NBC did not disclose that the obligor on the receivable was Abengoa Bioenergy Company, the United States subsidiary of its Spanish parent, Abengoa S.A. It also failed to disclose that Abengoa S.A. *had filed in late 2015 for preliminary protection under Spanish insolvency laws*. This material, undisclosed fact was relevant to the ability of the U.S. subsidiary to make payments, regardless of its "historical earnings performance." Indeed, the U.S. subsidiary filed for bankruptcy protection under Chapter 11 just weeks after the Company's February 2016 disclosures. Thus, contrary to First NBC's assertions, neither the U.S. ethanol company nor its Spanish parent possessed the wherewithal to make full payment of the receivable. ¶¶ 24, 105-109.

Ultimately, when First NBC filed its 2015 Form 10-K in August 2016, the Company recorded an impairment charge *for the entire balance of the $69.9 million receivable*, effectively acknowledging that the Company's February 1, 2016 earnings release was false because it failed to include this charge. First NBC also represented in the Form 10-K that the circumstances giving rise to this write-off were caused by a material weakness in internal controls "*related to the evaluation and ongoing monitoring of the financial stability and creditworthiness of companies from which [the Company] acquired short-term receivables*." ¶¶ 25, 255(b), 258. This material weakness does not excuse the belated write-off of the receivable since defendants Ryan and Verdigets clearly knew the identities of the ethanol company and its parent company and also knew the parent had commenced insolvency

proceedings that jeopardized full payment, but sought to conceal these facts to avoid including a $69.9 million write-off in the Company's reported results on February 1, 2016.

IV.    **First NBC Investors Were Injured When the Truth Was Revealed in a Series of Corrective Disclosures**

Starting on February 1, 2016, after the close of the market, when First NBC issued its unaudited fourth quarter and full year 2015 financial results, the artificial inflation of the Company's stock price resulting from its false and misleading statements began to be removed. The Company's reported 2015 earnings were significantly below consensus estimates based, in part, on a higher than expected fourth quarter tax credit impairment charge (which itself was woefully understated).  As described above, the earnings release also noted First NBC's $90.2 million exposure to the oil and gas sector and the $39.7 million that was past due on its $69 million ethanol receivable.  These disclosures prompted concern among investors and analysts. For example, analysts at Sandler O'Neill issued a report on February 2, 2016, stating:  "We were definitely disappointed in the bank's 4Q results given the much higher than expected tax credit impairment, the increase in energy-related loans (without a disclosed reserve percentage), and the announcement of past due receivables investments related to the oil and gas sector (ethanol)." In response to the February 1, 2016 press release, the price of First NBC stock dropped the next day by $3.20 per share, or about 10.5%, to close at $27.20.  ¶¶ 26, 333-334.

On March 16, 2016, First NBC stunned the market by announcing that it would delay filing its 2015 Form 10-K.  *The Company disclosed that it had identified errors in its accounting for its Federal and State Historic Rehabilitation tax credit entities and other items and that its previous release of 2015 earnings was being retracted.*  First NBC also said it was evaluating the impact of the accounting errors *with respect to previously issued financial*

*statements and assessing its internal controls*.   As a result of this news, First NBC stock plunged $5.33 per share, or 22%, to close at $19.09 on March 16, 2016.  ¶¶ 27, 335.

Shortly thereafter, on April 8, 2016, the Company filed a Form 8-K and press release disclosing that the Company's audit committee and management had determined that all of First NBC's previously-issued financial statements *from 2011 through 2014* should no longer be relied upon.  The Form 8-K stated:

> The Company's management determined that *the financial statements referred to above should be restated due to an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities and the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities*.  The Company is continuing to review and quantify these and other potentially other less significant matters, which are expected to be reflected in the restated financial statements.

As a result of this news, First NBC stock fell $0.47 per share to close at $18.65 on April 11, 2016, the next trading day, a decline of 2%.  ¶¶ 28, 247, 336.  The decline was clearly muted by Defendants' failure to indicate the magnitude of the contemplated restatement and their characterization of "other" matters as "less significant," notwithstanding that sizeable reserves and write-offs were required for the oil exploration company loan and the ethanol company receivable investment.

From its inception as a public company, First NBC maintained that the bank was "well-capitalized," the soundest capital classification for FDIC-insured institutions.   Defendants' accounting maneuvers concealed the fact that the Company's capital position was not as strong as investors had been led to believe.  On August 12, 2016, the Company's statements concerning its capital position were challenged when HoldCo Asset Management ("HoldCo"), an investor holding $8 million face value of First NBC's subordinated debt, published an open letter to First NBC.  HoldCo's letter posed a series of questions concerning First NBC's accounting for its tax

credit investments and the significance to the Company's capital position of its deferred tax asset arising from such investments. HoldCo posited that First NBC would need to raise at least $300 million in new common equity over the next two years to be considered a "well-capitalized" bank by banking regulators. In response to the publication of the HoldCo letter, the price of First NBC stock fell $2.21 to close at $13.54 on August 12, 2016, a 14% decline. On the next trading day, August 15, 2016, First NBC shares declined by an additional $1.33 to close at $12.21. The Company's stock thus experienced a two-day decline of $3.54, or nearly 22.5%, in response to the publication of the HoldCo letter. ¶¶ 29, 337.

On September 2, 2016, after the close of the market, First NBC filed a Form 8-K disclosing that defendant E&Y, its outside auditor from before the IPO and throughout 2015, had notified the Company "that it was declining to stand for re-appointment" as the Company's independent auditor. First NBC stated that E&Y's audit services would cease upon First NBC's filing of its Forms 10-Q for the quarters ended March 31, 2016 and June 30, 2016. As a result of this news, First NBC stock fell by $0.90 on the next trading day, September 6, 2016, to close at $11.95, a 7% decline. ¶¶ 32, 261, 338.

Finally, on October 20, 2016, First NBC filed its Form 10-Q for the quarter ended June 30, 2016. In addition to reporting its quarterly results, the Company reported it had been informed by the Federal Reserve Bank of Atlanta ("FRB") and the Louisiana Office of Financial Institutions ("OFI") that it had been deemed to be in "*troubled condition*" under the relevant banking regulations. Such designation places restrictions on, among other things, First NBC's ability to incur debt, pay interest and dividends, and appoint new directors and officers. As a result of this news, shares of First NBC plummeted by $2.15 to close at $9.05 on October 20, 2016, a 19% decline. First NBC stock continued to fall over the next two trading days, closing at

$6.65 on October 24, 2016. Over the three trading days following disclosure of First NBC's "troubled condition" designation, the Company's stock declined by $4.45 or 40.6%. ¶¶ 33, 340.

During the Class Period, First NBC stock, which was issued at $24 per share in the IPO, rose to a high of over $43.00 in November 2015, as a result of Defendants' false and misleading statements concerning the Company's reported financial results and business operations. ¶ 60. Based on the series of corrective disclosures described above, First NBC's stock fell from $30.40 at the close on February 1, 2016, to $6.65 at the close on October 24, 2016, a decline of more than 80% that erased over $450 million of the Company's market capitalization. Investors who purchased First NBC stock during the Class Period were thus massively injured by Defendants' fraud.

## ARGUMENT

### I.     The Complaint States Actionable Claims Under Section 10(b) of the Exchange Act

Defendants argue that the Complaint should be dismissed because Lead Plaintiffs have failed to adequately allege scienter, an actionable misstatement, or loss causation. Defendants, however, largely refuse to engage on the substantive allegations in the Complaint. Rather, Defendants ignore substantial portions of Lead Plaintiffs' allegations and rely on generalized, boilerplate holdings from cases with facts that are markedly different from those present here. As for the few allegations Defendants do address, they examine these allegations individually rather than collectively in direct contravention of the Supreme Court's analysis in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Because Lead Plaintiffs' allegations, taken collectively, more than adequately allege a violation of the Exchange Act by Defendants, Defendants' arguments for dismissal should be rejected.

### A.     The Complaint Adequately Alleges Scienter

#### 1.     Legal Standards Under the PSLRA

The Complaint asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(t)(2), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The PSLRA requires a securities fraud plaintiff to plead with particularity specific facts giving rise to a strong inference of scienter, *i.e.*, that the defendant either consciously misbehaved in issuing the statements, or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public.  *See Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 697 (5th Cir. 2005); *see also In re OCA, Inc.*, No. 05-2165, 2006 U.S. Dist. LEXIS 90854, at *36-*37 (E.D. La. Dec. 14, 2006).  Those who consciously avoid learning the truthfulness of a statement, as well as those who misspeak as a result of their refusal to see the obvious or investigate the doubtful, are considered to be severely reckless.  *See Bach v. Amedisys, Inc.*, Civil Action No. 10-00395-BAJ-RLB, 2016 U.S. Dist. LEXIS 111077, at *41 (M.D. La. Aug. 19, 2016); *see also In re Triton Energy Ltd. Secs. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at *31 (E.D. Tex. Mar. 30, 2001) ("*Triton*") ("Severe recklessness does not require that the defendant be aware of the actual falsity of his or her representation").

Under the Supreme Court's holding in *Tellabs,* courts must "accept all factual allegations in the complaint as true," and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  551 U.S. at 322-23 (emphasis in original); *see also Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014); *Bach*, 2016 U.S. Dist. LEXIS 111077 at *41.  Further, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences.'"  *Id.* at 324 (citation

omitted); *see also Stone*, 26 F. Supp. 3d at 599; *K.B. Partners I, L.P. v. Pain Therapeutics, Inc.*, No. A-11-CA-1034-SS, 2015 U.S. Dist. LEXIS 160519, at *19 (W.D. Tex. Dec. 1, 2015).

The Supreme Court cautioned that a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," and determine whether the allegations "accepted as true and taken collectively, would [allow] a reasonable person [to] deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 326; *see generally Stone,* 26 F. Supp. 3d at 599-600, 610-12 (discussing *Tellabs* and finding scienter adequately pleaded after "[t]aking the allegations in the aggregate").  Thus, in determining whether the Complaint alleges facts giving rise to a strong inference of scienter, the Court may "take into account" only those "plausible opposing inferences" – *i.e.*, plausible non-culpable explanations for the defendant's conduct – that may be "rationally drawn *from the facts alleged*." *Tellabs*, 551 U.S. at 314, 323-24 (emphasis added).  Whenever the inference of scienter is *at least as compelling* as any plausible opposing inference that can be drawn from the facts alleged, the complaint must be sustained.  *Id.* at 324; *see also Engel v. Sexton*, Civil Action No. 06-10447, 2009 U.S. Dist. LEXIS 12778, at *37 (E.D. La. Feb. 11, 2009) (Engelhardt, J.) (citing *Tellabs* and finding that "inference of scienter is at least as compelling as the opposing inference"); *Bach*, 2016 U.S. Dist. LEXIS 111077, at *41 ("'[a]t the pleading stage…a plaintiff…must only plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.'") (citation omitted).

Accordingly, on a motion to dismiss, it is a defendants' burden to demonstrate that the allegations give rise to an inference of non-culpable conduct that is *stronger* than the inference of scienter.  *Tellabs,* 551 U.S. at 314; *see also Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014) ("where there are competing inferences that establish or negate the

scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss").  Defendants claim there is an inference to be drawn that they erroneously believed in good faith that First NBC's financial results were correct when issued.  But that "inference" is simply a conclusory assertion that is completely untethered from the facts alleged in the Complaint.  In fact, Defendants' arguments with respect to scienter are devoid of any analysis of many of the allegations in the Complaint, and as such Defendants have necessarily failed woefully to meet their burden to support dismissal under *Tellabs*.  But even had Defendants been able to proffer a plausible non-culpable explanation, which they do not, a fair reading of the allegations of the Complaint, considered collectively, demonstrates a strong inference of scienter that far outweighs any opposing inference from the facts alleged.

### 2.     The Complaint Pleads Facts to Support a Strong Inference of Scienter

The Complaint alleges claims arising under Section 10(b) of the Exchange Act and Rule 10b-5 against defendants First NBC, Ryan, Verdigets, and E&Y in connection with a fraud that spanned well over three years and ultimately led to First NBC finally filing its 2015 Form 10-K, which included a massive restatement of its financial results for the entire time it had been a public company (and for prior periods as well), primarily due to large material misstatements concerning the financial results of First NBC's "core" tax credit business.  ¶¶ 6-8, 12-15, 30-31, 112-114, 254-260, 309-310, 321.  In the Form 10-K, Defendants acknowledged that First NBC's financial statements during the entirety of the Class Period were materially false ***at the times they were issued***.  ¶¶ 6, 256-258, 309-310.  Further, First NBC acknowledged a litany of material weaknesses in internal controls, stemming mostly from ***"the dominant influence of the Chief Executive Officer [Defendant Ryan] over accounting and reporting matters"*** and the ***"failure of executive management [including Defendants Ryan and Verdigets] to establish a tone and***

***control consciousness that consistently emphasize[d] the importance of internal control over financial reporting.*** ¶¶ 6, 15-16, 257-258, 304, 322.

The Complaint sets forth in painstaking detail the material misrepresentations and omissions made by Defendants as well as the accounting machinations and material weaknesses that constituted the fraud and necessitated the restatement (¶¶ 12-25, 55-111, 112-231, 305-308), and explains that this conduct was especially egregious in light of the fact that ***Defendants had disclosed a restatement and material weakness with respect to First NBC's tax credit business just over three years earlier when filing for First NBC's IPO***. ¶¶ 7, 15, 121, 258, 306. Specifically, in its 2013 IPO offering materials, First NBC disclosed that it was required to restate its previously issued 2011, 2010, and 2009 audited financial statements to properly allocate an amount of its deferred income taxes, and had determined that the errors necessitating that restatement were due to a material weakness in internal control that was ***virtually identical*** in description to the material weakness in internal control that necessitated First NBC's latest restatement:

| First NBC's Description in 2013 IPO Offering Documents of Material Weakness Necessitating Prior Restatement | First NBC's Description in 2016 of Material Weakness Necessitating Recent Restatement |
|---|---|
| "a lack of a sufficient number of accounting employees with the appropriate technical skills and knowledge regarding the income tax accounting for [First NBC's] tax credit investments." | "the lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax credit related entities and the related evaluation of impairment, if any, associated with these investments." |

The Complaint also details the critical importance of First NBC's tax credit business to the Company's bottom line and, therefore, to its investors. Specifically, in 2013 and 2014, tax credit benefits alone accounted for 48.2% and 48.5%, respectively, of First NBC's reported net income. ¶ 10.

20

The Complaint also alleges with specificity that defendants Ryan and Verdigets knew of non-public facts that contradicted the statements they were making, and that they were causing the Company to make, or that served to reveal that those statements were plainly misleading when made.  For example, in disclosing the prior restatement and material weakness concerning its tax credit business in First NBC's IPO offering materials and in public filings thereafter, Defendants reassured investors that the Company had taken appropriate actions to address the weakness, including the hiring of additional accounting personnel, providing training to personnel to develop expertise in tax credits, using outside accountants and consultants to supplement First NBC's internal staff when necessary, and implementing additional internal control procedures.  ¶¶ 122, 143, 171, 306.  Defendants also represented in the IPO offering materials that the Company's "board of directors, in coordination with [its] audit committee, w[ould] ***continually assess the progress and sufficiency of these initiatives*** and make adjustments, as necessary."  ¶ 122.  Defendants Ryan and Verdigets doubled down on these reassurances by issuing materially false and misleading statements concerning their evaluations of First NBC's disclosure controls as well as false and misleading SOX certifications during the Class Period.  ¶¶ 126, 131, 136, 143, 155, 161, 165, 171, 182, 191, 199, 308.

While Defendants were falsely reassuring investors that the Company's financial statements were accurate and its system of internal controls was effective, Defendants were aggressively touting the strong returns from First NBC's tax credit business to investors and stressing the importance of the business to the Company.  In periodic investor presentations throughout the Class Period, defendants Ryan and Verdigets repeatedly asserted that First NBC's tax credit business was a ***"unique feature"*** with ***"[s]trong financial returns"*** that was ***"an integral part of First NBC's commercial banking business"*** and ***"core to First NBC's***

*corporate strategy."* ¶¶ 11, 59, 128, 137, 139, 152, 158, 166, 179, 184, 192-193, 307.  Seeking to reassure investors who may have been skeptical of the outsized contribution to earnings from the Company's tax credit investments (rather than its traditional banking business), defendants Ryan and Verdigets also affirmatively asserted in the same presentations that *"[m]anagement has a deep understanding of this business."* *Id*.

First NBC was nevertheless forced to issue a massive restatement of its financial results *admitting that they were false when issued* and reveal a plethora of material weaknesses, one of which was nearly identical to the prior material weakness disclosed by the Company in the IPO offering materials related to its tax credit business.  ¶¶ 6-7, 14-15, 30-31, 254-260, 309-310, 321. Moreover, this particular material weakness was but one aspect of an overall "ineffective control environment" that was caused in large measure by the "dominant influence" of defendant Ryan over accounting and reporting decisions.  Defendant Ryan was, of course, aware that in 2012, First NBC's accounting department was insufficiently staffed and lacked the requisite expertise. That it remained so from 2012 through 2016 is a reflection of the dominant influence he exercised and of "the failure of executive management" to "emphasize[] the importance of internal control over financial reporting."  Defendants' knowledge of the failure to rectify an ongoing material weakness first recognized in 2012 means that they knew, or were severely reckless in not knowing, that there was no adequate basis for asserting that First NBC's financial statements complied with GAAP.  ¶¶ 309-311.  It was also a mechanism by which defendants Ryan and Verdigets could avoid having their financial statement misrepresentations caught by qualified accounting personnel.

Serving to further strengthen this strong inference of scienter are the Complaint's allegations regarding Defendants' knowledge of contradictory facts at the time they were making

false and misleading statements and omissions related to both (1) First NBC's exposure to the oil and gas industry and (2) the status of First NBC's investments in short-term receivables.  For example, despite their knowledge of plummeting oil prices beginning in mid-2014 that would severely impact First NBC's oil and gas industry loans, Defendants failed to take ***any reserves*** with respect to this exposure and falsely portrayed this exposure to the market, telling investors that falling prices would not have an impact on its portfolio and that First NBC had ***"very limited exposure"*** to the oil and oil service industries.  ¶¶ 17, 79-91, 203-208, 232-244, 254-259, 312, 316.  Only later would First NBC be forced to take an ***$11 million reserve*** specifically related to "the substantial decline in oil prices" (¶ 96) and then recognize a material weakness in its application of the allowance for loan loss methodology.  *Id.*

Defendants also knew about a large loan made by First NBC to an oil exploration and production company, and material details concerning problems with repayment of that loan, but knowingly misled investors concerning the loan and its problems.  ¶¶ 18-21, 92-97, 209-212, 232-244, 254-259, 313-316.  Specifically, Defendants knew that on December 29, 2014, a pipeline serving a well in the oil exploration and production company's largest oil field broke, and as such the company would have difficulty repaying the loan.  ¶¶ 18, 92, 209, 313.  Defendants also knew that, in lieu of repairing the pipeline, the borrower decided to drill a new well, which First NBC agreed to finance.  ¶¶ 18, 92, 209, 313.  Despite this contemporaneous knowledge, no mention of the loan – let alone a proper loss reserve – appeared in either First NBC's 2014 Form 10-K, filed on March 31, 2015, or in the Company's 10-Q for the first quarter of 2015, filed May 8, 2015.  ¶¶ 19, 210, 313.  When the Company finally did discuss the loan, Defendants falsely represented that the loan was ***"affected by the fluctuations in energy commodity prices and the level of production from its shallow-water well."***  ¶¶ 19, 93-94, 210,

23

314.  Meanwhile, the loan ballooned to a total balance of $90.2 million by the end of 2015.  ¶¶ 20, 96, 211, 233, 315.  Only later would First NBC be forced to take a ***$30 million reserve*** related to the loan and recognize a material weakness in monitoring borrowers' ability to repay loans.  ¶¶  21, 96, 211, 255(c), 257-258, 315.

Defendants also knew that First NBC had purchased $69 million in receivables from an ethanol company through a platform called the Receivables Exchange in 2015 and actively misled investors about the truth concerning the investment.  ¶¶ 22-25, 98-111, 213-225, 232-244, 254-259, 318-319.  Specifically, Defendants knew that: (1) the ethanol company was Abengoa Bioenergy Company, which was in extreme financial distress; and (2) its parent was Abengoa S.A., which had filed for preliminary creditor protection under Spanish insolvency laws.  ¶¶ 24, 105-109, 236(b), 242, 318.  Despite their knowledge, Defendants refused to disclose these material facts to investors and thereafter falsely told investors that both the ethanol company and its parent were capable of paying the full amount of the receivables balance over time, and that ***"management does not expect that the Company will incur any loss on its investment in short-term receivables related to"*** this contract.  ¶¶ 23-24, 104, 222-223, 236, 242, 318.  Once again, only later would First NBC be forced ***to write-down the entirety of its $69.9 million investment*** in these short-term receivables and recognize a material weakness related to the evaluation and ongoing monitoring of the financial stability and creditworthiness of companies from which the Company acquired short-term receivables.  ¶¶ 25, 110, 213, 255(b), 257-259.

Considered collectively, these allegations show a pattern of misconduct orchestrated by defendants Ryan and Verdigets, on behalf of First NBC, to affirmatively mislead investors despite their knowledge of non-public facts that plainly contradicted the statements they were making and that they were causing the Company to make, or that served to reveal that those

24

statements were plainly misleading when made. There can be no doubt that Lead Plaintiffs have adequately alleged a strong inference of scienter here, especially when considered collectively with the following facts: (1) *each misstatement or omission within the financial statements during the Class Period had the effect of inflating the Company's reported financial results* (¶ 320);[3] (2) the admissions by the Company concerning the roles of defendants Ryan and Veridgets in the material weaknesses that were announced in connection with the restatement (¶¶ 6, 16, 257, 322); (3) the lack of qualified and trained accounting personnel, a material weakness from First NBC's prior restatement which Defendants repeatedly and falsely represented had been cured (¶¶ 15, 254-259, 322);[4] (4) the massive size of the restatement (¶¶ 14, 30, 254-259, 321);[5] and (5) Defendants' knowledge and experience, which they themselves consistently touted to investors as an asset and for reassurance (¶¶ 11, 41-43, 59, 128, 137, 139, 152, 158, 166, 179, 184, 192-193, 307, 322).

In short, the only plausible inference to draw from the facts alleged is that defendants First NBC, Ryan and Verdigets acted with scienter.

---

[3] This fact alone is powerful evidence of scienter. *See Engel*, 2009 U.S. Dist. LEXIS 12778 at *38-39 ("the [stock option] grants that [the company] has admitted to dating incorrectly were *all* in favor of the Option Recipient Defendants, which cuts against the strength of any non-culpable inference") (emphasis in original); *In re Akorn Secs. Litig.*, No. 15 C 1944, 2017 U.S. Dist. LEXIS 31540, *41-45 (N.D. Ill. Mar. 6, 2017) (finding that inference defendants acted with scienter was cogent and as least as compelling as alternative inference where the nature and extent of the company's financial results were significant and company's "accounting violations had the near-uniform effect of *increasing* its reported revenue and net income, …unlike what one might expect from a random series of innocent mistakes.") (emphasis in original).

[4] *See, e.g.*, *In re OCA*, 2006 U.S. Dist. LEXIS 90854, at *53 ("The degree to which the problems identified in early 2004, before the class period, mirror those that still existed in June 2005, at the end of the class period, is undoubtedly evidence that defendants' repeated assurances of improving OCA's internal control processes were misleading when made.") & *68 ("In sum, the Palmisanos' fingerprints were all over OCA's accounting systems since at least 2000, creating a strong inference that Palmisano, Sr. knew that the company was not meaningfully enhancing its internal control processes during the class period.").

[5] *See e.g.*, *Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006) ; *In re Fleming Cos. Secs. and Derivative Litig.*, Civil Action No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488, at *116-19 (E.D. Tex. June 10, 2004).

### 3. Defendants Fail to Assert Any Factually Supported Non-Culpable Inferences

Ignoring just about all of the well-pled facts giving rise to a strong inference of scienter, Defendants portray the Complaint as being based on nothing more than the bare fact of First NBC's restatement and argue, in reliance on *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527 (5th Cir. 2008) ("*Shaw Group*"), that allegations concerning a restatement or GAAP violations, "standing alone," are insufficient to establish scienter. First NBC Br. at 16; Ryan Br. at 13-18. Defendants similarly rely on *Shaw Group* to argue that false and misleading SOX certifications, "standing alone," are not indicative of scienter. First NBC Br. at 17; Ryan Br. at 21-22. But courts within the Fifth Circuit and elsewhere routinely reject boilerplate arguments like this when, as here, plaintiffs have alleged much more than a mere restatement, false and misleading SOX certifications, or GAAP violations.

For example, in *Triton*, 2001 U.S. Dist. LEXIS 5920, at *31-36, the court rejected the very arguments made by Defendants here in a case with similar allegations. Plaintiffs in *Triton* alleged that the company committed a series of accounting violations that disguised material facts from the market with respect to a handful of assets that accounted for most or all of the company's market value, including what was perhaps the company's most important asset, and that the individual defendants knew or were severely reckless in not knowing that the company's small number of assets made proper representation of them essential to investors. *Id*. at *31-33. Combined with defendants' positions and experience with the particular financial disclosures at issue, the *Triton* court found that plaintiffs had sufficiently alleged defendants' scienter. *Id*.

The allegations here are even stronger than those in *Triton*, as the Complaint alleges that (1) Defendants committed accounting violations with respect to, among other things, a tax credit business that Defendants themselves touted as "core" to First NBC's corporate strategy and

which was responsible for nearly half of the Company's reported net income in 2013 and 2014; (2) Defendants repeatedly represented they had specialized expertise concerning this business; (3) First NBC ultimately announced a massive restatement of financial results directly attributable to its accounting for its tax credit business; (4) the restatement included a litany of material weaknesses stemming largely from the dominant influence exercised by defendant Ryan over accounting decisions; and (5) one of the material weaknesses identified was nearly identical to the material weakness that precipitated the Company's prior restatement, which Defendants falsely asserted had been remediated.

As such, Lead Plaintiffs' allegations relating to the restatement, Defendants' GAAP violations, and Defendants' blatantly false and misleading SOX certifications are not "standing alone," as Defendants suggest.   Like the allegations in *Triton*, the allegations here go well beyond mere allegations of a restatement, false SOX certifications or GAAP violations, and as the court in *Triton* observed, "[t]ime and again, courts have held that tautologies approximating this one are sufficient to avoid dismissal on the grounds that plaintiff has failed to allege scienter." *Id.* at *32-33 (citing cases);[6] *see also In re Fleming*, 2004 U.S. Dist. LEXIS 26488, at *35 (citing *Triton* and observing that "[w]hen the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences

---

[6] The Court in *Triton* also rejected the argument by defendants there, virtually identical to the boilerplate argument made by Defendants here, that plaintiffs had failed to allege that defendants knew (or were reckless in not knowing) of the supposed accounting violations and were instead seeking to impute knowledge to them based on their position within the company.  *See Triton*, 2001 U.S. Dist. LEXIS 5920, at *34-36; First NBC Br. at 17; Ryan Br. at 17-18. The court there stated:

> Plaintiffs do not simply argue scienter by virtue of Defendants' positions and experience. Rather, as discussed above, Plaintiffs contend that Defendants' positions and experience are factors that pled with others (e.g., the size of the accounting irregularities and that they pertained to [the company's] most important assets) state scienter with the required measure of specificity. To the extent Defendants argue that position-and-experience evidence is incompetent as proof of scienter, the Court has not found any case to that effect and Defendants have brought none to the Court's attention. Indeed, most authorities have found opposite.

*Id.* at *35-36 (citing cases).  Defendants' identical argument should be rejected here.

to be drawn from such allegations *may shift significantly in favor of scienter*") (emphasis added); *Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d at 664 (accord); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 634-37 (E.D. Va. 2000).[7]

Defendants' repeated reliance on the holding of *Shaw Group* is ill-taken because the facts there are entirely different from those presented here. The "nuanced conclusions" the court discussed in *Shaw Group* were only nuanced because plaintiffs there made "no attempt to estimate by how much the earnings were inflated." *Shaw Group,* 537 F.3d at 535-36.

> This case is quite unlike most securities fraud cases, which are ***precipitated when the company announces such revelations as a restatement in earnings due to accounting mistakes or the discovery and correction of material errors*** or misdeeds in a subsidiary. Here, ***there was no mea culpa from the company in the form of acknowledged wrongdoing or restated financial reports***, nor was there any ***auditor qualification to those aspects of the reports made the basis of this complaint***, nor any ***publicly expressed reservations by the auditors to the financials***. There is no ***single event or fact that the executives can be alleged to have known and concealed from the public***. In *Central Laborers,* by contrast, ***the company disclosed material weaknesses in its internal controls that eventually required restatement of two and a half fiscal years of financial results***.

*Id*. at 535-36 (emphasis added). In stark contrast, the Complaint here contains the very items that the court in *Shaw Group* observed the complaint in that case was missing. As such, the holding in *Shaw Group* actually highlights the strength of Lead Plaintiffs' allegations here and mandates the rejection of Defendants' arguments.[8]

---

[7] For the same reasons, Lead Plaintiffs' allegations concerning Defendants' false and misleading SOX certifications and GAAP violations, when combined with the other allegations of scienter, also support a strong inference of scienter. *See In re OCA*, 2006 U.S. Dist. LEXIS 90854 at *75 (finding that allegations concerning false and misleading SOX certifications, when viewed in combination with other allegations, supported an inference of scienter where defendants failed to disclose "serious, unremedied internal control problems"); *Stone*, 26 F. Supp. 3d at 610-11 (finding that plaintiffs adequately pleaded scienter when considering allegations of GAAP violations and other allegations of scienter in the aggregate, and noting that "the Court must look to the allegations as a whole, not in isolation as the Defendants do").

[8] Defendants' reliance on *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 Fed. Appx. 345 (5th Cir. 2012) ("*Zale*"), is similarly misplaced. In *Zale*, the complaint alleged that defendants had relied upon another employee with respect to the accounting determinations at issue and the court observed that none of the company's admissions showed "that Zale or any of its officers acted with scienter in making the initial inaccurate financial

Defendants next attempt to disclaim scienter by arguing that the accounting issues involved highly complex, subjective judgments. First NBC Br. at 16-17. Although First NBC's restatement involved several accounting issues, Defendants cite to just a single issue – the Company's failure to consolidate VIEs – in support of their assertion that the accounting issues were complex. But as Defendants admitted in the restatement, their failure to comply with GAAP in properly consolidating First NBC's VIEs had nothing to do with their after-the-fact and wholly unsupported claim of an analysis that is "highly complex" or "challenging." Rather, Defendants have admitted that it stemmed from a material weakness relating to a lack of accounting personnel with the technical expertise and knowledge to evaluate certain investments in real estate under GAAP, a material weakness first reported in First NBC's IPO offering materials that Defendants assured investors had been remedied. Those assurances were false. Rather, Defendants continued to foster a control environment where defendant Ryan exercised "***dominant influence … over accounting and reporting matters***" and defendants Ryan and Verdigets failed to "***establish a tone and control consciousness that consistently emphasize[d] the importance of internal control over financial reporting***."

Defendants' conclusory assertion that the accounting was "complex" does not make it so. Moreover, this improper fact-intensive argument[9] is belied by the allegations of the Complaint,

___

statements." *Id.* at 350. Here, in sharp contrast, the Complaint alleges that defendants Ryan and Verdigets were directly engaged in a fraudulent scheme to boost First NBC's reported profitability, which First NBC admitted in its restatement when it conceded that the errors precipitating the restatement were the direct result of the conduct of defendants Ryan and Verdigets, including defendant Ryan's "dominant influence…over accounting and reporting matters." Lead Plaintiffs also allege that Defendants were well aware of the accounting in this area by virtue of, among other things, the Company's prior restatement, and these Defendants themselves admitted as much by giving investors repeated reassurances during the Class Period that they had a "deep understanding" of First NBC's tax credit business. Finally, Lead Plaintiffs have alleged that Defendants repeatedly made false and misleading statements and omissions to investors with knowledge of specific facts showing Defendants' contemporaneous knowledge of the falsity or misleading nature of those statements. Defendants' reliance on *Zale* is unavailing.

[9] Fact-based arguments like this one advanced by defendants "are insufficient to support a motion to dismiss." *City of Pontiac Gen. Emples.' Ret. Sys. v. Dell Inc.*, Cause No. A-15-CV-374-LY, 2016 U.S. Dist. LEXIS 126219, at *13 (W.D. Tex. Sept. 16, 2016).

which make clear that the GAAP rules and accounting policies violated were straightforward and longstanding. *See, e.g.*, ¶¶ 66-78, 82-88; *see also MicroStrategy*, 115 F. Supp. 2d at 638 ("an inference of scienter becomes more probable as the violations become more obvious"). Indeed, specifically in regard to VIEs, the Complaint alleges that GAAP provides "a clear step by step analysis … to aid in evaluating VIEs for possible consolidation." ¶ 78. Defendants went to great lengths to assure the market they had taken the necessary steps to account for First NBC's tax credit business properly. But significantly, as Defendants admitted in the restatement, First NBC failed "to properly … consolidate a variable interest entity *that sustained losses over all periods presented in this Annual Report on Form 10-K* and that should have been included in the Company's reports of operations for such periods." ¶ 258. This is yet another instance where all of accounting "errors" were in the direction of boosting First NBC's reported profitability, rather than decreasing it, lending further support to Lead Plaintiffs' claim that the improper accounting was deliberately undertaken.[10]

Defendants also argue that a plausible inference of fraud is somehow negated by First NBC's Class Period disclosures that it was using the cost method to account for its tax credit investments, *see* First NBC Br. at 18-19, an assertion that is wholly without merit. The Company's disclosures that it was using the cost method *do not* mean that investors would have known that the application of the cost method violated GAAP. In fact, investors would have had no idea that First NBC was improperly employing the cost method because GAAP dictates that either the cost method or equity method be used *depending on "the terms of the operating*

---

[10] Defendants' "complexity" argument is also belied by the fact that First NBC failed to record *any* impairment charge on its tax credit investments in 2013 and 2014, notwithstanding their representations that the investments were evaluated for impairment. ¶¶ 141, 169. By failing to record impairment charges, First NBC's noninterest expenses in 2013 and 2014 were understated *by approximately 40%*. ¶ 75. If First NBC had assessed its tax credit investments for impairment in those years, the Company certainly would have recorded at least *some* impairment charges. The fact that no impairment was recorded is a strong indication that First NBC failed to conduct any impairment evaluation during those years and lied about doing so. Thus, whatever complexity may or may not be involved in performing an impairment analysis, it played no role in First NBC's violation of GAAP in this regard.

*agreement and the substance of the arrangement," which only Defendants would have known*.
¶¶ 66-71.  By representing to investors that First NBC was using the cost method of accounting,
First NBC was, in effect, representing that it had analyzed the operating agreements and the
substance of the arrangement for these investments, *something investors could not do*, and
found that First NBC exerted minimal or no influence.  ¶ 68 ("The cost method … is available
*only* to investors who exert minimal or no influence over an investee.").  It was only years later,
in First NBC's second quarter 2015 10-Q, that Defendants admitted the Company should have
applied the equity method of accounting to these tax credit investments from the beginning, and
specifically attributed the change to an analysis of its "equity ownership structure in certain of
these investments."  *Id*.  In other words, the only thing that changed in First NBC's decision to
switch from the cost method to the equity method of accounting for these investments was
Defendants' analysis of First NBC's equity ownership structure as set forth in the operating
agreements and substance of First NBC's arrangements, *the precise information to which
investors had no access*.[11]

Notably, Defendants make no attempt to explain how or why the "judgment" they made
about the cost method of accounting was incorrect or what the impetus was for the change to the
equity method, simply saying that the change was made "following analysis."  First NBC Br. at
7.  The Complaint, however, explains exactly why Defendants fraudulently employed the cost
method over the equity method:  because (1) amortizing its investments under the cost method
generated a ratable amortization expense to First NBC that was substantially smaller than the

---

[11] As such, Defendants' reliance on *Owens v. Jastrow*, 789 F.3d 529 (5th Cir. 2015), does nothing to aid them, as in
that case the "red flags" at issue, *"or at least the inputs that would allow the public to easily calculate them,"* were
disclosed by the company.  *Id*. at 541 (emphasis added).  Further, in *Jastrow*, defendants disclosed that the
company's MBS valuation was based on internal models, *and the company "disclosed the inputs it used in its
models."  Id*. (emphasis added).  As such, the facts are entirely different from the facts here, where investors were
plainly unable to ascertain that Defendants' application of GAAP to these investments was incorrect.

accumulated losses that would have "flowed through" to the Company's income statement under the equity method, thereby substantially understating First NBC's noninterest expenses and overstating its reported earnings; and (2) using the equity method would have required First NBC to record its initial investment at cost and to then adjust the carrying value of its investment to reflect its share of earnings or losses in the periods for which they were reported.  Given that First NBC initially had a 99% or more ownership in the limited partnership tax credit entities, and given that such entities typically generate substantial losses from the beginning of the investment, practically all of the losses on these investments should have been recorded on the Company's financial statements.  ¶¶ 69-71.

Further, as noted above, First NBC ultimately revealed a material weakness in accounting for its investments in tax credit entities that was nearly identical to the one the Company announced years earlier in its IPO offering materials, *which Defendants represented had been remediated*.  As such, the Complaint's allegations regarding Defendants' fraudulent use of the cost method of accounting for these investments are remarkably consistent with all of its other allegations regarding Defendants' scheme to fraudulently boost First NBC's bottom line, and further strengthen an already strong inference that Defendants acted with scienter.[12]

---

[12] Defendants also contend that Lead Plaintiffs' allegations are not sufficient to support a strong inference of scienter because defendant E&Y issued unqualified auditor's reports on the Company's annual financial statements for the years 2011 to 2014.  First NBC Br. at 18.  This argument is unavailing.  First, as defendant E&Y unequivocally asserts in its memorandum, "First NBC's financial statements are representations by First NBC, not EY."  E&Y Br. at 6.  Second, the argument ignores the Complaint's allegations concerning E&Y's role in perpetuating the fraud at First NBC by failing to conduct its audits in accordance with GAAS and misrepresenting in its reports that First NBC's financial statements were presented fairly in conformity with GAAP.  Third, E&Y's audit reports did not excuse defendants Ryan and Verdigets with respect to their own responsibilities to monitor First NBC's internal controls, especially given the enormous size of the fraud and Defendants' history of inadequate reporting.  *See In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214 (HB), 2014 U.S. Dist. LEXIS 9689, at *16-17 (S.D.N.Y. Jan. 27, 2014).  Indeed, given that outside auditors are required to opine on a public company's annual financial statements, Defendants' argument, taken to its logical conclusion, would virtually ensure that no company or its executives could ever be held liable for false financial statements under the federal securities laws.  Accordingly, E&Y's audit opinions are insufficient to counter the strong inference of scienter.  *See Epstein v. World Acceptance Corp.*, Civil Action No. 6:14-CV-01606-MGL, 2016 U.S. Dist. LEXIS 112727, at *33-34 (D.S.C. Aug. 24, 2016).

Defendant Ryan cites to a scattershot series of inapposite cases with boilerplate holdings, arguing that Lead Plaintiffs here have failed to adequately allege scienter.  Ryan Br. at 13-18. These cases do nothing to advance Defendants' argument.  For example, in discussing *Podraza v. Whiting*, 790 F.3d 828 (8th Cir. 2015), defendant Ryan fails to note that the court's decision with respect to the alleged GAAP violations rested heavily on the fact that defendants repeatedly and accurately explained to investors details on how the company was applying its accounting treatment, including the "exact amount of costs expected to be incurred."  *Id.* at 838-39.  This stands in stark contrast to the facts here.  Similarly, in his discussion of *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846 (LGS), 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014), defendant Ryan fails to explain that the entire opinion turns on the facts that: the accounting errors there occurred at the defendant company's *subsidiary*; it was not unreasonable for the parent company to rely on the subsidiary's audited financial statements; plaintiff did not allege that the individual defendants "had any reason or responsibility to be aware" of a red flag given that it involved the company's subsidiary; and defendants only became aware of the weak accounting controls after the allegedly false and misleading statements were issued.  *Id.* at *6-8. Indeed, the facts of *Turquoise Hill* could not be more different from those here, which do not involve a subsidiary but instead (among other things) multiple restatements involving First NBC's core business and a material weakness that existed before the beginning of the Class Period that Defendants falsely assured investors had been remediated.[13]

---

[13] The other New York cases defendant Ryan cites are similarly inapposite because they involved (1) a complaint where, unlike here, plaintiffs failed to "plead access to contrary facts or breach of a duty to monitor that would support an inference of recklessness" (*Wachovia Equity Sec. Litig. v. Wachovia Corp.*, 753 F. Supp. 2d 326, 366 (S.D.N.Y. 2011)); and (2) allegations concerning only one GAAP provision, which was merely a general conceptual statement relating to the significance and interpretation of historical financial information (*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004)).

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328 (C.D. Cal. 2014), is similarly inapposite.  There, the court found that plaintiffs did not allege that the accounting misconduct related to the company's "core" operations, *id.* at 1360-61, whereas here Defendants themselves repeatedly touted First NBC's tax credit business to investors during the Class Period as "core to First NBC's corporate strategy" and "an integral part of First NBC's commercial banking business."  The court in *Ixia* further found that plaintiffs had not alleged that defendants knew of the relevant accounting principles and how the company was interpreting them, *id.* at 1361-62, whereas here (1) Defendants themselves repeatedly told investors during the Class Period that they had a "deep understanding" of the Company's tax credit business; (2) Defendants were undoubtedly familiar with the accounting for First NBC's tax credit business; and (3) First NBC admitted in its recent restatement that one of the principal factors contributing to the "ineffective control environment" leading to the restatement included "***the dominant influence of the Chief Executive Officer over accounting and reporting matters.***"  The court in *Ixia* also found that plaintiffs failed to plead specific facts showing that the defendants "recklessly disregarded or intentionally exploited internal control deficiencies," *id.* at 1364, whereas here First NBC has admitted Defendants' actions were causative factors contributing to the material weakness relating to First NBC's "ineffective control environment."[14]

---

[14] The court in *Ixia*, like the court in *Citigroup*, also noted the GAAP violations alleged in that case involved general principles rather than "rules that require specific accounting treatment," 50 F. Supp. 3d at 1362, whereas here the opposite is true.  Morever, the court noted, and plaintiffs in *Ixia* conceded, that the GAAP violations at issue merely shifted the timing of recognizing earnings while the overall revenues were not impacted, *id.* at 1364, whereas here the restatement had a devastating impact on First NBC's bottom line.

The other cases cited by defendant Ryan are similarly distinguishable.  *See, e.g., In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1040-41 (S.D. Cal. 2014) (plaintiff failed to allege the necessary information about accounting principles and internal controls that would have allowed the court to evaluate whether the individual defendants should have been or must have been aware of the violations); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002) (largest change in earnings involved in restatement was not alleged to be the product of fraud and one of two individual defendants was not alleged to have been involved in drafting or reviewing financial statements); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 279-98 (S.D.N.Y. 2014) (company was consistently disclosing internal control weaknesses during the class period and disclosing their

In short, nothing in any of the cases cited by defendant Ryan compel dismissal of Lead Plaintiffs' claims against him.  Nor can defendant Ryan obtain dismissal of Lead Plaintiffs' claims by mischaracterizing the Complaint's allegations regarding First NBC's loan to the oil exploration company and its short-term receivables investments as claims concerning only loan loss reserves.  Ryan Br. at 18-21.  This mischaracterization ignores that these claims are based not only on GAAP violations but on Defendants' materially false and misleading statements and omissions *regarding the facts and circumstances surrounding these transactions*.  It further ignores that the false statements and omissions were designed to, and did, falsely inflate First NBC's appearance of profitability.

Finally, Defendants argue that the Complaint's motive and opportunity allegations are deficient and based on pure speculation.  First NBC Br. at 19-20; Ryan Br. at 23-24.  Once again, however, Defendants fail to examine Lead Plaintiffs' allegations holistically.  The Complaint (1) alleges that Defendants engaged in a coordinated scheme to boost First NBC's financial results by, among other things, fraudulently enhancing the financial results from its most important, and distinguishing, line of business (¶¶ 4-5, 9-25, 55-111, 304-323); (2) contains detailed allegations concerning Defendants' false and misleading statements and omissions that were intended to, and did in fact, deceive investors as to First NBC's true financial position (¶¶ 112-231); (3) explains that defendant Ryan had a powerful, personal motive to engage in the fraudulent scheme because almost all of the First NBC stock he owned, 435,000 shares out of a total of 475,000, was pledged as collateral for various debt obligations, including real estate investments

---

attempts to resolve them, negating an inference of fraud); *In re Polaroid Corp. Secs. Litig.*, 465 F. Supp. 2d 232, 249-50 (S.D.N.Y. 2006) (plaintiffs' allegations established, at best, that the individual defendants were too optimistic about their company's prospects for survival); *Schott v. Nobilis Health Corp.*, Civil Action No. H-16-141, 2016 WL 5539756, *10 (S.D. Tex. Sept. 29, 2016) (among other things, the improper accounting involved "did not uniformly benefit [the company] or consistently line up with a motive to skew the accounting results to favor [the company's] financial position").

(¶¶ 16, 323); and (4) alleges that if First NBC's stock price fell defendant Ryan would have been forced to post additional collateral on the loans secured by his stock (*id.*).  The pledging of so much stock by defendant Ryan – the Company's founder, chairman and CEO, whose "dominant influence ... over accounting and reporting matters" (¶¶ 6, 257-259, 322) led to the Company failing to hire and train qualified staff that might have uncovered the massive and numerous accounting violations – is just the type of motive and opportunity evidence that, when considered alongside Lead Plaintiffs' other allegations, as required by *Tellabs*, "meaningfully enhance[s]" the already strong inference of Defendants' scienter.  *See Spitzberg*, 758 F.3d at 685.

Tellingly, Defendants submit ***nothing*** to refute Lead Plaintiffs' allegations regarding defendant Ryan's pledging of First NBC stock as collateral and/or the allegations concerning additional collateral that he would have had to post upon a decline in First NBC's stock price.[15] Moreover, while Defendants point out that defendants Ryan and Verdigets are not alleged to have sold any First NBC stock during the Class Period, their argument in this regard is directly contrary to controlling Supreme Court and Fifth Circuit precedent.  *See Tellabs*, 551 U.S. at 325 (fact that plaintiffs did not allege that defendant sold shares during the class period does not disprove scienter); *Spitzberg*, 758 F.3d at 685 ("Even if [defendants] were unable to benefit financially from their alleged misrepresentations…, such misrepresentations would still be severely reckless and dangerous to investors.").  While the motive allegations here meaningfully

---

[15] Defendants reference similar allegations to those presented here regarding large amounts of stock pledged as collateral by a company's CEO in *Goldstein v. MCI WorldCom*, 340 F.3d 238, 250 (5th Cir. 2003).  Notably, however, contrary to defendant Ryan's assertions, the Fifth Circuit in *Goldstein* found that the stock collateral allegations ***were sufficiently particularized to demonstrate motive and opportunity***.  *Id.* at 250-51; *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416-17 (S.D.N.Y. 2003) (finding that "substantial pressure to maintain the price" of stock pledged as collateral for loans by the company's CEO satisfied the requirements for pleading scienter).  Although the court in *Goldstein* ultimately affirmed dismissal of the complaint, it did so because it felt that the allegations in that case, which lacked the substance of those presented here, amounted to inactionable mismanagement rather than recklessness.  In particular, plaintiffs in *Goldstein* failed to adequately connect the defendants to the misconduct alleged, *id.* at 251-54, whereas here there is significant evidence of the intentional misconduct of defendants Ryan and Verdigets in perpetrating the accounting manipulations that necessitated the restatement and the belated admissions of internal control weaknesses.

enhance the strength of the inference of Defendants' scienter, Lead Plaintiffs' other scienter allegations, considered collectively, are sufficient themselves to constitute a strong inference of the Defendants' scienter.  *Spitzberg*, 758 F.3d at 685 ("Although motive allegations might 'meaningfully enhance the strength of the inference of scienter,' a strong inference of severe recklessness does not depend on such an enhancement in the present case.") (citation omitted).

In sum, the Complaint, when viewed in its entirety, alleges facts demonstrating a strong inference of scienter on the part of the First NBC Defendants, which is at least as compelling as any contrary inferences Defendants have sought to put forward.

### B.    The Complaint Alleges Actionable Misstatements and Omissions

In addition to arguing that the Complaint fails to adequately allege scienter, Defendants also contend that Lead Plaintiffs fail to allege actionable misstatements.  Among other things, Defendants contend that the Complaint's allegations with respect to statements of opinion or belief are insufficient under the Supreme Court's *Omnicare* decision.  Defendants make no effort to identify which of the Complaint's many alleged false or misleading statements were statements of opinion (and thus subject to *Omnicare*) and which were statements of fact.  *See*, *e.g.*, First NBC Br. at 20-21.  Even if a few of the false and misleading statements made by Defendants during the Class Period do arguably qualify as opinions, such as Defendants' statements concerning First NBC's compliance with GAAP, the Complaint sets forth ample facts demonstrating that the statements are actionable under *Omnicare*.

Defendants argue that *Omnicare* mandates dismissal of allegations premised on statements of opinion or belief because the Complaint fails to allege facts showing that the speaker did not believe in the professed opinion or supplied information in support of it that was untrue.  *See* First NBC Br. at 20.  Contrary to Defendants' contention, that is not the *only* way in

which *Omnicare* held that statements of opinion or belief can be actionable. *Omnicare* also held

that omissions of facts can make a statement of opinion misleading and actionable. 135 S. Ct. at

1327-32. This is true because:

> a reasonable investor may, depending on the circumstances, understand an
> opinion statement to convey facts about how the speaker has formed the opinion –
> or, otherwise put, about the speaker's basis for holding that view. ***And if the real
> facts are otherwise, but not provided, the opinion statement will mislead its
> audience.*** …
>
> He expects not just that the issuer believes the opinion (however irrationally), ***but
> that it fairly aligns with the information in the issuer's possession at the time***.

*Id.* at 1328-29 (emphasis added). As such, a statement of opinion may also be actionable where

facts going to the basis for the opinion are omitted, and the omission of those facts makes the

opinion statement misleading to a reasonable person. *Id.* at 1332.

Here, Defendants' statements concerning First NBC's compliance with GAAP are

actionable under either prong of *Omnicare* because the Complaint sets forth particularized

allegations that Defendants (1) knew that their statements were false when made, and (2) omitted

to disclose material facts, the omission of which made the statements materially misleading. For

example, Defendants failed to disclose the material weaknesses in First NBC's internal controls,

which would have revealed that Defendants had ***no basis*** to support their statements regarding

First NBC's compliance with GAAP, rendering their statements misleading. *See id.* at 1327-32

(an opinion statement will mislead its audience where the speaker omits material facts going to

the basis of that opinion and that omission makes the opinion statement at issue misleading). But

the allegations at issue here go much further than merely alleging that Defendants omitted

material facts that made their statements of opinion misleading. Rather, Lead Plaintiffs allege

that Defendants: (1) knew about the material weaknesses in First NBC's internal controls by

virtue of, among other things, the Company's prior restatement and, in the case of Ryan and

Verdigets, their own control over the accounting and financial reporting processes; (2) falsely represented to investors that the material weakness with respect to what they touted as First NBC's most important and distinguishing business had been remediated; (3) made affirmative false and misleading statements attesting that the Company's internal controls were effective; and (4) stated they had conducted an impairment evaluation for tax credit investments when they failed to do so in 2013 and 2014.  Under these circumstances, there can be no doubt that any of Defendants' statements that could possibly be considered opinions would have still been misleading to First NBC's investors and are actionable under *Omnicare*.

Defendants also dispute whether certain of their statements about First NBC's troubled oil exploration and production company loan and its problematic investment in the short-term receivables of an ethanol company were misleading.  They contend, for example, that telling investors that a borrower had experienced issues with "the distribution and production from its shallow-water well" conveyed the substance of the allegedly omitted information.  ***But telling investors that the borrower was experiencing unidentified distribution and production problems with its shallow-water well is hardly tantamount to informing them that the pipeline serving the borrower's well broke and that First NBC would need to finance the drilling of an entirely new well – with a loan three times the amount of the original loan – in order for production to resume***.  By concealing this information, Defendants effectively prevented investors from knowing that First NBC's exposure to the borrower was increasing and that the borrower's ability to repay the loan was more speculative.  Similarly, First NBC's statement that the parent company to the receivables contract was experiencing financial difficulties and was evaluating certain restructuring options is hardly the same thing as disclosing ***that the parent company had already filed for protection under Spanish insolvency laws***.  Again, Defendants'

omission of highly material facts meant that investors lacked crucial information to properly evaluate the prospect that First NBC would need to write off this $69.9 million investment (as it eventually did).  Defendants simply chose not to disclose these critical facts.[16]

Defendants' arguments also ignore that "courts must … accept all factual allegations in the complaint as true."  *Tellabs*, 551 U.S. at 322.  As such, courts routinely refuse to consider fact-based arguments about the materiality of alleged omissions in ruling on motions to dismiss.  *See In re Elec. Data Sys. Corp. Secs. & "ERISA" Litig.*, 298 F. Supp. 2d 544, 559 (E.D. Tex. 2004) (observing that defendants were making "an improper attempt to raise a fact issue in a *Rule 12(b)(6)* motion to dismiss" and holding that the court would not "resolve a fact issue regarding how the market interpreted … accounting statements at this stage of the proceedings").

Defendant Ryan's arguments that the majority of the materially false and misleading statements set forth in the Complaint are not actionable or are immaterial, Ryan Br. at 5-11, fare no better than those advanced by defendants First NBC and Verdigets.  Relying on *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), defendant Ryan first argues that none of the statements in First NBC press releases issued during the Class Period or in annual meeting presentations that he gave during the Class Period were actually "made" by him as a matter of law.  This is nonsense.  In *Janus*, the Supreme Court considered whether a mutual fund investment advisor could be held liable under Rule 10b-5 for false statements included in its client mutual funds' prospectuses.  *Id.* at 137.  The Supreme Court held that "[f]or purposes of

---

[16] The Fifth Circuit has held that "under *rule 10b-5*, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.  Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009) (*quoting Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)); *see also Stone*, 26 F. Supp. 3d at 595-96 & n.11 (finding defendants' statements materially misleading and observing that "[a]lthough the contours of 'truthfulness' as defined in *Lormand* and *Rubinstein* were applied in the context of predictive statements, courts have applied such requirements to statements concerning present facts").  In other words, when a corporation makes a disclosure, whether it is voluntary or required, there is a duty to make it complete and accurate. *Bach*, 2016 U.S. Dist. LEXIS 111077, at *33. Defendants' omissions of these known, material facts rendered their statements materially misleading.

Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id*. at 142, 144. The Court found that the investment advisor was not the "maker" of the statements in its client mutual funds' prospectuses, resting that decision largely on the fact that the investment advisor and its client were "legally separate entities." *Id*. at 137, 146-48 (also noting that the client's board had more "independence than is required" (*id.* at 138)). Courts have repeatedly rejected arguments identical to defendant Ryan's argument here, distinguishing the facts of *Janus*, where plaintiffs sought to hold a corporate actor liable for statements over which a separate corporation had ultimate control, from the facts at issue here involving corporate officers that have ultimate authority and control over statements issued by their own company. *See*, *e.g.*, *Local 703 I.B. of T. Grocery & Food Emples. Welfare Fund v. Regions Financial Corp.*, CV: 10-2847-IPJ, 2011 U.S. Dist. LEXIS 93873, at *3 (N.D. Ala. Aug. 23, 2011) ("Nothing in *Janus* stands for the proposition that CEOs and CFOs can not be liable for false and misleading statements in their own company's financial statements, for which they signed Sarbanes-Oxley certifications"); *In re Pfizer Secs. Litig.*, No. 04 Civ. 9866 (LTS)(HBP), No. 05 MD 1688 (LTS), 2012 U.S. Dist. LEXIS 39454, at *18-21 (S.D.N.Y. Mar. 22, 2012) (finding the individual defendants could be liable for statements issued in company press releases, even when not explicitly attributed to them, because they were involved in drafting, reviewing and disseminating them and, as such, the circumstances showed that they adopted the statements as their own).

Defendant Ryan relies on *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015), a decision interpreting the holding in *Janus*, for the proposition that press releases cannot be said to have been "made" by the CEO unless the CEO actually exercised control over the content of the press releases and whether and how they were communicated. Ryan Br. at 6-7.

But even if one could argue that *Glickenhaus* contains a more strict interpretation of the holding in *Janus*, nothing in *Glickenhaus* would support dismissal of Lead Plaintiffs' claims here. Initially, *Glickenhaus* involved the Seventh Circuit's review of a $2.46 billion judgment entered for plaintiffs after a jury trial, rather than a ruling on a motion to dismiss.  787 F.3d at 412.  The *Glickenhaus* court specifically noted that whether a corporate officer actually exercised control over a press release's content involves "an inherently fact-bound inquiry" that was not even answerable on the voluminous record in that case, *id*. at 427, let alone at the motion to dismiss stage of this one.  For that reason alone, Defendant Ryan's argument should be rejected.

Further, the holding in *Glickenhaus* does nothing to alter *Janus*'s holding that attribution can be "implicit from surrounding circumstances."  *Janus,* 564 U.S. at 142-43; *see also Pfizer*, 2012 U.S. Dist. LEXIS 39454 at *20-21.  Thus, while defendant Ryan's fact-based argument about the surrounding circumstances involving the press releases and presentations is inappropriate for review on a motion to dismiss, the ***fact that defendant Ryan had control over the content of First NBC's statements and whether and how to communicate them, as shown below, is plainly apparent from the documents themselves***.

- *First*, each of First NBC's press releases during the Class Period were filed as attachments to Forms 8-K that ***were signed by defendant Ryan***.

- *Second*, rather than the typical listing of an investor relations executive as the contact person for information regarding First NBC's earnings releases, ***the press releases designated defendant Ryan as the person to contact "[f]or further information…."***

- *Third*, most of the slide presentations made by defendants Ryan and Verdigets during the Class Period were also attached to Form 8-Ks ***signed by defendant Ryan***, which stated that defendants Ryan and/or Verdigets would be making those presentations at conferences or to investors on specified dates.

- *Fourth*, the other slide presentations, which were attached to 8-Ks signed by Ryan, were made in connection with the Company's annual shareholders'

42

meetings for which ***the proxies and invitations to investors were also signed by defendant Ryan***.

- ***Fifth***, First NBC's 2013 and 2014 Annual Reports both included a letter to shareholders ***directly from, and signed by, defendant Ryan***.[17]

As such, the circumstances surrounding the press releases and presentations here, and the very face of the documents themselves, clearly show defendants Ryan's and Verdigets' control over the content of the statements, sufficient to attribute those statements to them.[18]

Defendants' arguments that certain statements of opinion and other statements qualify as forward-looking statements subject to the PSLRA's "safe harbor" provision (First NBC Br. at 21 n.7; Ryan Br. at 7-11) are also without merit. *First*, "calling a statement 'forward-looking' does not automatically endow it with the protections of the safe harbor provision." *Marcus v. J.C. Penney Co.*, Civil Action No. 6:13-CV-00736-MHS-KNM, 2015 U.S. Dist. LEXIS 121683, *11-13 (E.D. Tex. Sept. 11, 2015) (Magistrate Report and Recommendation Adopted by District Court at 2015 U.S. Dist. LEXIS 131613 (E.D. Tex. Sept. 29, 2015)). Particularly with respect to the statements identified by defendant Ryan, these are statements of present fact and as such are not covered by the PSLRA's safe harbor provision. *See*, *e.g.*, *Stone*, 26 F. Supp. 3d at 597 (finding that safe harbor did not apply because an evaluation of the statements revealed them to be "statements about the present strength of the company and of its product"). Even if it could be argued that any of the statements were mixed present/future statements, the safe harbor would still not apply to the parts of the statements that refer to the present. *Spitzberg*, 758 F.3d at 691

---

[17] Notably, First NBC's CFO, defendant Verdigets, who also signed the 10-Ks, 10-Qs and SOX certifications, and participated in the slide show presentations, does not dispute that she was a "maker" of the alleged false statements. Should the Court wish, Lead Plaintiffs can supply the Court with examples of the identified documents, some of which were submitted by Defendants in support of their motions to dismiss the Complaint.

[18] In *Janus*, the Supreme Court explicitly noted the importance of the fact that nothing "on the face of the prospectuses" in that case indicated the statements at issue came from the investment advisor. 564 U.S. at 147. As shown above, the facts here are entirely different. And this is consistent with the totality of the Complaint's other allegations, as well as First NBC's admission in its 2015 Form 10-K, that defendant Ryan exercised a ***"dominant influence"*** over, among other things, ***"reporting matters."***

("a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present").

*Second*, even if the statements at issue were forward looking, which they clearly are not, the safe harbor still would not apply because the statements were not accompanied by meaningful cautionary language that constituted substantive, company-specific warnings rather than mere boilerplate. *See*, *e.g.*, *Marcus*, 2015 U.S. Dist. LEXIS 121683, at *13-14; Stone, 26 F. Supp. 3d at 598. The "cautionary" language cited by defendant Ryan relating to Defendants' presentations and annual letters, Ryan Br. at 9-11, is a perfect example of the type of boilerplate language that is woefully inadequate to invoke the protection of the safe harbor. *Marcus*, 2015 U.S. Dist. LEXIS 121683, at *13-14 (mere recitation that "risks" and "uncertainties" could cause a future result to be different from projected is insufficient to warrant safe harbor protection); *Stone*, 26 F. Supp. 3d at 598 (boilerplate litany of generally applicable risk factors insufficient to warrant safe harbor protection). Further, the statutory safe harbor cannot provide the basis for dismissal as a matter of law where "reasonable minds could disagree as to whether the overall understanding of the statements and warnings is misleading." *Marcus*, 2015 U.S. Dist. LEXIS 121683, at *13 (*citing Lormand*, 565 F.3d at 248).

*Third*, the safe harbor could not apply here in any event because, as set forth above, Lead Plaintiffs have alleged that Defendants knew, or at a minimum were severely reckless in not knowing, that their statements were materially false and misleading. *See Lormand,* 565 F.3d at 244 (safe harbor provision is inapplicable where the plaintiff adequately alleges the defendants actually knew that their statements were misleading when made); *Stone*, 26 F. Supp. 3d at 598 (same); *Kaltman*, 447 F. Supp. 2d at 663 (court did not have to decide whether statements qualified for protection under safe harbor because plaintiffs had pled facts demonstrating that

44

defendant actually knew, or was severely reckless in not knowing, that statements were false when made).[19]

Defendants' argument that certain of their statements qualify as mere "puffery" (First NBC Br. at 23; Ryan Br. at 7-11) is equally unavailing because the Complaint alleges how Defendants' materially false and misleading statements "are more than vague or optimistic; they contain concrete factual information Defendants could be found to have misrepresented." *Brody v. Zix Corp.*, Civil Action No. 3:04-CV-1931-K, 2006 U.S. Dist. LEXIS 69302, *12-13 (N.D. Tex. Sept. 26, 2006); *see also Stone*, 26 F. Supp. 3d at 599 (defendants' statements did not constitute mere puffery where those statements about the strength of its company and of its product were material to investors); *Bach*, 2016 U.S. Dist. LEXIS 111077, at *36-37 (defendants' compliance-related statements did not constitute puffery, nor did they constitute non-actionable statements of opinion).[20]

For all of these reasons, Defendants' arguments that the Complaint fails to plead an actionable misstatement should be rejected.

### C.   The Complaint Adequately Alleges Loss Causation

Relying primarily on *Public Employees Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014), Defendants argue that the Complaint fails to adequately plead loss causation because they contend, at the pleading stage, Lead Plaintiffs "must" eliminate all other possible

---

[19] For the same reasons, the "bespeaks caution" doctrine would not apply here. And, in any event, Defendants have failed to set forth any specific statements that would qualify as economic forecasts or predictions.

[20] Perhaps the most astounding argument made by Defendants is that, in connection with a slide detailing accounting errors in 2015 that were the result of First NBC's change from the amortized cost method to the equity method of accounting for the Company's investments in tax credits, defendant Ryan's representation to investors that the errors were "immaterial" to anticipated 2015 financial results constituted a "classic example" of "puffing or sales talk upon which reasonable investors would not rely." Ryan Br. at 8. In other words, defendant Ryan is arguing that, upon disclosing accounting errors concerning what he represented to investors was a line of business that was "core to First NBC's corporate strategy" and "an integral part of First NBC's commercial banking business," *his representation to investors as the CEO of the Company that the errors were "immaterial" was, itself, not material*. This is clearly not the law and demonstrates the absurdity of Defendants' arguments.

explanations for the price drops set forth in the Complaint.  First NBC Br. at 23-25.  This distorts

the holding of *Amedisys* and erroneously conflates a plaintiff's burden of *proof* at trial with a

plaintiff's relatively minimal burden of adequately pleading loss causation.  In fact, Defendants'

argument is contrary to applicable Fifth Circuit law, including *Amedisys*, because it ignores that

distinction and is entirely fact-based.  In addition, Defendants fail to consider Lead Plaintiffs'

loss causation allegations holistically.  As such, Defendants' argument should be rejected.

Notably, in *Amedisys*, the Fifth Circuit **reversed** the district court's dismissal of a

complaint on loss causation grounds, holding, among other things, that consideration of a series

of corrective disclosures, viewed collectively, adequately alleged loss causation for purposes of a

Rule 12(b)(6) analysis.  The Fifth Circuit observed that in order for a plaintiff to adequately

plead loss causation after *Dura Pharmaceuticals, Inc., v. Broudo,* 544 U.S. 336 (2005), and *Bell

Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the complaint "need only set forth 'a short and

plain statement of the claim showing that the pleader is entitled to relief' and provide the

defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"

*Amedisys*, 769 F.3d at 320 (quoting *Dura*, 544 U.S. at 346).  As the Fifth Circuit similarly held in

*Spitzberg*, "***the PSLRA does not obligate a plaintiff to deny affirmatively that other factors

affected the stock price in order to defeat a motion to dismiss***."  758 F.3d at 688 (emphasis

added).  As such, a plaintiff is only required to allege that the truth that emerged was "related to"

or "relevant to" the defendants' earlier misstatements and omissions, and this standard of

relevance "is not a steep or difficult one to satisfy."  *Amedisys*, 769 F.3d at 321-22.  Stated

another way, "the truth disclosed must make the existence of the actionable fraud more probable

than it would be without that alleged fact, taken as true."  *Id*.  It follows then that courts are not

authorized or required to determine whether the plaintiff's plausible inference of loss causation is

equally or more plausible than other competing inferences, as they must when considering scienter.  *Spitzberg*, 758 F.3d at 687.  Further, the truth "can be gradually perceived in the marketplace through a series of partial disclosures" rather than through a single disclosure, and in such a case all of the partial disclosures must be considered *in their totality.*  *Amedisys*, 769 F.3d at 322-26.

The Complaint more than adequately satisfies this standard.  The Complaint sets forth detailed allegations concerning a series of corrective disclosures that were directly connected to and gradually revealed Defendants' fraudulent scheme, which caused corresponding drops in the price of First NBC stock and revealed information that makes the existence of the fraud more probable than not.  ¶¶ 26-34, 232-264, 324-341; *see also* Statement of Facts § IV, *supra*, at 13-16.  Defendants *do not dispute this*.  Instead, they make three entirely fact-based arguments: (1) that one of the corrective disclosures, the Holdco letter published on August 12, 2016, was based on analysis of public information; (2) that "a number" of the corrective disclosures were bundled with financial disclosures that announced additional, unrelated negative news about First NBC; and (3) that "several" of the corrective disclosures are unrelated to certain of the misrepresentations.  First NBC Br. at 24-25.

All three of these arguments are exactly the type of fact-based arguments that the court in *Amedisys* held were inappropriate for consideration in deciding a motion to dismiss:

> A motion to dismiss challenges the adequacy of the initial pleading.  To plead loss causation in a private securities action, the complaint need only allege facts that support an inference that the Defendants' misstatements and omissions concealed the circumstances that bear upon the loss suffered such that Plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud….  *Whether the connection between Amedisys's misleading statements and the alleged corrective disclosures may ultimately be found too attenuated at a later stage in litigation is a highly fact intensive inquiry that need not be reached at this point.*

47

769 F.3d at 325 (emphasis added) (internal citation omitted).  As such, the arguments should be rejected out of hand on this basis alone.  But even a cursory review of Defendants' points shows that they have no merit.

With respect to the Complaint's allegations concerning the August 12, 2016 Holdco letter (¶¶ 29, 251-252, 337), Defendants ignore the *Amedisys*'s admonition that "complex economic data understandable only through expert analysis may not be readily digestible by the marketplace" and, as such, a corrective disclosure should not be pushed aside "simply because the data it was based upon may have been technically available to the public, given that the raw data itself had little to no probative value in its native state."  769 F.3d at 323.  Defendants also ignore the nearly 22.5% stock drop that occurred after publication of the Holdco letter, which provides further evidence that the letter in fact constituted "new" news.[21]

Defendants' second and third arguments fail because the Complaint's loss causation allegations, taken collectively,[22] make it more plausible that the market, once aware of information that contradicted or called into question Defendants' earlier alleged false and misleading statements, incorporated that information into the price of First NBC stock. *Amedisys*, 769 F.3d at 325; *see also Spitzberg*, 758 F.3d at 688 (observing that defendants had identified "no authority requiring that a corrective disclosure … squarely and directly contradict the earlier misrepresentations").  That is all that is required at the pleading stage.[23]

---

[21] Defendants' reliance on *Catogas v. Cyberonics, Inc.*, 292 Fed. Appx. 311 (5th Cir. 2008), is misplaced because, among other reasons, that case involved only a single alleged corrective disclosure that plaintiffs were unable to link to their allegations of fraud.

[22] Defendants' failure to consider the Complaint's allegations in totality provides an independent basis to reject their arguments on loss causation.  *See Amedisys*, 769 F.3d at 322-26 (evaluating five corrective disclosures collectively in determining that complaint adequately pleaded loss causation).

[23] Defendants' reliance on *Greenberg v. Crossroads Sys.*, 364 F.3d 657 (5th Cir. 2004), and *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009) ("*Flowserve*"), actually provides substantial support for Lead Plaintiffs' position that Defendants' fact-based arguments regarding loss causation are inappropriate for

For these reasons, Defendants' motion to dismiss for failure to adequately plead loss causation should be denied.

## II.      The Complaint Adequately Alleges Control Person Liability

Lead Plaintiffs have alleged that Defendants, through their positions at First NBC, had control over First NBC and the information concerning First NBC that was disseminated to the public and filed with the SEC during the Class Period, and that Defendants engaged in a fraudulent scheme that involved making materially false and misleading statements and omissions about First NBC's operations and financial results. *See*, *e.g.*, ¶¶ 1-34, 40-43, 55-231, 304-323, 375-381. This is sufficient to state control status as to Defendants under Section 20(a) of the Exchange Act. *See*, *e.g.*, *Brody*, 2006 U.S. Dist. LEXIS 69302, at *25-27.

Defendants do not dispute their control over the Company or the statements the Company issued during the Class Period. Rather, their sole argument against control person liability is that Lead Plaintiffs have failed to adequately allege a primary violation of the securities laws. First NBC Br. at 25; Ryan Br. at 25. For all of the reasons set forth above, the Complaint adequately alleges Defendants' primary violation of the Exchange Act, which mandates denial of their argument regarding control person liability. *Stone*, 26 F. Supp. 3d at 612.

## CONCLUSION

For the foregoing reasons, the First NBC Defendants' motions to dismiss should be denied.[24]

Dated:  March 22, 2017                            /s/ Robert A. Hoffman
                                                  Jeffrey W. Golan (admitted *pro hac vice*)
                                                  Robert A. Hoffman (admitted *pro hac vice*)
                                                  Jeffrey B. Gittleman (admitted *pro hac vice*)

---

resolution at the pleading stage, because *Greenberg* and *Flowserve* involved analysis of motions for summary judgment and class certification rather than rulings on a motion to dismiss.

[24] Should the Court grant any part of the First NBC Defendants' motions to dismiss, Plaintiffs respectfully request leave to amend the Complaint.

Chad A. Carder (admitted *pro hac vice*)
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

*Lead Counsel and Attorneys for Lead Plaintiffs*

and

Vincent J. Glorioso, Jr. (#6064)
Maria B. Glorioso (#24435)
Vincent J. Glorioso, III (#26896)
**THE GLORIOSO LAW FIRM**
2716 Athania Pkwy.
Metairie, LA 70002
Telephone: (504) 569-9999
Facsimile: (504) 569-9022

Joel H. Bernstein (admitted *pro hac vice*)
Michael W. Stocker (admitted *pro hac vice*)
Alfred L. Fatale III (admitted *pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477

J. Gerard Stranch, IV
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801

*Additional Attorneys for Lead Plaintiffs*