**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ERIC R. KINZLER, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>FIRST NBC BANK HOLDING COMPANY, ASHTON J. RYAN, JR., MARY BETH VERDIGETS, and ERNST & YOUNG LLP, )<br><br>Defendants. ) | CIVIL ACTION<br><br>No. 2:16-cv-04243-SM-JVM |

---

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'
MOTION FROM RELIEF OF THE COURT'S MAY 11, 2017 JUDGMENT
PURSUANT TO FED. R. CIV. P. 60(b)**

Jeffrey W. Golan (admitted *pro hac vice*)
Robert A. Hoffman (admitted *pro hac vice*)
Jeffrey B. Gittleman (admitted *pro hac vice*)
Chad A. Carder (admitted *pro hac vice*)
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jgittleman@barrack.com
ccarder@barrack.com

*Lead Counsel and Attorneys for Lead Plaintiffs*

Vincent J. Glorioso, Jr. (#6064)
Maria B. Glorioso (#24435)
Vincent J. Glorioso, III (#26896)
**THE GLORIOSO LAW FIRM**
2716 Athania Pkwy.
Metairie, LA 70002
Telephone: (504) 569-9999
Facsimile: (504) 569-9022

*Additional Attorneys for Lead Plaintiff*

Jonathan Gardner
Alfred L. Fatale III (admitted *pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

J. Gerard Stranch, IV
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801

*Additional Attorneys for Lead Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     BACKGROUND ........................................................................................................8

    A.  Nature of the Action.............................................................................................8

    B.  Procedural History ...............................................................................................12

    C.  Criminal Proceedings, including Six Guilty Pleas, an FDIC
        Material Loss Review and an FDIC Complaint Against the
        Bank's Outside Auditor Have Revealed a Massive Fraud at
        First NBC Orchestrated by Defendant Ryan ......................................................13

        1.  The Three Initial Criminal Guilty Pleas.......................................................14

        2.  Further Criminal Proceedings Culminating in the 46-Count Indictment
            Against Defendant Ryan and Others, and Three Other Guilty Pleas...........19

        3.  FDIC Material Loss Review .........................................................................24

        4.  FDIC Complaint Against the Bank's Outside Auditor ................................25

III.    ARGUMENT ............................................................................................................30

    A.  Relief from the Judgment Is Warranted Under Rule 60(b)(2).............................31

        1.  The Evidence is Newly Discovered ..............................................................31

        2.  Lead Plaintiffs Could Not Have Discovered the Evidence
            with Due Diligence .......................................................................................32

        3.  The Newly Discovered Evidence Is Material and Controlling....................34

    B.  Alternatively, Relief Is Appropriate Under Rule 60(b)(6)..................................39

    C.  Granting Leave to Amend Would Not Be Futile ..................................................40

IV.     CONCLUSION...........................................................................................................41

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alpern v. UtiliCorp United, Inc.*,
   84 F.3d 1525 (8th Cir. 1996) .............................................. 38

*Bros Inc. v. W.E. Grace Mfg. Co.*,
   320 F.2d 594 (5th Cir. 1963) .............................................. 39

*Ellis v. Liberty Life Assur. Co. of Boston*,
   394 F.3d 262 (5th Cir. 2004) .............................................. 40

*Goldstein v. MCI WorldCom*,
   340 F.3d 238 (5th Cir. 2003) .......................................... 33, 38

*In re Fema Trailer Formaldehyde Prods. Liab. Litig.*,
   2011 WL 6748489 (E.D. La. Dec. 21, 2011) ............................ *passim*

*In re Under Armour Sec. Litig.*,
   2020 WL 363411 (D. Md. Jan. 22, 2020) ................................ 34, 38

*Kurzweil v. Philip Morris Companies*,
   1997 WL 167043 (S.D.N.Y. Apr. 9, 1997) .............................. 34, 38

*Laguna Royalty Co. v. Marsh*,
   350 F.2d 817 (5th Cir. 1965) .............................................. 39

*Liljeberg v. Health Servs. Acquisition Corp.*,
   486 U.S. 847 (1988) ....................................................... 30

*Menier v. United States*,
   405 F.2d 245 (5th Cir. 1968) .......................................... 31, 39

*Offshore Marine, L.L.C. v. Fish Offshore, L.L.C.*,
   2013 WL 3777038 (E.D. La. July 18, 2013) ............................ 30, 39

*Seven Elves, Inc. v. Eskenazi*,
   635 F.2d 396 (5th Cir. 1981) .............................................. 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ....................................................... 34

*Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*,
   38 F.3d 1404 (5th Cir. 1994) .............................................. 39

*Werner v. Werner*,
   267 F.3d 288 (3d Cir. 2001) .............................................. 40

**Statute**

15 U.S.C. §78u-4(a)(9)(B) ........................................................................ 33

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................... 34
Fed. R. Civ. P. 15(a)(2) ........................................................................... 40
Fed. R. Civ. P. 59(b) ............................................................................... 31
Fed. R. Civ. P. 60(b) ........................................................................ *passim*
Fed. R. Civ. P. 60(c) ............................................................................... 31

Pursuant to Rule 60(b)(2) and (6) of the Federal Rules of Civil Procedure, Lead Plaintiffs, Oakland County Employees' Retirement System and Voluntary Employees' Benefit Association, Plymouth County Retirement System, and Central Laborers' Pension Fund ("Lead Plaintiffs"), submit this memorandum of law in support of their motion for relief from the Court's May 11, 2017 Judgment ("Judgment") dismissing Lead Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws ("Complaint") with prejudice.  Lead Plaintiffs respectfully request that the Court: (1) vacate the Judgment; and (2) allow Lead Plaintiffs to file a second amended complaint.

## I.    INTRODUCTION

First NBC Bank Holding Company ("First NBC" or the "Company") was a bank holding company headquartered in New Orleans, Louisiana that offered a broad range of financial services through its wholly-owned banking subsidiary, First NBC Bank ("First NBC Bank" or the "Bank"). This securities class action asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 is brought on behalf of investors in First NBC common stock during the period from May 10, 2013 through October 20, 2016 (the "Class Period").  The action was commenced in May 2016 in the wake of a series of disclosures in which First NBC ultimately admitted that its 2011-2014 financial statements contained material errors and should no longer be relied upon.  The errors involved, among other things, the Company's accounting for impairments of its investments in Federal and State Historic Rehabilitation tax credit entities and in variable interest entities related to Low-Income Housing Tax Credits.  First NBC's tax credit business accounted for more than 48% of its reported net income in 2013 and 2014.  *See generally* Declaration of Jeffrey W. Golan in Support of Lead Plaintiffs' Motion Pursuant to Rule 60(b) to Open Judgment ("Golan Decl."), ¶¶ 3-10, 24, filed concurrently herewith.

The Complaint asserted claims against: First NBC; Ashton J. Ryan, Jr. ("Ryan"), First NBC's founder, Chairman and CEO; Mary Beth Verdigets ("Verdigets"), First NBC's CFO; and Ernst & Young LLP ("E&Y"), First NBC's outside auditor.  *Id.*, ¶ 8.  On April 26, 2017, then-Chief District Judge Engelhardt heard oral argument on Defendants' motions to dismiss the Complaint.  Following argument, Judge Engelhardt issued an oral decision from the bench granting Defendants' motions.  The principal basis for the ruling was that "the Court does not find the inference of scienter … in this case to be cogent or at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*, ¶ 12.

In just a matter of days following this ruling, First NBC Bank collapsed in what would become the largest bank failure in the United States since the end of the 2008 financial crisis.  On April 28, 2017, two days after the ruling, the Louisiana Office of Financial Institutions ordered the Bank to be closed and the Federal Deposit Insurance Corporation ("FDIC") was appointed as Receiver.  Then, on May 11, 2017 – the same day that the Court entered a Judgment of dismissal with prejudice in this action – First NBC commenced a voluntary bankruptcy proceeding under Chapter 11 of Title 11 of the U.S. Bankruptcy Code.  Lead Plaintiffs filed a timely notice of appeal from the Judgment on May 24, 2017.  Briefing of the appeal was subsequently suspended in light of the bankruptcy proceedings, which stay continues in place to this day. *Id.*, ¶¶ 13-18, 20.

However, in the bankruptcy proceedings, on May 15, 2020, the Bankruptcy Court entered an Order Confirming Second Amended Joint Plan of Reorganization for First NBC Bank Holding Company, as Immaterially Modified Through March 6, 2020 ("Plan of Reorganization") (BK Dkt. No. 863).  After several extensions, the Effective Date of the confirmed Plan of Reorganization recenntly took effect on January 22, 2021.  Golan Decl., ¶ 19.

During the pendency of the bankruptcy stay, significant, new evidence has emerged of the fraudulent misconduct alleged in the Complaint.  The newly discovered evidence provides a compelling and, in many respects, irrefutable basis for pleading Defendants' scienter and warrants reopening the Judgment to allow Lead Plaintiffs to file a second amended complaint.  The evidence stems in part from criminal indictments of ten individuals who were part of a scheme in which *over $250 million in fraudulent loans were issued by the Bank*.  Those indicted include Defendant Ryan, First NBC's former General Counsel, Gregory St. Angelo (who was indicted in his capacity as a borrower of the Bank), two other Bank officers, and six other borrowers.  *See generally id.*, ¶¶ 21-78.  St. Angelo and five other borrowers, Jeffrey Dunlap, Kenneth Charity, Gary Gibbs, Warren Treme and Arvind Vira, have pleaded guilty to a conspiracy to defraud the Bank.  *See generally id.*, ¶¶ 32-67.  Each signed a "Factual Basis" for their guilty pleas, the common denominator of which was the knowledge and active participation of Ryan in a scheme to fraudulently enrich himself and his co-conspirators.  Each has admitted to Ryan's knowing participation in their submission of false loan documents to the Bank.  These loan documents, which among other false statements overstated the borrowers' assets and understated their liabilities, were used by Ryan to issue new loans that concealed overdrafts on more mature loans to these borrowers and the fact that such loans were non-performing.  Among other things, St. Angelo has also admitted that *Ryan caused First NBC to pay at least $9.6 million for fake tax credit investments for which Ryan knew no tax credit could rightfully be claimed*.  *Id.*, ¶ 39.

Following the guilty pleas of St. Angelo, Dunlap and Charity and a continuing investigation of First NBC led by the United States Attorney's Office for the Eastern District of Louisiana (the "USAO"), between June 15, 2020 and July 9, 2020, the USAO filed criminal felony charges

against three other First NBC Bank borrowers, Gary Gibbs, Arvind Vira and Warren Treme.  *See generally id.*, ¶¶ 53-67.  They would each plead guilty in August or September, 2020.  *Id.*.

The investigation culminated with the filing, on July 10, 2020, of a 46-count Indictment for Conspiracy to Commit Bank Fraud, Bank Fraud, False Entries and Notice of Forfeiture against Ryan, Burnell, Calloway, and another Bank borrower Frank Adolph.  *See generally id.*, ¶¶ 29-31, 70-78.  The Indictment charges that Ryan and his co-conspirators "unjustly enriched themselves by disguising the true financial status of certain borrowers and their troubled loans in order to conceal the true financial condition of the Bank from the Board, auditors, and examiners."  The Indictment provides extensive details of Ryan's banking relationships with each of the seven identified Bank borrowers, and charges that Ryan and others "masked the true financial condition of troubled loans in many ways, including (1) overdrawing demand deposit accounts to make loan payments; (2) using Bank loan proceeds from nominee and related entities, at times without authorization from the borrower, to make loan payments; and (3) *increasing, extending, or renewing existing loans, and issuing new loans, to hide borrowers' inability to make loan payments.  These actions benefitted the defendants by, among other things, preventing the borrowers from being forced into default and the Bank from declaring a loss*."

Ryan also personally benefitted from the fraudulent loans issued to several borrowers, according to several indictments.  One borrower, Arvind Vira, lent millions of dollars to Ryan at the same time Vira was a borrower of the Bank.  Another borrower, Warren Treme, was Ryan's partner in several businesses and real estate development projects, and Ryan used Treme's borrowing from the Bank as a way to spend Bank loan proceeds on Ryan's own projects.  And a third borrower, Jeffrey Dunlap, was a contractor for a business that Ryan and Treme ran, and Ryan

used loan proceeds from Dunlap's business to benefit his own development project. *Id.*, ¶¶ 31, 76-77; *see also id.*, ¶¶ 33-36, 57-62, 63-67 (citing admissions by Dunlap, Vira and Treme).

Apart from the criminal indictments and guilty pleas, additional evidence has emerged during the stay of this action through actions undertaken and made public by the FDIC.  In November 2017, for example, a report was issued of a Material Loss Review conducted by the FDIC's Office of Inspector General.  *Id.*, ¶¶ 80-83.  The Material Loss Review buttresses the allegations of the Complaint that Ryan's dominance over First NBC's board of directors and executive management constituted a material weakness of internal controls that was concealed from investors.  The Material Loss Review concluded that the Bank's failure was due, in large measure, to "***a dominant official [i.e., Defendant Ryan] with broad lending authority and limited Board of Directors (Board) oversight, rapid growth fueled by high-cost deposits, and large lending relationships and concentrations without adequate risk management controls to mitigate the risks***.  The bank also developed ***significant concentrations in trade receivables and complex tax credit investments***."  The Material Loss Review also found that Ryan "[f]ulfilled roles usually incompatible with that of a CEO," "directly oversaw the audit function and its reporting," "[o]perated the bank outside policy guidelines," and "[c]ontinued to make loan extensions and other risky credit and investment decisions … even when those activities were subject to examiner criticisms."

The newly discovered evidence also includes a complaint filed by the FDIC against the Bank's former outside auditor.  *Id.*, ¶¶ 84-93.  The complaint, which was filed on April 22, 2020, in *Federal Deposit Insurance Corporation v. Ernst & Young LLP, et al.*, 2:20-cv-01259 (E.D. La.), is based in part on "***repeated fraudulent conduct by First NBC's President and Chief Executive Officer, Ashton Ryan ('Ryan'), in his material loan and tax credit investment portfolios***,"

including "*outright lies*" that Ryan told E&Y, and that Ryan "*improperly advance[d] hundreds of millions of dollars to promote his own financial interests and mask the deteriorating financial condition of his lending and tax credit investment portfolios*."  It further confirms that Ryan exercised "*a dominant influence over the Bank's lending and financial statement processes, including personally handling a large portfolio of loans and tax credit investments and recklessly advancing tens of millions of dollars to borrowers without any meaningful control.*"

While the FDIC complaint alleges negligence on the part of the outside auditor, it outlines the fraud that Ryan carried out at First NBC, which included his fraudulent actions (a) with respect to its tax credit investments, (b) its commercial lending, and (c) its oil and gas industry-related lending, stating: "*Ryan committed fraud at First NBC by repeatedly causing the Bank to advance money through loans and tax credit investments on false pretenses.  In committing this fraud, Ryan was acting entirely in his own self-interest* and contrary to the interests of the Bank, …. Rather than recognize losses on existing credits, *Ryan concealed the true condition of his loan portfolio by causing the Bank to make advances to his borrowers to cover repeated overdrafts and service debt, all of which magnified the losses on these credits.  In an attempt to justify additional lending, Ryan made false statements in loan approval memoranda regarding the condition of collateral, alleged payments by borrowers, and the existence and financial condition of guarantors*."

And, for the first time in a public document, the FDIC complaint provides an example of Ryan's fraudulent lending *in the oil and oil services industry*, to Robert Linder and the Linder Oil Company.  Among other things, the complaint evidences that the Bank's oil and gas lending and the loans to Linder, which Ryan controlled, should have been classified as impaired because "(a) *there were critical operational problems with the wells*; (b) crude oil prices had dropped 53

percent in 2014; (c) *the Bank had grossly overstated the collateral values by failing to account for non-producing wells*; (d) *unaudited borrower-prepared financial statements showed a negative net worth exceeding $60.5 million*; (e) *Ryan had repeatedly extended the loans and advanced new money to cover interest payments*; and (f) regulatory guidance required discounting of the borrowers' asserted reserves." It further chronicled "*Ryan's repeated, unilateral extensions of millions of dollars throughout 2014 to borrowers with no ability to repay their loans*."

This and other newly discovered evidence detailed below, and in the accompanying declaration, strengthen and corroborate Lead Plaintiffs' allegations and cure the pleading deficiencies that resulted in the dismissal of the Complaint with prejudice. The actions of Ryan, *as admitted to by certain of his co-conspirators, as criminally charged by the USAO, and as found by the FDIC after serving as the Receiver for First NBC Bank with access to internal Bank and other non-public records over the past three years*, dispel any notion that the accounting errors that First NBC admitted to were somehow innocent "mistakes." Indeed, the newly discovered evidence paints a striking portrait of Ryan's scienter as an individual who falsified First NBC's financial condition for the express purpose of enriching himself and his associates, which scienter is equally applicable to First NBC, the entity that Ryan controlled. The newly discovered evidence also has uncovered a fraud of such a vast magnitude that Verdigets, First NBC's former CFO, was either willfully blind or severely reckless in attesting to the accuracy of the Company's financial statements and the effectiveness of its internal controls.

Lead Plaintiffs and the class of investors they seek to represent have suffered enormous losses at Defendants' expense. Their action to recover damages was stayed for more than three years during the pendency of the bankruptcy proceedings, and they now seek relief pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. Rule 60(b) provides an exception to the general

rule favoring finality and allows the Court to relieve a party from a final judgment for "newly discovered evidence" or for "any other reason that justifies relief." *See* Fed. R. Civ. P. 60(b)(2), (6). Because this case presents precisely the type of exceptional circumstances envisioned by Rule 60(b), justice requires that this case be adjudicated in view of ***all*** the relevant facts and outweighs any considerations of finality.

## II.     BACKGROUND

### A.     Nature of the Action

First NBC was founded by Ryan in 2006 and completed an initial public offering in May 2013, raising $115 million through the issuance of nearly 4.8 million shares of common stock priced at $24 per share. ¶ 3.[1] From its inception as a public company through the duration of the Class Period, Defendants deceived investors by, among other things, vastly overstating First NBC's reported profitability and concealing material weaknesses in its internal controls over financial reporting. ¶ 4. Manipulative accounting techniques employed by Defendants created the appearance that First NBC was enjoying solid earnings growth, with the Company reporting steady increases in net income from $29.4 million in 2012, to $40.9 million in 2013, to $55.6 million in 2014. On February 1, 2016, First NBC issued unaudited financial results for 2015 reporting a further increase in net income to $67.3 million. ¶ 5. As 2016 unfolded, however, a series of disclosures revealed that First NBC's growth story was fiction. In March and April 2016, First NBC disclosed that the filing of its 2015 Form 10-K would be delayed due to accounting errors the Company had identified, that its previously issued financial statements could no longer be relied upon, and that it was retracting its previously-issued unaudited 2015 financial results.

---

[1] "¶__" refers to paragraph numbers of the Complaint.

Throughout the Class Period, a major portion of First NBC's income was derived not from traditional banking businesses, but from investments in entities engaged in development projects that purported to qualify for various federal and/or state tax credit programs.  First NBC claimed that it was generating returns on these investments through its receipt of tax credits.  During the Class Period these claimed tax credits provided an enormous boost to First NBC's net income.  In 2013 and 2014, tax credit benefits accounted for more than 48% of the Company's reported net income.  ¶ 10.  Ryan repeatedly touted the Company's tax credit investment strategy to investors. For example, he stated that the Company's tax credit investments were a "core" part of its business strategy and that the "net returns are excellent and contribute to our strong earnings performance." He further asserted that while the Company's tax credit investments were the most "misunderstood part of our business," "[m]anagement has a deep understanding of this business."  ¶ 11.

Indeed, Ryan understood something about First NBC's tax credit business that investors did not:  namely, that the supposedly "excellent" returns from this business were bogus.  The tax credit entities in which First NBC invested were generally partnerships involved in real estate rehabilitation and/or construction.  The early phases of these projects typically generate substantial losses.  Under generally accepted accounting principles ("GAAP"), First NBC was required to record its proportionate share of the partnerships' losses generated by the development projects and the impairment expenses arising from the reduced carrying value of the investments.  First NBC manipulated its tax credit accounting to avoid doing so and, as a result, artificially boosted its reported net income, among other financial metrics.  ¶¶ 12-13.  Nevertheless, First NBC, Ryan and Verdigets  repeatedly represented that the Company's financial statements had been prepared in accordance with GAAP, and  Ryan and Verdigets repeatedly certified that the Company's internal controls were effective.  *See* ¶¶ 126, 131, 136, 143, 155, 161, 165, 171, 182, 191, 199.

In early 2016, First NBC's fraudulent tax credit investment scheme began to unravel, ultimately contributing to the collapse of the First NBC Bank and the Company's bankruptcy filing. On February 1, 2016, after the market closed, the Company issued unaudited fourth quarter and full year 2015 financial results. Although these results continued to be inflated by phony tax credit accounting maneuvers, they were below analysts' expectations, based, in part, on a higher than expected $8.2 million fourth quarter impairment charge associated with First NBC's tax credit investments.[2] In response, the price of First NBC stock declined the next day by $3.20 per share, or 10.5%, to close at $27.20. ¶ 26. Then, on March 16, 2016, First NBC disclosed that the filing of its 2015 Form 10-K was being delayed due to errors that had been identified in its accounting for Federal and State Historic Rehabilitation tax credit entities. ***The Company stated that the information contained in its February 1, 2016 earnings release should not be relied upon and that it expected that net income would likely be reduced from the amounts previously reported for 2015***. In response to these disclosures, First NBC stock plunged $5.33 per share, or 22%, to close on March 16, 2016 at $19.09 per share. ¶ 27.

On April 8, 2016, First NBC filed a Form 8-K and press release disclosing that ***the Company's audit committee and management had determined that all of the Company's financial statements from 2011 through 2014 should no longer be relied upon***. The Form 8-K further stated: "The Company's management determined that ***the financial statements referred to***

---

[2] The Company's February 1, 2016 earnings announcement also noted First NBC's $90.2 million exposure to an underwater oil exploration and production company and the fact that $39.7 million was past due on its investment in $69 million in receivables from an ethanol company. In addition to being artificially bolstered by phony tax credit investment accounting, the earnings announced by First NBC were also overstated by (i) the Company's failure to establish a reserve for the loans extended to the oil exploration company that was in financial distress due to the rupture in late 2014 of a pipeline serving the company's largest oil field; and (ii) the failure to record an impairment charge associated with the receivables from the ethanol company arising from the fact that the parent of the ethanol company had filed in late 2015 for preliminary protection under Spain's insolvency laws. As described further herein, First NBC belatedly acknowledged that a reserve and impairment charge associated with these matters were required by GAAP.

*above should be restated due to an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities and the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities*.  The Company is continuing to review and quantify these and other potentially other less significant matters, which are expected to be reflected in the restated financial statements."  As a result of this news, First NBC stock fell $0.47 per share to close at $18.65 on April 11, 2016, the next trading day, a 2% decline.  ¶ 28.

First NBC did not file its 2015 Form 10-K and issue restated financial results until August 25, 2016.  The 2015 Form 10-K revealed the enormous impact of the Company's false financial reporting.  For example, while First NBC, in its February 1, 2016 press release, had initially reported 2015 net income of $67 million, *the Company actually incurred a net loss of $25 million*.[3]  Moreover, restated financial results for 2013 and 2014 showed that First NBC's reported net income had been inflated by approximately 18% and 20%, respectively, due entirely to the Company's manipulative accounting for its tax credit investments.  *See* ¶¶ 30, 256.   This deceptive accounting also caused First NBC's financial results for the first three quarters of 2015 to be overstated by 36.8%, 26.0% and 36.7%, respectively.  *Id.*

First NBC also belatedly acknowledged in its 2015 Form 10-K that the Company had numerous material weaknesses in internal controls.  These material weaknesses were the product of "*the dominant influence of the Chief Executive Officer [i.e., Ryan] over accounting and reporting matters*" and the "*failure of executive management to establish a tone and control consciousness that consistently emphasizes the importance of internal control over financial*

---

[3] The principal components of this loss were: (i) a $59.5 million impairment charge on First NBC's investments in tax credit entities; (ii) a $30 million reserve allowance arising from the loan to the financially-distressed oil exploration company; and (iii) a write-off of the entire $69.9 million balance of the ethanol company receivable whose parent was insolvent.

11

*reporting.*" ¶¶ 6, 257-58.  Despite Ryan's assertions of management's "deep understanding" of First NBC's tax credit business, the Company was found to "*lack a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its tax credit related entities and the related evaluation of impairment, if any, associated with these investments*." ¶ 15.  And while Ryan had also represented that First NBC was "actively monitoring" its oil-related loans, material weaknesses of internal controls were also found with respect to the monitoring of borrowers' ability to pay loans.  ¶ 21.  Additional internal control weaknesses were found with respect to the Company's evaluation and monitoring of the financial stability and creditworthiness of companies from which it acquired short-term receivables.  ¶ 25.

     **B.**    **Procedural History**

     The initial complaint alleging violations of the federal securities laws was filed on May 8, 2016.  ECF No. 1.  Following the Court's appointment of the above-identified pension and retirement funds as Lead Plaintiffs, the Complaint was filed on December 5, 2016.  ECF. No. 60. The Complaint asserted Section 10(b) and 20(a) claims under the Exchange Act against First NBC, Ryan, Verdigets and E&Y on behalf of purchasers of First NBC common stock during the Class Period.  On April 26, 2017, Judge Engelhardt heard oral argument on Defendants' motion to dismiss the Complaint and issued an oral decision granting the motion.  ECF No. 114 (Reporter's Official Transcript, Apr. 26, 2017) at 35-41.  The primary ground upon which the Court dismissed the Complaint was that Lead Plaintiffs had not sufficiently alleged Defendants' scienter, stating that "the Court does not find that plaintiffs have, under the jurisprudence and particularly the Fifth Circuit jurisprudence, pled with sufficient particularity the facts establishing that defendants acted with the requisite level of scienter."  *Id.* at 39.  The Court further found that Lead Plaintiffs "fail

to plead particular facts that would allow the Court to find a strong inference of scienter. Therefore, the Court does not find the inference of scienter … in this case to be cogent or at least as compelling as any opposing inferences one could draw from the facts alleges." *Id.* at 39.

Just two days after the Court issued its oral dismissal decision, the Louisiana Office of Financial Institutions ordered the closure of First NBC Bank, and the FDIC was appointed as Receiver.   On May 11, 2017, First NBC commenced a voluntary Chapter 11 bankruptcy proceeding.   On the same day, a Judgment was entered in this action, dismissing the case with prejudice for the reasons stated in the Court's ruling from the bench.  ECF No. 119.  Lead Plaintiffs filed a timely notice of appeal from the Judgment on May 24, 2017.  ECF No. 120.  The Fifth Circuit Court of Appeals thereafter entered orders suspending the briefing of appeal against First NBC (the debtor), Ryan and Verdigets, but severing the appeal as to E&Y and allowing it proceed. *See, e.g., Central Laborers' Pension Fund, et al. v. First NBC Bank Holding Company, et al.,* No. 17-30443 (5th Cir., Oct. 17, 2017).  Rather than go forward with the appeal process piecemeal, Lead Plaintiffs dismissed their appeal from the dismissal of E&Y, leaving intact their claims against First NBC, Ryan and Verdigets.  The Fifth Circuit's stay of proceedings has remained in effect to this day.  However, on May 15, 2020, the Bankruptcy Court entered an Order confirming the Second Amended Joint Chapter 11 Plan of Reorganization for First NBC Bank Holding Company, and that Order recenntly took effect on January 22, 2021.  Golan Decl. ¶ 19.

### C.    Criminal Proceedings, including Six Guilty Pleas, an FDIC Material Loss Review and an FDIC Complaint Against the Bank's Outside Auditor Have Revealed a Massive Fraud at First NBC Orchestrated by Defendant Ryan

While this action was stayed by the bankruptcy proceedings, new details of matters with a direct bearing on this case were revealed by criminal investigations and prosecutions, as well as a review of the Bank's failure undertaken by the FDIC and a complaint that the FDIC filed against

the Bank's former outside auditor.  What has emerged is a portrait of a massive fraud at First NBC that was orchestrated by Ryan.

### 1.    The Three Initial Criminal Guilty Pleas

A federal grand jury initially presented Bills of Information against three individuals – Gregory St. Angelo, Jeffrey Dunlap and Kenneth Charity – who were borrowers of First NBC Bank.  St. Angelo also served as the Bank's General Counsel from 2006 to 2016.  Each of these individuals pled guilty to a conspiracy to defraud the Bank.  Each signed a "Factual Basis" for their guilty plea in which they admit that they conspired with Ryan to submit fraudulent loan documents to the Bank.  These loan documents overstated the respective assets of St. Angelo, Dunlap and Charity (and entities they controlled), while understating their respective liabilities.  On this basis, First NBC Bank, at Ryan's direction and with his knowledge and active participation, issued over $80 million in fraudulent loans to these borrowers, the purpose of which was to cover overdrafts on outstanding prior loans issued to them and to conceal that the prior loans were nonperforming.  Further details of the Bills of Information, Factual Basis statements, and guilty pleas of these individuals, as well as borrower Gary Gibbs, are set forth below.

**Gregory St. Angelo**

On March 22, 2019, the United States Attorney's Office for the Eastern District of Louisiana brought charges against St. Angelo who, together with entities owned or controlled by him, were borrowers of First NBC Bank from 2006 to 2016, at the same time St. Angelo was serving as the Bank's General Counsel.  Golan Decl., ¶ 37.  The Bill of Information alleged that St. Angelo, "Bank President A [Ryan] and Bank Officer B [William J. Burnell, First NBC's former Chief Lending Officer], and others, provided the Bank with materially false and fraudulent documents and personal financial statements," which among other things, overstated the value of

St. Angelo's and his affiliated entities' assets and understated their liabilities. *Id.* Describing St. Angelo, Bank President A, and Bank Officer B as conspirators, a press release issued by the U.S. Attorney's Office stated that the purpose of the conspiracy was for St. Angelo, Ryan and Burnell "to enrich themselves unjustly." *Id.* It described that Ryan, Burnell and others disguised St. Angelo's and his affiliated entities' true financial condition by, among other things, issuing new loans to pay older loans that St. Angelo was unable to repay and to cover his overdrafts. The charges against St. Angelo alleged that the new loans then appeared to be current, while in reality, the new loans were designed to avert the downgrading or impairment of St. Angelo's and his entities' loans and to avoid reporting them as nonperforming or losses to the Bank. The Bill of Information further alleged that on multiple occasions, Ryan, St. Angelo and others executed false documents to make it appear that the payments to St. Angelo were legitimate. *Id.*

On June 28, 2019, St. Angelo pleaded guilty to conspiring to defraud the Bank and signed a 22-page Factual Basis that confirmed the material allegations in the Bill of Information. *Id.*, ¶ 39. The Factual Basis detailed the actions that St. Angelo, Ryan and others took in furtherance of their fraudulent scheme, including: (a) creating and placing false risk ratings in the Bank's records relating to the loans that St. Angelo and his affiliated entities applied for and received; (b) creating and submitting false personal financial statements to support the loans made to St. Angelo and his affiliated entities and understating their liabilities to mislead bank examiners into believing St. Angelo's net worth was greater than it was; (c) presenting false statements about the purposes of the loan applications, ***which were executed by Ryan, St. Angelo and Burnell with knowledge that the stated purpose was false***; (d) conspiring to use "Nominee Loan" proceeds to cover St. Angelo's and his affiliated entities' loan payments and overdrafts; and (e) ***conspiring to cause the Bank to disburse money to St. Angelo and his affiliated entities "under the guise that the bank was***

15

*investing in tax credits that St. Angelo and the [affiliated] entities owned," when, in reality,*

*neither St. Angelo nor those entities ever earned any tax credits and First NBC "never had any*

*basis to obtain any tax credits from St. Angelo's or the [affiliated] entities' properties*." *Id.*

Particularly germane to Lead Plaintiffs' allegations that Defendants engaged in knowingly

false accounting for First NBC's investments in tax credit entities, *the Factual Basis identifies*

*three properties where a series of "fake tax credit purchase agreements" were executed by Ryan*

*and St. Angelo that "were designed to conceal the fact that [Ryan] was funneling First NBC*

*Bank funds to St. Angelo to cover his overdrafts and make loan payments*." *Id.*, ¶¶ 40-41. St.

Angelo was not entitled to tax credits on these properties because he did not have an ownership

interest in them or never applied for the tax credits. Indeed, even after being advised by outside

counsel that potential tax credits for one property could not be claimed because St. Angelo neither

owned the property or had a long enough lease, *Ryan submitted "additional false documents to*

*First NBC Bank based on false representations that St. Angelo was entitled to tax credits for*

*[the property]*." *Id.*, ¶ 40.

By the time the Bank was placed into receivership, *First NBC Bank had advanced*

*approximately $46 million to St. Angelo and his affiliated entities based on the false personal*

*financial statements and other fraudulent documents, and had further paid St. Angelo an*

*additional $9.6 million for false tax credit investments*. *Id.*, ¶ 38.

**<u>Jeffrey Dunlap</u>**

On May 14, 2018, the U.S. Attorney for the Eastern District of Louisiana brought charges

against Jeffrey Dunlap, who together with a contracting company he owned were borrowers of the

Bank. Golan Decl., ¶ 33. On October 17, 2018, Dunlap pleaded guilty to conspiring to defraud

the Bank and signed a 10-page Factual Basis that confirmed the material allegations of the Bill of

Information.  *Id.*, ¶ 34.  Dunlap acknowledged that between 2009 and 2016, **Ryan "instructed Dunlap to inflate his accounts receivable in order to increase the borrowing base of the LOC [line of credit].***"  *Id.*, ¶ 35.  Ryan also told Dunlap that he did not need to age his accounts receivable, which directly contradicted bank policy prohibiting the bank from relying on accounts receivable from calculating the borrowing base if they had not been paid in full within 90 days. *Id.*  Ryan benefitted directly from the extension of loans to Dunlap, whose construction company performed services for a company in which Ryan held a co-ownership position.  *Id.*  **The falsified loan documents submitted to the Bank at Ryan's direction allowed Dunlap to secure a line of credit of more than $22 million**, which remained outstanding at the time that the Bank was placed into receivership.  *Id.*, ¶ 33.

The Factual Basis signed by Dunlap also underscores Ryan's efforts to conceal his fraudulent misconduct.  Ryan and his administrative staff maintained a list of borrowers who consistently had overdrafts on the accounts.  The list was known by the acronym D.O.R.K.S., with each letter identifying a different borrower (the "D" was for Dunlap).  Ryan personally served as the loan officer for each of these borrowers.  Ryan directed his staff to monitor the borrowers on a daily basis.  The purpose of the monitoring activity was to ensure that the D.O.R.K.S. did not appear on the month-end overdraft report to the Board of Directors.  As acknowledged by Dunlap in the Factual Basis: "***By concealing the D.O.R.K.S.'s overdrafts, [Ryan] hid the true status of their losses from the Board, bank regulators, and investors***."  *Id.*, ¶ 34.

### <u>Kenneth Charity</u>

On May 15, 2019, the U.S. Attorney's Office for the Eastern District of Louisiana brought charges against Kenneth Charity, who together with affiliated entities he controlled were also borrowers of the Bank.  Golan Decl., ¶ 44.  Charity subsequently pleaded guilty to conspiracy to

defraud the Bank and signed a Factual Basis supporting the guilty plea.  *Id.*, ¶ 46.  As with St. Angelo and Dunlap, Charity, **with Ryan's knowledge and assistance**, submitted fraudulent loan documents to the Bank that were used to secure loans to cover overdrafts on mature loans.  This practice made it falsely appear that the loans to Charity and his affiliated entities were current and had no overdrafts.  *Id.*

Charity was the "K" in the D.O.R.K.S. acronym that referred to the list of borrowers who consistently had overdrafts that Ryan "fraudulently cured … by applying loan proceeds to pay the overdrafts, therefore making it appear that these borrowers were servicing their accounts and had sufficient cash to pay their recurring bills."  *Id.*, ¶ 47.  The Factual Basis signed by Charity highlights the close attention that Ryan paid to Charity's loans:

> Bank President A, CHARITY's loan officer, would monitor the status of CHARITY's accounts on a monthly basis by taking CHARITY-related "homework" to his house at night to review.  Bank President A completed monthly analyses of CHARITY's accounts, detailing the date, payee, and amount of all transactions and whether they were business or personal.  He would also identify loan payments due and overdrafts.  ***He directed his assistants to the specific funds they should use to pay the Charity Loans and overdrafts.  Documents show that Bank President A reconciled CHARITY's accounts down to the dollar and was well-aware that CHARITY did not spend and demonstrated no intention of spending the loan proceeds for the approved purpose.***

*Id.*, ¶ 48.

Ryan's practice of covering Charity's overdrafts was especially glaring because Ryan knew that Charity was using the money to finance a lavish lifestyle that included car purchases, private school tuition for his children, country club dues and jewelry.  In January 2013, Ryan sent an email to Charity stating: "The way I see it any other bank would have foreclosed on you years ago if you could indeed get a loan from them in the first place."  Yet even after this writing, Ryan continued to extend loans to Charity and his affiliated entities totaling more than $5.2 million.  *Id.*  ***Over the***

*duration of Charity's relationship with the Bank, Charity and his affiliated entities fraudulently obtained more than $18 million in loans*. *Id.*, ¶ 44.

### 2. Further Criminal Proceedings Culminating in the 46-Count Indictment Against Defendant Ryan and Others, and Three Other Guilty Pleas

Between June 15, 2020 and July 9, 2020, the USAO filed Bills of Information against three additional Bank customers – **Arvind Vira; Gary Gibbs; and Warren Treme** – all of whom were alleged to have received fraudulent loans and fraudulent renewals of loans from First NBC at Ryan's direction.  Since then, all three have pleaded guilty to defrauding First NBC Bank.

The Bill of Information against Vira, filed June 15, 2020, alleges that Vira, individually and through his companies that held budget hotels in the New Orleans area, had a banking relationship with First NBC from approximately April 2010 through April 2017, and that Ryan acted as Vira's "de facto loan officer."  Golan Decl.., ¶ 58.  It alleges that Vira received beneficial interest rates on savings accounts, checking accounts, and loans, and that in return *Vira agreed to make loans to Ryan*, which Vira concealed from employees of the Bank at Ryan's direction.  Ryan similarly concealed this relationship from others at First NBC Bank and from FDIC examiners. *Id.*, ¶ 59.  For example, it alleges that Vira borrowed $5 million from the Bank at the end of 2009 and then, seven months later, lent back $400,000 to Ryan to pay Ryan's property taxes on a property that he owned, Lake Forest Plaza.  The following year, Ryan arranged for favorable interest rates on several of Vira's checking accounts and raised his lending limit to $9 million, and later that year, Vira lent another $2 million to Ryan.  The pattern continued right up to the end of 2016, with both parties continually supplying false supporting documentation to keep the conspiracy concealed. *Id.,* ¶¶ 60-61.  On September 17, 2020, Vira pleaded guilty to these charges and signed a Factual Basis statement in support of the guilty plea.  *Id.,* ¶¶ 61-62, and Exhibits 30 and 31.

The Bill of Information filed against Gibbs on July 1, 2020, similarly alleged that from approximately 2010 through April 2017, Gibbs, individually and through various corporate entities he controlled, were "regularly unable to pay existing loans or overdrafts on First NBC Bank accounts," but that Ryan, Burnell and Calloway "disguised Gibbs's and his entities' true financial condition by making new loans to pay Gibbs's existing loans and to cover his overdrafts." *Id.*, ¶ 56 (citing Exhibit 19, press release of July 1, 2020). The Bill of Information charged that Ryan, Burnell and Calloway (using their Bank President A, Bank Officer B and Bank Officer C designations), "unjustly enriched themselves by disguising the true financial status of Gibbs, his entities, and other borrowers; concealing the true performance of loans; and misrepresenting the nature of payments to Gibbs and his entities." *Id.*, Exhibit 20 at ¶ 1 (page 3). Among its many other details of transactions between Gibbs and the Bank, the Bill of Information alleged that Gibbs told Ryan and others at some point that he was considering declaring his companies' bankruptcy and not making further payments on the loans from First NBC Bank, ***but that Ryan told him that the Bank could not afford for him to default and made further loans to him, throughout Ryan's service as the Bank's CEO***. *Id.* at ¶¶ 5-10 (pages 4-7). In all, ***Gibbs and his companies owed approximately $123 million to the Bank when it was taken into Receivership in April 2017***. Golan Decl., ¶ 56 (citing Exhibit 19, press release of July 1, 2020, as well as Exhibits 28 and 29, the USAO's press release of August 26, 2020 and Factual Basis signed by Gibbs, ***indicating Gibbs' guilty plea and admissions of conspiring with Ryan and others to defraud First NBC Bank***).

The Bill of Information filed on July 9, 2020, identified Treme, through various entities he controlled, as a co-owner of several entities with Ryan, but that he also had a banking relationship with First NBC Bank from about 2008 through April 2017 and that Ryan exercised authority over Treme's loans along with Treme's loan officer. *Id.*, ¶¶ 63-66 & Exhibit 24 (Bill of Information).

Among other allegations, the Bill of Information described a scheme by Ryan and Burnell to take $400,000 from Treme's business partners as part of a settlement, but rather than using the $400,000 to pay down on the outstanding loan debt owed by Treme and his business partners, Ryan and Burnell gave $300,000 to Treme, who spent the money on gambling, a trip to the Caribbean, ***and expenses related to a real estate development company that Treme co-owned with Ryan***. *Id.* ¶ 64. It further alleges that during a subsequent Board meeting, Ryan and Burnell falsely stated that the $300,000 was used to pay down the outstanding loan debt owed by Treme and his business partners. *Id.* On September 2, 2020, Treme pleaded guilty to these charges and signed a Factual Basis statement in support of the guilty plea. *Id.,* ¶ 67, and Exhibits 32 and 33.

And on July 10, 2020, the USAO filed a 46-count Indictment for Conspiracy to Commit Bank Fraud, Bank Fraud, False Entries, and Notice of Forfeiture against Defendant Ryan, Burnell, Calloway, and another borrower Frank Adolph. Golan Decl., ¶¶ 28-31, 70-78. As summarized in the USAO's press release announcing the filing of the charges, the Indictment alleges that Ryan and others "***conspired to defraud First NBC Bank by disguising the true financial status of certain borrowers and their troubled loans, concealing the true financial condition of the Bank from the Board, auditors, and examiners***." *Id.* ¶ 31. It specifically identified as co-conspirators: two real estate developers, Gary Gibbs and Kenneth Charity; a borrower who was also the Bank's General Counsel, Gregory St. Angelo; a factoring business owner, Frank Adolph; a hotel owner Arvind "Mike" Vira; and two contractors, Jeffrey Dunlap and Warren Treme. *Id.* ¶ 31; *see also* Exhibit 4 (Indictment) at ¶¶ 9-15 (pages 3-6). It alleges that while Calloway was Gibbs's loan officer, Ryan served "as the loan officer or oversaw the loan officers for all of those borrowers." *Id.*, Exhibit 4 at ¶ 3 (page 7).

The press release announcing the filing of the Indictment states that during the course of the conspiracy, Ryan, Burnell and Calloway "*repeatedly extended loans to borrowers who were unable to pay their loans without relying on loan payments to keep them current*"; they "*made false statements in loan documents and elsewhere about the purposes of loans, the borrowers' abilities to repay those loans, and the sources of funds used to pay those loans*" to "hide this practice"; and "*[w]hen the borrowers were unable to pay those loans, RYAN, BURNELL, and CALLOWAY made new loans to these same borrowers and then used the proceeds from those new loans to pay the existing loans*." *Id.*, ¶ 31.   According to the press release:

> *This created the false impression that the borrowers were able to pay their loans, when in fact they would not have been able to pay their loans without going further into debt through new borrowing from the Bank*. The new loans prevented these borrowers from appearing on lists that RYAN and BURNELL gave the Bank's Board each month, which would have highlighted that the borrowers were unable to make loan payments or had cash flow problem*s. RYAN, BURNELL, and CALLOWAY also made false statements about the purpose of those loans, misrepresenting in Bank documents that the borrowers were able to pay loans with cash generated from the borrowers' businesses, when in fact the borrowers were only able to pay those loans with proceeds from new Bank loans*. The borrowers often spent the proceeds of these business loans on unrelated personal expenses, including by overdrawing their checking accounts at the Bank, and RYAN, BURNELL, and CALLOWAY paid these overdrafts by issuing new loans to the borrowers. *This practice kept the borrowers off of month-end overdraft reports to the Board and hid the borrowers' inability to pay their own expenses without new loan proceeds*.

*Id.*

The Indictment specifically alleges that Ryan and the other Bank executives included borrower documents in loan files *despite knowing that the documents were false*. *Id.*  It provided specific examples relating to all seven of the identified borrowers, including, for the first time in a USAO filing, Adolph, stating that "even after **RYAN** and **BURNELL** learned that **ADOLPH** was submitting falsified documents to the Bank to inflate his collateral, **RYAN** and **BURNELL** continued to submit loans for **ADOLPH** that included the false documents." *Id.*; *see also id.* ¶¶

68-69.  Similar allegations were made with respect to Gibbs: "[E]ven though **RYAN, BURNELL**, and **CALLOWAY** knew that Gibbs could not pay his loans with cash generated from his businesses, they continued to submit loan documents that included false documents showing that Gibbs's business earned enough cash to pay his loans at the Bank."  *Id.* ¶ 31.  Moreover, when the Bank's Board members, outside auditors or examiners asked about loans to these borrowers, Ryan and the others "***made false statements about the borrowers and their loans, and left out the truth about the borrowers' inability to pay their debts without getting new loans. As a result, the balance on these borrowers' loans continued to grow. By the time regulators closed First NBC Bank in April of 2017, Gibbs owed the Bank $123 million; Charity owed $18 million; St. Angelo owed $46 million; ADOLPH owed $6 million; Vira owed $39 million; Treme owed $6 million; and Dunlap owed $22 million. The Bank's failure cost the Federal Deposit Insurance Corporation deposit insurance fund just under $1 billion***."  *Id.*

The Indictment also alleges the direct personal benefits that Ryan fraudulently obtained from his direction of and participation in the conspiracy.  In addition to the millions of dollars that he received as compensation from the Bank during the course of the conspiracy, as summarized in the press release:

> ***RYAN also received personal benefits from three of the borrower relationships. Vira lent millions of dollars to RYAN at the same time Vira was a borrower at the Bank, and RYAN and Vira conspired to hide their business dealings from the Board, auditors, and examiners. Treme was RYAN's partner in several businesses and real estate development projects, and RYAN used Treme's borrowing from the Bank as a way to spend Bank loan proceeds on RYAN's own projects. Even when parts of RYAN's business dealings with Vira and Treme were revealed to regulators, RYAN continued to conceal from regulators that he exercised authority over loans to Vira and Treme. Dunlap was a contractor for a business that RYAN and Treme ran, and RYAN used loan proceeds from Dunlap's business to benefit his own development project, Wadsworth Estates. RYAN never disclosed his business relationship with Dunlap to the Board, auditors, or examiners.***

*Id.*

### 3. FDIC Material Loss Review

A Material Loss Review of the Bank operated by First NBC was conducted by the FDIC Office of Inspector General, which issued a report in November 2017 (the "Material Loss Review"). Golan Decl., ¶ 80. The Material Loss Review estimated that the loss to the Deposit Insurance Fund resulting from the bank's failure was ***nearly $1 billion***. Buttressing the Complaint's allegations that the dominant influence of Ryan was a material undisclosed internal control deficiency, the Material Loss Review concluded that Ryan, "as a dominant official who made most, if not all, operational and executive decisions," was directly responsible for the Bank's failure:

> First NBC exhibited many of the characteristics of bank failures we have identified in prior material loss reviews and other reviews of the FDIC's supervision program. These characteristics included a ***dominant official with broad lending authority*** and limited Board of Directors (Board) oversight, rapid growth funded by high-cost deposits, and ***large lending relationships and concentrations without adequate risk management controls to mitigate the risks***. The bank also developed ***significant concentrations in trade receivables and complex tax credit investments***. The losses the bank realized on its large loan relationships, trade receivables, and tax credit investments severely diminished earnings and depleted capital to a point at which the bank could not recover.

*Id.*, ¶ 81. The Material Loss Review also found that Ryan was the "driver" behind the Bank's "aggressive growth and funding strategy"; "[f]ulfilled roles not usually compatible with that of a CEO," including serving as the Bank's CFO for a four-year period and directly overseeing the audit function and its reporting; "operated outside policy guidelines;" "continued to make loan extensions and other risky credit and investment decisions … even when those activities were subject to examiner criticism;" and oversaw loan reviews rather than having such review be conducted by a separate loan review department staffed by independent credit analysts and loan review personnel. *Id.*, ¶¶ 82-83. ***Ryan also directly benefitted from questionable loan decisions,***

*personally obtaining a $2 million loan from a bank borrower who had received a $9 million unsecured loan*. *Id.*, ¶ 82.

### 4.   FDIC Complaint Against the Bank's Outside Auditor

On April 22, 2020, the FDIC – as the Receiver for First NBC Bank – filed a complaint against the Bank's former outside auditor in *Federal Deposit Insurance Corporation v. Ernst & Young LLP, et al.*, 2:20-cv-01259 (E.D. La.).   Golan Decl., ¶ 84.   While the FDIC alleges negligence claims against the auditor in its complaint, those claims are based almost entirely on "*repeated fraudulent conduct by First NBC's President and Chief Executive Officer, Ashton Ryan ('Ryan'), in his material loan and tax credit investment portfolios*," including "*outright lies*" that Ryan told the Bank's outside auditor, and that Ryan "*improperly advance[d] hundreds of millions of dollars to promote his own financial interests and mask the deteriorating financial condition of his lending and tax credit investment portfolios*." *Id.*, ¶ 85.   It confirms and provides new evidence that Ryan exercised "*a dominant influence over the Bank's lending and financial statement processes, including personally handling a large portfolio of loans and tax credit investments and recklessly advancing tens of millions of dollars to borrowers without any meaningful controls.*"   *Id.*   Specifically, Ryan: (a) "*dominated the Bank's affairs and spearheaded its rapid growth through concentrated loan positions to a number of large commercial borrowers and tax credit investments*"; (b) "oversaw the lending department" in addition to his formal roles and "routinely exercised *incremental lending authority and repeatedly advanced funds in $1 million increments throughout 2014 through 2016, effectively avoiding limits on his loan approval authority under the Bank's loan policy*"; (c) had "unilateral authority to approve tax credit investments"; (d) "*was personally involved in determining the accounting treatment for Bank transactions*"; and (e) "*had the ability to directly manipulate the accounting*

records." *Id.*, ¶¶ 86-87.  All of these are **key facts** for the accounting fraud claims alleged in this securities class action.  The FDIC complaint further revealed that Ryan "personally managed" a lending portfolio in excess of $100 million, which was highly unusual for a Chief Executive Officer of a bank the size of First NBC, and that his loan portfolio had "repeated intra-month overdrafts that were cleared by the end of the month through Ryan's unilateral extensions of Bank funds."  *Id.* ¶ 87.  Further, Ryan "**repeatedly exercised his incremental lending authority to ultimately transfer tens of millions of dollars to his borrowers through $1 million incremental advances**."  *Id*.

The FDIC complaint outlines the fraud that Ryan carried out at First NBC, which included his fraudulent actions (a) with respect to its tax credit investments, (b) its commercial lending, and (c) its oil and gas industry-related lending, stating: "**Ryan committed fraud at First NBC by repeatedly causing the Bank to advance money through loans and tax credit investments on false pretenses.  In committing this fraud, Ryan was acting entirely in his own self-interest** and contrary to the interests of the Bank, ....  Rather than recognize losses on existing credits, **Ryan concealed the true condition of his loan portfolio by causing the Bank to make advances to his borrowers to cover repeated overdrafts and service debt, all of which magnified the losses on these credits.  In an attempt to justify additional lending, Ryan made false statements in loan approval memoranda regarding the condition of collateral, alleged payments by borrowers, and the existence and financial condition of guarantors**."  *Id.,* ¶ 89.

After citing to the guilty pleas of Jeffrey Dunlap, Gregory St. Angelo, and Kenneth Charity, **the FDIC noted Ryan's very significant personal motives for carrying out the fraud**.  These included that Ryan had "significant personal real estate development investments that he helped finance **through fraudulent loans to third parties that provided services for him personally**,"

including the fraudulent loans he made to Phoenix Civil [Dunlap's company] "to obtain construction services for Ryan's personal projects." *Id.,* ¶ 90.  In addition, Ryan received "***large bonuses tied to the reported financial performance***" of First NBC and he had also pledged his shares of First NBC stock "***as security for personal loans from other financial institutions to finance his personal business ventures***." *Id.*

In addition to confirming Ryan's fraudulent conduct with respect to the lending and payments to St. Angelo,[4] Dunlap and Charity, the FDIC also identified, with specificity, the Bank's lending to Gary R. Gibbs (identified in the FDIC Complaint as "GG") and to Linder Oil Company and Robert Linder, its founder and president (identified in the FDIC Complaint as "RL").  Golan Decl., ¶ 91.  As the FDIC complaint states:

> GG was a commercial real estate developer and one of the largest customers of the Bank.  Loans to GG and his related businesses totaled approximately $123 million at the Bank's closure.  ***During 2014 and 2015, the Bank, at Ryan's direction, repeatedly extended credit to allow GG and his businesses to cure large overdrafts, pay operating expenses, and service existing debt.  Despite the borrowers' demonstrated inability to repay existing obligations, Ryan in 2014 extended eighteen $1 million incremental advances and one $500,000 incremental advance to GG's businesses (representing a 26 percent increase in the loans outstanding), and then in 2015 extended 26 additional $1 million incremental advances***.  All of these advances under Ryan's incremental lending authority, which exceeded $44 million, were for the stated purpose of providing "working capital," ***a false characterization that Ryan used to conceal the true purpose of these advances—to mask overdrafts and pay interest on other loans issued by the Bank***.

---

[4] With regard to St. Angelo, the FDIC specifically asserts that "***Ryan personally managed St. Angelo's tax credits outside of the Bank's normal operations for the handling of tax credit investments***" and that he was "***the only person who could address questions regarding St. Angelo's tax credits***."  Golan Decl. ¶ 86.  It further asserts, among other things: "***According to Ryan***, the Bank's investment in 622 Conti, LLC was for a historic property located at 622 Conti Street that St. Angelo allegedly owned through that LLC."  In fact, however, "***St. Angelo did not own the property at 622 Conti Street.  Nor was St. Angelo ever a member of 622 Conti, LLC. Instead, St. Angelo had a leasehold interest as a tenant at 622 Conti Street that, given its length, could never be a basis for a legitimate tax credit investment by the Bank***."  *Id.*

*Id.* (quoting from the FDIC complaint).

And, *for the first time in a public document*, the FDIC complaint provides an example of Ryan's highly improper and fraudulent lending *in the oil and oil services industry*, to Robert Linder and the Linder Oil Company.  Among other things, the complaint evidences that the Bank's oil and gas lending and the loans to Linder, which Ryan controlled, should have been classified as impaired because "(a) there were critical operational problems with the wells; (b) crude oil prices had dropped 53 percent in 2014; (c) *the Bank had grossly overstated the collateral values by failing to account for non-producing wells*; (d) *unaudited borrower-prepared financial statements showed a negative net worth exceeding $60.5 million*; (e) *Ryan had repeatedly extended the loans and advanced new money to cover interest payments*; and (f) regulatory guidance required discounting of the borrowers' asserted reserves."  It further chronicled "*Ryan's repeated, unilateral extensions of millions of dollars throughout 2014 to borrowers with no ability to repay their loans*."  Golan Decl., ¶ 93.  As an article issued on May 7, 2020 summarized: "The pattern of lending to Linder is familiar from previous cases brought by the feds, in that the FDIC alleges that Ryan kept lending to Linder to cover up the fact that the oil company was unable to make payments on previous loans while also over-valuing the collateral, in this case offshore wells that were worthless."  *Id.*, ¶ 94 (citing to Exhibit 27).

As chronicled in the accompanying Declaration, this newly available evidence about the Bank's oil and gas lending is highly significant because it confirms that Ryan's fraud, as well as First NBC's and the Individual Defendants' false accounting and financial reporting, was not limited to lending to commercial real estate development projects and the Company's tax credit investments.  Rather, it has now been disclosed that Ryan's fraud extended to his direction of lending in the oil and gas industry, which is consistent with the allegations in the Complaint filed

by the Lead Plaintiffs in the securities class action.  As alleged in the Complaint in the securities class action, in Ryan's March 31, 2015 letter to shareholders (that was part of the Company's 2014 Annual Report), he told investors that "First NBC has very limited exposure (3% of its loan portfolio) to the oil and oil service industries."  ¶¶ 17, 91, 206.  However, as Lead Plaintiffs alleged, First NBC, Ryan and Verdigets had failed to disclose that the Company was then at risk on a large loan that it had made to an oil exploration and production company, and that in December 2014, a pipeline serving a well in the largest oil field of the borrower broke.  Rather that repair the pipeline, the borrower elected to drill a new well, which First NBC agreed to finance.  As a result, First NBC's exposure to the borrower increased from around $30 million to over $90 million by the end of 2015.  ¶¶ 18, 211.

As the securities class Complaint further alleged, although the pipeline broke at the end of 2014, First NBC remained silent about the loan in its 2014 Form 10-K and First Quarter 2015 Form 10-Q.  Moreover, the Second Quarter 2015 Form 10-Q, filed nearly eight months after the pipeline broke, made only passing reference to the loan, noting that it was now classified as substandard due to the "fluctuations in energy commodity prices and the level of production from [the borrower's] shallow-water well."  After making a similar disclosure in the Third Quarter 2015 Form 10-Q, First NBC issued a press release on February 1, 2016, in which the Company reported its fourth quarter and full year 2015 financial results and stated that its "exposure to exploration and production in its oil and gas portfolio was approximately $90.2 million."  Separately, First NBC told analysts at Sandler O'Neill that the loan "related to a shallow-water drilling project that has been offline for some time now … but that is now ready to return to production."  Absent in all of these disclosures was that the borrower's pipeline had broken and that the First NBC was financing the drilling of an entirely new well.  ¶¶ 19-20, 210-211, 233, 236(c).

Finally, it was only when First NBC filed its long overdue 2015 Form 10-K in August 2016 that the Company admitted that, as of year-end 2015, it was required to deeply discount the value of the collateral for the loan and establish a $30 million reserve allowance.  The 2015 10-K attributed the reserve to a material weakness in First NBC's internal controls relating to the monitoring of borrowers' ability to repay loans, but it is clear that First NBC and the Individual Defendants did not want to disclose the truth about the broken pipeline and First NBC's risk of loss on financing a replacement well.  And, in any case, the admitted material weakness flies in the face of assurance during the Class Period in the securities class case that the Company was "actively monitoring" its oil and gas related credits.  ¶ 91.

## III.    ARGUMENT

Lead Plaintiffs seek relief from the Court's May 11, 2017 Judgment pursuant to Fed. R. Civ. P. 60(b).  "[Rule 60(b)] provides a procedure whereby, in appropriate cases, a party may be relieved of a final judgment."  *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988).  The Fifth Circuit has observed that "[t]he purpose of Rule 60(b) is to delineate the circumstances under which relief may be obtained from the operation of final judgments" and that, "[b]y its very nature, the rule seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts."  *Offshore Marine, L.L.C. v. Fish Offshore, L.L.C.*, No. CIV. A 11-2339, 2013 WL 3777038, at *4 (E.D. La. July 18, 2013) (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir.  1981)) (internal quotes omitted).  "In this light, it is often said that the rule should be liberally construed in order to do substantial justice."  *Seven Elves*, 635 F.2d at 401.  Motions under Rule 60(b) are directed to the sound discretion of the district court.  *Id*. at 402.

"In sum, then, Rule 60(b) is 'a grand reservoir of equitable power to do justice in a particular case' … that may be tapped by the district court in the sound exercise of its discretion, and within the strictures inherent in the underlying objectives of the rule." *Id*. at 402 (quoting *Menier v. United States*, 405 F.2d 245, 248 (5th Cir. 1968)).  Here, the need to decide this case on the merits in view of "all the facts" outweighs any considerations of finality, and as such equity dictates that Lead Plaintiffs' motion be granted.

### A.      Relief from the Judgment is Warranted Under Rule 60(b)(2)

Rule 60(b)(2) permits courts to relieve a party from a final judgment as a result of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)."  Fed. R. Civ. P. 60(b)(2); *see also In re Fema Trailer Formaldehyde Prods. Liab. Litig.*, No. 10-2248, 2011 WL 6748489, at *4 (E.D. La. Dec. 21, 2011).  A movant must meet two requirements to obtain Rule 60(b)(2) relief, demonstrating that: (1) it exercised reasonable diligence in obtaining the information; and (2) the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment.  *See In re Fema Trailer*, 2011 WL 6748489 at *4.[5]

### 1.      The Evidence Is Newly Discovered

The criminal investigations involving Ryan, at least two other Bank executives and seven Bank borrowers, as well as the guilty pleas of St. Angelo, Dunlap, Charity, Gibbs, Vira and Treme, show that Ryan not only knew that First NBC's financial results were overstated during the Class Period, but that he personally orchestrated the actions that defrauded investors.  All of these

---

[5] In addition, pursuant to Fed. R. Civ. P. 60(c), a motion under Rule 60(b)(2) must be made within one year of the entry of the judgment.  Lead Plaintiffs submit that their Rule 60(b)(2) motion is timely given that they were unable to file such a motion while the bankruptcy stay was in effect.  Excluding the duration of the bankruptcy stay, the motion has been brought less than 365 days from when the Judgment was entered.  To the extent the Court finds that Lead Plaintiffs' motion under Rule 60(b)(2) is precluded by Rule 60(c), Lead Plaintiffs, as discussed in § III.C, *infra*, submit that their motion is also appropriate under Rule 60(b)(6), which has no such time limit.

investigations, indictments and guilty pleas became known only *after* the Court entered the Judgment.  As such, the facts revealed through these matters constitute newly discovered evidence that was not known to Lead Plaintiffs until after the Court's Judgment.  Specifically, the grand jury investigation of Ryan was not publicly reported until September 2, 2017, more than three months after the Judgment was entered.  Golan Decl., ¶ 28.  The FDIC Material Loss Review did not become publicly available until November 3, 2017, nearly six months after the Judgment was entered. *Id*., ¶ 80.  The indictments of St. Angelo, Dunlap and Charity did not occur until 2018 and 2019.  *Id.*, ¶¶ 33, 37, 44.  The FDIC complaint was not filed until April 22, 2020.  *Id*., ¶¶ 23, 84.  The Bills of Information against Gibbs, Vira and Treme were not filed until June and July 2020, and their guilty pleas were not entered until August and September 2020.  *Id.*, ¶¶ 53-56, 57-62, 63-67.  And the Indictment against Ryan and others was not filed until July 10, 2020.  *Id.*, ¶¶ 29, 70.

The evidence made available through these materials document a sweeping fraud undertaken by Ryan and others *during the Class Period* to artificially inflate First NBC's financial condition, including misconduct relating directly to the tax credit investments, commercial lending, and oil and gas lending that were the subjects of the Company's restatement of financial results.  Thus, the underlying evidence of Defendants' misconduct during the Class Period existed at the time the Court entered the Judgment, but Lead Plaintiffs were unaware of its existence until the criminal investigations, indictments and guilty pleas, as well as the FDIC's material loss review of the Bank and complaint against the outside auditor, became public.

## 2. Lead Plaintiffs Could Not Have Discovered the Evidence with Due Diligence

Rule 60(b)(2) requires that the newly discovered evidence could not, "with reasonable diligence," have been discovered prior to the entry of judgment.  *In re Fema Trailer*, 2011 WL 6748489 at *4.  Here, Lead Plaintiffs could not have discovered the hundreds of millions of dollars

in fraudulent loans issued by First NBC or the nearly $10 million in fake tax credit purchase agreements it entered into with St. Angelo.  Nor could Lead Plaintiffs have discovered the sweeping fraud that the U.S. Attorney's Office for the Eastern District of Louisiana has now pieced together, step by step, through its tenacious investigation that has required reviews of internal Bank documents not available to outside parties, interviews with Bank personnel and customers, the initial guilty pleas of three such Bank borrowers, culminating in the Indictment of Ryan and others on July 10, 2020, and further guilty pleas of three Bank customers on August 26, September 2, and September 17, 2020.  Indeed, the indictments make clear that Ryan and others engaged in a scheme to falsify documents ***to create an appearance that all of the Bank's transactions were legitimate***. Until the indictments became public, Lead Plaintiffs could not have discovered the evidence that these loan and tax credit transactions had been falsified.  Similarly, Lead Plaintiffs could not have known of the evidence of First NBC Bank's and Ryan's fraudulent actions and domination of the Bank's lending, financial reporting and operations that was disclosed in the FDIC's Material Loss Review and in its complaint against the Bank's outside auditor, which the FDIC was able to uncover and chronicle in its Material Loss Review and complaint because it gained access to internal First NBC records as the Receiver for First NBC Bank.

Because this case is governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), all discovery was stayed during the pendency of Defendants' motions to dismiss.  *See* 15 U.S.C. §78u-4(a)(9)(B).[6]  As a result, Lead Plaintiffs were prohibited from serving document requests or interrogatories that may have obligated Defendants to produce the evidence that might

---

[6] The Fifth Circuit has acknowledged that the PSLRA discovery stay does not give rise to a "blanket rule" precluding a district court's consideration of newly discovered evidence pursuant to a Rule 60(b)(2) motion.  *Goldstein v. MCI WorldCom*, 340 F.3d 238, 258 n.7 (5th Cir. 2003).

have made apparent their fraud.  In short, there is no way Lead Plaintiffs could have discovered this evidence prior to the entry of the Court's Judgment.

### 3.     The Newly Discovered Evidence Is Material and Controlling

A movant under Rule 60(b)(2) is also required to demonstrate that the newly discovered evidence is material and controlling and clearly would have produced a different result if present before the original judgment.   *In re Fema Trailer*, 2011 WL 6748489 at *4.  Here, the "result" in question is the dismissal of the Complaint with prejudice for failure to adequately plead scienter. In determining whether newly discovered evidence would have changed the outcome of Defendants' Rule 12(b)(6) motions, this Court must accept Plaintiffs' factual allegations as true. *In re Under Armour Sec. Litig.*, No. CV RDB-17-0388, 2020 WL 363411, at*7 (D. Md. Jan. 22, 2020); *Kurzweil v. Philip Morris Companies*, No. 94 CIV 2373 (MBM), 1997 WL 167043, at *5 (S.D.N.Y. Apr. 9, 1997).   Additionally, Supreme Court precedent interpreting the pleading requirements of the PSLRA requires the Court to consider the allegations in their "entirety" to determine whether the facts alleged, "taken collectively," give rise to an inference of scienter that is "***at least as likely as*** any plausible opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325-26, 328 (2007).

In their motions to dismiss, First NBC, Ryan and Verdigets asserted that "Plaintiffs' proposed inference of fraudulent intent is belied by the more compelling non-culpable inference, *i.e.*, that Defendants erroneously believed in good faith in the accuracy of the financial reports when reported."  ECF No. 78-2 at p. 20 (Memorandum in Support of First NBC and Mary Beth Verdigets in Support of Motion to Dismiss).[7]  That argument, which was accepted by the Court in

---

[7] Ryan joined the motion of First NBC and Verdigets and similarly asserted that "an inference of fraudulent intent is far less compelling than an inference that First NBC at one point became aware of certain accounting errors and weaknesses in internal controls and has been working to address them, albeit imperfectly."  ECF No. 74-1 at 24 (Memorandum in Support of Ashton J. Ryan, Jr.'s Joinder and Motion to Dismiss).

dismissing the Complaint, now lies in tatters.  The newly discovered evidence belies any contention that the false portrayal of First NBC's financial condition was somehow the product of innocent mistakes.  To the contrary, that evidence shows that Ryan, among other misconduct:

- Knowingly filed falsified loan documents with the Bank that overstated the assets of borrowers and understated their liabilities;

- Caused the Bank to issue more than $250 million in fraudulent commercial and real estate loans to conceal overdrafts on older loans issued to the borrowers and the fact that such older loans were non-performing;

- Entered into fake tax credit investment agreements with St. Angelo totaling at least $9.6 million, knowing that tax benefits could not be lawfully claimed in connection with the properties that were the subject of the investments;

- Knowingly overstated collateral for loans to oil and gas industry borrowers, while maintaining such loans by fraudulently extending them without designating them as non-performing and taking required impairments on a timely basis;

- Personally benefitted from falsified loans and falsified financial performance reports by (1) obtaining services from a construction company owned by one borrower, (2) receiving a $2 million personal loan from another borrower who had recently obtained a $9 million unsecured loan from the Bank, (3) receiving large bonuses tied to First NBC's reported financial performance, and (4) pledging his shares in First NBC stock as security for personal loans from other financial institutions to finance his personal business ventures; and

- Dominated all aspects of the Bank's operations, including its audit and financial reporting functions, overrode internal control procedures, and knowingly operated outside the Bank's policy guidelines.

This newly discovered evidence, when considered collectively with Lead Plaintiffs' other allegations, supports a cogent and more than compelling inference that First NBC's false financial reporting that is the subject of the Complaint was the product of deliberate misconduct by Ryan and willful blindness or severe recklessness by Verdigets, rather than good faith judgments that were ultimately deemed incorrect.

The misconduct documented by the Indictment and the Bills of Information, plea agreements, the FDIC's Material Loss Review and its complaint against the outside auditor is highly relevant to the misconduct alleged in the Complaint in several respects:

First, the Complaint alleges that First NBC's true financial condition was concealed from investors during Class Period.  The newly discovered evidence confirms that Ryan falsified loan documentation so that new loans could be issued to conceal overdrafts on more mature loans. Through these maneuvers, which impacted not only the Bank's real estate and commercial lending but also its oil and gas lending, First NBC avoided write downs and charge offs on substantial loan amounts, making the Company's financial condition appear better than it was;

Second, the Complaint alleges that First NBC failed to properly account for its investments in tax credit entities.  The newly discovered evidence shows that Ryan entered into $9.6 million in fake tax credit investments with St. Angelo, knowing that tax credits could not be rightfully claimed on the investments that were the subject of the agreements.  Ryan's knowledge in this regard guts any argument that First NBC's tax credit accounting was the product of good faith errors of judgment;

Third, the Complaint alleges that in its February 1, 2016 announcement of unaudited 2015 earnings, First NBC's earnings were not only overstated by false tax credit investment accounting, but by the failure to include a $30 million reserve on loans issued to an oil exploration company that was in financial distress and the failure to write off a $69 million investment in the receivables of an ethanol company whose parent was insolvent.  The newly discovered evidence is highly probative of Ryan's scienter with respect to these matters because, just as Ryan sought to avoid write downs and charge offs of loans extended to St. Angelo, Dunlap, Charity, Gibbs, Vira, Treme and Adolph, he similarly sought to avoid establishing a reserve on the oil loan and writing off the

36

ethanol receivable investments that would have diminished investors' and regulators' view of First NBC's financial condition;

Fourth, the Complaint alleges that First NBC had numerous material weaknesses of internal controls over financial reporting that were concealed from investors, all stemming from the dominant influence of Ryan over the board of directors and executive management of the Company. The newly discovered evidence confirms that Ryan (and Defendant Verdigets) knowingly and falsely certified the effectiveness of First NBC's internal controls. Ryan overrode internal controls and operated outside policy guidelines, causing the Company to issue over $250 million in real estate and commercial loans that lacked adequate credit protections, as well as extending loans and failing to write-down on a timely basis oil and oil services loans. He closely monitored the "D.O.R.K.S." borrowers so that they would not appear on month-end overdraft reports that went to the board. He also directed the accounting and financial reporting for the Company's transactions and purported results. Ryan's dominance and control of all aspects of the Company's operations renders baseless any argument that he was somehow unaware of the matters alleged in the Complaint, and further renders baseless any attempt by Defendant Verdigets to claim that she actually believed that the auditing and financial reporting functions – which are the job of a CFO – were being carried out as represented in the certifications that she signed as CFO throughout the Class Period; and

Fifth, the Complaint alleges that Ryan had a strong personal financial motive and opportunity to engage in deceptive conduct. ¶ 16. The newly discovered evidence shows that Ryan acted as a co-conspirator in submitting false documentation to the Bank in order to "unjustly enrich" himself and his co-conspirators. Ryan received construction services from Dunlap and a $2 personal million loan from a borrower who had recently received a $9 million unsecured loan

from the Bank.  And, as the FDIC complaint shows, Ryan also benefited personally from the fraud because he received "large bonuses tied to the reported financial performance" of First NBC and he had also pledged his shares of First NBC stock "as security for personal loans from other financial institutions to finance his personal business ventures."

Lead Plaintiffs submit that this newly discovered evidence is material and controlling and clearly would have produced a different result had it been available at the time the Judgment was rendered.  Courts have been willing to grant relief under Rule 60(b)(2) to plaintiffs in cases brought under the federal securities laws where new evidence has emerged that would have significantly impacted a district court's prior rulings.  *See Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1535-38 (8th Cir. 1996) (reversing district court's denial of motion under Rule 60(b)(2) based on newly presented evidence supportive of plaintiffs' claims under the federal securities laws); *In re Under Armour Sec. Litig.*, 2020 WL 363411, at *7-9 (previously undisclosed federal investigation of accounting practices warranted relief under Rule 60(b)); *Kurzweil*, 1997 WL 167043, at *9.  Similarly, Lead Plaintiffs here have satisfied the requirements of Rule 60(b)(2) and relief from the Court's Judgment is warranted.[8]

---

[8] While the Fifth Circuit, in *Goldstein v. MCI WorldCom*, affirmed the denial of Rule 60(b) relief in a case arising under the federal securities laws, the facts here compel a different result.  The plaintiffs in *WorldCom* alleged that the company allowed $500 million of uncollectible receivables to remain on WorldCom's books, rather than writing them off.  *Goldstein*, 340 F.3d at 243.  The district court dismissed the complaint for failure to plead a strong inference of scienter.  *Id.* at 244.  While plaintiffs' appeal was pending, WorldCom announced a restatement of its financial results and subsequently filed for bankruptcy protection.  *Id.* at 243, 255.  The Fifth Circuit affirmed the district court's denial of plaintiffs' Rule 60(b) motion, finding that plaintiffs' four-page motion merely asserted in "conclusory fashion" that hundreds of pages of newly discovered evidence submitted in support of the motion would have been probative of defendants' fraudulent intent.  *Id.* at 259.  Indeed, the Fifth Circuit found that "the plaintiffs here simply inundated the district court with an avalanche of material in the hopes that the court would, on its own, connect the dots between any bad act found in the material and allegations related to the single claim [pertaining to uncollectible receivables] against Ebbers and Sullivan in this case."  *Id.* at 258.  And because much of the evidence submitted by plaintiffs pertained to WorldCom's improper capitalization of certain line item costs, rather than the uncollectible receivables that were the subject of plaintiffs' complaint, the Fifth Circuit found that the newly discovered evidence was insufficiently probative of defendants' scienter with respect to decisions to write off uncollectible receivables.  *Id.* at 259.

Here, by contrast, Lead Plaintiffs have "connected the dots" between the newly discovered evidence and the allegations in the Complaint.  As demonstrated herein as well as in the Golan Declaration and the exhibits submitted

38

### B.      Alternatively, Relief Is Appropriate Under Rule 60(b)(6)

"Rule 60(b)(6) allows a court to set aside a final judgment, order, or proceeding 'for any other reason that justifies relief.'" *In re Fema Trailer*, 2011 WL 6748489 at *4 (quoting Fed. R. Civ. P. 60(b)(6)).  "The broad language of clause (6) gives the court ample power to vacate judgments whenever such action is appropriate to accomplish justice," and the Fifth Circuit "has recognized and implemented wide equitable force and effect for Rule 60(b)(6)." *Menier*, 405 F.2d at 248 (citing *Bros Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d 594 (5th Cir. 1963) and *Laguna Royalty Co. v. Marsh*, 350 F.2d 817 (5th Cir. 1965)).  Unlike subparts (1) through (3) of Rule 60(b), a Rule 60(b)(6) motion is not required to be brought within a year of the entry of judgment.  *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994).  Rather, a Rule 60(b)(6) motion need only be brought within a "reasonable time," which depends on the particular facts and circumstances of the case.  *Id.*  Factors to consider in determining the timeliness of the motion include the interest in finality, the reason for the delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and the prejudice to other parties.  *Id.*

Here, consideration of the relevant factors weighs heavily in favor of finding that Lead Plaintiffs' Rule 60(b)(6) motion is timely and that they are entitled to relief.  The dismissal of the Complaint with prejudice was not an adjudication of the merits based on all the facts in this case.  *See Offshore Marine L.L.C.*., 2013 WL 3777038, at *4 (rule seeks to strike a delicate balance between "the desire to preserve the finality of judgments and the incessant command of the court's conscience that justice be done in light of ***all*** the facts") (emphasis added) (internal quotations omitted).  The newly discovered facts cure the pleading deficiency cited by the Court in its

---

therewith, the newly discovered evidence of hundreds of millions of dollars in fraudulent loans, fake tax credit investments, and flagrant and willful disregard of internal controls that served to unjustly enrich Ryan are highly probative of the Complaint's allegations of accounting improprieties and concealed material weaknesses of internal controls.

dismissal decision.   The prejudice to Defendants is "negligible" where "the only consequence to them of granting relief to the movant is that they will now be required to defend against plaintiff's claims on the merits…"   *In re Fema Trailer*, 2011 WL 6748489, at *6.

Moreover, the timing of this motion was beyond Lead Plaintiffs' control.  While the bankruptcy stay was in effect, Lead Plaintiffs were precluded from filing this motion.  Lead Plaintiffs have diligently brought this motion as soon as practicable after the bankruptcy stay was lifted.  And until the newly discovered evidence became available through the Indictment, Bills of Information, plea agreements, FDIC Material Loss Review, FDIC complaint against E&Y, and other source materials cited in the Golan Declaration, Lead Plaintiffs had no practical ability to develop the evidence on their own.  As discussed herein, they have been subject to the PSLRA's discovery stay, which precluded them from serving Defendants with discovery while the motions to dismiss were pending.  In light of all the relevant factors, justice requires that Lead Plaintiffs be allowed to file a second amended complaint so that this case is fairly adjudicated based on all of the relevant facts.  *See Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001) (holding that, "[g]iven the high burdens the PSLRA placed on plaintiffs, justice and fairness require that the plaintiffs before us be allowed an opportunity to amend their complaint to include allegations relating to" newly discovered evidence and recognizing that allowing the new evidence "to be introduced in the District Court will not unduly prejudice the defendants").

### C.   Granting Leave to Amend Would Not Be Futile

Federal Rule of Civil Procedure 15(a)(2) states that leave to amend pleadings "shall be freely given when justice so requires."  *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 268 (5th Cir. 2004).  In determining whether to grant leave, the Court may consider factors such as (1) undue delay; (2) bad faith; (3) dilatory motive on the part of the movant; (4) repeated failure

to cure deficiencies by any previously allowed amendment; (5) undue prejudice to the opposing party; and (6) futility of amendment.  *Id.*  None of these factors warrant the denial of Lead Plaintiffs' request for leave to amend.

As set forth above, there is no undue prejudice to Defendants since the dismissal of the Complaint was not an adjudication on the merits.  The request for leave to file a second amended complaint is not the product of any undue delay, bad faith or dilatory motives, given that the new evidence supporting Lead Plaintiffs' allegations only became available (a) through the USAO's and FDIC's investigations with access to internal First NBC records and (b) while these proceedings were stayed by First NBC's bankruptcy.  Finally, granting leave to amend would not be futile because the new evidence that Lead Plaintiffs would include in a second amended complaint cures any deficiencies for pleading scienter.

## IV.    CONCLUSION

The collapse of First NBC was the result of a massive fraud orchestrated by the Company's founder and former CEO and Chairman, Ashton J. Ryan, Jr., to enrich himself and his cronies. Details of this fraud only emerged after the Complaint was dismissed and after First NBC filed for bankruptcy.  While the bankruptcy proceedings were ongoing, Lead Plaintiffs' hands were effectively tied, preventing them from bringing the new evidence of Defendants' fraud – which has now been ***admitted by six Bank borrowers, including its former General Counsel, and asserted by the FDIC as the Bank's Receiver*** – to the Court's attention.  The litigation represents the only avenue left open for injured investors to recover the losses they sustained when they purchased First NBC stock in the mistaken belief that Defendants had been truthful in their depiction of the Company's financial condition and internal controls.  Given the exceptional circumstances here, considerations of justice being done in view of all of the relevant facts far

outweigh any considerations of finality.  Lead Plaintiffs therefore respectfully request that the

Court: (1) vacate the May 11, 2017 Judgment; and (2) grant leave for Lead Plaintiffs to file a

second amended complaint.

Dated:  January 27, 2021

*s/ Jeffrey W. Golan*
Jeffrey W. Golan (admitted *pro hac vice*)
Robert A. Hoffman (admitted *pro hac vice*)
Jeffrey B. Gittleman (admitted *pro hac vice*)
Chad A. Carder (admitted *pro hac vice*)
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jgittleman@barrack.com
ccarder@barrack.com

*Lead Counsel and Attorneys for Lead Plaintiffs*

and

Vincent J. Glorioso, Jr. (#6064)
Maria B. Glorioso (#24435)
Vincent J. Glorioso, III (#26896)
**THE GLORIOSO LAW FIRM**
2716 Athania Pkwy.
Metairie, LA 70002
Telephone: (504) 569-9999
Facsimile: (504) 569-9022

Jonathan Gardner
Alfred L. Fatale III (admitted *pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477

J. Gerard Stranch, IV
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801

*Additional Attorneys for Lead Plaintiffs*

42