## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ERIC R. KINZLER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | CIVIL ACTION |
| Plaintiff, | ) ) ) | No. 2:16-cv-04243-SM-JVM |
| v. | ) ) ) | |
| FIRST NBC BANK HOLDING COMPANY, ASHTON J. RYAN, JR., MARY BETH VERDIGETS, and ERNST & YOUNG LLP, | ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF JEFFREY W. GOLAN IN SUPPORT OF LEAD PLAINTIFFS' MOTION PURSUANT TO RULE 60(b) TO OPEN JUDGMENT

Jeffrey W. Golan, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a member in good standing of the bar of the Supreme Court of Pennsylvania, and was admitted *pro hac vice* in the above-captioned Action in the United States District Court for the Eastern District of Louisiana.  I submit this declaration in support of the motion being filed by Lead Plaintiffs, consisting of Oakland County Employees' Retirement System and Voluntary Employees' Benefit Association, Plymouth County Retirement System, and Central Laborers' Pension Fund, pursuant to Rule 60(b), Fed. R. Civ. Proc., to open the judgment entered in this matter.

2.      I have personal knowledge of the statements made in this Declaration.

**Background to the Motion**

3.      The corporate defendant in this Action, First NBC Bank Holding Co. ("First NBC" or the "Company"), first issued common stock to public investors in an Initial Public Offering completed on May 9, 2013, which raised $115 million through the issuance of nearly 4.8 million shares of common stock priced at $24 per share (the "IPO").

4.      First NBC was a bank holding company headquartered in New Orleans, Louisiana that offered a broad range of financial services through its wholly-owned banking subsidiary, First NBC Bank ("First NBC Bank" or the "Bank").  First NBC's primary market was the New Orleans metropolitan area and the Florida panhandle.  The Company had a main office located in the Central Business District of New Orleans, 38 full service branch offices and a loan production office.  As of December 31, 2015, First NBC reported that it had total assets of $4.7 billion, net loans of $3.4 billion, and total deposits of $3.8 billion.

5.      On February 1, 2016, after the market closed, the Company issued unaudited fourth quarter and full year 2015 financial results that were below analysts' expectations, based, in part, on a higher than expected $8.2 million fourth quarter impairment charge associated with First NBC's tax credit investments.  The Company's earnings announcement also noted First NBC's $90.2 million exposure to oil exploration and production and the fact that $39.7 million was past due on its investment in $69 million in receivables from an ethanol company.  A Sandler O'Neill research report issued on the day of the earnings release stated: "We were definitely disappointed in the bank's 4Q results given the much higher than expected tax credit impairment, the increase in energy-related loans (without a disclosed reserve percentage), and the announcement of past due receivables investments related to the oil and gas sector (ethanol)."  In response to the February 1, 2016 press release, the price of First NBC stock declined the next day by $3.20 per share, or 10.5%, to close at $27.20.

6.      On March 16, 2016, First NBC disclosed that the filing of its 2015 Form 10-K was being delayed due to errors that had been identified in its accounting for Federal and State Historic Rehabilitation tax credit entities.  ***The Company stated that the information contained in its February 1, 2016 earnings release should not be relied upon and that it expected that net income***

*would likely be reduced from the amounts previously reported for 2015*.  In response to these disclosures, First NBC stock plunged $5.33 per share, or 22%, to close on March 16, 2016 at $19.09 per share.

7.       On April 8, 2016, First NBC filed a Form 8-K and press release disclosing that ***the Company's audit committee and management had determined that all of the Company's financial statements from 2011 through 2014 should no longer be relied upon***.   The Form 8-K further stated: "The Company's management determined that ***the financial statements referred to above should be restated due to an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities and the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities***.  The Company is continuing to review and quantify these and other potentially other less significant matters, which are expected to be reflected in the restated financial statements."  First NBC also disclosed in its press release that the Company was assessing its internal controls over financial reporting.  As a result of this news, First NBC stock fell $0.47 per share to close at $18.65 on April 11, 2016, the next trading day, a 2% decline.

8.       On May 8, 2016, plaintiff Kinzler filed a complaint in this Action, asserting claims under Sections 10(b) and 20(a) of the federal Securities Exchange Act of 1934 ("Exchange Act") against First NBC, its founder, President, and Chief Executive Officer ("CEO") Ashton J. Ryan, Jr. ("Ryan"), its Chief Financial Officer ("CFO"), Mary Beth Verdigets ("Verdigets" and, together with Ryan, the "Individual Defendants"), and the Company's outside auditor, Ernst & Young LLP ("Ernst & Young").  The case was originally assigned to District Judge Zainey, but was re-assigned to then-Chief Judge Engelhardt on June 6, 2016.

9.     Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a notice of the filing of the complaint was issued and, on July 5, 2016, certain purchasers of First NBC stock filed motions for appointment as lead plaintiff.  On August 25, 2016, Judge Engelhardt issued an order appointing the above-identified pension and retirement funds as Lead Plaintiffs, and appointed Barrack, Rodos & Bacine, the law firm in which I am a partner, to serve as Lead Counsel.

10.     Lead Plaintiffs filed their Amended Complaint for Violations of the Federal Securities Laws on December 5, 2016 (the "Complaint").  The Complaint asserted Section 10(b) and 20(a) claims under the Exchange Act against First NBC, Individual Defendants Ryan and Verdigets, and Ernst & Young on behalf of purchasers of First NBC common stock, other than Defendants and their affiliates, during the period from May 10, 2013 to October 20, 2016, inclusive (the "Class Period"), and who were injured thereby.

11.     Defendants moved to dismiss the Complaint on February 15, 2017, to which Lead Plaintiffs responded on March 22, 2017, and Defendants filed reply briefs on April 6 and April 12, 2017.

12.     Judge Engelhardt held a hearing on the motions to dismiss on April 26, 2017, and issued an oral decision dismissing the Complaint after hearing argument from counsel ("Oral Dismissal Decision").  *See* Reporter's Official Transcript, Apr. 26, 2017, at 35-41.  The primary ground upon which Judge Engelhardt dismissed the Complaint was that Lead Plaintiffs had not sufficiently alleged the Defendants' scienter, stating that "the Court does not find that plaintiffs have, under the jurisprudence and particularly the Fifth Circuit jurisprudence, pled with sufficient particularity the facts establishing that the defendants acted with the requisite level of scienter." *Id.* at 39.  He further held that the Lead Plaintiffs "fail to plead particular facts that would allow the

Court to find a strong inference of scienter.  Therefore, the Court does not find the inference of scienter to be – in this case to be cogent or at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 39.

13.     On May 11, 2017, the District Court entered a Judgment dismissing the Complaint with prejudice for the reasons stated in the Oral Dismissal Decision.

14.     On May 24, 2017, Lead Plaintiffs filed a Notice of Appeal from all Orders entered by the District Court.

15.     On April 28, 2017, two days after the District Court heard oral argument and issued its Oral Dismissal Decision, First NBC Bank, New Orleans, LA, was closed by the Louisiana Office of Financial Institutions.  The Federal Deposit Insurance Corporation ("FDIC") was then named Receiver.  Subsequently, Whitney Bank, in Gulfport, MS, acquired all of the transactional deposits and some of the assets of First NBC Bank from the FDIC as Receiver.  *See* FDIC Question and Answer Guide, First NBC Bank, New Orleans, LA, Last Updated 05/23/2017 (attached as Exhibit 1).

16.     On May 11, 2017, the board of First NBC Bank Holding Company commenced a voluntary bankruptcy proceeding under Chapter 11 of Title 11 of the U.S. Bankruptcy Code, captioned *In re: First NBC Bank Holding Co., Debtor,* Case No. 17-11213 (E.D. La. Bankruptcy Ct.).

17.     In order to protect the interests of Lead Plaintiffs and the putative Class in this Action, Lead Plaintiffs have participated in First NBC's bankruptcy proceedings, including but not limited to the filing of a claim on behalf of Lead Plaintiffs and the putative Class in the bankruptcy proceeding.

18.     Meanwhile, the Fifth Circuit Court of Appeals entered orders staying the briefing with respect to Lead Plaintiffs' appeal from the Judgment against First NBC (the Debtor), Defendant Ryan, and Defendant Verdigets, but severed and allowed the appeal to go forward with respect to Ernst & Young.  *See, e.g., Central Laborers' Pension Fund, et al. v. First NBC Bank Holding Company, et al.,* No. 17-30443 (5th Cir., Oct. 17, 2017) (severing appeal as to Ernst & Young).  Rather than go forward with the appeal process piecemeal, Lead Plaintiffs dismissed their appeal from the dismissal of Ernst & Young, leaving intact their claims against the Company, Ryan and Verdigets.

19.     In the bankruptcy proceedings, on May 15, 2020, the Bankruptcy Court entered an Order Confirming Second Amended Joint Plan of Reorganization for First NBC Bank Holding Company, as Immaterially Modified Through March 6, 2020 ("Plan of Reorganization") (BK Dkt. No. 863).  On July 2, 2020, the Bankruptcy Court entered an Order (BK Dkt. No. 877) extending the deadline for the occurrence of the Effective Date of the confirmed Plan of Reorganization to September 14, 2020.  Subsequent Orders further extended the Effective Date, which recently took effect on January 22, 2021.  *See* Joint Notice of Occurrence of the Effective Date and Funding of Chapter Plan of Reorganization, filed Jan. 22, 2021 (BK Dkt. No. 949).

20.     The Fifth Circuit's stay of proceedings with respect to Defendants First NBC, Ryan and Verdigets, which commenced shortly after the filing of the bankruptcy proceedings by First NBC, remains in effect.

**The Newly Discovered Evidence of the Fraud that Took Place at First NBC that Came to Light During the Pendency of the Appeal and First NBC's Bankruptcy Proceeding**

21.     During the time during which the Bankruptcy Court and the Fifth Circuit Court of Appeals ordered that Lead Plaintiffs' action be stayed with respect to the Company and the Individual Defendants, there has been significant new evidence of the securities fraud that Lead

6

Plaintiffs asserted against the Company and the Individual Defendants in the Complaint filed on December 5, 2016.

22.     The new information includes: (a) criminal charges to which six individuals – all borrowers of the Bank, including the Bank's former General Counsel – have now pleaded guilty; (b) criminal charges asserted on July 10, 2020, against Defendant Ryan, two other Bank executives and a Bank borrower; (c) a complaint filed on April 22, 2020, by the FDIC against the Bank's former auditor, Ernst & Young; (d) a detailed FDIC report concerning First NBC's management; (e) FDIC actions being taken against Defendant Ryan and two former Bank executives; and (f) certain newspaper and media reports of these and other developments since First NBC's bankruptcy proceedings were commenced.  As shown below, including in the attached exhibits, as well as in Lead Plaintiffs' Rule 60(b) motion and supporting memorandum of law, the new information dovetails with and provides compelling support for many of the primary claims made in the Complaint that were dismissed, and clearly establishes the basis for opening the judgment entered by this Court.

23.     *First*, the criminal charges, guilty pleas, and FDIC filings ***directly support*** the Complaint's pleading of the "***dominant influence***" that former CEO Ryan exercised over all facets of First NBC's business, including its accounting and reporting functions, which directly impacts the scienter requirement for pleading First NBC's and the Individual Defendants' violations of Section 10(b) of the Exchange Act.  *See, e.g.,* Complaint ¶¶ 6, 258.  As stated in the FDIC complaint: "***Ryan exercised a dominant influence over the Bank's lending and financial statement processes, including personally handling a large portfolio of loans and tax credit investments and recklessly advancing tens of millions of dollars to borrowers without any***

*meaningful controls*."  *See* Complaint, *Federal Deposit Insurance Corporation v. Ernst & Young LLP, et al.*, Case No. 2:20-cv-01259 (E.D. La., filed April 22, 2020) (attached as Exhibit 2), ¶ 5.

24.     *Second*, the criminal charges, guilty pleas, FDIC report and case filing, and other sources provide significant new information and support for the Complaint's pleading of intentional and/or recklessly false and materially misleading statements that First NBC and Ryan made concerning the Company's tax credit business.  The tax credit business accounted for 48.2% and 48.5% of First NBC's reported net income in 2013 and 2014, respectively.  *See* Complaint ¶¶ 10, 56-57.  The charges and other newly available information *completely undermines* not only the Company's reported financial statements but also First NBC's and Ryan's statements during the Class Period that the net returns on the tax credit investments were "excellent and contribute to our strong earnings performance," was the "core" of the Company's business strategy, and that management had "a deep understanding of the business."  Complaint ¶¶ 11, 59, 128, 137, 139, 152, 158, 172, 179, 184, 192.

25.     *Third*, based on the fraud to which six First NBC lending customers (including one who also served as the Bank's General Counsel) have now pleaded guilty, *which pleas directly implicate former CEO Ryan as the mastermind and as a key participant of the fraudulent conspiracy*, as well as the criminal charges that have been asserted against Defendant Ryan and another Bank borrower, the new information provides further compelling support for the claims that the Company's accounting for the tax credit investments, its failure to recognize any impairments of its tax credit investments throughout most of the Class Period, and its failure to properly account for losses generated by its tax credit entities were all intentional and fraudulent.  *See* Complaint ¶¶ 72-75, 76-78.  The charges to which the six individuals have pleaded guilty – along with the criminal charges that have also now been lodged against Defendant Ryan, two other

former Bank executives, and one other Bank borrower – confirm that ***Ryan directed multiple new loans to be issued for numerous commercial loans that should have been designated as non-performing and for which reserves should have been taken, at the least, and that many of these actions were undertaken to fraudulently provide Defendant Ryan personally, and illegally, with millions of dollars and services***.  In furtherance of this scheme, Defendant Ryan concealed the overdrafts of a group of borrowers he personally monitored so that such overdrafts would not be reported to the Bank's board of directors, outside auditor or examiners.  The new loan proceeds were then used to pay down older loans to create a deceptive appearance that the older loans were current.

26.     ***Fourth,*** the criminal charges and FDIC complaint against the Bank's former auditor provide compelling evidence for the claims that the Company's operations and reporting done by CEO Ryan and CFO Verdigets in its commercial lending, including its lending in the oil and oil services industry, were also driven by fraud.  *See* Complaint ¶¶ 17-20, 91, 210-211, 233, 236(c).  Indeed, the FDIC complaint provides precise evidence that Ryan's fraudulent lending, reporting and accounting decisions extended to the Bank's lending to a large customer in the oil and oil services industry.  *See* ¶¶ 95-97, below.

27.     The new evidence, which relates to actions and events that occurred during the Class Period but was concealed by Defendants First NBC, Ryan and Verdigets, stems from the following documents and information that have come to light since the commencement of the Company's bankruptcy proceedings.

### The Criminal Investigations and Charges Against Defendant Ryan and Others

28.     The existence of a federal grand jury investigation concerning First NBC and Defendant Ryan, among others, was first reported in September 2017, after the stay of proceedings

went into effect. *See* Richard Thompson, *Federal grand jury opens probe into First NBC Bank meltdown, exploring bank's dealing with Gregory St. Angelo,* New Orleans Advocate (Sept. 2, 2017). The article stated that a federal grand jury had "opened a criminal inquiry into the $1 billion collapse of First NBC Bank … that failed earlier this year and was seized by regulators in the costliest collapse of an American bank since the height of the 2008-10 financial crisis, …." It noted Ryan's "high appetite for risk and his 'dominant influence' at the bank," and reported that the grand jury was "exploring the bank's dealings with Gregory St. Angelo, who served as First NBC's attorney." *See also Official Committee of Unsecured Creditors of First NBC Bank Holding Company v. Ryan, et al.,* Civil Action No. 19-10341, 2019 WL 3858953 (E.D. La., Aug. 16, 2019) (Order and Reasons staying civil action in light of "concurrent criminal investigations" into activities of First NBC, Ryan and others).

29.     Ultimately, on July 10, 2020, the United States Attorney's Office for the Eastern District of Louisiana ("USAO") filed criminal charges against former CEO Ryan, former Chief Credit Officer William J. Burnell, former loan officer Robert Brad Calloway, and a Bank borrower Frank J. Adolph, which charges are more fully described below at paragraphs 68-76. The press release issued by the USAO on July 10, 2020, is attached as Exhibit 3, and the Indictment for Conspiracy to Commit Bank Fraud, Bank Fraud, False Entries, and Notice of Forfeiture, Criminal No. 20-00065 (E.D. La., filed July 10, 2020), is attached as Exhibit 4. Laurie Younger, Special Agent in Charge, Dallas Region, Office of Inspector General for the FDIC, was quoted in the press release as stating: "This indictment is the product of a complex investigation involving multiple agencies over a long period." Other press releases issued by the USAO reported that related cases were investigated by the Federal Bureau of Investigation; the FDIC, Office of Inspector General; and the Board of Governors of the Federal Reserve System, Consumer Financial Protection

10

Bureau, Office of Inspector General.  *See, e.g.,* USAO Press Release, "New Orleans Hotel Owner

Charged With Conspiracy to Defraud First NBC Bank," June 15, 2020 (attached as Exhibit 5).

      30.     There was extensive news and media coverage of the Indictment and the preceding

criminal investigation.  *See, e.g.,* Anthony McAuley, "First NBC's former chief, Ashton Ryan,

indicted on bank fraud and conspiracy," NOLA.com (July 10, 2020); and "Ashton Ryan, founder

of First NBC Bank, indicted on bank fraud, conspiracy counts," WWLTV.com (July 9, 2010)

(accessible at: https://www.youtube.com/watch?v=Q9AznPRPN0U).

      31.     The press release of July 10, 2020, Exhibit 3 hereto, summarizes the criminal

charges against Ryan and the others, as follows:

### Three First NBC Executives Indicted For Fraud against Failed $5 Billion Bank

NEW ORLEANS – The United States Attorney's Office announced that a grand jury
indicted ASHTON J. RYAN, age 72, of Kenner; WILLIAM BURNELL, age 70, of
Kenner; ROBERT BRAD CALLOWAY, age 60, of Metairie; and FRANK J. ADOLPH,
age 60, of Kenner, for defrauding First NBC Bank, the New Orleans-based bank that failed
in April 2017.

According to the 46-count Indictment, from 2006 through April 2017, RYAN, BURNELL,
CALLOWAY, and ADOLPH conspired to defraud First NBC Bank (the "Bank") through
a variety of schemes. RYAN was the President and CEO of the Bank for most of its
existence. BURNELL was the Chief Credit Officer. CALLOWAY was an Executive Vice
President. ADOLPH was a borrower at the Bank who was charged with conspiring with
the three Bank executives to obtain loans based on false statements and forged documents.

The Indictment alleges that ***RYAN, BURNELL, CALLOWAY, ADOLPH, and others
conspired to defraud First NBC Bank by disguising the true financial status of certain
borrowers and their troubled loans, concealing the true financial condition of the Bank
from the Board, auditors, and examiners***. The borrowers included real estate developer
Gary Gibbs, real estate developer Kenneth Charity, Bank general counsel Gregory St.
Angelo, factoring business owner FRANK ADOLPH, hotel owner Arvind "Mike" Vira,
contractor Warren Treme, and contractor Jeffrey Dunlap. CALLOWAY was Gibbs's loan
officer, and RYAN served as the loan officer or oversaw the loan officers for all of those
borrowers. BURNELL approved the risk rating for all of these borrowers' loans and was
the gatekeeper tasked with protecting the safety and soundness of the Bank's loan portfolio.
***Dunlap, Charity, and St. Angelo have previously been charged in individual Bills of
Information with conspiracy to commit bank fraud, and all three have pled guilty. Vira,
Gibbs, and Treme have been charged more recently, in their own individual Bills of***

*Information, with conspiring to defraud First NBC Bank. All six of these borrowers are listed in the Indictment as members of the bank fraud conspiracy with RYAN, BURNELL, CALLOWAY, and ADOLPH.*

*During the course of the conspiracy, RYAN, BURNELL, and CALLOWAY repeatedly extended loans to borrowers who were unable to pay their loans without relying on loan payments to keep them current. To hide this practice, RYAN, BURNELL, and CALLOWAY made false statements in loan documents and elsewhere about the purposes of loans, the borrowers' abilities to repay those loans, and the sources of funds used to pay those loans. When the borrowers were unable to pay those loans, RYAN, BURNELL, and CALLOWAY made new loans to these same borrowers and then used the proceeds from those new loans to pay the existing loans. This created the false impression that the borrowers were able to pay their loans, when in fact they would not have been able to pay their loans without going further into debt through new borrowing from the Bank.* The new loans prevented these borrowers from appearing on lists that RYAN and BURNELL gave the Bank's Board each month, which would have highlighted that the borrowers were unable to make loan payments or had cash flow problems*. RYAN, BURNELL, and CALLOWAY also made false statements about the purpose of those loans, misrepresenting in Bank documents that the borrowers were able to pay loans with cash generated from the borrowers' businesses, when in fact the borrowers were only able to pay those loans with proceeds from new Bank loans.* The borrowers often spent the proceeds of these business loans on unrelated personal expenses, including by overdrawing their checking accounts at the Bank, and RYAN, BURNELL, and CALLOWAY paid these overdrafts by issuing new loans to the borrowers. *This practice kept the borrowers off of month-end overdraft reports to the Board and hid the borrowers' inability to pay their own expenses without new loan proceeds.*

*For certain loans, RYAN, BURNELL, and CALLOWAY included borrower documents in loan files despite knowing that the documents were false.* For example, even after RYAN and BURNELL learned that ADOLPH was submitting falsified documents to the Bank to inflate his collateral, RYAN and BURNELL continued to submit loans for ADOLPH that included the false documents. Similarly, even though RYAN, BURNELL, and CALLOWAY knew that Gibbs could not pay his loans with cash generated from his businesses, they continued to submit loan documents that included false documents showing that Gibbs's business earned enough cash to pay his loans at the Bank.

*When members of the Board or the Bank's outside auditors or examiners asked about loans to these borrowers, RYAN, BURNELL, and CALLOWAY made false statements about the borrowers and their loans, and left out the truth about the borrowers' inability to pay their debts without getting new loans. As a result, the balance on these borrowers' loans continued to grow. By the time regulators closed First NBC Bank in April of 2017, Gibbs owed the Bank $123 million; Charity owed $18 million; St. Angelo owed $46 million; ADOLPH owed $6 million; Vira owed $39 million; Treme owed $6 million; and Dunlap owed $22 million. The Bank's failure cost the Federal Deposit Insurance Corporation deposit insurance fund just under $1 billion.*

RYAN, BURNELL, and CALLOWAY each received millions of dollars in compensation from the Bank during the course of the conspiracy. *RYAN also received personal benefits from three of the borrower relationships. Vira lent millions of dollars to RYAN at the same time Vira was a borrower at the Bank, and RYAN and Vira conspired to hide their business dealings from the Board, auditors, and examiners. Treme was RYAN's partner in several businesses and real estate development projects, and RYAN used Treme's borrowing from the Bank as a way to spend Bank loan proceeds on RYAN's own projects. Even when parts of RYAN's business dealings with Vira and Treme were revealed to regulators, RYAN continued to conceal from regulators that he exercised authority over loans to Vira and Treme. Dunlap was a contractor for a business that RYAN and Treme ran, and RYAN used loan proceeds from Dunlap's business to benefit his own development project, Wadsworth Estates. RYAN never disclosed his business relationship with Dunlap to the Board, auditors, or examiners*. BURNELL was aware of this business relationship and also never disclosed it to the Board, auditors, or examiners. …

RYAN, BURNELL, CALLOWAY, and ADOLPH are each charged in Count 1 of the Indictment with conspiracy to commit bank fraud, in violation of Title 18, United States Code, Sections 1344 and 1349. RYAN, BURNELL, CALLOWAY, and ADOLPH are also charged with multiple instances of bank fraud, as listed in Counts 2 through 37, in violation of Title 18, United States Code, Section 1344. RYAN, BURNELL, and CALLOWAY are charged with making false entries in bank records, in violation of Title 18, United States Code, Section 1005, as listed in Counts 38 through 46. For each of the charged counts, the maximum penalties that may be imposed upon conviction are thirty years in prison; a fine of $1,000,000, or the greater of twice the gain to a defendant or twice the loss to any victim; up to five years of supervised release; and a $100 mandatory special assessment.

**The Felony Criminal Convictions Against Six Bank Borrowers**

32.    Criminal investigations since the closing of First NBC Bank have thus far resulted in felony charges being brought against six individuals – Jeffrey Dunlap, Gregory St. Angelo, Kenneth Charity, Gary R. Gibbs, Warren Treme and Arvind ("Mike") Vira – *who have pleaded guilty to at least certain of the charges against them*. Tellingly, in each of those cases, the actions of Defendant Ryan, who the USAO identified in charging documents as "Bank President A," and the actions of the Bank's former Chief Lending Officer, William J. Burnell, who has been identified as "Bank Officer B," are front and center.

13

**Criminal Proceedings Against First NBC Bank Customer, Jeffrey Dunlap**

33.     On May 14, 2018, the USAO brought charges against Jeffrey Dunlap, a borrower of First NBC Bank.  The Bill of Information charged that from March 2009 through April 2017, Dunlap and his contracting company had a banking relationship with First NBC Bank, and that during that timeframe, "Bank President A" (*i.e.*, Defendant Ryan) acted as the loan officer for Dunlap and his company.  It alleged that ***at Ryan's direction***, Dunlap submitted false financial statements and inflated accounts receivable on behalf of his company to justify incremental increases on its Letter of Credit (LOC), ***and that Ryan caused the false supporting documents to be placed in the Bank's records***.  It further alleged that Ryan "reviewed and approved new loans, lines of credit, and advances or incremental increases" for Dunlap and his company, and that even after Ryan stopped acting as the loan officer, "***he continued to exercise approval authority on their loans and lines of credit through in or around November 2016***."  The bogus loan documents, which were submitted at Ryan's direction, allowed Dunlap to secure a line of credit from the Bank of more than $22 million, which remained outstanding when the FDIC took over the Bank as Receiver.

34.     On October 17, 2018, Dunlap pleaded guilty to one count of conspiracy to defraud First NBC Bank.  A 10-page Factual Basis, which was filed in *U.S. v. Dunlap,* Case 2:18-cr-00099-ILRL-JVM (E.D. La.) on October 17, 2018 and agreed to and signed by the USAO and Dunlap, ***provides extensive evidence of the criminal actions that Ryan and Dunlap undertook from approximately July 2009 through November 2016***, which match in all material respects the allegations in the Bill of Information.  In addition, the Factual Basis disclosed for the first time that: (a) two companies jointly owned by Defendant Ryan and Chief Lending Officer Burnell (Company A and Company C in the Factual Basis) benefited directly from the extensions of loans

14

and loan renewals to Dunlap and his company, which provided construction services for Company A; (b) Ryan and his administrative staff kept a list of problem borrowers who consistently had overdrafts on their deposit accounts, which Ryan – who was the loan officer for these borrowers – directed his staff to monitor on a daily basis; (c) the staff referred to the borrowers by the acronym "D.O.R.K.S.," because each of the letters represented a different borrower (Dunlap was the "D"); and (d) the daily monitoring ensured that the D.O.R.K.S. were not on the month-end overdraft report to the Board.  As stated in the Factual Basis: "***By concealing the D.O.R.K.S.'s overdrafts, [Ryan] hid the true status of their loans from the Board, bank regulators, and investors***."  Based on the Factual Basis and other sources, to this point we have been able to identify Dunlap as the "D", Charity as the "K", and St. Angelo as the "S" in D.O.R.K.S.

35.    The Factual Basis further states that between 2009 and November 2016, ***Ryan "instructed DUNLAP to inflate his accounts receivable in order to increase the borrowing base of the LOC***," and assured Dunlap that his company's obligation to repay the LOC would be resolved when Company A [which was jointly owned by Ryan and Burnell] completed and sold a 100-acre subdivision Company A was developing.  Further, as admitted in the Factual Basis, ***Ryan told Dunlap that he "did not need to age his accounts receivable," which directly "contradicted bank policy and bank documents that DUNLAP signed, …, which prohibited the bank from relying on accounts receivable to calculate a borrowing base if they had not been paid in full within 90 days***."  Ryan also instructed Dunlap "that he could list potential work as accounts receivable, as well as potential change orders," which was not how to properly and truthfully list accounts receivables.   Finally, the Factual Basis identifies specific transactions and communications between Dunlap and Ryan from July 2009 to December 2016 that were taken in furtherance of the conspiracy to which Dunlap pleaded guilty.

36.     Copies of the USAO's press release of May 15, 2018 (announcing the charges), the Bill of Information filed May 14, 2018, the USAO's press release of October 17, 2018 (announcing the guilty plea), and the Factual Basis filed October 17, 2018 are attached as Exhibits 6, 7, 8 and 9, respectively.

**Criminal Proceedings Against First NBC Bank's Former General Counsel and Bank Customer, Gregory St. Angelo**

37.     On March 22, 2019, the USAO brought charges against Gregory St. Angelo, who served as the General Counsel of First NBC Bank from approximately September 2006 through September 2016. During that time, St. Angelo and several businesses owned or controlled by him were also First NBC borrowers. The Bill of Information alleged that ***St. Angelo, "Bank President A" [Ryan] and Bank Officer B [Burnell], and others, provided the Bank with materially false and fraudulent documents and personal financial statements*****,**" which among other things, overstated the value of St. Angelo's and his affiliated entities' assets and understated their liabilities. ***Describing St. Angelo, Bank President A, and Bank Officer B as conspirators, the press release issued by the USAO stated that the purpose of the conspiracy was for St. Angelo, Ryan and Burnell "to enrich themselves unjustly***." It described that Ryan, Burnell and others disguised St. Angelo's and his affiliated entities' true financial condition by, among other things, issuing new loans to pay older loans that St. Angelo was unable to repay and to cover his overdrafts. ***Echoing allegations in Lead Plaintiffs' Complaint, the charges against St. Angelo alleged that the new loans then appeared to be current, while in reality, the new loans were designed to avert the downgrading or impairment of St. Angelo's and his entities' loans and to avoid reporting them as nonperforming or losses to the Bank***. The Bill of Information further alleged that on multiple occasions, Ryan, St. Angelo and others executed false documents to make it appear that the payments to St. Angelo were legitimate.

16

38.     By April 28, 2017, when the FDIC took over First NBC Bank, the Bank had advanced approximately $46 million to St. Angelo and his affiliated entities based on the false personal financial statements and other fraudulent documents, and had further paid St. Angelo an additional $9.6 million for false tax credit investments.

39.     On June 28, 2019, St. Angelo pleaded guilty to conspiring to defraud the Bank, after signing and agreeing to a 22-page Factual Basis that was filed in the criminal action against him, *U.S. v. St. Angelo*, 2:19-cr-00055-CJB-JCW (E.D. La.).  As with the Factual Basis signed by Jeffrey Dunlap, the Factual Basis that St. Angelo and the USAO signed confirmed the material allegations in the Bill of Information.  It described St. Angelo's banking relationship with First NBC Bank, including his dealings with Defendant Ryan and Chief Lending Officer Burnell, as well as the services that St. Angelo provided to the Bank as its General Counsel.  ***The Factual Basis also described the sweeping fraud that St. Angelo and Ryan, among others, undertook, which included: (a) creating and placing false risk ratings in the Bank's records related to the loans that St. Angelo and his affiliated entities applied for and received, including how the conspirators utilized the monies that First NBC Bank paid to St. Angelo for his services as General Counsel to justify additional loans that were made to him, even though the payments for his services were very rarely used to make loan payments; (b) creating and submitting false personal financial statements to support the loans made to St. Angelo and his affiliated entities, which statements overstated his assets and understated his liabilities, and which were further used to "mislead the FDIC and LOFI examiners into thinking that ST. ANGELO's net worth was greater than it was"; (c) presenting false statements about the purposes of loan applications, which the Factual Basis states were executed by Ryan, Burnell, St. Angelo and others "knowing the stated purpose was false"; (d) conspiring between 2006 and 2017 to permit St. Angelo to use***

*"Nominee Loan" proceeds to cover his and his affiliated entities' loan payments and overdrafts; and (e) conspiring to cause the Bank to disburse money to St. Angelo and his affiliated entities "under the guise that the bank was investing in tax credits that ST. ANGELO and the Entities owned," when, in reality, neither St. Angelo nor the Entities ever earned any tax credits and First NBC Bank "never had any basis to obtain any tax credits from ST. ANGELO 's or the Entities' properties.*"

40.     The Factual Basis states that in total, between July 2010 and June 2015, Ryan and St. Angelo entered into eight agreements entitled "Agreements to Purchase Tax Credits" for an entity called 622 Conti, LLC.  As St. Angelo admitted in the Factual Basis: "*These fake tax credit purchase agreements were designed to conceal the fact that [Ryan] was funneling First NBC Bank funds to ST. ANGELO to cover his overdrafts and make loan payments.*"  Moreover, St. Angelo "falsely signed the document as "Managing Member" of 622 Conti, LLC *even though he and Bank President A knew that ST. ANGELO was not, and never was, a member of 622 Conti, LLC.*"  Further with respect to Conti 622, LLC: "For each agreement listed above, bank records demonstrate that funds were debited from First NBC Bank's general ledger and transferred to ST. ANGELO or the Entities' First NBC deposit accounts.  *These debits from the First NBC Bank general ledger were approved by Bank President A and Bank Officer B.*"  Indeed, as the Factual Basis further states, even after Ryan and St. Angelo were advised by the Bank's outside counsel that the potential tax credits in 622 Conti, LLC could not be claimed because St. Angelo "neither owned the property nor had a long enough lease," *Ryan submitted "additional false documents to First NBC Bank based on the false representation that ST. ANGELO was entitled to tax credits for 622 Conti.*"

41.     The Factual Basis identifies similar fraudulent acts by Ryan, Burnell and St. Angelo relating to two other properties: a building at 616 Girod Street, in New Orleans; and a restaurant named "Annadele" on Chestnut Street, in Covington.  For these properties, similar Agreements to Purchase Tax Credits were signed, but even though the documents purported that First NBC Bank would advance funds in exchange for a 99% ownership interest in these two entities, in fact, in or about March 2016, St. Angelo "sold the property located at 616 Girod Street, before First NBC Bank could claim the tax credits it had purchased" and St. Angelo "never applied for tax credits for either property."  As the Factual Basis further admits, **_Ryan and St. Angelo executed three false tax credit purchase agreements that purported to be investments relating to Annadele and 616 Girod, but the disbursements "were used to cover overdrafts and loan payments_**."

42.     The Factual Basis that St. Angelo signed provides an extensive array of false and fraudulent actions taken by St. Angelo, Ryan and others, with highly specific statements of what occurred and when the actions were taken.  Thus, the Factual Basis provides exacting evidence that goes to the heart of the claims made in Lead Plaintiffs' Complaint.

43.     Copies of the USAO's press release of March 22, 2019 (announcing the filing of charges), the Bill of Information filed March 22, 2019, the USAO's press release of July 2, 2019 (announcing the guilty plea), and the Factual Basis filed on June 28, 2019 are attached as Exhibits 10, 11, 12 and 13, respectively.

**Criminal Proceedings Against First NBC Bank Customer, Kenneth Charity**

44.     On May 15, 2019, the USAO brought charges against Kenneth Charity, another borrower of First NBC Bank, for conspiracy to commit fraud.  Charity was a developer and client of the Bank for more than a decade.  The charges alleged that Charity used front companies and conspired with "Bank President A" to submit false documents to obtain loans that totaled $18

million by the time the Bank collapsed in April 2017.   As stated in the U.S. Attorney's press release of May 17, 2019, "*the purpose of the conspiracy was for CHARITY, Bank President A, and others to unjustly enrich themselves, disguise the true financial status of CHARITY and [his affiliated entities], conceal the accurate performance, and misrepresenting the purpose of the loans made to KENNETH CHARITY and the Entities*."

45.     The Bill of Information charged that Charity, *with Ryan's knowledge*, falsely claimed assets from his father's trust and further falsely claimed that companies Charity controlled were owed millions of dollars from a government program, whereas the supposed assets were, in truth, only possible grant proceeds.  As with Dunlap and St. Angelo, the Bill of Information alleged that Ryan helped Charity to file false financial reports in order to receive new loans to pay off old loans – despite Ryan knowing that Charity was insolvent.  As stated in the Bill of Information, *Ryan "was well aware that CHARITY was unable to repay his loans, yet Bank President A continued to falsely represent in bank records that CHARITY and his entities were profitable*."

46.     Charity pleaded guilty to conspiracy to commit bank fraud on July 30, 2019, and signed and agreed to a Factual Basis filed that day in *U.S. v. Charity,* Case 2:19-cr-00090-LMA-JVM (E.D. La.).  As stated in the Factual Basis: "By their signatures below, the parties expressly agree that there is a factual basis supporting the defendant's guilty plea."  As with the others, the Factual Basis states that Charity had a banking relationship with First NBC Bank, and that Ryan acted as Charity's loan officer.  It identified companies with which Charity was affiliated, referred to as the "Entities."  It identified the purpose of the conspiracy to allow Charity, Ryan and others "to disguise the true financial condition of CHARITY and the Entities' by renewing and increasing loans, paying mature loans with new loans, making loan payment with loan proceeds, and using

loan proceeds to cover overdrafts.  This practice made it falsely appear that CHARITY and the Entities' loans were current and that they had no overdrafts."

47.     In describing Charity's and Ryan's relationship, the Factual Basis states: "As was the case with a select group of borrowers at First NBC Bank, Bank President A was CHARITY's loan officer and CHARITY and his Entities *enjoyed a special status at the bank where Bank President A and others regularly circumvented the bank's loan policies to funnel money to uncreditworthy and unqualified borrowers."*  The Factual Basis identified Charity as the "K" in the acronym "D.O.R.K.S.," which was used to identify problem borrowers who consistently had overdrafts of their deposit accounts, but which Ryan "fraudulently cured … by applying loan proceeds to pay the overdrafts, therefore making it appear that these borrowers were servicing their accounts and had sufficient cash flow to pay their recurring bills."   As further stated: "*Bank President A's practice of covering CHARITY's overdrafts was particularly problematic because of his personal knowledge of CHARITY's excessive spending and use of loan proceeds to finance his lifestyle*," which the Factual Basis said in various places included using the proceeds for travel, car purchases, clothing, Charity's children's private school tuition, country club dues, jewelry, and other luxury items.

48.     The Factual Basis also notes the particular attention that Ryan paid to Charity's loans, as follows:

> Bank President A, CHARITY's loan officer, would monitor the status of CHARITY's accounts on a monthly basis by taking CHARITY-related "homework" to his house at night to review.  Bank President A completed monthly analyses of CHARITY's accounts, detailing the date, payee, and amount of all transactions and whether they were business or personal.  He would also identify loan payments due and overdrafts.  *He directed his assistants to the specific funds they should use to pay the Charity Loans and overdrafts.  Documents show that Bank President A reconciled CHARITY's accounts down to the dollar and was well-aware that CHARITY did not spend and demonstrated no intention of spending the loan proceeds for the approved purpose.*

The Factual Basis further stated: "In heated exchanges with CHARITY, Bank President A frequently acknowledged CHARITY had insufficient cash flow to pay his loans at the bank. *Despite this, Bank President A never put CHARITY in default status or foreclosed on any of his collateral*." Indeed, in an email that Ryan sent to Charity on January 30, 2013, Ryan wrote: "The way I see it any other bank would have foreclosed on you years ago if you indeed could get a loan from them in the first place." Yet, even after writing this, Ryan continued to have the Bank lend Charity and his affiliated entities funds totaling more than $5.2 million.

49.     The Factual Basis also (a) identifies by date and amounts the false personal financial statements that Charity and Ryan "knowingly and intentionally submitted … about CHARITY's assets to First NBC Bank" in support of loans, *which both Charity and Ryan "well-knew" were false*, going so far as noting the facts that *Ryan prepared a 2011 Tax Return for Charity and his wife for Charity's First NBC Bank loan file, even though IRS records show that Charity "did not file a tax return in 2011"*; and (b) identifies how Ryan and Charity disguised Charity's true financial condition by issuing new loans to Charity and his entities, which would pay older loans that Charity was unable to repay (a practice called "Loan Masking"), while the new loans would then appear to be current and performing and the old loans appeared to have been paid.

50.     The Factual Basis further detailed (a) false statements and loan payments and extensions made with respect to rental properties for which Charity obtained Bank loans but that Ryan "was aware that CHARITY was not renting many of these properties and spent loan proceeds meant to renovate the properties on personal expenses"; (b) loans provided for development of a Lake Terrace Shopping Center, which was never developed and was cited for blight while Charity owned it, until 2016, when it was sold, but as late as December 2015, "*Bank President A falsely*

*and fraudulently represented to an auditor that the shopping center was under construction or close to being finished*"; and (c) that Charity and Ryan "also lied about the status of another loan and development project" at 620 Decatur Street in the French Quarter, with regard to which, among other things, "*Records show that Bank President A approved 1.2 million dollars for a $350,000 enclosure that Bank President A knew CHARITY never started and never completed*."

51.     Finally, as with other fraudulent borrowers, the Factual Basis identifies Nominee Loans that were made by the Bank after, in some instances, Ryan had his employees "book" without receiving required signatures, and with the proceeds of the loans going to Charity or into bank accounts owned by him, rather than going to the nominee.  As stated in the Factual Basis: "CHARITY's status at First NBC Bank and his poor credit rating would have made it difficult for CHARITY to obtain these loans had they not been in Nominee D's name."

52.     Copies of the USAO's press release of May 17, 2019 (announcing the charges), the Bill of Information filed May 15, 2019, the USAO's press release of July 30, 2019 (announcing the guilty plea), and the Factual Basis filed on July 30, 2019 in *U.S. v. Charity,* Case 2:19-cr-00090-LMA-JVM (E.D. La.) are attached as Exhibits 14, 15, 16 and 17, respectively.

**Criminal Proceedings Against First NBC Bank Customer, Gary R. Gibbs**

53.     The criminal investigation into First NBC Bank customer Gibbs first came to light in September 2019.  On September 7, 2019, an article in NOLA.com by Anthony McAuley, "*Mississippi developer alleged to be major player in loans that brought down First NBC Bank*," reported on a notice that the FDIC filed in early September 2019.  The article stated that Robert Brad Calloway, a former loan officer and chief credit officer at First NBC Bank, "submitted false or misleading documentation in order to make a series of loans to Diamondback, Mississippi-based businessman Gary R. Gibbs that totaled $123 million at the time of the New Orleans bank's

collapse." The article reported that the FDIC filing said that Calloway, **along with Ryan**, got the loans to Gibbs approved "***when they knew he didn't have the necessary collateral, and that they also knew the money was being used by Gibbs to cover payments on existing loans instead of for Gibbs' business expenses, as was represented to the bank's loan committee.***" It further reported "Gibbs and one of his top lieutenants have been subpoenaed by federal investigators to provide documents in relation to the bank's collapse, according to people with direct knowledge of the investigation." The FDIC case against Calloway includes documents that purport to show that Gibbs and his affiliated entities had borrowed more than $161 million from the Bank without sufficient collateral. A copy of the September 7, 2019 article is attached as Exhibit 18.

54.     The FDIC complaint against Ernst & Young, the Bank's former auditor, described below at paragraphs 82-91 and attached as Exhibit 2, provides further evidence of Defendant Ryan's active involvement in the fraudulent lending to Gibbs.

55.     On July 1, 2020, the USAO filed criminal charges against Gibbs in a Bill of Information. The USAO issued a press release the same day, summarizing the charges as follows (utilizing Bank President A to refer to Ryan, Bank Officer B to refer to Burnell, and Bank Officer C to refer to Calloway):

### Developer Charged With Conspiracy to Defraud First NBC Bank Out Of Over $123 Million

NEW ORLEANS – The United States Attorney's Office announced that GARY R. GIBBS ("GIBBS"), age 66, a resident of Niceville, Florida, was charged today with conspiracy to defraud First NBC Bank, the New Orleans-based bank that failed in April 2017.

According to the Bill of Information, ***from in or around 2010 through April 2017, GIBBS had a banking relationship with First NBC Bank, individually and through various corporate entities he controlled. During that time, GIBBS and his entities were regularly unable to pay existing loans or overdrafts on First NBC Bank accounts. Bank President A, Bank Officer B, and Bank Officer C disguised GIBBS's and his entities' true financial condition by making new loans to pay GIBBS's existing loans and to cover his overdrafts. They falsely stated in loan documents that GIBBS was able to pay his loans***

*with cash generated by his businesses, and they hid from the First NBC Bank Board of Directors, auditors, and examiners that GIBBS was only making his existing loan payments by getting new loans from First NBC Bank. Bank President A, Bank Officer B, and Bank Officer C hid the fact that they actually made loans to GIBBS to keep him and his entities off of month-end reports* to the Board, auditors, and examiners. These month-end reports listed borrowers who were not paying their loans or whose accounts were overdrawn. By keeping GIBBS and his entities off of those reports, Bank President A, Bank Officer B, and Bank Officer C were able to hide their scheme to keep lending to GIBBS despite his inability to pay his loans.

*When GIBBS told Bank President A and Bank Officer C that he was considering filing bankruptcy or not paying his loans, Bank President A told GIBBS that First NBC Bank could not afford for GIBBS to default on the loans. After that, Bank President A and Bank Officer C continued to make false statements and material omissions in loan documents to hide from the Board, auditors, and examiners that the purpose of the new loans was to keep GIBBS and his entities from defaulting and that, in reality, GIBBS was not able to make his payments to the bank without receiving proceeds from new loans*. Neither Bank President A nor Bank Officer C ever disclosed to the Board, auditors, or examiners that GIBBS was considering defaulting on his loans or filing bankruptcy, because that would have revealed that GIBBS did not generate enough cash to pay his loans.

To hide their scheme, Bank President A directed GIBBS to inflate certain financial statements that GIBBS provided to First NBC Bank, by falsely increasing the income of GIBBS's entities to hide the amount of money these entities were losing. Bank President A did not tell the Board, auditors, or examiners that GIBBS inflated his financial statements at Bank President A's direction. Bank Officer C also made false statements to First NBC Bank's external auditors about GIBBS and the GIBBS loans. By the time First NBC Bank failed in April of 2017, GIBBS and his entities owed the bank over $123 million.

56.     And on August 26, 2020, the USAO issued a press release and filed a Factual Basis statement in which Gibbs pleaded guilty to defrauding First NBC Bank out of over $123 million and admitted to the facts summarized in the July 1, 2020 press release and included in the Bill of Information. The press release of August 26, 2020, announcing the guilty plea, stated that Ryan, Burnell and Calloway "disguised **GIBBS's** and his entities' true financial condition by making new loans to pay **GIBBS's** existing loans and to cover his overdrafts. They falsely stated in loan documents that **GIBBS** was able to pay his loans with cash generated by his businesses, and they

hid from the First NBC Bank Board of Dfirectors, auditors, and examiners that **GIBBS** was only making his existing loan payments by getting new loans from First NBC Bank." It further stated:

> When **GIBBS** told Ryan and Calloway that he was considering filing bankruptcy or not paying his loans, Ryan told **GIBBS** that First NBC Bank could not afford for **GIBBS** to default on the loans. After that, Ryan, Burnell, and Calloway continued to make false statements and material omissions in loan documents to hide from the Board, auditors, and examiners that the purpose of the new loans was to keep **GIBBS** and his entities from defaulting and that, in reality, GIBBS was not able to make his payments to the bank without receiving proceeds from new loans. Neither Ryan nor Calloway ever disclosed to the Board, auditors, or examiners that **GIBBS** was considering defaulting on his loans or filing bankruptcy, because that would have revealed that **GIBBS** did not generate enough cash to pay his loans.
>
> To hide their scheme, Ryan directed **GIBBS** to inflate certain financial statements that **GIBBS** provided to First NBC Bank, by falsely increasing the income of **GIBBS's** entities to hide the amount of money these entities were losing. Ryan did not tell the Board, auditors, or examiners that GIBBS inflated his financial statements at Ryan's direction. Calloway also made false statements to First NBC Bank's external auditors about **GIBBS** and his loans. By the time First NBC Bank failed in April of 2017, **GIBBS** and his entities owed the bank over $123 million.

The USAO's press release and Bill of Information against Gibbs of July 1, 2020, are attached as Exhibits 19 and 20; the press release issued on August 26, 2020 and the Factual Basis filed in *U.S. v. Gibbs* on August 26, 2020 are attached as Exhibits 28 and 29.

**Criminal Proceedings Against First NBC Bank Customer, Arvind Vira**

57.    On June 15, 2020, the USAO filed criminal charges against Vira. According to the USAO, Defendant Ryan served as Vira's de facto loan officer and "ensured that **VIRA** received beneficial interest rates on savings accounts, checking accounts, and loans." The USAO's press release and Bill of Information against Vira of June 15, 2020, are attached as Exhibits 5 and 21.

58.    In return, according to the USAO charges, Vira agreed to make loans to Ryan, which Vira agreed to keep concealed from employees of First NBC Bank at the direction of Ryan. As the USAO press release further states:

According to the Bill of Information, from in or around April 2010 through April 2017, VIRA had a banking relationship with First NBC Bank, individually and through his companies.  During that time, Bank President A acted as VIRA'S de facto loan officer and ensured that VIRA received beneficial interest rates on savings accounts, checking accounts, and loans.  ***In return, VIRA agreed to make loans to Bank President A.  VIRA agreed to keep these loans to Bank President A concealed from employees of First NBC Bank at the direction of Bank President A.  Bank President A likewise concealed this relationship from others at First NBC Bank and from Federal Deposit Insurance Corporation (FDIC) examiners***.

***The Bill of Information also alleges that, at the direction of Bank President A, VIRA inflated his own assets on financial statements that he submitted to First NBC Bank in support of his loans.  As a result, VIRA and Bank President A were able to defraud First NBC Bank by using nominee loans to funnel money to Bank President A without bank or regulatory scrutiny***.

59.     An article by Anthony McAuley, "To defraud First NBC, a Kenner hotelier conspired with the bank's former CEO, feds say," NOLA.com (June 15, 2020) (attached as Exhibit 22), noted the significance of the Bill of Information filed against Vira, who was described as the owner of a number of budget hotels in the New Orleans area, including a Holiday Inn, Quality Inn and Econo Lodge on the West Bank, and a Holiday Inn on Causeway Boulevard in Metairie.  First, the conspiracy charge alleged that Vira borrowed money from First NBC Bank and then loaned some of that money back to Ryan, while concealing the relationship.  Second, the article noted that the charge against Vira "is only the latest in a series of fraud charges stemming from the failure of First NBC," following the guilty pleas from St. Angelo, Dunlap and Charity.  It further noted that the charges against Vira and Dunlap (to which Dunlap pleaded guilty) "are especially significant because both had private business relationships with Ryan, and they both appear poised to testify that Ryan extended them bank credit in order to help himself financially – which could be a key component of a criminal trial."

60.     As the article further reported:

In one example laid out in charging documents, Vira had borrowed $5 million from First NBC Bank at the end of 2009 and then seven months later lent back $400,000 to Ryan to

pay Ryan's property taxes on a property he owned, Lake Forest Plaza.  The business arrangement was not disclosed to bank employees, as required by federal banking law, prosecutors said.

The following year, Ryan arranged for a favorable interest rates on several of Vira's checking accounts and raised his lending limit to $9 million, prosecutors alleged.  Later that year, Vira lent another $2 million to Ryan, they said.

The pattern continued right up to the end of 2016, and both parties continually lied on supporting documentation to keep the conspiracy concealed, the U.S. Attorney's Office alleges.

61.    On September 17, 2020, Vira pleaded guilty to the charges against him.  The USAO's press release and the Factual Basis are attached, respectively, as Exhibits 30 and 31.  The press release summarized Vira's guilty plea, as follows:

> According to court documents, in 2006, Ryan lobbied VIRA to move his business accounts to First NBC Bank.  VIRA agreed and became a customer of First NBC Bank.  Thereafter, Ryan provided VIRA with preferential treatment.  Although VIRA was assigned another loan officer, Ryan acted as his de facto loan officer at the bank.  Ryan provided VIRA with low interest rates for VIRA's loans.  He also ensured that VIRA received high interest rates on his savings and checking accounts.  Ryan personally approved 3% interest rates for savings and checking accounts held by VIRA, his businesses, and his family members.  Ryan instructed VIRA to inflate his assets on bank loan documents, and VIRA complied by claiming to have substantial real estate and outside bank accounts that did not exist.
>
> VIRA, in turn, provided personal loans to Ryan at Ryan's request.  Ryan, knowing that such a loan relationship was prohibited by banking regulations, instructed VIRA to conceal this personal loan relationship from First NBC Bank employees.  During an FDIC regulatory exam in December 2012, FDIC examiners discovered that Ryan had borrowed money from First NBC Bank using VIRA's loan proceeds.  When examiners questioned him, Ryan admitted to their relationship, but claimed that he had not been aware that the source of the funds were First NBC Bank loan proceeds.
>
> In order to further conceal the loans that he made to Ryan, VIRA misrepresented or omitted the interest payments he received from Ryan on his personal tax returns from 2011 through 2015.  From 2011 through 2017, VIRA received approximately $1,220,271.07 in profits from Ryan's interest payments and from Ryan's preferential treatment at First NBC Bank.

62.    The same day, NOLA.com published an article about the guilty plea.  *See* Anthony McAuley, "In First NBC case, this Kenner hotelier pleads guilty to bank fraud*,"* NOLA.com (Sept. 17, 2020) (accessible at: https://www.nola.com/news/business/article_8b9b35be-f931-11ea-8657-878b92979768.html).  As reported in the McAuley article, Vira's guilty plea followed guilty pleas of Dunlap, St. Angelo, Cherry, Gibbs and Treme, leaving a seventh First NBC customer, Frank Adolph, as well as Ryan, Burnell and Calloway, still facing charges.  The article further noted:

> The case against Vira resembles those against other defendants. The government alleges he filed documents claiming fictitious assets in order to borrow money, increasingly to cover up that he couldn't pay back previous loans.
>
> Prosecutors allege Ryan lured Vira to First NBC with promises of preferential treatment on loans and investments, then persuaded Vira to inflate his assets on bank loan documents by claiming substantial real estate and outside bank accounts that didn't exist.
>
> Ryan then got Vira to loan money back to him, knowing that such a relationship was prohibited by banking regulations, prosecutors allege.

*Id.*

### Criminal Proceedings Against First NBC Bank Customer, Warren Treme

63.    The USAO brought criminal charges against Treme on July 9, 2020, and issued a press release about the Bill of Information the same day.  The USAO's press release and Bill of Information against Treme of July 9, 2020, are attached as Exhibits 23 and 24.

64.    Again emphasizing sharp conflicts of interest that Ryan concealed with respect to another First NBC Bank borrower, the press release summarized the charges against Treme, as follows (referring to Ryan as Bank President A and Burnell as Bank Officer B):

### Developer Charged With Conspiracy to Defraud First NBC Bank over $6 Million

NEW ORLEANS – The United States Attorney's Office announced that WARREN G. TREME ("TREME"), age 55, a resident of Metairie, Louisiana, was charged July 8, 2020 with conspiracy to defraud First NBC Bank, the New Orleans-based bank that failed in April 2017.

According to the Bill of Information, from in or around 2008 through April 2017, TREME had a banking relationship with First NBC Bank, individually and through various entities he controlled. *TREME also co-owned several entities with Bank President A. Because of this conflict of interest, Bank President A should not have been involved with TREME's loans. However, Bank President A exercised authority over TREME's loans with Bank Officer B. Throughout his borrowing relationship at First NBC Bank, TREME lacked sufficient income and cash flow from his businesses to pay his loans and personal expenses. Bank President A and Bank Officer B disguised TREME's true financial condition by making new loans to pay TREME's existing loans*.

The Bill of Information further describes a scheme by Bank President A and Bank Officer B to take $400,000 from TREME's business partners as part of a settlement. Rather than using the $400,000 to pay down an outstanding loan debt owed by TREME and his business partners, Bank President A and Bank Officer B gave $300,000 to TREME. TREME spent the money on gambling, a trip to the Caribbean, and expenses related to a real estate development company TREME co-owned with Bank President A. During a subsequent Board meeting, Bank President A and Bank Officer B falsely stated that the $300,000 was used to pay down the outstanding loan debt owed by TREME and his business partners.

The Indictment further alleges that during a subsequent Board meeting, Ryan and Burnell falsely stated that the $300,000 was used to pay down the outstanding loan debt owed by Treme and his business partners.

65.    An article by Anthony McAuley, "In First NBC case, feds charge sixth alleged conspirator with bank fraud," NOLA.com (July 9, 2020) (attached as Exhibit 25), noted that Treme was the third former First NBC Bank client to be charged by the USAO since mid-June 2020.  It further reported that the allegations against Treme "follow a pattern similar to that laid out in the previous charges brought and support the [sic] prosecutor's theory of the conspiracy: that a vast web of fraud was orchestrated by the bank's chief executive to cover mounting bad loans as well as side deals he was involved in and led ultimately to the bank's demise."  It further reported that based on the allegations, "Treme obtained millions of dollars in loans by filing documentation that all three [Treme, Ryan and Burnell] knew to be false."

66.     The article also summarized allegations in the Bill of Information that related to Wadsworth Estates, a 161-acre Mandeville land development deal that Ryan had been involved with since the early 2000s.  As stated in the article: "The prosecutor alleges that Ryan never disclosed his relationship with Treme in the land deal to the bank's board and at the same time oversaw and approved loans to Treme."  The article further cited to the USAO's allegations that Ryan and Burnell "knowingly and intentionally diverted loan proceeds from Treme's loans to benefit Wadsworth Estates, a real estate development project jointly owned by Treme and (Ryan). … These actions benefited Treme by, among other things, preventing Treme from being forced into default and the bank from declaring a loss."

67.     On September 2, 2020. Treme pleaded guilty to the charges against him.  The USAO's press release about Treme's guilty plea and the Factual Basis are attached, respectively, as Exhibits 32 and 33.  The press release summarized the guilty plea, as follows:

> According to court documents, from in or around 2008 through April 2017, TREME had a banking relationship with First NBC Bank, individually and through various entities he controlled. TREME also co-owned several entities with Ashton J. Ryan ("Ryan"), President of First NBC Bank. Because of this conflict of interest, Ryan should not have been involved with TREME's loans. However, Ryan exercised authority over TREME's loans with William J. Burnell ("Burnell"), the Bank's Chief Credit Officer. Throughout TREME's borrowing relationship at First NBC Bank, TREME lacked sufficient income and cash flow from his businesses to pay his loans and personal expenses. Ryan and Burnell disguised TREME's true financial condition by making new loans to pay TREME's existing loans. …

> Court documents further describe a scheme by Ryan and Burnell to take $400,000 from TREME's business partners as part of a settlement. Rather than using the $400,000 to pay down an outstanding loan debt owed by TREME and his business partners, Ryan and Burnell gave $300,000 to TREME. TREME spent the money on gambling, a trip to the Caribbean, and expenses related to a real estate development company TREME co-owned with Ryan. During a subsequent Board meeting, Ryan and Burnell falsely stated that the $300,000 was used to pay down the outstanding loan debt owed by TREME and his business partners.

**Criminal Proceedings Against First NBC Bank Customer, Frank J. Adolph**

68.     The USAO brought criminal charges against Adolph on July 10, 2020, as part of the Indictment filed that day against Ryan, Burnell, Calloway and Adolph.  The Indictment charges that Adolph was a businessman and borrower at First NBC Bank individually and through related entities, including Metro Rediscount, and that his loans were secured, in part, by accounts receivable from his factoring business.  By the time the Bank closed, Adolph and his related entities owed the Bank approximately $6.1 million.  *See* Indictment dated July 10, 2020 (Exhibit 4), ¶ 12 (page 4).  It further alleges, in Section C of the Indictment, entitled "The Scheme and Artifice to Defraud," that Adolph was a borrower at the Bank from in or around August 2008 through April 2017, and that while Ryan was not Adolph's loan officer, Ryan signed Adolph's loan documents as an approving officer.  *Id.* ¶ 30 (pages 13-14).

69.     The Indictment charges that Adolph submitted false documentation to the Bank to obtain loans, including a forged bank statement that gave the false impression that Metro Rediscount was receiving payments from companies that were not actually in business with Adolph.  An outside auditor hired by Adolph's loan officer at the Bank uncovered that the accounts receivable did not exist.  As stated in the Indictment, by February 2014, Adolph's loan officer "repeatedly alerted **RYAN** and **BURNELL** about **ADOLPH's** fraudulent accounts receivable and warned them that **ADOLPH** was living beyond his means and could not pay his debt to the Bank." *Id.* ¶ 35 (page 15).  The Indictment continues:

> Despite their knowledge of **ADOLPH's** fraudulent representations to the Bank, **RYAN** and **BURNELL** chose to approve additional loans for **ADOLPH**, and failed to alert the Board, auditors, or examiners about **ADOLPH's** fraudulent accounts receivable.

> Between in and around December 2013 and September 2015, **RYAN** and **BURNELL** recommended, authorized, and approved approximately $5.8 million in new loans, renewals with increases and consolidated loans to **ADOLPH**, despite being aware of **ADOLPH's** fraud.  Although the stated purpose of many of the loans was to finance the working capital needs of Metro Rediscount or to finance Metro Rediscount's accounts receivable, **RYAN** and **BURNELL** knew the loan documents were fraudulent.

>   **RYAN** and **BURNELL** included **ADOLPH's** false accounts receivable in loan documents despite their knowledge that the accounts receivable were fraudulent and that they gave the false impression that **ADOLPH** could pay his loans.

*Id.* ¶¶ 35-37 (page 15).

### The Criminal Charges Against Defendant Ryan

70.     As noted in ¶¶ 22 and 28-31 above, the USAO brought criminal charges on July 10, 2020, against Ryan, Burnell, Calloway, and Adolph.  The Indictment for Conspiracy to Commit Bank Fraud, Bank Fraud, False Entries, and Notice of Forfeiture alleges that Ryan was a founder of the Bank and acted as its President, Chief Executive Officer, and Chairman of the Board from in or around May 2006 until in or around December 2016, when he stepped down as CEO and Chairman of the Board.  *Id.* ¶ 6 (page 2).  It further alleges that Ryan "was responsible for developing and executing the Bank's strategic plan, overseeing all of the Bank's affairs, and managing the Bank's day-to-day operations."  *Id.*

71.     The Indictment identifies and describes in extensive detail the dealings that Ryan had with Bank borrowers and customers Gibbs, Charity, St. Angelo (who also served as the Bank's General Counsel), Adolph, Vira, Treme, and Dunlap, and expressly alleges that Ryan, among others, exercised authority of each of their loans.  *Id.* ¶¶ 9-15 (pages 3-6).  Moreover, in Section C of the Indictment, it describes the banking relationships of Gary Gibbs (*id.* ¶¶ 3-8 (pages 7-9)); Kenneth Charity (*id.* ¶¶ 9-24 (pages 9-12)); Gregory St. Angelo (*id.* ¶¶ 25-29 (pages 12-13)); Frank J. Adolph (*id.* ¶¶ 30-37 (pages 13-15)); Arvind Vira (*id.* ¶¶ 38-45 (pages 15-17)); Warren Treme (*id.* ¶¶ 46-59 (pages 17-21)); and Jeffrey Dunlap (*id.* ¶¶ 60-66 (pages 21-22)).

72.     The Indictment provides extensive details of Ryan's banking relationships with each of seven identified Bank borrowers, and charges that Ryan and others "***masked the true financial condition of troubled loans in many ways***, including (1) overdrawing demand deposit

33

accounts to make loan payments; (2) using Bank loan proceeds from nominee and related entities, at times without authorization from the borrower, to make loan payments; and (3) *increasing, extending, or renewing existing loans, and issuing new loans, to hide borrowers' inability to make loan payments. These actions benefitted the defendants by, among other things, preventing the borrowers from being forced into default and the Bank from declaring a loss*." *Id.* ¶ 2 (pages 6-7).   It asserts criminal felony charges of Conspiracy to Commit Bank Fraud against Ryan and others in Count 1, Bank Fraud against Ryan and others in Counts 2-37, and False Entries in Bank Records against Ryan and others in Counts 38-46.   It further asserts a Notice of Forfeiture against Ryan and others "upon conviction of the offenses in violation of Title 18, United States Code, Sections 1349, 1344, and 1005 set forth in Counts 1 through 46 of this Indictment." *Id.* ¶ 2 (page 31).

73.     The Indictment is filled with instances of intentional misconduct on Ryan's part, much of which had been described previously (a) in the Factual Bases that St. Angelo, Dunlap and Charity acknowledged as part of their guilty pleas, (b) in the Bills of Information against Bank customers Gibbs, Treme and Vira, and (c) in the portion of the Indictment involving the Adolph banking relationship.   For example, the Indictment alleges that despite Ryan's knowledge that Gibbs's spending was out of control and that Gibbs's entities did not generate sufficient income to make Gibbs's loan payments, Ryan and others "funneled loan proceeds to Gibbs by approving and facilitating loans" and that in an effort to "avoid or minimize Gibbs's appearances on the overdraft and past-due reports, **RYAN, BURNELL,** and **CALLOWAY** made misrepresentations and material omissions regarding Gibbs's creditworthiness and financial status," which allowed Ryan and the others "to avoid writing off Gibbs's loans and to evade inquiries by the Board, auditors, and examiners."  *Id.* ¶ 4 (pages 7-8).   The Indictment further alleges that Ryan "directed Gibbs to

submit false financial statements to the Bank to support Gibbs's loans." *Id.* ¶ 7 (page 8).

Concluding the Gary Gibbs Banking Relationship section of the Indictment, the USAO alleges:

> By the end of 2016, **RYAN, BURNELL** and **CALLOWAY's** practice of funneling money
> to Gibbs led to Gibbs's borrowing relationship becoming one of the largest in the Bank's
> loan portfolio.   Despite the numerous risks associated with Gibbs's loans and the
> substantial threat Gibbs's borrowing relationship posed to the Board, **RYAN, BURNELL**
> and **CALLOWAY** continued to approve and facilitate Gibbs's loans, and they concealed
> the truth regarding Gibbs's inability to pay his loans from the Board, auditors, and
> examiners.

*Id.* ¶¶ 12-24 (pages 10-12); *see also id.* at pages 23- 29 (Counts 2, 4, 6, 9-10, 12-13, 15-16, and

33) and at pages 29-31 (Counts 41-46).

74.     Regarding the Gregory St. Angelo banking relationship, the Indictment alleges that

St. Angelo was General Counsel of the Bank from 2006 through September 2016, and that he and

his entities were borrowers at the Bank from 2006 through April 2017.  *Id.* ¶ 25 (page 12).  It

alleges that in order to avoid detection by the Board, auditors, and examiners, Ryan and Burnell

"directed Bank employees to track monthly payments due on St. Angelo's loans and overdrafts in

his accounts," and (b) after reviewing these reports, they "issued fraudulent loans to St. Angelo

and his entities in order to clear his accounts, …."  It further alleges that Ryan and Burnell "used

St. Angelo's loan proceeds to pay other borrowers' debt or, alternatively, used other borrower's

loans to pay St. Angelo's debt."  *Id.* ¶¶ 27, 29 (page 13).  And, specifically with regard to

investment tax credits, the Indictment alleges:

> From at least 2009 through 2015, **RYAN** and **BURNELL** caused the Bank to make
> false and fraudulent investments in fake tax credits for St. Angelo's projects at 622
> Conti Street and 616 Girod Street in New Orleans and Annadele's restaurant in
> Covington.   **RYAN** and **BURNELL** used the fraudulent tax credit investment
> money to pay St. Angelo's loans and cover his overdrafts with the Bank.

*Id.* ¶ 28 (page 13); *see also id.* at pages 23-27 (Counts 3, 5, 14, 19-20, 23-25, and 27).

75. Regarding the Kenneth Charity banking relationship, the Indictment alleges that Ryan, as Charity's loan officer, "kept Charity and his related entities off the overdraft and past-due loan lists by directing employees to keep a 'cheat sheet.'  This cheat sheet helped **RYAN** determine the amount of loan proceeds Charity needed to cover loan payments and overdrafts by month-end so **RYAN** could keep Charity off the month-end reports."  *Id.* ¶ 10 (page 9).  The Indictment further provides specific instances involving Ryan's fraudulent actions and representations relating to Charity's Lake Terrace Shopping Center, a supposed guarantor on certain of Charity's real estate projects, and commercial real estate that Charity purchased at 620 Decatur Street in the French Quarter with Bank loan proceeds.  *Id.* ¶¶ 12-24 (pages 10-12); *see also id.* at page 28 (Counts 30, 34 and 35) and at pages 29-30 (Counts 38-40).  The allegations regarding to Ryan's actions and misrepresentations concerning the other bank borrowers are similar.

76. Ryan's actions and relationships with Dunlap, Treme and Vira are especially egregious because they also involved ***personal benefits that Ryan obtained from those relationships, which he kept concealed from others at First NBC and directed the borrowers not to disclose***.  According to the Indictment, Vira was a borrower at the Bank from in or around June 2008 until 2017, and that in or around 2010, Ryan "began borrowing money from Vira."  *Id.* ¶¶ 38-39 (page 15).  Knowing that FDIC regulations required Ryan to disclose his relationship with Vira to Bank employees "because it could improperly result in favorable treatment for a customer," Ryan instead, according to the Indictment, "instructed Vira not to disclose to Bank employees that he was loaning **RYAN** money."  *Id.*  Indeed, as alleged, in return for loaning money to Ryan, Ryan ensured that Vira received "beneficial treatment" from the Bank in the form of low interest rates on his loans with the Bank and high interest rates on Vira and his family's personal and business

savings and checking accounts." *Id.* ¶ 42 (page 16).  In all, by the time the Bank failed in April 2017, the balances on loans issued to Vira totaled over $39 million, and as of the date of the Indictment, Ryan owed Vira approximately $2.75 million, not including accrued interest.  *Id.* ¶¶ 44-45 (page 17).

77.    Ryan's self-interested actions with respect to Dunlap have been previously described in the Factual Basis signed by Dunlap, and also appear in the Indictment.  *See id.* ¶¶ 60-66 (pages 21-22); *see also* paragraphs 33-36, above.  Regarding borrower Treme, as alleged, Ryan and Treme were partners in several business ventures, including Wadsworth Estates. Notwithstanding this business relationship, although Ryan "was not supposed to be involved in Treme's borrowing relationship [as a borrower at First NBC Bank], he continued to exercise authority over Treme's loans by, among other things, approving overdraft payments and loan disbursements." *Id.* (Exhibit 4) ¶¶ 46-47 (page 17).  Indeed, citing examples concerning a June 2014, February 2016 and November 2016 loans, as well as dealings concerning BNW Ventures / Gulf Mississippi River Port entities owned in part or wholly by Treme, the Indictment alleges that from in or about June 2014 through April 2017, Ryan and Burnell "diverted loan proceeds to Treme and **RYAN's** co-owned businesses, knowing that Treme lacked sufficient income to pay his debts to the Bank." *Id.* ¶ 48 (page 17); *see also id.* ¶¶ 48-59 (pages 18-21).

78.    Finally, if there were any doubt about Ryan's personal involvement and direction of the fraud at First NBC, the Indictment includes specific dates from November 23, 2010 through November 29, 2016, when Ryan and others made false statements and material omissions, and otherwise caused Bank funds to be disbursed fraudulently (the bases of Counts 2-37), and false entries that Ryan made or directed to be made in the Bank's records "with intent to deceive the

Board, auditors, and examiners," from March 30, 2012 through March 18, 2016 (the bases of Counts 38-46).  *Id.* at pages 23-29 and 29-31.

### The FDIC Has Confirmed the Details and the Enormity of the Fraud that Took Place at First NBC

79.      FDIC statements and reports make clear that a massive fraud took place at First NBC Bank with the knowing involvement or reckless disregard of the Individual Defendants, and that the damage from the fraud that took place at First NBC has been enormous.

### The FDIC Material Loss Review of First NBC Bank

80.      A Material Loss Review of First NBC Bank, New Orleans, Louisiana, issued by the FDIC's Office of Inspector General in November 2017 (attached as Exhibit 26), states that the estimated loss to the Deposit Insurance Fund after the closing of First NBC Bank was *$996.9 million – nearly a billion dollars*!  It further found that the Bank "*became increasingly dependent on the loans and direct investments in projects eligible for investment tax credits* to help meet requirements under the Community Reinvestment Act, generate earnings, and reduce income tax liability when the bank was profitable."  *Id.* at i.  However, echoing allegations in Lead Plaintiffs' Complaint, the FDIC Material Loss Review states that First NBC's 2015 external audit "identified significant accounting errors related to the tax credit investments" and resulted in the restatement of the Bank's December 31, 2015 financial statements, "including a reduction in retained earnings of approximately $54 million."  *Id.*

81.      Buttressing the allegations in the Complaint, the Material Loss Review cited the following as causes of First NBC Bank's failure and material loss (*id.*):

> First NBC exhibited many of the characteristics of bank failures we have identified in prior material loss reviews and other reviews of the FDIC's supervision program. These characteristics included a *dominant official with broad lending authority* and limited Board of Directors (Board) oversight, rapid growth funded by high-cost deposits, and *large lending relationships and concentrations without adequate*

38

*risk management controls to mitigate the risks*.  The bank also developed *significant concentrations in trade receivables and complex tax credit investments*.  The losses the bank realized on its large loan relationships, trade receivables, and tax credit investments severely diminished earnings and depleted capital to a point at which the bank could not recover.

82.  The 37-page FDIC Memorandum dated November 3, 2017 (Report No. AUD-2018-002) that is included in the Material Loss Review contains a detailed analysis of the causes of First NBC Bank's failure – much of which is based on Defendant Ryan's actions.  Among other things, the Report found that: "*Throughout its history, examiners characterized First NBC's Chief Executive Officer (CEO) as a dominant official who made most, if not all, of the operational and executive decisions. … According to a statement in the 2016 examination report, the First NBC Bank CEO dominated the bank's strategy, risk appetite, credit culture, and daily operations through December 2016, when the Board replaced him*."  Report at 5.  Indeed, according to earlier FDIC reports (which were not available previously), Defendant Ryan:

> *Was the driver behind the bank's aggressive growth and funding strategy*, ….
>
> *Fulfilled roles not usually compatible with that of a CEO*.  For example, he acted as the Chief Financial Officer (CFO) overseeing the bank's accounting and financial activities for the first 4 years of the bank's existence, served on the Audit Committee early in the bank's history, *and directly oversaw the audit function and its reporting*.
>
> Operated the bank *outside policy guidelines* at times and engaged in certain lending practices that were not prudent.
>
> *Continued to make loan extensions and other risky credit and investment decisions during his tenure even when those activities were subject to examiner criticisms*.
>
> *Was involved in questionable lending decisions.  For example, the CEO obtained a $2 million personal loan from one of the bank's borrowers, who had recently received a $9 million unsecured loan from the Bank*.

The Report also found that the Board did not adequately control the CEO's activities and influence until the bank's asset quality, earnings, and capital had diminished to a point at which the bank

was unable to recover.  The 2016 examination report attributed the significant weaknesses in corporate governance and oversight to the Board's reliance on the CEO.  *Id.*

83.     Other significant findings of the FDIC Report, which buttress the claims in Lead Plaintiffs' Complaint that First NBC and Ryan knowingly (*i.e.,* with scienter) made false and materially misleading statements about the Company's operating and financial condition, include: (a) "the bank's liberal lending practices to financially distressed borrowers, such as numerous renewals with little or no repayment of principal, new loans or renewals with additional advances, and questionable collateral protection" and that First NBC "also extended loans and allowed proceeds to be used to pay off other delinquent bank loans, again without any requirement for principal payments from the borrowers" (*id.* at 8); (b) that ***First NBC's loan reviews "were overseen by the CEO" rather than by a separate loan review department staffed by independent credit analysts and loan review personnel*** (*id.* at 9); (c) that a "small number of the bank's large loan relationships comprised a large percentage of the total Adversely Classified Items (ACI) coverage ratio," which greatly increased the Bank's risk profile (*id.* at 10); and (d) that the Bank's oversized investment in trade receivables was done under "First NBC's loan policy [which] ***granted unlimited authority to the CEO up to an average exposure level of $250 million*** without prior approval or ratification by the Board" (*id.* at 10).

## The FDIC Complaint Against the Bank's Former Auditor

84.     On April 22, 2020, the FDIC brought a professional negligence claim against First NBC's former auditor, Ernst & Young LLP ("EY"), based on the services it provided in connection with its 2014 and 2015 audits of First NBC.  *See* Complaint, *Federal Deposit Insurance Corporation v. Ernst & Young LLP, et al.*, 2:20-cv-01259 (E.D. La. April 22, 2020) (attached as Exhibit 2).

85.     Based on its access to First NBC Bank's books and records since taking over the Bank as Receiver in May 2017, among other sources, the FDIC alleged that "**EY failed to detect repeated fraudulent conduct by First NBC's President and Chief Executive Officer, Ashton Ryan ('Ryan'), in his material loan and tax credit investment portfolios** …." *Id.* at ¶ 2.  As the FDIC alleged, "EY not only failed to detect fraudulent conduct by Ryan, but **even when EY identified outright lies by Ryan**, EY failed to further investigate them …" *Id.* at ¶ 3.  As a result, EY's misconduct "**allowed Ryan to improperly advance hundreds of millions of dollars to promote his own financial interests and mask the deteriorating financial condition of his lending and tax credit investment portfolios**." *Id.* at ¶ 4.  As the FDIC further alleged: "EY knew or should have known that **Ryan exercised a dominant influence over the Bank's lending and financial statement processes, including personally handling a large portfolio of loans and tax credit investments and recklessly advancing tens of millions of dollars to borrowers without any meaningful controls**." *Id.* at ¶ 5.

86.     In its Complaint against EY, the FDIC alleged the following with respect to Ryan's dominant positions at First NBC Bank:

> **Ryan dominated the Bank's affairs and spearheaded its rapid growth through concentrated loan positions to a number of large commercial borrowers and tax credit investments**.  Ryan was the Bank's founder and became the Bank's Chairman and Chief Executive Officer at its inception.  Ryan was also the Holding Company's [*i.e.*, First NBC's] Chairman and Chief Executive Officer from its formation in 2007.  In September 2016, the Bank restricted Ryan's formal lending authority and reassigned his lending portfolio, and in December 2016, he was forced to resign as the Chief Executive Officer of the Bank and the Holding Company.  Ryan served on the Holding Company and Bank's Boards of Directors until April 2017, when he resigned shortly before the Bank's failure.

> **In addition to his formal roles, Ryan oversaw the lending department**.  Ryan had ultimate authority to approve loans for submission to the Senior Loan Committee or Board Loan Committee and had personal authority to unilaterally approve extensions of credit up to $1 million and to approve overdrafts.  **In handling his own loan portfolio, Ryan routinely exercise his incremental lending authority**

> *and repeatedly advanced funds in $1 million increments throughout 2014 through 2016, effectively avoiding limits on his loan approval authority under the Bank's loan policy*.
>
> *Ryan also had unilateral authority to approve tax credit investments*. No approval of any committee or independent body was required for Ryan to advance millions of dollars in tax credit investments. Ryan repeatedly exercised his unilateral authority to increase the Bank's exposure to these investments, including investments in entities controlled by St. Angelo, the Bank's General Counsel and a related party. These tax credits were a material part of the Bank's investments and constituted a continually increasing portion of the Bank's net income from 2012 forward.

*Id.* at ¶¶ 17-19.

87.     Expanding on Ryan's dominance of the Bank's lending, tax credit investment, accounting and reporting functions, and EY's knowledge of that dominance, the FDIC further alleged:

> In the 2014 Audit, EY knew that Ryan dominated the Bank's operations in numerous respects. *First, as stated in EY's work papers, Ryan had a "heavier involvement" than normal for a Chief Executive Officer and "very in depth" involvement in the Bank's financial statement procedures. EY knew that Ryan was personally involved in determining the accounting treatment for Bank transactions*. Ryan's dominance over the accounting department and financial statement close process was a fraud risk due to the risk of override of controls. Given that management is in a unique position to perpetrate fraud *and Ryan had the ability to directly manipulate the accounting records*, EY was required to perform specific audit procedures to address the risk of Ryan's override of controls. …
>
> *Second, EY knew that Ryan personally managed a lending portfolio in excess of $100 million, which was highly unusual for a Chief Executive Officer of a bank the size of First NBC. EY also knew or should have known from its review of Bank records that borrowers within Ryan's loan portfolio had repeated intra-month overdrafts that were cleared by the end of the month through Ryan's unilateral extensions of Bank funds*. That fact was a red flag that Ryan was masking problem credits by advancing money to these borrowers to clear their overdrafts. EY ignored that red flag.
>
> Third, EY knew during the Audits that *Ryan repeatedly exercised his incremental lending authority to ultimately transfer tens of millions of dollars to his borrowers through $1 million incremental advances. EY also knew that the Bank's internal loan review department, which was not independent and ultimately reported to*

> *Ryan, rationalized Ryan's excessive loan extensions as "unacceptable" but* *"understandable," citing his "substantial duties" as President and Chief* *Executive Officer as an "extenuating circumstance*." This conduct raised an obvious internal control problem that EY ignored during the 2014 Audit.
>
> Fourth, EY knew that *Ryan had unilateral authority to approve tax credit investments and personally handled tax credit investments relating to St. Angelo, the Bank's General Counsel, outside of the Bank's normal operations, and unilaterally approved multiple $1 million advances to St. Angelo or his alleged entities*.

*Id.* ¶¶ 53-56.

88. With regard to St. Angelo, the FDIC alleged that EY knew that the audit risk was magnified for St. Angelo's material transactions with the Bank because, among other reasons, "*Ryan personally managed St. Angelo's tax credits outside of the Bank's normal operations for the handling of tax credit investments*" and "*Ryan was the only person who could address questions regarding St. Angelo's tax credits*." *Id.* ¶ 61. It further alleged: "According to Ryan, the Bank's investment in 622 Conti, LLC was for a historic property located at 622 Conti Street that St. Angelo allegedly owned through that LLC. The Bank's investments in 622 Conti, LLC were intended to generate tax credits for the Bank by funding qualified historic rehabilitation expenses. *In fact, St. Angelo did not own the property at 622 Conti Street. Nor was St. Angelo ever a member of 622 Conti, LLC. Instead, St. Angelo had a leasehold interest as a tenant at 622 Conti Street that, given its length, could never be a basis for a legitimate tax credit investment by the Bank*. St. Angelo has since admitted these facts through a guilty plea to a criminal information that charged him with conspiring to commit bank fraud with Ryan." *Id.* ¶¶ 68-69. Indeed, "during the 2015 Audit, EY received a property appraisal showing that St. Angelo leased but did not own the 622 Conti property. *This directly contradicted the fundamental premise of this tax credit investment that St. Angelo owned the property through 622 Conti, LLC*

*and could sell tax credits to the Bank*. The appraisal identified the true owners of the property, and St. Angelo was not one of them." *Id.* ¶ 74.

89.     The FDIC specifically outlined the fraud that Ryan carried out at First NBC, which included his fraudulent actions (a) with respect to its tax credit investments, (b) its commercial lending, and (c) its oil and gas industry-related lending.

> *Ryan committed fraud at First NBC by repeatedly causing the Bank to advance money through loans and tax credit investments on false pretenses.  In committing this fraud, Ryan was acting entirely in his own self-interest* and contrary to the interests of the Bank, ….  Rather than recognize losses on existing credits, *Ryan concealed the true condition of his loan portfolio by causing the Bank to make advances to his borrowers to cover repeated overdrafts and service debt, all of which magnified the losses on these credits.  In an attempt to justify additional lending, Ryan made false statements in loan approval memoranda regarding the condition of collateral, alleged payments by borrowers, and the existence and financial condition of guarantors*.

*Id*. at ¶ 20.

90.     Further, after citing to the guilty pleas of Jeffrey Dunlap, Gregory St. Angelo, and Kenneth Charity, which are discussed above, *the FDIC noted Ryan's very significant personal motives for carrying out the fraud*:

> Ryan's fraud at First NBC included (a) misrepresenting in Bank records the use of loan proceeds, the existence and availability of cash flow to repay loans, the existence and condition of loan collateral, and the performance of loans, (b) creating fake tax credit investments, and (c) misrepresenting to the Bank the identities and financial condition of guarantors.
>
> *Ryan had a strong financial incentive to conceal the true condition of his lending and tax credit investment portfolios*.  Ryan had significant personal real estate development investments that he helped finance through fraudulent loans to third parties that provided services for him personally.  For example, according to Ryan's co-conspirator, Ryan made fraudulent loans to Phoenix Civil [Dunlap's company] to obtain construction services for Ryan's personal projects.  In addition, *Ryan received large bonuses tied to the reported financial performance of the Holding Company* [*i.e.,* First NBC] and was a significant Holding Company shareholder. *Ryan also pledged his shares in the Holding Company as security for personal loans from other financial institutions to finance his personal business ventures*.

*Id.* at ¶¶ 24-25.

91.     In addition to confirming Ryan's fraudulent conduct with respect to the lending and payments to St. Angelo, Dunlap and Charity, the FDIC also identified, with specificity, the Bank's lending to Gary R. Gibbs (identified in the FDIC Complaint as "GG") and to Linder Oil Company and Robert Linder, its founder and president (identified in the FDIC Complaint as "RL"), according to an article in NOLA.com by Anthony McAuley, "Federal regulator sues auditor Ernst & Young for negligence over First NBC collapse," NOLA.com (May 7, 2020) (attached hereto as Exhibit 27).  Confirming the report and facts cited above with respect to Gibbs, the FDIC complaint alleges that:

> GG was a commercial real estate developer and one of the largest customers of the Bank.  Loans to GG and his related businesses totaled approximately $123 million at the Bank's closure.  ***During 2014 and 2015, the Bank, at Ryan's direction, repeatedly extended credit to allow GG and his businesses to cure large overdrafts, pay operating expenses, and service existing debt.  Despite the borrowers' demonstrated inability to repay existing obligations, Ryan in 2014 extended eighteen $1 million incremental advances and one $500,000 incremental advance to GG's businesses (representing a 26 percent increase in the loans outstanding), and then in 2015 extended 26 additional $1 million incremental advances***.  All of these advances under Ryan's incremental lending authority, which exceeded $44 million, were for the stated purpose of providing "working capital," ***a false characterization that Ryan used to conceal the true purpose of these advances—to mask overdrafts and pay interest on other loans issued by the Bank***.

FDIC Complaint, Exhibit 2 at ¶ 105.

92.     Among the loans issued to Gibbs were three consolidation loans made in September 2014, which "totaled $41.3 million and consolidated seventeen existing loans, dramatically cut GG's interest obligations, and extended another $1 million to the borrower under Ryan's incremental lending authority."  *Id.* ¶ 110.  Ultimately, however, when the Bank re-evaluated the relationship with Gibbs in 2017, when Ryan was no longer in charge of the lending relationship, "the Bank found a $38.29 million collateral shortfall as of year-end 2014."  *Id.* at ¶ 109.

93.    The FDIC complaint further disclosed, for the first time, an example of Ryan's highly improper and fraudulent lending in the oil and oil services industry, to Robert Linder and the Linder Oil Company.  Below are the FDIC's allegations with respect to the Bank's oil and gas lending and the loans to Linder:

> EY negligently failed to identify a material weakness in internal controls over the Bank's oil-and-gas lending.  *At the time of the 2014 Audit, the Bank had no underwriting guidelines or loan policies regarding oil-and-gas lending*.  Despite the glaring lack of any lending standards for oil-and-gas loans, EY failed to identify this internal control weakness.

> In the 2014 Audit, EY also negligently conducted a loan review of almost $50 million in oil-and-gas loans to borrowers affiliated with RL.  In reviewing this loan relationship, EY not only failed to identify the lack of underwriting standards as a material control weakness, but also negligently concluded that the RL loans were performing.  EY *should have classified the these loans as impaired* because (a) *there were critical operational problems with the wells*; (b) crude oil prices had dropped 53 percent in 2014; (c) *the Bank had grossly overstated the collateral values by failing to account for non-producing wells*; (d) *unaudited borrower-prepared financial statements showed a negative net worth exceeding $60.5 million*; (e) *Ryan had repeatedly extended the loans and advanced new money to cover interest payments*; and (f) regulatory guidance required discounting of the borrowers' asserted reserves.

> Had EY properly audited the RL relationship, EY would have identified a material weakness in internal controls over lending based on the absence of any Bank policies governing oil-and-gas lending and *Ryan's repeated, unilateral extensions of millions of dollars throughout 2014 to borrowers with no ability to repay their loans*.  EY should have also identified that the RL relationship was impaired, *given the borrowers' inability to repay their loans and inadequate collateral, and that Ryan's additional advances were being used to pay the borrower's interest obligations, which masked the true condition of the loan*.

*Id.* at ¶¶ 113-115.

94.    As the McAuley article issued on May 7, 2020 summarized: "The pattern of lending to Linder is familiar from previous cases brought by the feds, in that the FDIC alleges that Ryan kept lending to Linder to cover up the fact that the oil company was unable to make payments on

previous loans while also over-valuing the collateral, in this case offshore wells that were worthless." *See* Exhibit 27, at 6.

95.     This newly available evidence about the Bank's oil and gas lending is highly significant because it confirms that Ryan's fraud, as well as First NBC's and the Individual Defendants' false accounting and financial reporting, was not limited to lending to commercial real estate development projects and the Company's tax credit investments.  Rather, as the FDIC alleges, Ryan's fraud extended to his direction of lending in the oil and gas industry, which is consistent with the allegations in the Complaint filed by the Lead Plaintiffs in the securities class action.  As alleged in the Complaint in the securities class action, in Ryan's March 31, 2015 letter to shareholders (that was part of the Company's 2014 Annual Report), he told investors that "First NBC has very limited exposure (3% of its loan portfolio) to the oil and oil service industries."  ¶¶ 17, 91, 206.  However, as Lead Plaintiffs alleged, First NBC, Ryan and Verdigets had failed to disclose that the Company was then at risk on a large loan that it had made to an oil exploration and production company, and that in December 2014, a pipeline serving a well in the largest oil field of the borrower broke.  Rather that repair the pipeline, the borrower elected to drill a new well, which First NBC agreed to finance.  As a result, First NBC's exposure to the borrower increased from around $30 million to over $90 million by the end of 2015.  ¶¶ 18, 211.

96.     As the securities class Complaint further alleged, although the pipeline broke at the end of 2014, First NBC remained silent about the loan in its 2014 Form 10-K and First Quarter 2015 Form 10-Q.  Moreover, the Second Quarter 2015 Form 10-Q, filed nearly eight months after the pipeline broke, made only passing reference to the loan, noting that it was now classified as substandard due to the "fluctuations in energy commodity prices and the level of production from [the borrower's] shallow-water well."  After making a similar disclosure in the Third Quarter 2015

Form 10-Q, First NBC issued a press release on February 1, 2016, in which the Company reported its fourth quarter and full year 2015 financial results and stated that its "exposure to exploration and production in its oil and gas portfolio was approximately $90.2 million."  Separately, First NBC told analysts at Sandler O'Neill that the loan "related to a shallow-water drilling project that has been offline for some time now … but that is now ready to return to production."  Absent in all of these disclosures was that the borrower's pipeline had broken and that the First NBC was financing the drilling of an entirely new well.  ¶¶ 19-20, 210-211, 233, 236(c).

97.     Finally, it was only when First NBC filed its long overdue 2015 Form 10-K in August 2016 that the Company admitted that, as of year-end 2015, it was required to deeply discount the value of the collateral for the loan and establish a $30 million reserve allowance.  The 2015 10-K attributed the reserve to a material weakness in First NBC's internal controls relating to the monitoring of borrowers' ability to repay loans, but it is clear that First NBC and the Individual Defendants did not want to disclose the truth about the broken pipeline and First NBC's risk of loss on financing a replacement well.  And, in any case, the admitted material weakness flies in the face of assurance during the Class Period in the securities class case that the Company was "actively monitoring" its oil and gas related credits.  ¶ 91.

98.     Below is a list of the exhibits attached to this Declaration, which are true and correct copies of the following:

> Exhibit 1     FDIC Question and Answer Guide, First NBC Bank, New Orleans, LA, Last Updated 05/23/2017
>
> Exhibit 2     Complaint, *Federal Deposit Insurance Corporation v. Ernst & Young LLP, et al.*, Case No. 2:20-cv-01259 (E.D. La., filed April 22, 2020)
>
> Exhibit 3     U.S. Attorney's Office, Press Release, "Three First NBC Executives Indicted For Fraud against Failed $5 Billion Bank," July 10, 2020

Exhibit 4      Indictment for Conspiracy to Commit Bank Fraud, Bank Fraud, False Entries, and Notice of Forfeiture, *U.S. v. Ryan, et al.,* Case No. 20-cr-00065-JTM-KWR (E.D. La., filed July 10, 2020)

Exhibit 5      U.S. Attorney's Office, Press Release, "New Orleans Hotel Owner Charged With Conspiracy to Defraud First NBC Bank," June 15, 2020

Exhibit 6      U.S. Attorney's Office, Press Release, "Northshore Contractor Charged with Conspiracy to Defraud First NBC Bank, May 15, 2018

Exhibit 7      Bill of Information, *U.S. v. Dunlap,* Case No. 2:18-cr-00099-ILRL-JVM (E.D. La., filed May 14, 2018)

Exhibit 8      U.S. Attorney's Office, Press Release, "Northshore Contractor Pleads Guilty to Conspiracy to Defraud First NBC Bank, October 17, 2018

Exhibit 9      Factual Basis, *U.S. v. Dunlap,* Case No. 2:18-cr-00099-ILRL-JVM (E.D. La., filed October 17, 2018)

Exhibit 10      U.S. Attorney's Office, Press Release, "Bank General Counsel Charged With Conspiracy to Defraud First NBC Bank," March 22, 2019

Exhibit 11      Bill of Information, *U.S. v. St. Angelo,* Case No. 2:19-cr-00055-CJB-JCW (E.D. La., filed March 22, 2019)

Exhibit 12      U.S. Attorney's Office, Press Release, "Bank General Counsel Pleads Guilty To Conspiracy to Defraud First NBC Bank," July 2, 2019

Exhibit 13      Factual Basis, *U.S. v. St. Angelo,* Case No. 2:19-cr-00055-CJB-JCW (E.D. La., filed June 28, 2019)

Exhibit 14      U.S. Attorney's Office, Press Release, "New Orleans Business Owner Charged With Conspiracy to Defraud First NBC Bank," May 15, 2019

Exhibit 15      Bill of Information, *U.S. v. Charity,* Case No. 2:19-cr-00090-LMA-JVM (E.D. La., filed May 15, 2019)

Exhibit 16      U.S. Attorney's Office, Press Release, "New Orleans Business Owner Pleads Guilty to Conspiracy to Defraud First NBC Bank," July 30, 2019

Exhibit 17      Factual Basis, *U.S. v. Charity,* Case No. 2:19-cr-00090-LMA-JVM (E.D. La., filed July 30, 2019)

Exhibit 18      Anthony McAuley, "*Mississippi developer alleged to be major player in loans that brought down First NBC Bank*," NOLA.com, September 7, 2019

| Exhibit 19 | U.S. Attorney's Office, Press Release, "Developer Charged with Conspiracy to Defraud First NBC Bank Out Of Over $123 Million," July 1, 2020 |
| Exhibit 20 | Bill of Information, *U.S. v. Gibbs,* Case No. 2:20-cr-00060 (E.D. La., filed July 1, 2020) |
| Exhibit 21 | Bill of Information, *U.S. v. Vira,* Case No. 2:20-cr-00053-NJB-KWR (E.D. La., filed June 15, 2020) |
| Exhibit 22 | Anthony McAuley, "To defraud First NBC, a Kenner hotelier conspired with the bank's former CEO, feds say," NOLA.com (June 15, 2020) |
| Exhibit 23 | U.S. Attorney's Office, Press Release, "Developer Charged With Conspiracy to Defraud First NBC Bank over $6 Million," July 9, 2020 |
| Exhibit 24 | Bill of Information, *U.S. v. Treme,* 2:20-cr-00062-SSV-DMD (E.D. La., filed July 9, 2020) |
| Exhibit 25 | Anthony McAuley, "In First NBC case, feds charge sixth alleged conspirator with bank fraud," NOLA.com (July 9, 2020) |
| Exhibit 26 | FDIC Office of Inspector General, Office of Program Audits and Evaluations, Report No. AUD-18-002, "Material Loss Review of First NBC Bank, New Orleans, Louisiana," November 2017 |
| Exhibit 27 | Anthony McAuley, "Federal regulator sues auditor Ernst & Young for negligence over First NBC collapse," NOLA.com, May 7, 2020 |
| Exhibit 28 | U.S. Attorney's Office, Press Release, "Developer Admits To Wrongdoing with Bank Executives to Defraud First NBC Bank Out of Over $123 Million," Aug. 26, 2020 |
| Exhibit 29 | Factual Basis, *U.S. v. Gibbs,* Case No. 2:20-cr-00060-JTM-JVM (E.D. La., filed Aug. 26, 2020) |
| Exhibit 30 | U.S. Attorney's Office, Press Release, "Hotel Owner Pleads Guilty to Conspiring with Bank President to Defraud First NBC Bank Out of Over $123 Million," Sept. 17, 2020 |
| Exhibit 31 | Factual Basis, *U.S. v. Vira,* Case No. 2:20-cr-00053-JTM-JVM (E.D. La., filed Sept. 17, 2020) |
| Exhibit 32 | U.S. Attorney's Office, Press Release, "Developer Admits To Conspiring with First NBC Bank President to Defraud First NBC Bank," Sept. 2, 2020 |

    <u>Exhibit 33</u>    Factual Basis, *U.S. v. Treme,* Case No. 2:20-cr-00062-JTM-JVM (E.D. La., filed Sept. 2, 2020)

    I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Dated:  January 27, 2021                    <u>/s/ *Jeffrey W. Golan*</u>
                                                Jeffrey W. Golan